1    LINDA E. SHOSTAK (CA SBN 64599)
     LShostak@mofo.com
2    DEREK F. FORAN (CA SBN 224569)
     DForan@mofo.com
3    CHRISTOPHER L. ROBINSON (CA SBN 260778)
     ChristopherRobinson@mofo.com
4    MORRISON & FOERSTER LLP
     425 Market Street
5    San Francisco, California  94105-2482
     Telephone: 415.268.7000
6    Facsimile: 415.268.7522

7    Attorneys for Plaintiff
     NATIONAL ABORTION FEDERATION
8

9                     UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11

12   NATIONAL ABORTION FEDERATION (NAF),      Case No.

13                        Plaintiff,           **COMPLAINT FOR INJUNCTIVE
                                               RELIEF AND DAMAGES**
14              v.
                                               **JURY TRIAL DEMANDED**
15   THE CENTER FOR MEDICAL PROGRESS,
     BIOMAX PROCUREMENT SERVICES, LLC,
16   DAVID DALEIDEN (aka "ROBERT SARKIS"),
     and TROY NEWMAN,
17
                         Defendants.
18

19

20

21

22

23

24

25

26

27

28

1    National Abortion Federation ("NAF" or "Plaintiff") brings this action against The Center

2    for Medical Progress, Biomax Procurement Services, LLC, David Daleiden (aka "Robert

3    Sarkis"), and Troy Newman ("Defendants"):

4                                    **INTRODUCTION**

5         1.      This case is about an admitted, outrageous conspiracy to defraud, carried out by

6    extremist anti-abortion activists against NAF and its constituent members, and perpetrated for the

7    purpose of intimidating and harassing providers of abortion care services to women, and to end

8    access to reproductive health services in America.  Defendants The Center for Medical Progress

9    ("CMP"), David Daleiden, Troy Newman and individuals acting in concert with them conspired

10   to defraud and did defraud NAF by setting up a fake company (Defendant "Biomax Procurement

11   Services"), which held itself out as a legitimate fetal tissue procurement organization.  Daleiden

12   and his cohorts pretended to be officers and employees of their fake company, Biomax

13   Procurement Services.  They assumed false identities, used fake driver's licenses and approached

14   NAF in order to gain access to its annual meetings.  Using their fake names and identities, they

15   signed agreements with NAF, agreements designed to protect NAF members from exactly the

16   type of anti-abortion harassment that is the subject of this lawsuit, in which Defendants among

17   other things promised that they (1) would not make video or audio recordings of any meetings or

18   discussions at NAF's conferences; (2) would only use information learned at these meetings to

19   help enhance the quality and safety of services provided by NAF members; and (3) would not

20   disclose information learned at NAF's conferences to any third party without first obtaining

21   NAF's consent.  Defendants' intentional intrusion upon NAF's privacy, and the privacy of its

22   members, is highly offensive to a reasonable person in light of the malice and oppression

23   underlying Defendants' motives, and the history of violence, harassment and oppression

24   perpetrated by Defendants towards NAF members over time.

25        2.      Defendants have now admitted that Biomax Procurement Services was a sham,

26   and have revealed that the express written promises Daleiden and his co-conspirators made to

27   NAF were false when made.  Daleiden publicly admitted in interviews with Fox News that

28   Biomax Procurement Services was a bogus company that misrepresented its identity and purpose

in order to gain access to abortion providers and their facilities, including NAF's confidential annual meetings. He has publicly boasted about the size and scope of the conspiracy, which he refers to as the "Human Capital Project," and has admitted outright that he used fake "actors" to infiltrate providers of abortion care (including numerous institutional and individual NAF members) for a period of three years. This elaborate scheme was explicitly designed as an attack on women's reproductive rights – Daleiden stated goal is to end safe access to reproductive health services in the United States, and discredit lawful fetal tissue donation programs.

3. To that end, on July 14, 2015, and again on July 21, 2015, Defendants released highly misleading videos, the first of which contains numerous express references to NAF's annual meetings, and in both tapes numerous individual NAF members are identified by name. Defendants claim to have thousands of hours of such videotape. Defendants released yet another heavily edited video on July 28, 2015, a so-called "web-series" that contains yet more misleading clips. Some of the footage on this third video was clearly taken in medically sensitive clinical areas, displaying a flagrant and gross disrespect for patient confidentiality. Defendants released a fourth misleading video on July 30, 2015. Their stated purpose is to release dozens upon dozens of hours of edited videotape in the days and months to come, at a rate of one video per week. Their illegal and misleading videotaping campaign – which they perpetrated by fraudulently infiltrating NAF member organizations and NAF's annual meetings, among other acts – is a calculated effort by Defendants to demonize and intimidate NAF members in the national media without any regard for NAF members' safety, security, and privacy, and to discredit legal fetal tissue donation programs that advance life-saving medical research.

4. Abortion is one of the safest and most commonly provided medical procedures in the United States. Many women seeking safe, legal abortion care appreciate the opportunity to further medical research through tissue donation. This research has the potential to help millions of Americans suffering from diabetes, Parkinson's, Alzheimer's, muscular dystrophy, leukemia and other serious medical conditions. There is no financial gain for women or health care providers involved in tissue donation.

5. Despite the legality of abortion care, abortion providers are relentlessly targeted by anti-abortion extremists. Many of the physicians and clinic staff at NAF meetings have been stalked, threatened, and intimidated, including being picketed at their homes, churches, and their children's schools. Some attendees have had death threats made against them, and bomb threats made against their clinics. NAF members who attend NAF meetings have had their names put on threatening "wanted" posters and websites featuring their photos and personal information that are intended to incite violence against them. Given the hostile climate and the history of violence, some NAF members go to great lengths to preserve their privacy and identity. Many NAF members have security protocols in place to try and protect the identity of their physicians. This may entail not having the doctors enter the building wearing scrubs, driving a different way to the clinic each day, and for some wearing disguises when entering and exiting facilities. Some wear bulletproof vests to work every day. A number of NAF members try to remain under the radar in their communities, and may not speak publicly about their work out of fear for their personal safety or the safety of their families.

6. The most important role of NAF as a membership organization is the responsibility to protect the safety and security of NAF members. A critical aspect of this duty is to protect attendees at NAF's annual meetings and provide a safe space for them to collaborate and learn the latest developments in all aspects of abortion care, and advance this field of medicine. NAF meetings provide essential accredited continuing medical education and training, and bring together approximately 700-850 abortion providers, researchers, and advocates. Many of the attendees are high-profile targets of anti-abortion extremists. NAF's annual meetings are one of the only places where abortion providers can come together to learn about the latest research in the field and network without fear of harassment or intimidation. As one recent meeting attendee said, "It is great to be in a place where I can say 'abortion' out loud and be supported." The recent security breaches at NAF's 2014 and 2015 annual meetings have negatively impacted the organization and the membership, to the point where members have reported that they feel unsafe as a result of attending the NAF meetings. NAF members need to

feel and be safe at the meetings and protected from those who wish to do them harm. This is a top priority for NAF as a membership organization.

7.      According to published reports the federal government is currently being urged to launch its own investigation into Defendants' conspiracy, including whether CMP committed tax fraud.  Moreover, on July 24, 2015, California Attorney General Kamala Harris announced that she was opening an investigation into Defendants' conspiracy and scheme to defraud and mislead to determine if criminal charges should be brought.  NAF now brings this civil action in order to mitigate the severe and irreparable consequences of Defendants' illegal activities on the safety, security, and privacy of NAF, its staff, and its members, and to hold Defendants responsible for their reprehensible, admitted fraud.

## PARTIES

8.      **National Abortion Federation:**  Founded in 1977, Plaintiff NAF is a 501(c)(3) not-for-profit organization incorporated in Missouri and headquartered in Washington, D.C.  It is the professional association of abortion providers.  It takes no public funding.  It is supported by member dues, meeting fees, individual contributions, and foundation support.  NAF is an accredited charity with the Better Business Bureau, has earned the Independent Charities of America's Seal of Excellence, and is one of the top 5 pro-choice organizations on Philanthropedia.  Its mission is to ensure safe, legal, and accessible abortion care, which promotes health and justice for women.  NAF members include individuals, private and non-profit clinics, Planned Parenthood affiliates, women's health centers, physicians' offices, and hospitals who together care for half the women who choose abortion in the U.S. and Canada each year.  Among other things, NAF:

- Sets the standards for quality abortion care and develops ethical principles for abortion providers;

- Provides resources for woman seeking safe abortion care;

- Develops groundbreaking accredited continuing medical education and training programs for health care professionals; and

- Protects providers and patients from the everyday reality of anti-abortion intimidation, threat, and violence.

1    9.    NAF has suffered, and continues to suffer, financial and other hardships because it

2    has had to divert resources from the association's normal activities in order to combat

3    Defendants' conspiracy to defraud, and to educate and inform members, patients, political

4    officials and the public of the fraud and lies perpetrated by Defendants.

5    10.    **The Center for Medical Progress:**  On information and belief, Defendant CMP is

6    a charitable trust based in Irvine, California.  Its Articles of Incorporation – filed with the

7    California Secretary of State – states that CMP is a "nonpartisan" organization and that "no

8    substantial part of the activities of the Corporation shall consist of carrying on propaganda, or

9    otherwise attempting to influence legislation."  Until recently, it described itself on its website as

10   a nonprofit "dedicated to informing and educating both the lay public and the scientific

11   community about the latest advances in regenerative medicine, cell-based therapies, and related

12   disciplines" (this description was recently removed).  It claims tax-exempt status with the IRS by

13   labeling itself as a not-for-profit under the IRS's category for "Diseases, Disorders, Medical

14   Disciplines: Biomedicine, Bioengineering."  A separate IRS category applies to anti-abortion

15   groups, and in reality, that is exactly what CMP is.  It is backed and funded by known anti-choice

16   extremists.

17   11.    As described in filings with the California Secretary of State, CMP's three

18   registered officers are David Daleiden (CEO), Albin Rhomberg (CFO), and Troy Newman

19   (Secretary).  According to published reports, Daleiden previously worked as "Director of

20   Research" for the discredited anti-abortion group Live Action, and according to those same

21   reports, over the last eight years he has gained access to Planned Parenthood facilities under false

22   pretenses, taping staff and even patients without their knowledge on 65 occasions (this is separate

23   and apart from his latest fraud on NAF).  He was banned from Pomona College's campus for

24   attempting to videotape a Planned Parenthood of Los Angeles speaker.  Daleiden has stated

25   publicly that he considers James O'Keefe – the notorious video provocateur whose illegal

26   videotaping campaign brought down the liberal community organizing group Acorn – a "friend."

27   12.    Troy Newman is the President of the extremist anti-abortion group Operation

28   Rescue, the discredited organization that harassed NAF member Dr. George Tiller for a decade

1    until, according to published reports, an individual who donated thousands of dollars to Operation

2    Rescue and received specific information from Operation Rescue about Dr. Tiller's whereabouts,

3    murdered Dr. Tiller in 2009 in his church in Wichita, Kansas.  In 2003, Newman issued a press

4    release claiming that the murder of another abortion doctor, Dr. John Britton, was "justifiable

5    defensive action."  Newman is apparently proud of his role in the conspiracy that is at the heart of

6    this lawsuit.  In fact, an article published by LifeNews.com in the wake of the videotape releases

7    stated that "Operation Rescue President Troy Newman serves on the Board of Daleiden's Center

8    for Medical Progress.  During this investigation, Newman advised Daleiden, providing

9    consultation services and material support."  And Operation Rescue's website boasts that the

10   conspiracy that is the subject of this lawsuit – the so-called "Human Capital Project" – was

11   conducted "in consultation with Operation Rescue."

12          13.    Albin Rhomberg, like Daleiden and Newman, is also a known anti-abortion

13   extremist who, according to published reports, regularly shows up to scream at and harass women

14   attempting to gain access to Planned Parenthood facilities in Sacramento.  In 1991, he was

15   arrested for disrupting a religious service held in honor of Governor Pete Wilson, claiming it was

16   "sacrilegious" for a Catholic Cathedral to hold a nondenominational service for a pro-choice

17   politician.

18          14.    In short, far from being an organization dedicated to "Medical Progress," CMP is

19   nothing more than a front for dangerous extremists whose sole aim is to end safe and legal access

20   to abortion care in the United States.  As described below, this organization – including its

21   individuals and backers – is behind Biomax and the fraud perpetrated on NAF.

22          15.    **Biomax Procurement Services, LLC:**  Defendant Biomax Procurement Services,

23   LLC ("Biomax") is a California limited liability company headquartered in Norwalk, California.

24   Biomax was formed on October 11, 2013, and held itself out as a legitimate tissue procurement

25   organization.  In reality, the company was a sham, formed by CMP, Daleiden and others in order

26   to embark on a campaign of corporate espionage and fraud that is the subject of this lawsuit.

27          16.    **David Daleiden:**  Defendant David Daleiden is an individual who on information

28   and belief resides in Yolo County, California.  As detailed above, he is a known anti-abortion

1    extremist with ties to the discredited anti-abortion group Live Action.  Using the fake name

2    "Robert Daoud Sarkis," he held himself out as Procurement Manager and Vice President of

3    Operations for Biomax in order to fraudulently gain access to NAF's annual meetings, and to

4    otherwise perpetrate the wrongdoing that is the subject of this lawsuit.

5         17.    **Troy Newman:**  Defendant Troy Newman is an individual who on information

6    and belief resides in Wichita, Kansas (where Operation Rescue is headquartered).  As detailed

7    above, Newman is a dangerous extremist who operates the discredited anti-abortion group

8    Operation Rescue and is associated with Live Action.  Not only is Newman the Secretary of CMP

9    – according to published reports, Newman and Operation Rescue provided "consultation services

10   and material support" to Daleiden and the other co-conspirators.

11        18.    **Unnamed Co-Conspirators Who Participated in Defendants' Conspiracy to**

12   **Defraud:**  Daleiden, Newman, and CMP did not act alone.  As articulated more fully below,

13   other individuals assumed fake names and identities and posed as officers and employees of

14   Biomax in order to defraud NAF.  Biomax's supposed CEO assumed the fake name "Susan

15   Tennenbaum."  Biomax's fake CEO even set up a phony Facebook page, where her "likes"

16   include Hillary Clinton, The Rachel Maddow Show, and Stem Cell Research.  Her supposed

17   assistant assumed the fake name "Brianna Allen."  In connection with registering Biomax for

18   NAF's annual meetings in 2014 and 2015, "Allen" sent numerous emails to NAF staff using a

19   fake "@biomaxps.com" email address, and held Biomax out as a company engaged in "biological

20   specimen procurement" and "stem cell research."  "Rebecca Wagner" held herself out as a

21   Contract Administrator for Biomax, and "Adrian Lopez" claimed to be Biomax's "Procurement

22   Technician."

23        19.    These individuals, using their fake identities and mocked up driver's licenses,

24   approached NAF and held Biomax out as a legitimate fetal tissue procurement organization

25   whose purpose was consistent with that of NAF's (i.e., to enhance the quality and safety of

26   services provided by NAF members).  But the exact opposite was true.  In order to gain access to

27   NAF's annual meetings, they then signed agreements with NAF promising not to record video or

28   audio tape, to only use information learned at NAF's national meetings to enhance the quality and

safety of services provided by NAF members, and not to disclose any information learned at NAF's annual meetings to any third parties.  All of these promises were false and fraudulent when they were made.  The foregoing individuals, among others, were knowing and willful participants in the conspiracy to defraud NAF and harm the organization and its constituent members.

20.    **Alter Egos:**  NAF is informed and believes and on that basis alleges that there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendants CMP, Biomax, David Daleiden, Troy Newman, and unnamed co-conspirators, including, without limitation, "Susan Tennenbaum," "Brianna Allen," "Rebecca Wagner," and "Adrian Lopez," such that any individuality and separateness between these Defendants have ceased.  CMP, Daleiden, Newman, and unnamed co-conspirators "Tennenbaum" and "Allen" among other things, established Biomax as a fake company for the purpose of perpetrating a fraud on NAF, Planned Parenthood, and providers of abortion care.  Defendants and unnamed co-conspirators have at all times exercised dominion and control over Biomax, and have acted with total disregard for the separate legal status of Biomax in an attempt to defraud NAF.  Adherence to the fiction of the separate existence of Biomax and CMP as separate entities distinct from each other, Daleiden, and the unnamed co-conspirators, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

**JURISDICTION AND VENUE**

21.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 (action arising under the Racketeer Influenced and Corrupt Organizations Act) and 28 U.S.C. § 1331 (federal question jurisdiction).  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).  Specifically, every Defendant is a citizen of a different state than Plaintiff NAF.  *See* 28 U.S.C. § 1332(a)(1).  The amount in controversy, which, as further detailed below, includes statutory fees for violation of California Penal Code § 637.2 ($5,000 per violation), attorney fees as authorized by the parties' written agreements, and harm to NAF based

1     on Defendants' fraudulent and criminal conduct, far exceeds $75,000 exclusive of interest and

2     costs.

3           22.      Defendants CMP, Biomax, and David Daleiden are subject to personal jurisdiction

4     in this District because these Defendants:  (1) are either based in, incorporated in, or reside in the

5     state of California; and (2) have conducted business and/or purported to conduct transactions

6     within this District, and such conduct has caused injury to Plaintiff in this District.  Defendants

7     CMP, Biomax, David Daleiden and Troy Newman are subject to personal jurisdiction in

8     California because they have directed, participated in and provided material support for a scheme

9     to deceive Plaintiff and its members within California.  Each Defendant has actively participated

10    in the conspiracy to defraud Plaintiff with the intent to injure Plaintiff and its members within

11    California.

12          23.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because

13    Defendants' transactions in this District constitute a substantial part of the events giving rise to

14    Plaintiff's complaint, and because Plaintiff has suffered harm in this District as a result of

15    Defendants' transactions.  Specifically, NAF held its annual meeting at the Westin St. Francis in

16    San Francisco in April 2014.  Defendants came to San Francisco, fraudulently presented

17    themselves as officers and employees of a legitimate tissue procurement organization,

18    fraudulently signed written agreements to not make any recordings and to only use information

19    learned at the conference to enhance the quality and safety of abortion care, and promised not to

20    disclose information learned at NAF's conferences to third parties.  Based on these fraudulent

21    representations and written agreements, they gained admittance to NAF's annual meetings,

22    whereupon they set up a fake booth replete with fake signage and brochures, all in order to dupe

23    NAF members, who believed they were in a safe and harassment-free environment, into talking to

24    them.  They perpetrated their fraud, and signed the agreements that are at issue in this case, in this

25    District.  Accordingly, venue is proper here.

26

27

28

1

**FACTUAL ALLEGATIONS**

2

A.      <u>The History of Violence Against Providers of Abortion Care.</u>

3       24.      The outrageous nature of Defendants' conspiracy to defraud in this matter – and

4   the harm facing NAF members if Defendants make good on their threat to release more

5   selectively edited videotapes – takes place amidst a backdrop of violence and intimidation

6   perpetrated against NAF members.  Since the 1973 *Roe v. Wade* Supreme Court decision

7   legalizing abortion, there has been an organized campaign by anti-abortion extremists which has

8   resulted in escalating levels of violence against women's health care providers.  In an attempt to

9   stop lawful abortion, anti-abortion extremists have chosen to take the law into their own hands.

10  What began as peaceful protests with picketing moved to harassing clinic staff and patients as

11  they entered clinics and eventually escalated to blockading clinic entrances.

12      25.      This foundation of harassment led to violence, with the first reported clinic arson

13  in 1976 and a series of bombings in 1978.  Arsons and bombings have continued until this day.

14  Anti-abortion extremists have also used chemicals to block women's access to abortion,

15  employing butyric acid to vandalize clinics and sending anthrax threat letters to frighten clinic

16  staff and disrupt service.

17      26.      In the early 1990s, anti-abortion extremists concluded that murdering providers

18  was the only way to stop abortion.  The first provider was murdered in 1993.  Since then, there

19  have been seven subsequent murders and seventeen attempted murders of clinic staff and

20  physicians, several of which occurred in their own homes.  In 2009, according to published

21  reports, NAF member Dr. George Tiller was shot and killed in his church in Wichita, Kansas by

22  an individual who donated at least a thousand dollars to Operation Rescue and received specific

23  information from Operation Rescue about Dr. Tiller's whereabouts.  Before his assassination,

24  Dr. Tiller had been the subject of a relentless campaign of harassment and intimidation.

25  According to published reports, Bill O'Reilly of Fox News' "The O'Reilly Factor" had discussed

26  Dr. Tiller on no fewer than 28 episodes in the four years leading up to his murder, vilifying him

27  as "Tiller the Baby Killer" and accusing him of being guilty of "Nazi stuff."  In the wake of

28  Dr. Tiller's murder, several editorial articles brazenly came out in support of his murder.  Jacob

Sullum, for example, a senior editor at *Reason* magazine and a nationally syndicated columnist whose work has reportedly appeared in the *Wall Street Journal*, *USA Today*, the *New York Times*, the *Los Angeles Times*, and the *San Francisco Chronicle*, published an article the day after Dr. Tiller's death entitled, "Why Is Killing Abortionists Wrong?"  Mr. Sullum argued in his article that "if you honestly believe abortion is the murder of helpless children, it's hard to see why using deadly force against those who carry it out is immoral."

27.     NAF has compiled statistics on violence that abortion providers face, based on reports from member clinics, the news media, law enforcement and other pro-choice organizations, and those statistics are staggering:

### NAF Violence and Disruption Statistics (1977-2014)

| Type of Incident | Number |
|---|---|
| Murder | 8 |
| Attempted Murder | 17 |
| Bombing | 42 |
| Arson | 182 |
| Attempted Bombing/Arson | 99 |
| Assault & Battery | 199 |
| Butyric Acid Attacks | 100 |
| Anthrax/Bioterrorism | 663 |
| Kidnapping | 4 |
| Stalking | 554 |
| Death Threats | 429 |
| Invasion | 400 |
| Vandalism | 1507 |
| Trespassing | 2560 |
| Burglary | 184 |
| Hate Mail/Harassing Calls | 16,301 |
| Email/Internet Harassment | 626 |
| Hoax Device/Suspicious Package | 188 |
| Bomb Threats | 662 |
| Obstruction | 726 |

| Clinic Blockades | 801 |
| Arrests for Clinic Blockades | 33,839 |
| **Total** | **60,091** |

28.     While these reported figures are shocking, the actual number of incidents of violence and harassment perpetrated against abortion providers is likely much higher.  NAF only began tracking incidents of trespassing in 1999 and email harassment in 2002, and any incidents of violence against abortion providers ruled inconclusive or accidental are not included in the foregoing statistics.  The words of one NAF member perfectly describe the impact of caring for women in this climate:

> "[Abortion providers] deal with intimidation and harassment from anti-abortion extremists every single day.  We are threatened verbally and physically.  Protestors picket us at our homes.  They harass our families. We spend much of our time with the police, FBI, politicians, picketers, protestors or bomb squads and the media that follow them.  We spend more money on security than we do on medical equipment.  Our lives are filled with enormous stress and anxiety.  It is no wonder that many of the doctors, nurses and other health care professionals who chose to provide abortion care, have left the field."

**B.      Defendants' Ongoing Conspiracy to Defraud Is Placing Providers of Abortion Care at Risk.**

29.     Given the unique risks of violence, intimidation, and targeting by anti-abortion extremists, abortion providers whose images and names are blasted across the internet through the tactics that Defendants are employing face grave threats to their and their families' safety.  But Defendants have no concern for the safety of NAF members.  They have already released four heavily edited and misleading videotapes in an attempt to discredit abortion providers and shut down public funding for Planned Parenthood.

30.     Dr. Deborah Nucatola, Senior Director of Medical Services for Planned Parenthood Federation of America ("PPFA"), was Defendants' first victim.  PPFA is itself an organizational member of NAF.  On Tuesday, July 14, 2015, Defendants released a video of a Biomax agent (on information and belief, Daleiden) talking with Dr. Nucatola over lunch at a

1   restaurant in California on July 25, 2014.  Under California law, purposely taping a confidential

2   discussion without the subject's consent is a crime.  Cal. Penal Code § 632.

3          31.    Defendants selectively edited the tape to make it look as if Dr. Nucatola was

4   "selling" fetal tissue, when in fact the opposite was true.  Here are just some examples:

5       •   During the taped meeting Dr. Nucatola expressly stated that "nobody
            should be selling tissue.  That's just not the goal here."  This statement was
6           omitted by Defendants from their excerpted tape.

7       •   Ten times during the conversation, Dr. Nucatola said Planned Parenthood
            would not sell tissue or profit in any way from tissue donations.  All ten
8           instances were cut out of the video released by the Defendants.

9       •   At one point, Dr. Nucatola stated that reimbursement costs for a tissue
            specimen could range from $30 to $100.  This statement was immediately
10          clarified by Dr. Nucatola, who explained that the reimbursement amount
            could only be based on the clinic's costs, which is lawful.  Dr. Nucatola
11          explained: "It just has to do with space issues, are you sending someone
            there who's going to be doing everything, is there shipping involved, is
12          somebody going to have to take it out… [I]t's really just about if anyone
            were ever to ask them, well what do you do for this $60, how can you
13          justify that? …. So it needs to be justifiable."  This important passage was
            omitted entirely by Defendants in their effort to smear lawful tissue
14          donation programs and Dr. Nucatola.

15      •   Dr. Nucatola repeatedly stated that Planned Parenthood affiliates do not
            profit from tissue donation.  For example, she says: "To them, this is not a
16          service they should be making money from, it's something they should be
            able to offer this to their patients, in a way that doesn't impact them";
17          "affiliates are not looking to make money by doing this.  They're looking
            to serve their patients and just make it not impact their bottom line"; "we're
18          not looking to make money from this, our goal is to keep access available";
            and "this is not a new revenue stream that affiliates are looking at, this is a
19          way to offer the patient the service that they want, do good for the medical
            community and still have access."  Not a single one of these comments was
20          included in Defendants' excerpted and misleading video.  They were
            purposely cut to create the false impression that Dr. Nucatola was saying
21          the exact opposite of what she actually said.

22      •   Nearly all of Dr. Nucatola's references to "tissue donation" are deleted
            from the tape.
23
        •   The video was cut to convey the impression that nearly all Planned
24          Parenthood affiliates have tissue donation programs.  To the contrary, just
            a small number of affiliates have such programs, to help women and families
25          who wish to donate tissue to advance life-saving medical research.

26         32.    But the damage Defendants clearly intended to inflict on Dr. Nucatola's reputation

27   was already done.  Within an hour and a half of the posting, Dr. Nucatola was forced to shut

28

1   down her Twitter account. Inflammatory comments on right-wing blogs and websites directed to

2   Dr. Nucatola have since proliferated. Comments like "evil," "vile," "inhuman," a "ghoul," a

3   "murderer of babies," that "she deserves everything she has coming to her" and that she will

4   "suffer for eternity in a roasting pit" are commonly directed to her.

5        33.    The same is true with respect to the second victim of Defendants' unlawful

6   conduct, Dr. Mary Gatter, Medical Director for Planned Parenthood Los Angeles. As noted

7   above, Planned Parenthood Federation of America is itself an organizational member of NAF.

8   On Tuesday, July 21, 2015, Defendants released a second surreptitiously taken videotape that

9   describes Dr. Gatter as the "President of the Planned Parenthood Medical Directors Council,"

10  with the video edited to make it appear as if Dr. Gatter was discussing selling fetal tissue. But in

11  the unedited version of the video, Dr. Gatter states clearly that any tissue donation program would

12  have to comply with federal law: "[I]t's absolutely a requirement that we use only the official

13  federal government form for tissue donation, that we don't modify it in any way." She also

14  explained in the unedited version of the video that tissue donation was not about profit, but "about

15  people wanting to see something good come out" of their situations, "they want to see a silver

16  lining…." These and other highly relevant statements were omitted by Defendants from the

17  selectively excerpted, misleading tape that they released to the public.

18       34.    Once again, however, the damage was done before the truth could be told.

19  Dr. Gatter has since been called a "baby butcher," "evil," and "a vicious demonic force" who

20  deserves "no mercy" and "the hangman's noose." She and Dr. Nucatola have been described

21  online as "demons," and they have both been compared to Adolf Hitler and Joseph Mengele.

22       35.    The same pattern repeated itself with the release of Defendants' third illegal

23  videotape on July 28, 2015, a so called "web-series" that contains still more misleading video

24  clips of Dr. Nucatola and Dr. Gatter. This third release also illustrates the lengths to which

25  Defendants will go: Some of the footage was clearly filmed in medically sensitive areas inside a

26  clinic, showing a flagrant disregard for patient privacy and confidentiality. On information and

27  belief, some of the footage was also taken at a national conference hosted by Planned Parenthood

28  in Miami in 2014.

36. The pace at which Defendants are releasing selectively edited and misleading videos is increasing. On July 30, Defendants released a fourth videotape. Like the prior videos, it has been selectively edited to mislead viewers as to the content of the recorded conversations, and to portray the clinician in a false light. On information and belief, released footage was taken at a national conference hosted by Planned Parenthood in Miami in 2014.

37. Following the release of these videos, anonymous internet posters have leveled death threats against Dr. Nucatola on right-wing internet comment threads: "I'll pay ten large to whomever kills Dr. Deborah Nucatola. Anyone go for it." The poster followed that up with the following: "Dr. Deborah Nucatola is a monster, worse than Dr. Kevorkian worse than the terrorists, worse than the devil himself. Dr. Deborah Nucatola should die, today. Earth does not deserve her." The same poster is also personally threatening to murder the executive of a lawful tissue procurement organization named in the Nucatola video, stating that the CEO of StemExpress, a legitimate tissue disposal company "is a death-profiteer" and "should be hung by the neck using piano wire and propped up on the lawn in front of the building with a note attached…." The person posting went on to identify where the CEO lives and stated: "I'm going there…. I'll pay ten grand to whomever beats me to [CEO]…. [CEO] must die to save the innocents."

38. Defendants' brutally dishonest attacks on legitimate, life-saving practices regarding lawful tissue donation a campaign to target and harass individual abortion providers, and to trash their professional reputations. The reputational harm and the physical danger that NAF members and other abortion providers face in the event that even more selectively edited, misleading videos are released – as Defendants have promised to do – is obvious and speaks for itself.

C.   **NAF Annual Meetings and Its Concern for the Safety and Privacy of Its Members.**

39. One of NAF's most important events is its annual meeting, which takes place over the course of four days and is held in a different location each year. NAF has been holding its annual meetings since 1977. Companies that apply to exhibit at NAF's annual meetings include health care product manufacturers, service providers, and reproductive rights advocates.

1   Attendees at NAF's annual meetings include clinicians, facility administrators, and counselors.

2   Attendees also include researchers, educators and thought leaders in the pro-choice field, who

3   have long-standing commitments to health care, women's rights, and reproductive choice. NAF

4   also provides an ongoing program of accredited continuing medical education at its annual

5   meetings, covering all aspects of safe and ethical abortion care. The annual meeting draws

6   approximately 700-850 professional attendees each year.

7        40.    Precisely because attendees of NAF's annual meetings represent the exact

8   population that is the target of violence and intimidation perpetrated against abortion providers

9   described above, NAF has security measures in place that are not common at other conferences.

10  As noted above, many of the physicians and clinic staff at NAF's annual meetings have been

11  targeted by anti-abortion extremists. They have been stalked, threatened, and intimidated. They

12  have been picketed at their homes, churches, and their children's schools. Some attendees have

13  had death threats made against them, and bomb threats made against their clinics. Anti-abortion

14  extremists have placed NAF members who attend NAF's annual meetings on threatening

15  "wanted" posters, and have posted NAF members' photos and personal information on websites

16  with the intention of inciting violence against them. NAF members go to great lengths to

17  preserve their privacy and identity given this hostile environment, and many of them have

18  security protocols in place. Some wear bullet-proof vests to work.

19       41.    NAF's annual meetings are one of the only places where abortion providers can

20  come together to exercise their right to assemble, learn about the latest research, and to network

21  without fear of harassment, intimidation, and violence. Accordingly, NAF implements a multi-

22  faceted Security Program to help ensure the safety of its members, and goes to great lengths to

23  ensure a safe, secure, and intimidation-free environment for annual meeting attendees each year.

24  NAF's full-time security staff are involved in the selection process for hotels in order to ensure

25  that conference sites meet their strict security guidelines. When screening sites, the security staff

26  prioritize the location and floor of the meeting space, and the ability to secure NAF meeting

27  rooms and restrict access from others in the hotel. In advance of a meeting, NAF security staff

28

travel to the meeting site at least once in order to assess the security risks and needs at the hotel and the surrounding area.

42. During these advance meetings, NAF staff meet with hotel management and hotel security to discuss security issues and explain the overall plan NAF will implement and how hotel security will be integrated into that plan. The security staff also meet with local police officials, FBI and/or ATF agents, and fire and rescue personnel to review security issues, potential threats, and the security needs of NAF members. They also employ guards for the on-site conference security team (typically former law enforcement officers, private security guards, off-duty local law enforcement officers, hotel security staff, and security staff from partner organizations).

43. NAF security staff arrive prior to the beginning of each conference to set up the security team and their assignments; orient security staff about procedures and protocols; arrange for the safe receipt of mail and packages at the hotel; and finalize the involvement of K-9 teams. During the conferences, they supervise the security team and remain available on a 24/7 basis for any issues that occur. In the past, NAF security personnel have also coordinated with private security personnel to accompany a high-target physician who regularly attended NAF meetings prior to his death in 2014.

44. Throughout the entire conference, there are security officers posted at strategic locations throughout the meeting areas and outside entrances to meeting rooms. One of their primary responsibilities is checking to ensure that everyone entering a meeting room is wearing a NAF badge. Security staff will restrict access to meeting areas for anyone without a visible NAF badge. K-9 security personnel patrol the NAF meeting spaces and the exhibit hall with explosive-detector dogs.

45. NAF also goes to great lengths to make sure that the dates and locations of their meetings do not fall into the wrong hands. This information is not posted on NAF's public website, and is only given out to members and trusted others. All emails about the conference remind recipients to: "Please be mindful of security concerns and do not forward this email or share information about NAF meetings." NAF sends a security reminder to all attendees the week before the meeting, reminding them not to post their travel plans or information about the

meeting on social media. Attendees are prohibited from posting information related to content and/or the location of NAF's annual meeting on social media of any kind. This is communicated to attendees in the security reminder email, in the conference Final Program, and through signs posted at the registration booth and throughout the meeting space. Media representatives are regularly not allowed at NAF meetings, and media are not informed about the meetings.

46.     Upon arrival, each attendee must show photo ID and sign a confidentiality agreement before obtaining their meeting materials and gaining access to meeting areas. Attendees are given a name badge, which they must wear in order to enter any NAF meeting rooms.

47.     During the conference, all signage uses a version of the NAF logo that omits the words "National Abortion Federation" so that non-meeting attendees in the hotel are not alerted to NAF's presence. NAF also works with the hotel to make sure that its full name is not listed in any public hotel schedules or bulletins. Attendees and staff are advised to remove their conference badges when they leave the meeting areas, including in elevators, in order to decrease the chances of non-meeting attendees learning about the meeting.

48.     For security reasons, NAF does not allow luggage or large bags to be brought into meeting or event rooms. Meeting attendees must make arrangements to store luggage in their hotel room or with the hotel concierge, who is alerted to the need for extra baggage handling personnel on the last day of NAF's meeting.

49.     There is a reminder of NAF's unique security guidelines in each annual meeting Final Program, and attendees are advised to do the following:

- Wear meeting badges at all times during the meeting, including all day and evening sessions and receptions/social events.

- Remove name badges when they leave the meeting areas within the hotel, including elevators, and when they leave the hotel.

- Stay alert and aware of their surroundings both in the hotel and around the host city.

- When in their hotel rooms, store meeting materials out of sight.

- Keep personal information (e.g., hotel room number, phone number) confidential.

**D.** **NAF Put Agreements in Place in Order to Protect the Security of Their Annual Meetings and Its Attendees.**

50.     Separate and apart from the foregoing strict security requirements, in order to allow its members to assemble safely and securely, NAF requires all exhibitors who attend a meeting to sign written agreements representing that they are legitimate organizations with goals that are consistent with those of NAF, and to promise to hold any information received at the meeting in confidence.

51.     This was not always the case.  At one point, before the violence against providers had escalated, NAF had no security at its meetings, and in fact it allowed known anti-abortion protesters to attend its meetings.  However, by the early 1990s, NAF was forced to hire trained security professionals to put the security measures outlined above in place.  By the late 1990s, notwithstanding these security measures, anti-abortion extremists attempted to infiltrate NAF's meetings.  Extremist Mark Crutcher and his group Life Dynamics worked to develop a network of "spies for life" to infiltrate NAF member clinics.  Crutcher also offered substantial rewards for materials from NAF meetings, including audio recordings, which NAF made for educational purposes.  As a result of this targeted campaign to intimidate providers, NAF stopped taping its meeting sessions, started labeling all NAF meeting packets confidential, and in 2000 started requiring all meeting attendees to sign non-disclosure agreements.

52.     Accordingly, exhibitors who wish to attend NAF's annual meeting must first submit an "Application and Agreement for Exhibit Space."  This application is typically submitted months in advance of the annual meeting to NAF staff.  The Application requires the proposed exhibitor to identify itself, its representatives, and the products or services it wants to exhibit at the annual meeting.  The Application and Agreement for Exhibit Space expressly incorporates NAF's "Exhibit Rules and Regulations," and as a condition of attending NAF's annual meeting, all exhibitors must agree to the following conditions:

- Only companies with "an intended business interest in reaching reproductive health care professionals, including NAF provider members," are eligible to participate in NAF's annual meeting.  (Exhibit Rules and Regulations ¶ 1.)

- NAF reserves the right to exclude from its annual meeting any exhibitor whose "products, services, or performance in the field are not consistent with NAF's purposes and objectives."  (*Id.* ¶ 2.)

- All exhibiting companies and their attendees "must be registered for the NAF annual meeting, and must wear identifying badges as requested by NAF."  (*Id.* ¶ 8.)

- The Exhibit Rules and Regulations provide that "security will be provided by NAF for the conference period."  (*Id.* ¶ 10.)

- Photography of exhibits by anyone other than NAF, or the assigned exhibitor of the space being photographed, is "strictly prohibited."  (*Id.* ¶ 13.)

- All exhibitors must agree to display and represent their business, products, or services "truthfully, accurately, and consistently with the information provided in the Application."  (*Id.* ¶ 15.)

- Exhibitors agree to reimburse NAF for "all costs incurred by NAF, including reasonable attorneys' fees," for "any violations of any provision" of the Agreement.  (*Id.* ¶ 16.)

- All exhibitors agree that "all written information provided by NAF, or any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee, is to be used solely in conjunction with Exhibitor's business" and "unless authorized in writing by NAF, all information is confidential and should not be disclosed to any other individual or third parties."  (*Id.* ¶ 17.)

- All exhibitors agree that "monetary damages would not be a sufficient remedy for any breach of this agreement by Exhibitor or Exhibitor's officers, employees, or agents and that NAF will be entitled to specific performance and injunctive relief as remedies for any such breach."  (*Id.* ¶ 18.)

- All exhibitors agree that all of the information contained in its application, or "any past or future correspondence with … NAF … is truthful, accurate, complete, and not misleading."  (*Id.* ¶ 19.)

- The confidentiality of NAF's annual meeting is once again emphasized in language that is italicized, immediately before the signature line: Exhibitors "*agree to hold in trust and confidence any confidential information received in the course of exhibiting at the NAF Annual Meeting and agree not to reproduce or disclose confidential information without express permission from NAF.  Violation of this paragraph could result in civil and/or criminal penalties.*"  (*Id.*)

53.    Once an exhibitor signs on to these conditions and submits the required written

agreement and documentation and fees, it is registered as an exhibitor.

54. Beyond that, as explained above, to protect its members' safety and privacy, starting in 2000, NAF began requiring attendees at its annual meetings to sign a non-disclosure agreement with the following terms:

- "**1. Videotaping or Other Recording Prohibited.** Attendees are prohibited from making video, audio, photographic, or other recordings of the meetings or discussions or discussions at this conference." (Confidentiality Agreement for NAF Annual Meeting, ¶ 1.)

- Attendees agree that "Conference Information," which NAF defines as "all information distributed or otherwise made available at [the] conference by NAF or any conference participants through all written materials, discussions, workshops, or other means," is provided to "Attendees to help enhance the quality and safety of services provided by NAF members and other participants. Attendees may not use NAF Conference Information in any manner inconsistent with these purposes." (*Id.* ¶ 2 (emphasis added).)

- Attendees are prohibited from disclosing NAF Conference Information to any third parties, without NAF's consent. (*Id.* ¶ 3.)

55. The foregoing security practices and agreements are vitally important to NAF's ability to protect the privacy, identity, and security of its members.

**E. Defendants' Conspire to Defraud NAF and Gain Access to Its 2014 Annual Meeting in San Francisco.**

56. Until July 14, 2015, when Defendants released their first selectively edited videotape, Defendants' scheme was secret. Biomax held itself out to the world as a legitimate tissue procurement organization. It did so in order to gain access to NAF meetings, as well as Planned Parenthood meetings and facilities, under false pretenses. It created highly professional-looking brochures, which it sent to NAF member physicians along with a "welcome letter" from its fake CEO "Susan Tennenbaum," in order to persuade NAF members to talk to Biomax representatives. An excerpt from Biomax's fake advertising material is shown below:

57.   Biomax's brochures included the following statement:  "BioMax Procurement Services, LLC is a biological specimen procurement organization headquartered in Norwalk, CA. BioMax provides tissue and specimen procurement for academic and private bioscience researchers. Our commitment is to provide the highest-quality specimens with efficient, professional service to facilitate world-changing discoveries."  This statement – which also appeared on Biomax's fake website until it was locked – is a complete falsehood.

58.   In its marketing materials, Biomax trumpeted the fact that it "respects the integrity of your medical practice and handles all donor center relationships discretely and professionally to protect patient privacy."  Its marketing materials also touted its fake CEO "Tennenbaum" as "a passionate patient advocate and entrepreneur with a vision to bridge the gap between routine medical practice and cutting-edge medical research."  She claimed to have "worked in surgical offices and patient advocacy" and that she founded Biomax "to help give patients and providers an opportunity to give back and to connect medical researchers with critical biospecimens." These statements are false.

59.     Biomax first officially contacted NAF on November 27, 2013, when "Brianna Allen" sent an email to NAF, using a biomaxprocurementservices@gmail.com address, and introduced herself as "assistant for Susan Tennenbaum at Biomax" (susan@biomaxps.com is cc'd), and highlighted that she had met two members of the NAF staff at a previous professional meeting. "Allen" stated that Biomax wanted to "reserv[e] exhibitor space at the conference your organization will have in San Francisco" in 2014. Several more emails followed between "Brianna Allen" and NAF staff concerning Biomax's application to reserve exhibit space at the San Francisco annual meeting. On December 16, 2013, "Allen," using a Brianna@biomaxps.com email address, again emailed NAF staff asking about "Exhibit Hall registration for the April meeting. Can you tell us about pricing and location availability?" Once Biomax's agents received a copy of the Exhibitor Prospectus, they followed up with more questions. On January 13, 2014, "Allen," cc'ing her supposed boss "Susan Tennenbaum," sent an email to NAF in which she professed to be "having trouble understanding the format/agenda of the meetings" and "which additional registrations to purchase." "Allen" stated that she "expect[ed] to be at the booth full-time, **but I know Susan really likes to be able to attend sessions and mingle with attendees**."

60.     On February 7, 2014, "Allen" sent another email concerning Biomax's registration to NAF staff. This time, she cc'd both "Susan Tennenbaum" and someone identified as "Robert Sarkis." "Allen" indicated that Biomax was going to send its Exhibitor Agreement in on the following Monday, but wanted to inquire about getting "access" to the annual meeting for "2 additional representatives," "one for Susan and **one for our new VP for Operations, Robert Sarkis**."

61.     Using these false pretenses, the Defendants purchased from NAF the right to set up an exhibit booth for Biomax, the right to attend the NAF annual meeting for "Sarkis," "Tennenbaum," and "Allen," and the right to participate in educational workshops. In particular, Defendants registered Biomax as a "Commercial Firm" and paid to NAF the associated $2100 "Commercial Firm" exhibit booth fee. The Defendants further purchased two additional passes for "Additional Reps," paying $395 each, in addition to the single complimentary conference

1   registration that came with the booth registration.  The Defendants paid extra for these passes so

2   that they could obtain "Educational Passes," which would allow them to attend educational

3   sessions.  In addition, Defendants purchased (for $345) the right to attend the "Second-Trimester

4   Abortion Workshop."  Defendants paid a total of $3235, using a credit card under the name of

5   "Phil Cronin," and attaching a signature for "Phil Cronin." Registration and payment of these fees

6   is a precondition for a commercial firm – which the Defendants falsely portrayed Biomax to be –

7   to gain access to NAF's otherwise exclusive and secure annual meeting sessions in San Francisco,

8   and neither the Defendants nor their co-conspirators would have been allowed access to the

9   annual meeting sessions without this step.

10          62.     Once the registration fees were confirmed, Biomax duly submitted its Application

11  and Agreement for Exhibit Space, attached hereto as Exhibit A.  The Agreement is dated

12  February 5, 2014, and is signed by Biomax's fake CEO, Susan Tennenbaum.  The

13  "Representatives" of Biomax who were going to attend the meeting in San Francisco were

14  "Brianna Allen," Biomax "Procurement Assistant," fake CEO Susan Tennenbaum, and "Robert

15  Sarkis, V.P. Operations" (in reality Daleiden).  Biomax described itself in the Agreement as a

16  "biological specimen procurement [and] stem cell research" organization.  This description is

17  false.  Biomax also expressly promised to represent its business "truthfully" and "accurately" at

18  the annual meeting, and further agreed not to disclose any information it learned at the meeting

19  absent NAF's written consent.

20          63.     After executing the Exhibitor Agreement, and in advance of the annual meeting in

21  San Francisco, "Brianna Allen" sent still more emails to NAF staff concerning arrangements for

22  the meeting.  On March 14, 2014, she emailed NAF to ask where Biomax was "going to be

23  placed in the exhibit hall" because Biomax was "ordering our custom signage from the printers

24  and it would be helpful to know the exact setting we'll be working with!"  When NAF staff did

25  not respond, she sent another email on March 19, 2014, asking for NAF to "get us that

26  information today, that would be great!"  Allen also wanted to know if Biomax would "have an

27  electrical outlet at the booth? Thanks!"  And on March 27, 2014, Allen (again cc'ing

28

"Tennenbaum" and "Sarkis") wanted to know if the "final program" and "exhibitor kit" were available.

64.    The annual meeting was held on April 5-8, 2014, at the Westin St. Francis in San Francisco.  On the first day of the meeting, three individuals presented themselves at the registration desk purporting to be representatives of Biomax.  Because no one is admitted to the annual meeting absent presenting a valid identification, David Daleiden – who identified himself as Robert Sarkis – and his co-conspirator "Tennenbaum" presented the following identification to NAF registration personnel in order to gain access to the exhibit hall:

 

65.    These IDs are utterly fake.  None of the addresses listed on these fake IDs appear on GoogleMaps.  On information and belief, Daleiden (Sarkis), and his co-conspirators "Tennenbaum," and "Allen" transferred, produced, and caused to produce identification documents or false identification documents, as defined by 18 U.S.C. § 1028, and possessed a document-making implement, as defined by 18 U.S.C. § 1028, used to produce the fake identification provided to NAF registration personnel.

66.    After presenting fake identifications, "Sarkis" (really Daleiden), "Tennenbaum" and "Allen" all signed non-disclosure agreements in which they promised (1) not to make video or audio recordings of the meetings or discussions, (2) to only use information learned at the annual meeting to "enhance the quality and safety of services provided by NAF members and other participants," and (3) not to disclose information learned at the meeting to third parties without NAF's consent.  The non-disclosure agreements are attached hereto as Exhibits B-D.

67.     Once "Sarkis," "Tennenbaum," and "Allen" gained admittance to the exhibit hall, they proceeded to set up a "Biomax" booth replete with signage and brochures, touting itself to attendees and NAF staff as a legitimate tissue procurement service, as shown in the following photograph taken by NAF's official conference photographer:



68.     The older person on the left of the photograph identified herself to NAF staff as the CEO, "Tennenbaum"; the younger person identified herself as "Allen." As shown in the photograph, both "Tennenbaum" and "Allen" wore loose-fitting scarves around their shoulders during the meeting, which could easily be used to conceal recording equipment. "Sarkis," "Tennenbaum," and "Allen" then roamed the exhibit hall, freely mingling with attendees, holding themselves out as representatives of "Biomax," and handing out their fake business cards, as shown below:

69.     On information and belief, upon gaining admittance to NAF's annual meeting, Daleiden and his co-conspirators "Allen" and "Tennenbaum" surreptitiously taped – via audio, video, or otherwise – conversations with annual meeting attendees and NAF staff, and/or otherwise embarked on a campaign to collect identifying information concerning NAF members who provide abortion care.

70.     In addition to mingling with attendees in the exhibit hall, Defendants also attended panel presentations on Fetal Disposal Choices and Restrictions, as well as the meeting of Second Trimester Providers.  The panel on Fetal Disposal Choices and Restrictions is directly referenced in the Nucatola videotape released on July 14, 2015.  Professor Jennifer Dunn of UC Hastings School of Law spoke on that panel, addressing laws and regulations concerning fetal tissue disposal.  In light of the facts that have now emerged about Defendants' conspiracy, and the fact that this panel discussion is explicitly referenced in the Nucatola videotape, Professor Dunn is now concerned that the Defendants continued their illegal videotaping campaign at the annual meeting, that the comments she and other panelists made were taped, that those comments will be distorted and taken out of context, that her name will be splashed all over the internet like

1   Nucatola and Gatter before her, and that she too will be the subject of a vitriolic smear campaign

2   that would injure her professional reputation.

3         71.    To take just one other example, Dr. Matthew Reeves, NAF's Medical Director

4   since April 2013, remembers being approached by Daleiden at the annual meeting in San

5   Francisco. Daleiden said he wanted to talk, and Dr. Reeves remembers Daleiden being "pushy"

6   and asking "leading questions." According to Dr. Reeves, Daleiden had an "unusual stiff

7   posture" and a "lack of movement," and had a "strange face-forward stiffness when speaking,"

8   which Dr. Reeves attributed to a personality quirk at the time, but which he now realizes was

9   because Daleiden was most likely carrying equipment and filming or recording the conversation

10  with Dr. Reeves. When Defendants went public with their conspiracy on July 14, 2015, the

11  heavily edited videotape of Dr. Nucatola contains an express reference to Dr. Reeves by name,

12  and the interviewer (on information and belief, Daleiden) discloses details of his conversation

13  with Dr. Reeves on the tape. Having witnessed the terrible reaction toward Drs. Nucatola and

14  Gatter, Dr. Reeves now fears that he too will be a victim of Defendants' smear campaign, and that

15  he too will suffer the same reputational harm as Defendants' first victims. He is also fearful for

16  his safety and for that of his family. NAF security personnel have conducted an on-site visit of

17  his home, and Dr. Reeves has been forced to hire a private security team to install a security

18  system at his home.

19  **F.    Defendants Continue Their Conspiratorial Campaign Between the San Francisco**
    **      and Baltimore Annual Meetings.**

20

21        72.    NAF now knows that, after NAF's annual meeting in San Francisco, Defendants

22  continued their illegal videotaping campaign by targeting providers of abortion care, like

23  Drs. Nucatola and Gatter. The video of Dr. Nucatola was filmed at a lunch meeting in California

24  on July 25, 2014, three months after NAF's annual meeting in San Francisco. On information

25  and belief, the interviewer was Daleiden, the same person who identified himself to NAF staff as

26  Robert Sarkis. During the course of the interview, NAF's annual meeting in San Francisco is

27  referred to by Daleiden and Dr. Nucatola multiple times, including the meeting of Second

28  Trimester Providers and the panel discussion on Fetal Disposal Choices and Restrictions. In

1  addition to numerous references to Dr. Reeves – NAF's Medical Director – during the course of

2  the interview, twelve individual abortion providers who are NAF members via institutional

3  memberships are mentioned, by name, in the tape.  On information and belief, Daleiden and his

4  cohorts learned of these individuals at NAF's annual meeting in San Francisco.

5        73.    The video of Dr. Gatter was filmed at a lunch meeting in California on February 6,

6  2015, 10 months after the annual meeting in San Francisco and two months before NAF's annual

7  meeting in Baltimore.  On information and belief, the interviewer was the person who identified

8  herself to NAF staff as Biomax CEO "Tennenbaum."  Two abortion providers who are either

9  current or former NAF members via institutional membership are mentioned by name on the tape.

10  On information and belief, Defendants learned of these individuals at NAF's annual meeting in

11  San Francisco.  Defendants released a third heavily edited video on July 28, 2015, this one

12  targeting an abortion provider in Denver, Colorado, which contained still more misleading clips

13  of Dr. Nucatola and Dr. Gatter.  A fourth heavily edited video was released on July 30, 2015.

14  The campaign continues.

15        74.    Between the 2014 annual meeting and the 2015 annual meeting, Defendants also

16  reached out to individual NAF members in an attempt to set up appointments to discuss their

17  "business," whereupon they intended to continue their grossly fraudulent campaign.  On

18  information and belief, Defendants learned of these individuals at NAF's annual meeting in San

19  Francisco.  To take just one example, on October 17, 2014, Daleiden (posing as "Sarkis" and

20  using the email address "bob@biomaxps.com") sent an email to a clinic in a southwestern state

21  concerning "specimen procurement."  Daleiden claimed to be "excited about the possibilities in"

22  that state, and he was "looking forward" to working with this NAF member.  He stated that there

23  were "scientists looking for intact cardiac specimens" and wanted to know what "protocols will

24  come into play with these kinds of requests and how they can accommodate and **compensate for**

25  **that**."  He attached "one of [Biomax's] brochures and a welcome letter from our founder & CEO,

26  Susan Tennenbaum, who is cc'd on this email."  The "welcome letter" from the "CEO" stated

27  that Biomax wanted to "work together for your patients, and for the scientific research that will

28  benefit future patients" and offered to "return a portion of [Biomax's] researcher fees to you

1  based on specimen access." These deceptive and false materials and representations had one

2  purpose and one purpose only – to get NAF members to talk to Daleiden and his co-conspirators

3  under false pretenses.

4  **G.  Defendants' Conspire to Defraud NAF and Gain Access to Its 2015 Annual Meeting
   in Baltimore.**

5

6  75.  NAF's 2015 annual meeting was held in Baltimore, Maryland on April 18-21. Yet

7  again, Daleiden and his cohorts conspired to approach and did approach NAF to gain admittance.

8  On September 23, 2014, Daleiden – using his fake name "Sarkis" – submitted a proposal online

9  to NAF that Biomax would conduct a panel discussion on "providing fetal tissue for medical

10 research." In his proposal, he claimed to have an M.S. in Biological Science. On information

11 and belief, that statement is false. He has no such credentials. Even more incredible, Daleiden's

12 proposal indicated that the Panel Faculty would include Dr. Deborah Nucatola, the very physician

13 Daleiden had secretly recorded two months earlier, and who would later be the victim of

14 Defendants' outrageous campaign to destroy her reputation by releasing a selectively edited

15 videotape falsely suggesting that Dr. Nucatola was profiting from fetal tissue donation programs.

16 Daleiden's "proposed panel discussion" concerned "how providers can integrate tissue donation

17 services into their clinical practice to contribute to medical research and augment patient choice

18 and provider satisfaction." The proposal was rejected by the Annual Meeting Planning

19 Committee.

20 76.  Once again, "Brianna Allen," the fake assistant to "Tennenbaum," reached out to

21 NAF staff via email to secure a place at the annual meeting for Biomax. On February 10, 2015,

22 she emailed NAF looking for "information for exhibiting at the 39th NAF meeting in Baltimore

23 this April" because Biomax "definitely want[s] to have a booth again. Thanks!"

24 77.  On March 25, 2015, "Tennenbaum," on behalf of Biomax, entered into NAF's

25 Agreement for Exhibit Space, attached hereto as Exhibit E. The Agreement contains the same

26 false and fraudulent representation as the 2014 Agreement to the effect that Biomax was in the

27 business of "fetal tissue procurement" and "human biospecimen procurement." As with the 2014

28 Agreement, Biomax again expressly promised (falsely) to represent its business "truthfully" and

1    "accurately" at the annual meeting, and further agreed not to disclose any information it learned

2    at the meeting absent NAF's written consent. On the same day, "Allen" sent an email to NAF

3    listing Biomax's attendees for the Baltimore meeting: "Susan Tennenbaum, CEO," "Robert

4    Sarkis, Procurement Manager/VP Operations," "Rebecca Wagner, Contract Administrator," and

5    "Adrian Lopez, Procurement Technician." The email indicated that "Susan, Robert, and Adrian

6    should be at the 2nd Tri workshop on Saturday, and we want everyone registered for the full

7    conference as well. Thanks for your help and for keeping an eye out for us!"

8       78. As with the San Francisco meeting, the Defendants again purchased the right to set

9    up an exhibit booth for Biomax, as a "Commercial Firm," at the NAF annual meeting.

10   Defendants further procured access passes for "Tennenbaum," "Sarkis," and "Lopez," including

11   two "Educational Passes." Defendants again paid for the exhibit booth and access passes with a

12   credit card.

13      79. On the first day of the meeting, on information and belief, four individuals

14   identifying themselves as Tennenbaum, Sarkis, Wagner, and Lopez presented themselves at the

15   registration desk purporting to be representatives of Biomax. Because no one is admitted to the

16   annual meeting absent presenting a valid identification, on information and belief, Daleiden

17   (Sarkis) and his co-conspirators "Tennenbaum," "Wagner," and "Lopez" presented fake

18   identification to NAF registration personnel in order to gain access to the exhibit hall and meeting

19   sessions. On information and belief, Daleiden (Sarkis) and his co-conspirators "Tennenbaum,"

20   "Wagner," and "Lopez" transferred, produced, and caused to produce identification documents or

21   false identification documents, as defined by 18 U.S.C. § 1028, and possessed a document-

22   making implement, as defined by 18 U.S.C. § 1028, used to produce the fake identification

23   provided to NAF registration personnel.

24      80. On information and belief, all four individuals, before gaining entrance to the

25   meeting, signed non-disclosure agreements in which they promised (1) not to make video or

26   audio recordings of the meetings or discussions, (2) to only use information learned at the annual

27   meeting to "enhance the quality and safety of services provided by NAF members and other

28   participants," and (3) not to disclose information learned at the meeting to third parties without

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES      31

NAF's consent. The non-disclosure agreement signed by the Biomax agent "Adrian Lopez" is attached hereto as Exhibit F.

81.    Once Daleiden and his co-conspirators gained admittance to the exhibit hall, as in the prior year, they proceeded to set up a "Biomax" booth replete with signage and brochures, touting itself to attendees and NAF staff as a legitimate tissue procurement service. Daleiden roamed the exhibit hall and attempted to get meeting attendees to speak to him. The following photographs taken by NAF's official photographer captured Daleiden's presence at the annual meeting in Baltimore:

 

82.    On information and belief, upon gaining admittance to NAF's annual meeting, Daleiden and his co-conspirators "Tennenbaum," "Wagner," and "Lopez" surreptitiously taped – via audio, video, or otherwise – conversations with annual meeting attendees and NAF staff, and/or otherwise embarked on a campaign to collect identifying information concerning NAF members who provide abortion care. NAF staff also recall that "Susan Tennenbaum," just as she did in San Francisco, wore a heavy, loose-fitting scarf around her neck and shoulders, a scarf that could easily hide recording equipment.

83.    Multiple NAF staff recall being approached by Biomax's agents. "Adrian Lopez" attended numerous sessions and attempted to have multiple conversations with NAF staff over the course of the annual meeting. Dr. Matthew Reeves, NAF's Medical Director, was again

1    approached by Daleiden.  NAF staff also recall "Tennenbaum" falsely represented that Biomax

2    was "a tissue procurement facility operating in Long Beach."

3    **H.    Defendants' Campaign to Harass and Intimidate NAF Members Goes Public.**

4         84.    On July 7, 2015, Biomax's Registered Agent for Service of Process in California

5    "resigned" (as reflected on the California Secretary of State's website).  One week later, on

6    July 14, 2015, as detailed more fully above, Defendants began releasing secretly taped and highly

7    edited videotapes of Planned Parenthood physicians.  Daleiden then began giving press interviews

8    in which he openly admitted to the conspiracy, a conspiracy he labels the "Human Capital

9    Project."  In an interview with Bill O'Reilly on Fox News, he stated that he and his co-

10   conspirators had "spent three years with actors" who "pos[ed] as representatives of a middleman

11   biotech company" (i.e., Biomax) in order to fraudulently infiltrate NAF members.  As his

12   interview with O'Reilly clearly shows, Daleiden is the same man that fraudulently identified

13   himself as Robert Sarkis to NAF and its personnel:



14

15

16

17

18

19

20

21

22

23        85.    Daleiden/Sarkis has also promised "a lot more to come."  A cynical manipulator of

24   the news cycle, his stated goal is to release one selectively edited video – which he refers to as

25   "highlight videos" in interviews – per week.  On an interview with Sean Hannity of Fox News,

26   Daleiden boasted that he and his cohorts at CMP "probably have hundreds to even thousands of

27   hours total of videotape over the past two-and-a-half years," which would "continue to be

28

1     released in the days and months to come." When confronted by the *New York Times* about the

2     fraud and illegal conduct that he and CMP orchestrated against Planned Parenthood, NAF, and

3     others, he dismissed those concerns, saying "only Planned Parenthood or its supporters would

4     object." On Monday, July 20, 2015, CMP issued a press release stating that "The Center for

5     Medical Progress follows all applicable laws in the course of" what it describes as "investigative

6     journalism." Nothing could be further from the truth.

7        86.     Before CMP went public with Defendants' fraud, NAF and its members did not

8     know, and could not have known, that Defendants had fraudulently obtained access to NAF's

9     meetings, or that they had surreptitiously made recordings during those meetings. NAF was

10    unaware of the fraud until after Defendants began releasing the edited recordings on July 14,

11    2015.

12    **I.      Impact of Defendants' Fraud on NAF and Its Constituent Members.**

13        87.     The impact and injury to NAF are significant and ongoing. While NAF staff are

14    deeply dedicated to their mission, the fact is that normal operations have been disrupted, and the

15    entire organization has had to divert resources – resources that would otherwise be employed in

16    pursuing NAF's goals of ensuring access to safe, legal abortion care – in order to combat

17    Defendants' conspiratorial and fraudulent smear campaign. The resources that NAF has been

18    forced to expend as a direct result of the Defendants' actions include (but are not limited to)

19    expenses for staff time, meals, and transportation for working weekends and late nights working;

20    a cancelled out-of-state site visit to one of our members for our Medical Director because he was

21    concerned for his safety and having a home security assessment; cell phone and data usage for a

22    member of senior staff who was out of the country and was contacted by members when the first

23    video was released; and IT security consultants to assess the security of NAF's network against

24    further breaches or hacks. NAF expects to incur additional expenses for security consultants to

25    recommend enhancements to the vetting process and security protocols for our meetings, and

26    travel costs to support its members as it addresses the damage caused by the smear campaign.

27

28

88. Since Defendants went public with their conspiracy, NAF has also been forced to increase its security activities. It has worked with the security at its headquarters in Washington D.C. to ensure that strict protocols are being followed for admittance to NAF's offices.

89. NAF has also conducted an off-site inspection of the homes of NAF staff member Dr. Matthew Reeves, NAF's Medical Director. As explained above, Dr. Reeves was approached by Defendants at both the San Francisco and Baltimore annual meetings. He remembers "Sarkis" (whom he now knows was in fact David Daleiden) as an aggressive and pushy individual who asked him several misleading questions and had "unusual stiff posture" and a "strange forward facing stiffness," which Dr. Reeves now believes was because Daleiden was carrying recording equipment. Given Defendants' release of four illegally recorded and highly misleading videotapes, the fraud they have already perpetrated on NAF, the fact that he is mentioned personally in the misleading video of Dr. Nucatola that has already been released, and their boast that they have thousands of hours more video which they intend to release, Dr. Reeves is understandably concerned that he and his family will suffer the same fate as Dr. Nucatola and Dr. Gatter, and that Defendants will release a videotape that will portray him in a false light. Accordingly, NAF staff have conducted an on-site visit of his home, and Dr. Reeves has had to hire a professional security company to install a security system at his home, to protect himself and his family.

90. Moreover, Defendants know about the dates, times, and locations of NAF's next two meetings, information that NAF does not release publicly for reasons already stated. Defendants learned of this information because NAF sends out save-the-date reminders to participants at prior meetings. NAF is already in contact with the hotel management and hotel security staff for its next two meetings to let them know that information concerning NAF's annual meeting dates and locations have been compromised, and that NAF will likely need to take additional security precautions, leading to increased security costs for NAF.

91. Beyond the harm to NAF and its staff, its members now fear that they too will be the subject of an illegal and fraudulent campaign to smear their professional reputations and place them and their families in personal jeopardy. NAF security personnel have issued advisories to

1  its members to be on heightened alert and to contact NAF's Security Department with any

2  concerns. NAF has also seen an increase in "off hour" correspondence regarding security

3  concerns from its members.

4      92.     Professor Jennifer Dunn illustrates the grave consequences of Defendants' ongoing

5  conspiracy. Professor Dunn is a member of UC Hastings faculty and Lecturer in Law. Her

6  scholarship focuses on women's health and reproductive justice. She is a member of NAF and a

7  faculty panel member on Fetal Disposal Choices and Restrictions at NAF's 2014 annual meeting

8  in San Francisco, a panel discussion that Defendants attended, and which is specifically

9  referenced in the videotaped conversation with Dr. Nucatola. Professor Dunn understandably

10  believes Defendants carried on their illegal videotaping scheme during the 2014 annual meeting,

11  and she is now concerned that Defendants will do the same thing that they did to Drs. Nucatola

12  and Gatter – they will release a videotape of her discussion that will distort and twist her words or

13  the words of other speakers in order to portray her and NAF in a false light, exposing her to the

14  same character assassination, vitriol, and bile that have been leveled at Defendants' victims thus

15  far.

16      93.     If Defendants release audio or videotapes (or any other confidential information)

17  obtained at any of NAF's annual meetings, which they fraudulently intruded upon, the damage to

18  NAF and its members will be incalculable and irreversible. Accordingly, on July 30, 2015, NAF

19  wrote to Defendants and demanded an accounting of any information in their possession –

20  including any video or audio tapes that they obtained at NAF's annual meetings as a result of

21  their fraud and in violation of the Exhibitor Agreements and non-disclosure agreements.

22  Defendants have ignored that demand and otherwise failed to respond, necessitating the instant

23  legal action to protect NAF's legal rights and those of its members.

24                          **CLAIMS FOR RELIEF**

25                       **FIRST CAUSE OF ACTION**
                     **(Violation of 18 U.S.C. § 1962(c))**
26                       **(Against All Defendants)**

27      94.     Plaintiff incorporates and realleges paragraphs 1 through 93, inclusive, as though

28  set forth in full herein.

95.     Plaintiff is a "person" as that term is defined in 18 U.S.C. § 1961(3).

96.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of an associated-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.  Furthermore, in violation of 18 U.S.C. § 1962(d), the Defendants knowingly agreed and conspired to conduct or participate in the conduct of said enterprise's affairs through a pattern of racketeering activity.

97.     While the full extent of the conspiracy and its participants is not yet known, for purposes of this claim, the RICO enterprise is an associated-in-fact enterprise consisting of, at minimum, Defendants CMP, Biomax Procurement Services, David Daleiden, and Troy Newman, and unnamed co-conspirators Albin Rhomberg, "Susan Tennenbaum," "Brianna Allen," "Rebecca Wagner" and "Adrian Lopez" (the "Enterprise").  The Enterprise is an ongoing and continuing business organization consisting of corporations, charitable trusts, and individuals that are and have been associated for the common or shared purposes of, among other things, (1) defrauding NAF and its constituent members in order to unlawfully obtain access to NAF's annual meetings and to the offices and clinics of its constituent members; (2) depriving NAF of its property rights – including without limitation its right to exclude from its annual meetings fraudsters and anti-abortion extremists whose goals are not consistent with those of NAF; (3) carrying out an illegal videotaping campaign in which they surreptitiously tape physicians and other providers under false pretenses and in violation of law; (4) portraying NAF and its constituent members in a false light by releasing heavily edited and grossly misleading "highlight tapes" of physicians who were surreptitiously taped, in order to falsely portray the victims of their campaign as profiting from fetal tissue donation programs, when the exact opposite is true; (5) carrying out a campaign of intimidation and harassment against NAF and its constituent members for lawfully engaging in the provision of abortion care to women in the United States, which campaign is designed to injure the professional reputation of NAF and its constituent members, and to place NAF members in personal jeopardy; (6) unlawfully burdening NAF members' constitutional right to freedom of association; and (7) unlawfully burden the constitutional right of women to access lawful and safe abortion care in the United States.

98.     According to Daleiden's own statements, the Enterprise has operated for a period of two-and-a-half to three years, and has taken hundreds if not thousands of hours of videotape of physicians who provide abortion care.  The Enterprise, acting through Daleiden, has released four surreptitiously taken and misleadingly edited videotapes, and has threatened and continues to threaten the release of more such videotapes.  The Enterprise therefore has functioned for a period of two-and-a-half to three years and continues to function, as evidenced by the continuing release of unlawful, surreptitiously edited videotapes and in coordinated communication activities of CMP, Daleiden, and Troy Newman.

99.     Defendants Daleiden, Newman, CMP, and others associated with the Enterprise, and were willing participants in it.  Each had a common purpose and interest in the establishment and operations of the scheme.  They also agreed to the manner in which the Enterprise would be conducted, *i.e.*, as evidenced by Daleiden's own statements, the creation of an admittedly fake company (Biomax Procurement Services) in order to infiltrate by false and fraudulent pretenses NAF's annual meetings, and to infiltrate the offices and clinics of its constituent members, all for the purposes of portraying NAF and its constituent members in a false light, destroying their professional repuations, and placing NAF members in personal jeopardy.  At all relevant times, Daleiden, CMP, Biomax and Newman were generally aware of each other's conduct in furtherance of the scheme, and were knowing and willing participants in that conduct.

100.     The Enterprise affected interstate commerce by purchasing the right to set up an exhibit booth at NAF annual meetings, by registering as a "Commercial Firm" and paying the associated fees, and by purchasing additional rights of access by paying for additional per-person registration fees, for each of the annual meetings in 2014 and 2015.  The Enterprise further affected interstate commerce because it has diverted NAF from its core mission of ensuring access to safe and legal abortion care and providing medical practitioners with a safe and secure venue in which they can associate, to instead combatting the misrepresentations disseminated by Defendants and protecting its members from future harm.

101.     Defendants participated in the conduct of the affairs of the Enterprise, and not just their own affairs.  Daleiden has given press interviews in which he boasted about the scheme and

his, CMP's, and Biomax Procurement Service's knowing and willing participation in the scheme. Defendants exerted control over the Enterprise and, in violation of section 1962(c) of RICO, Defendants have conducted or participated in the affairs of those RICO enterprises, directly or indirectly, in at least the following ways:

(a) By setting up a sham company – Biomax Procurement Services – which falsely held itself out as a legitimate tissue procurement organization;

(b) By making false and misleading promises and representations to NAF and its constituent members concerning Biomax and the reasons its agents wanted to attend NAF's annual meetings and make visits to NAF member clinics and offices;

(c) By entering into false agreements with NAF for the purpose of inducing NAF into allowing Defendants access to its annual meetings;

(d) By engaging in an ongoing campaign to surreptitiously videotape NAF members in violation of law;

(e) By engaging in a smear campaign to destroy the professional reputation of NAF and its constituent members, which campaign places NAF members in personal jeopardy; and

(f) By creating, transferring and maintaining false identities and documentation to obtain access to NAF's annual meetings and the offices and clinics of its constituent members.

102. The Enterprise had a hierarchical decision-making structure headed by Daleiden. Daleiden directed how the scheme was to be perpetrated. In violation of section 1962(c) of RICO, Defendants conducted the affairs of the Enterprise by, among other things, defrauding NAF, making false promises and representations, and entering into false agreements, all in order to fraudulently gain access to NAF's annual meetings, whereupon they continued their illegal and misleading campaign to intimidate, harass, and discredit lawful and legitimate providers of abortion care in the United States.

103. The Enterprise engaged in a pattern of racketeering activity, consisting of, among other crimes, mail and wire fraud violations. Defendants have publicly boasted about the illegal nature and pervasiveness of the scheme. The racketeering activities of Daleiden, CMP, Biomax, Newman and their co-conspirators amounted to a common course of conduct, with similar pattern

and purpose, intended to defraud NAF and its constituent members who provide lawful, legal, safe abortion care. Each separate use of the U.S. mails and/or interstate wire facilities employed by the co-conspirators was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including NAF. Daleiden, CMP, and Biomax Procurement Services have each engaged in the pattern of racketeering activity for the purpose of conducting the continuing and ongoing affairs of the Enterprise.

104. Plaintiff does not and cannot now know the full extent of the conspiracy. Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records of Defendants. Indeed, an essential part of the successful operation of the scheme alleged herein depended upon secrecy, misrepresentations, and outright falsehood. At a minimum, however, Defendants' use of the U.S. mails and interstate wire facilities to perpetrate their unlawful scheme included, *inter alia*, the following, all of which are identified with specificity above:

(a) November 27, 2013 email from Biomax representative to NAF staff;

(b) December 16, 2013 email from Biomax representative to NAF staff;

(c) January 13, 2014 email from Biomax representative to NAF staff;

(d) February 5, 2014 wire transmission of the Application and Agreement for Exhibit Space to NAF staff, and the associated payment of registration fees through a credit card under the name of "Phil Cronin";

(e) February 7, 2014 email from Biomax representative to NAF staff;

(f) March 14, 2014 email between Biomax representative and NAF staff;

(g) March 19, 2014 email between Biomax representative and NAF staff;

(h) March 27, 2014 email between Biomax representative and NAF staff;

(i) September 23, 2014 wire transmission of Biomax proposal to hold panel discussion at 2015 annual meeting in Baltimore;

(j) February 10, 2015 email between Biomax representative and NAF staff;

1      (k)     March 25, 2015 wire transmission of the Application and Agreement for Exhibit

2   Space to NAF staff, and the associated payment of registration fees through a credit card; and

3      (l)     March 25, 2015 email between Biomax representative and NAF staff confirming

4   NAF's receipt of Exhibitor Agreement.

5      105.    The foregoing emails and wire transmissions were sent for the purpose of

6   deceiving and defrauding NAF into believing that Biomax was a legitimate fetal procurement

7   organization whose interests were aligned with those of NAF's, in order to falsely and

8   fraudulently obtain confidential and proprietary information related to NAF's annual meetings, to

9   obtain the identities of NAF members, and to purchase booth space in, and access to, NAF's

10   annual meetings. In sending the foregoing false and fraudulent emails and wire transmissions,

11   Defendants intended NAF to rely on their false and fraudulent misrepresentations, and NAF did

12   rely on those misrepresentations in permitting Defendants access to their annual meetings, which

13   permission was secured falsely and fraudulently.

14      106.    In addition, on information and belief, Defendants also produced, transferred, and

15   possessed with the intent to use fake identification documents that appeared to be issued by a

16   state so that they could gain admission to NAF's annual meetings in 2014 and 2015 in violation

17   of 18 U.S.C. § 1028(a), and conspired to do the same in violation of 18 U.S.C. § 1028(f).

18   Specifically, on April 5, 2014, Biomax representatives – including Daleiden – presented fake IDs

19   to gain access to NAF's annual meeting in San Francisco. And on April 18, 2015, Biomax

20   representatives – including Daleiden – presented fake IDs to gain access to NAF's annual

21   meeting in Baltimore, Maryland.

22      107.    NAF has been injured in its business and property by reason of these violations. It

23   has had to divert resources that would otherwise be used in furtherance of its core mission of

24   ensuring access to safe and legal abortion care and providing medical practitioners with a safe and

25   secure venue in which they can associate, to instead combatting the misrepresentations

26   disseminated by Defendants and to protect its members from future harm. This diversion of

27   resources includes, but is not limited to, expenses for staff time, meals, and transportation for

28   working during weekends and late nights; a cancelled out-of-state site visit to a NAF member by

1  NAF's Medical Director because he was concerned for his safety and to have a home security

2  assessment; cell phone and data usage for a member of senior staff who was out of the country

3  and was contacted by members when the first video was released; and the costs of hiring IT

4  security consultants to assess the security of NAF's network against further breaches or hacks.

5  NAF expects to incur additional security costs as a direct result of the Defendants' conduct,

6  including expenses for security consultants to recommend enhancements to the vetting process

7  and security protocols for NAF meetings, as well as travel costs to support its members as it

8  addresses the damage caused by the smear campaign. NAF has further lost the exclusive use and

9  control of confidential and proprietary information, including the location and dates of its next

10  two U.S. meetings. Accordingly, NAF has suffered economic and non-economic injury as a

11  result of Defendants' unlawful conspiracy.

12      108.    Under the provisions of section 1964(c) of RICO, each of the Defendants is jointly

13  and severally liable to NAF for three times the damages NAF has sustained, plus the costs of

14  bringing this lawsuit, including reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**(Civil Conspiracy)**
**(Against All Defendants)**

17      109.    Plaintiff incorporates and realleges paragraphs 1 through 108, inclusive, as though

18  set forth in full herein.

19      110.    On or about November 27, 2013 through the present day, Defendants and

20  Defendants' co-conspirators knowingly and willfully conspired and/or agreed among themselves

21  to defraud Plaintiff and to injure Plaintiff with a pattern of fraudulent and malicious conduct,

22  including but not limited to: (1) setting up a fake biological specimen procurement company

23  called Biomax; (2) presenting fake ID cards and fake business cards, and using fake email

24  addresses, signage, and brochures, all for the purpose of deceiving NAF; (3) inducing NAF to

25  enter into fraudulent contracts with Plaintiff in order to gain admission to NAF's annual meetings

26  under false pretenses; (4) violating Plaintiff's confidentiality agreements by secretly videotaping

27  NAF members at NAF conferences; and (5) releasing – and threatening to continue to release –

28  heavily edited, misleading videos obtained through violation of NAF's confidentiality agreement

1  with the express purpose of harming the reputation of NAF and its constituent members, injuring,

2  harassing, and intimating Plaintiff and its members, discrediting life-saving, legal fetal tissue

3  donation programs, and undermining access to safe and legal abortion care in the United States.

4      111.   Defendants and Defendants' co-conspirators did the acts and things herein alleged

5  pursuant to, and in furtherance of, the conspiracy and the above-alleged agreement.

6      112.   In doing the things herein alleged, Defendants acted with malice and oppression,

7  as defined under California Civil Code § 3294(c), with the intent to cause injury to Plaintiff,

8  thereby warranting an assessment of punitive damages in an amount appropriate to punish

9  Defendants and deter others from engaging in similar misconduct.

10     113.   As a proximate result of the wrongful acts herein alleged, Plaintiff has diverted

11  needed resources to addressing the consequences of Defendants' fraud, thereby suffering

12  pecuniary loss, and has suffered reputational harm as a result Defendants' fraudulent conduct and

13  dissemination of false and misleading information.

14     114.   Defendants' ongoing conspiracy to defraud, as described above, presents a

15  continuing threat to Plaintiff.  If Defendants are allowed to continue their wrongful acts, Plaintiff

16  will suffer further immediate and irreparable injury and loss.

**THIRD CAUSE OF ACTION**
**(Promissory Fraud)**
**(Against Daleiden, CMP, and Biomax)**

19     115.   Plaintiff incorporates and realleges paragraphs 1 through 114, inclusive, as though

20  set forth in full herein.

21     116.   On February 5, 2014 and again on March 25, 2015, Defendants signed Exhibitor

22  Agreements with NAF in which they promised that Biomax was a biological specimen

23  procurement company, that Biomax's exhibit for the annual meetings would be consistent with

24  NAF's purposes, that they would identify and display their services truthfully and accurately, and

25  that any information disclosed orally or visually at the annual meeting would not be disclosed to

26  any third party absent NAF's written consent.

27     117.   On April 5, 2014 and again on April 18, 2015, Defendants signed non-disclosure

28  agreements in which they promised not to make video, audio, photographic, or other recordings at

1   the NAF annual meetings, that they would not disclose any information learned at NAF's annual

2   meetings to third parties absent NAF's consent, and that they would only use information learned

3   at NAF's annual meeting in order to enhance the quality and safety of services provided by NAF

4   members and other annual meeting participants.

5        118.   When Defendants made these promises, Defendants knew them to be false and had

6   no intent to honor them. Defendants made these promises with the intent to deceive and defraud

7   Plaintiff and to induce Plaintiff to act in reliance on the promises in the manner herein alleged, or

8   with the expectation that Plaintiff would so act.

9        119.   Plaintiff, at the time Defendants made these promises and at the time of the actions

10   herein alleged, was unaware of the falsity of Defendants' promises and believed them to be true.

11       120.   In reliance on Defendants' promises, Plaintiff provided Defendants with access to

12   the 2014 and 2015 annual meetings and allowed Defendants to participate in those meetings.

13       121.   Defendants created Biomax – a fictitious company – to fraudulently infiltrate

14   Plaintiff's 2014 and 2015 annual meetings. On information and belief, Defendants improperly

15   and surreptitiously made video or audio recordings at the 2014 and 2015 annual meetings without

16   Plaintiff's consent, including video or audio recordings of NAF staff, members, exhibitors, and

17   attendees of the 2014 and 2015 annual meetings, and improperly gained access to, misused, and

18   disclosed confidential information acquired as a result of the fraud perpetrated by Defendants,

19   including confidential information acquired at the 2014 and 2015 annual meetings.

20       122.   Defendants have stated they plan to release video and audio recordings to the

21   public that, on information and belief, were improperly and surreptitiously acquired as a result of

22   the fraud perpetrated by Defendants. Defendants refuse to return the video and audio files and

23   continue to threaten to release the fraudulently obtained videos on a weekly basis.

24       123.   As a result of Defendants' wrongful acts, Plaintiff has suffered and/or will suffer

25   economic harm and irreparable harm caused by the improper acquisition, use, and disclosure of

26   Plaintiff's confidential information, including harm to the safety, security, and privacy of Plaintiff

27   and its members, harm to the reputation of Plaintiff and its members, and harm caused by the

28   diversion of necessary resources to address the consequences of Defendants' actions. If

1  Defendants are allowed to continue their wrongful acts, Plaintiff will suffer further immediate and

2  irreparable injury and loss.

3       124.    Defendants' actions constitute malice and oppression, as defined under California

4  Civil Code § 3294(c), as Defendants fraudulently induced NAF into believing their promises in

5  order to gain access to NAF's annual meetings. Punitive damages are appropriate to punish

6  Defendants and deter others from engaging in similar misconduct.

7  **FOURTH CAUSE OF ACTION**<br>**(Fraudulent Misrepresentation)**

8  **(Against Daleiden, CMP, and Biomax)**

9       125.    Plaintiff incorporates and realleges paragraphs 1 through 124, inclusive, as though

10  set forth in full herein.

11       126.    On February 5, 2014 and again on March 25, 2015, Defendants made at least the

12  following representations to NAF: that Biomax was a biological specimen procurement company,

13  that their proposed exhibit for the annual meetings was consistent with NAF's purposes, that they

14  would identify and display their business and its services truthfully and accurately, and that any

15  information disclosed orally or visually at the annual meeting would not be disclosed to any third

16  party absent NAF's written consent.

17       127.    On April 5, 2014 and again on April 18, 2015, Defendants made at least the

18  following representations to NAF: (1) that that they were affiliated with Biomax, a biological

19  specimen procurement company; (2) that they would not make video, audio, photographic, or

20  other recordings at the NAF annual meetings; (3) that they would not disclose any information

21  learned at NAF's annual meeting to third parties absent NAF's consent; and (4) that they would

22  only use information learned at NAF's annual meeting in order to enhance the quality and safety

23  of services provided by NAF members and other annual meeting participants.

24       128.    These representations were false. Defendants created a fictitious company and

25  presented fake identifications to infiltrate and gain access to Plaintiff's 2014 and 2015 annual

26  meetings.

27       129.    When Defendants made these representations, Defendants knew them to be false.

28  Defendants made these representations with the intent to deceive and defraud Plaintiff and to

1   induce Plaintiff to act in reliance on the representations in the manner herein alleged, or with the
2   expectation that Plaintiff would so act.

3        130.    Plaintiff, at the time Defendants made these representations and at the time of the
4   actions herein alleged, was unaware of the falsity of the Defendants' representations and believed
5   them to be true.

6        131.    In reliance on Defendants' misrepresentations, Plaintiff provided Defendants with
7   access to the 2014 and 2015 annual meetings and allowed Defendants to participate in those
8   meetings.

9        132.    As a result of Defendants' wrongful acts, Plaintiff has suffered and/or will suffer
10  economic harm and irreparable harm caused by the improper acquisition, use, and disclosure of
11  Plaintiff's confidential information, including harm to the safety, security, and privacy of Plaintiff
12  and its members, harm to the reputation of Plaintiff and its members, and harm caused by the
13  diversion of necessary resources to address the consequences of Defendants' actions.  If
14  Defendants are allowed to continue their wrongful acts, Plaintiff will suffer further immediate and
15  irreparable injury and loss.

16       133.    Defendants' actions constitute malice and oppression, as defined under California
17  Civil Code § 3294(c), as Defendants fraudulently induced NAF into gaining access to NAF's
18  annual meetings.  Punitive damages are appropriate to punish Defendants and deter others from
19  engaging in similar misconduct.

20                              **FIFTH CAUSE OF ACTION**
                                **(Breach of Contract(s))**
21                              **(Against Daleiden, CMP, and Biomax)**

22       134.    Plaintiff incorporates and realleges paragraphs 1 through 133, inclusive, as though
23  set forth in full herein.

24       135.    On February 5, 2014 and again on March 25, 2015, Defendants entered into
25  written Exhibitor Agreements with NAF in which they promised that Biomax was a biological
26  specimen procurement company, that Biomax's exhibit for the annual meetings would be
27  consistent with NAF's purposes, that Biomax would identify and display its services truthfully

28

1   and accurately, and that any information disclosed orally or visually at the annual meeting would

2   not be disclosed to any third party absent NAF's written consent.

3        136.    On April 5, 2014 and again on April 18, 2015, Defendants signed non-disclosure

4   agreements in which they promised not to make video, audio, photographic, or other recordings at

5   the NAF annual meetings, that they would not disclose any information learned at NAF's annual

6   meetings to third parties absent NAF's consent, and that they would only use information learned

7   at NAF's annual meetings in order to enhance the quality and safety of services provided by NAF

8   members and other annual meeting participants.

9        137.    Defendants have breached these agreements.  Contrary to their written Exhibitor

10   Agreements, Biomax is not a biological specimen procurement company, Biomax's exhibit for

11   the annual meetings was not consistent with NAF's purposes, and Biomax did not identify itself

12   or its services truthfully and accurately.  Contrary to their written Exhibitor Agreements, on

13   information and belief, Defendants have disclosed information orally or visually at the annual

14   meetings to third parties without NAF's written consent.  Contrary to their written NDA, on

15   information and belief, Defendants did make video, audio, photographic, or other recordings at

16   the NAF annual meetings, have disclosed information learned at NAF's annual meetings to third

17   parties without NAF's consent, and have not used information learned at NAF's annual meetings

18   in order to enhance the quality and safety of services provided by NAF members and other annual

19   meeting participants.

20        138.    Plaintiff has performed all of the conditions of the agreements on its part to be

21   done and performed in accordance with the terms of the agreements.

22        139.    As a result of Defendants' wrongful acts, Plaintiff has suffered and/or will suffer

23   economic harm and irreparable harm caused by Defendants' breaches, including harm to the

24   safety, security, and privacy of Plaintiff and its members, harm to the reputation of Plaintiff and

25   its members, and harm caused by the diversion of necessary resources to address the

26   consequences of Defendants' actions.  If Defendants are allowed to continue their wrongful acts,

27   Plaintiff will suffer further immediate and irreparable injury and loss.

28

## SIXTH CAUSE OF ACTION
### (Anticipatory Breach of Contract(s))
### (Against Daleiden, CMP, and Biomax)

140. Plaintiff incorporates and realleges paragraphs 1 through 139, inclusive, as though set forth in full herein.

141. On February 5, 2014 and again on March 25, 2015, Defendants entered into written Exhibitor Agreements with NAF in which they promised, among other things, that any information disclosed orally or visually at the annual meeting would not be disclosed to any third party absent NAF's written consent.

142. On April 5, 2014 and again on April 18, 2015, Defendants signed non-disclosure agreements in which they promised, among other things, not to make video, audio, photographic, or other recordings at the NAF annual meetings, that they would not disclose any information learned at NAF's annual meetings to third parties absent NAF's consent, and that they would only use information learned at NAF's annual meetings in order to enhance the quality and safety of services provided by NAF members and other annual meeting participants.

143. On information and belief, Defendants have breached the contracts by, among other things, making video or audio recordings at the 2014 and 2015 annual meetings without Plaintiff's consent, including recordings of NAF staff, members, exhibitors, and attendees of the 2014 and 2015 annual meetings, and by otherwise collecting information about NAF and its members for purposes other than to enhance the quality and safety of services provided by NAF members and other annual meeting participants.

144. Defendants have publicly stated they have hundreds if not thousands of hours of video or audio tape, which on information and belief includes video or audio tape taken at NAF's annual meetings. Defendants have publicly stated that they intend to continue to disclose such information.

145. Despite NAF's demand that Defendants cease violating the Exhibitor Agreements and non-disclosure agreements, and that they immediately return all audio or videotapes, or any other confidential information gathered at NAF's annual meetings, Defendants refuse to return

1    the video and audio files and continue to threaten to release the obtained videos on a weekly

2    basis.

3         146.    Plaintiff has performed all of the conditions of the agreements on its part to be

4    done and performed in accordance with the terms of the agreements.

5         147.    As a result of Defendants' wrongful acts, Plaintiff has suffered and/or will suffer

6    economic harm and irreparable harm caused by Defendants' breaches, including harm to the

7    safety, security, and privacy of Plaintiff and its members, harm to the reputation of Plaintiff and

8    its members, and harm caused by the diversion of necessary resources to address the

9    consequences of Defendants' actions.  If Defendants are allowed to continue their wrongful acts,

10   Plaintiff will suffer further immediate and irreparable injury and loss.

**SEVENTH CAUSE OF ACTION**
**(Trespass)**
**(Against Daleiden, CMP, and Biomax)**

13        148.    Plaintiff incorporates and realleges paragraphs 1 through 147, inclusive, as though

14   set forth in full herein.

15        149.    NAF possessed a right to exclusive use and enjoyment of the real property it

16   rented for its 2014 and 2015 annual meetings.

17        150.    As alleged herein, Defendants fraudulently induced NAF's consent to attend these

18   conferences, and on information and belief subsequently exceeded the scope of NAF's consent by

19   knowingly and intentionally videotaping NAF members at conferences in violation of NAF's

20   confidentiality agreement.  Defendants also did not have an intended business interest in reaching

21   reproductive health care professionals in attending the conferences, and divulged confidential

22   information in violation of NAF's exhibit rules and regulations, thereby further exceeding NAF's

23   consent.

24        151.    Defendants' knowing and intentional conduct alleged herein, which exceeded the

25   scope of Plaintiff's consent to enter NAF conference premises, constitutes a trespass.

26        152.    As a result of Defendants' trespass, Plaintiff has suffered – and continues to suffer

27   – economic harm and irreparable harm that includes, but is not limited to:  being forced to divert

28   resources to combat Defendants' misrepresentations in highly edited videos taken while

1    trespassing on Plaintiff's property that Defendant subsequent released; and suffering reputational

2    harm as a result of such videos.

3           153.   Defendants' actions constitute malice and oppression, as defined under California

4    Civil Code § 3294(c), as Defendants fraudulently induced NAF's consent and intentionally

5    exceeded the scope of its consent to cause mental anguish, shame, mortification, and mental

6    suffering to NAF members.  Punitive damages are appropriate to punish Defendants and deter

7    others from engaging in similar misconduct.

8                          **EIGHTH CAUSE OF ACTION**
     **(Violations of California Business & Professions Code § 17500, *et seq.***
9          **Based on False and Misleading Advertising)**
                   **(Against Daleiden, CMP, and Biomax)**
10

11          154.   Plaintiff incorporates and realleges paragraphs 1 through 153, inclusive, as though

12   set forth in full herein.

13          155.   As alleged herein, Defendants made or caused to be made untrue or misleading

14   statements regarding the nature of their services, which Defendants knew or reasonably should

15   have known were untrue or misleading, with the intent to induce NAF to enter into obligations

16   relating thereto, and with the intent not to provide those services as advertised, in violation of

17   California Business and Professions Code § 17500, *et seq.*

18          156.   Such statements include but are not limited to statements that Biomax Procurement

19   Services was a "biological specimen procurement organization" that "provides tissue and

20   specimen procurement for academic and private bioscience researchers."  Defendants stated that

21   the company was committed to "provid[ing] the highest-quality specimens with efficient,

22   professional service to facilitate world-changing discoveries."

23          157.   These and other statements identified herein are false.  Defendants created Biomax

24   Procurement Services as a fictitious corporation for the purpose, among others, of gaining access

25   to NAF's annual meetings and placing NAF's members and the services they provide in a false

26   light.  Defendants never intended to procure biological specimens or "facilitate world-changing

27   discoveries."  Instead, Defendants advertised their "services" as part of scheme designed to

28

1  achieve their stated goal of ending legal abortion care and placing life-saving, legal fetal tissue

2  donation programs in jeopardy.

3      158.    In creating Biomax and entering into false agreements with Plaintiff, Defendants

4  disseminated false and misleading information concerning Defendants' services, and advertised

5  their services with the intent not to sell them as advertised in violation of California Business and

6  Professions Code § 17500.

7      159.    Moreover, the heavily edited videos released by Defendants are false and

8  misrepresent the character and quality of NAF's members and the services they provide. The

9  videos expressly and impliedly convey the false message that NAF members promote the sale and

10  profit of fetal tissue and human organs, when the exact opposite is true. These videos are likely

11  to mislead the general public and potential funders into believing that Plaintiff engages in illegal

12  or unethical business practices.

13      160.    In releasing these videos online, Defendants have disseminated false and

14  misleading information regarding Plaintiff's organization.

15      161.    An action for injunctive relief and restitution is specifically authorized under

16  California Business and Professions Code § 17535.

17      162.    As alleged herein, Plaintiff has suffered injury in fact and lost money and property

18  as a result of Defendants' false advertising. Plaintiff has diverted substantial resources to combat

19  Defendants' fraud and misrepresentations. Plaintiff has thus suffered injury in fact and lost

20  money or property as a result of Defendants' deceptive and fraudulent conduct.

21      163.    The false advertising of Defendants, as described above, presents a continuing

22  threat to Plaintiff. If Defendants are allowed to continue their wrongful acts, Plaintiff will suffer

23  further immediate and irreparable injury and loss.

24  

**NINTH CAUSE OF ACTION**
**(Violations of California Business & Professions Code § 17200, *et seq.***
25  **Based on Commission of Unlawful, Unfair, and Fraudulent Acts)**
**(Against Daleiden, CMP, and Biomax)**
26  

27      164.    Plaintiff incorporates and realleges paragraphs 1 through 163, inclusive, as though

28  set forth in full herein.

165.     As alleged herein, Defendants have committed "unlawful" acts of unfair competition, as defined by California Business and Professions Code § 17200, by: (1) conspiring to defraud and defrauding Plaintiff; (2) breaching NAF's Exhibitor Agreements and non-disclosure agreements; (3) engaging in false advertising in violation of California Business and Professions Code § 17500; (4) engaging in trespass by exceeding the scope of NAF's consent through surreptitiously taping NAF meetings in violation of NAF's confidentiality agreement; (5) intruding in a private place in a highly offensive manner; (6) physically and constructively invading NAF's privacy and the privacy of its members in violation of California Civil Code § 1708.8; (7) violating California Penal Code § 632; and (8) violating corresponding Maryland privacy law provisions.

166.     Plaintiff reserves the right to allege other violations of law which constitute unlawful business practices.  Such conduct is ongoing and continues today.

167.     Defendants have committed "unfair" acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging – and continuing to engage – in conduct that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  This conduct includes, but is not limited to: (1) creating a fictitious company to gain access to Plaintiff's members; (2) violating – and publicly threatening to continue violating – NAF's confidentiality agreements; (3) trespassing on NAF's property; and (4) engaging in a smear campaign against NAF and its members and otherwise portraying NAF and its members in a false light.  Defendants engaged in this immoral, unethical, oppressive, and unscrupulous conduct for the sole purpose of demonizing and intimidating NAF's members and discrediting legal fetal tissue donation programs that advance life-saving medical research.

168.     Plaintiff had no way of reasonably knowing that Defendants perpetrated a fraudulent scheme to gain access to NAF annual meetings, nor could it have reasonably known that Defendants surreptitiously videotaped Plaintiff's members during NAF meetings with the intent of releasing edited videos that attempt to discredit Plaintiff and portray its members in a false light.  The gravity of harm caused by Defendant's conduct as described herein far outweighs the utility, if any, of such conduct.

169. Defendants have committed "fraudulent" acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging – and continuing to engage – in conduct that is likely to deceive members of the public. This conduct includes, but is not limited to: (1) conspiring to defraud and defrauding Plaintiff for the sole purpose of gaining access to Plaintiff's conferences and members; (2) secretly taping Plaintiff's members at NAF annual meetings in violation of Plaintiff's confidentiality agreement; and (3) publicly releasing – and threatening to continue to release – heavily edited versions of such videos, with the intent of harassing and intimidating abortion providers, undermining safe and legal abortion care, and discrediting life-saving, legal fetal tissue donation programs.

170. An action for injunctive relief and restitution is specifically authorized under California Business and Professions Code § 17203.

171. As a result of Defendants' "unlawful," "unfair," and "fraudulent" acts, Plaintiff has diverted substantial resources from promoting its mission to ensure access to safe and legal abortion care to instead combatting the misrepresentations disseminated by Defendants and to protecting its members from future harm. Plaintiff and its members have also suffered reputational damage as a result of Defendants' unlawful acts. Plaintiff has thus suffered injury in fact and has lost money and property as a direct result of Defendants' unlawful, unfair, and fraudulent conduct.

172. Defendants' unlawful, unfair, and fraudulent practices, as described above, present a continuing threat to Plaintiff. If Defendants are allowed to continue their wrongful acts, Plaintiff will suffer further immediate and irreparable injury and loss.

### TENTH CAUSE OF ACTION
#### (Violation of California Penal Code § 632)
#### (Against Daleiden, CMP, and Biomax)

173. Plaintiff incorporates and realleges paragraphs 1 through 172, inclusive, as though set forth in full herein.

174. Plaintiff presents this claim on its own behalf, as well as on behalf of its members. Plaintiff has associational standing to present this claim on behalf of its members because: (1) its

members would otherwise have standing to sue in their own right; (2) the privacy and safety issues NAF seeks to vindicate on behalf of its members are central to its core purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Plaintiff also has standing to bring this claim because it has diverted resources to combat Defendants' invasions, resources that would otherwise be dedicated to its core mission of ensuring access to safe, legal abortion care.

175. On information and belief, Plaintiff alleges that Defendant Daleiden and his co-conspirators intentionally recorded confidential communications made during Plaintiff's 2014 annual meeting in San Francisco, in violation of California Penal Code § 632.

176. Plaintiff and its members believed that any communication during the 2014 annual meeting in San Francisco would be confidential, as defined in section 632. Plaintiff's belief was objectively reasonable because (1) all attendees at the meeting, including Defendants, were required to sign non-disclosure agreements with confidentiality provisions prior to entering the conference and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (2) Plaintiff had in place a Security Program to ensure that communications concerning and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (3) the nature and subject matter of the meeting were highly sensitive and historically have caused providers of abortion care and their members to be victims of violence and harassment.

177. Defendants' recordings of NAF members during the 2014 annual meeting were made without NAF's consent, the consent of its members and/or the consent of all parties.

178. Plaintiff is authorized by statute to bring a civil action for $5,000 or three times the amount of actual damages pursuant to California Penal Code § 637.2(a)(2).

### ELEVENTH CAUSE OF ACTION
**(Violation of § 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code)**
**(Against Daleiden, CMP, and Biomax)**

179. Plaintiff incorporates and realleges paragraphs 1 through 178, inclusive, as though set forth in full herein.

180.    Plaintiff presents this claim on its on behalf, as well as on behalf of its members. Plaintiff has associational standing to present this claim on behalf of its members because: (1) its members would otherwise have standing to sue in their own right; (2) the privacy and safety issues NAF seeks to vindicate on behalf of its members are central to its core purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Plaintiff also has standing to bring this claim because it has diverted resources to combat Defendants' invasions, resources that would otherwise be dedicated to its core mission of ensuring access to safe, legal abortion care.

181.    On information and belief, Plaintiff alleges that Defendant Daleiden and his co-conspirators willfully intercepted and/or procured other persons to intercept private oral communications during Plaintiff's 2015 annual meeting in Baltimore, Maryland, in violation of the Maryland Wiretapping and Electronic Surveillance Act, section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

182.    Plaintiff and its members had a reasonable expectation of privacy regarding Plaintiff's communications during the 2015 annual meeting.  Plaintiff's expectation was reasonable because (1) all attendees at the meeting, including Defendants, were required to sign non-disclosure agreements with confidentiality provisions prior to entering the meeting and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (2) Plaintiff had in place a Security Program to ensure that communications concerning and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (3) the nature and subject matter of the conferences were highly sensitive and historically have caused providers of abortion care to be victims of violence and harassment.

183.    Defendants' recordings of Plaintiff's private communications, and those of its members,  at the 2015 annual meeting were made without NAF's consent and/or the consent or authorization of all parties.

184.    Plaintiff is authorized to bring a civil action for actual damages equal to the higher of $1,000 or $100 per day for each day of violation pursuant to section 10-410(a).

**TWELFTH CAUSE OF ACTION**
**(Invasion of Privacy: Intrusion upon a Private Place)**
**(Against Daleiden, CMP, and Biomax)**

185.    Plaintiff incorporates and realleges paragraphs 1 through 184, inclusive, as though set forth in full herein.

186.    Plaintiff presents this claim for and on behalf of its members. Plaintiff has associational standing to present this invasion of privacy claim on behalf of its members because: (1) its members would otherwise have standing to sue in their own right; (2) the privacy and safety issues NAF seeks to vindicate on behalf of its members are central to its core purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Plaintiff also has standing to bring this claim because it has diverted resources to combat Defendants' invasions, resources that would otherwise be dedicated to its core mission of ensuring access to safe, legal abortion care.

187.    NAF and its members had an objectively reasonable expectation that the annual meetings would be private, as well as an objectively reasonable expectation that all conversations, exhibits, and presentations occurring during those conferences would remain private. Not only did NAF preclude videotaping or other recordings in its confidentiality agreements, but it also limited conference attendance to those who possessed "an intended business interest in reaching reproductive health care professionals." At the same time, NAF excluded exhibitors whose "products, services, or performance . . . [were] not consistent with NAF's purposes and objectives." NAF also adopted stringent security measures to ensure that conference attendees – often the target of anti-abortion violence – remained safe and secure throughout the event.

188.    By fraudulently inducing NAF's consent to attend its private annual meetings for the sole purpose of intimating and harassing Plaintiff and its members, and by surreptitiously videotaping and recording conference attendees thereafter, Defendants intentionally intruded upon the privacy of NAF's meetings as well as the private conversations and presentations that occurred therein.

189.     Defendants' intentional intrusion upon NAF's privacy is highly offensive to a reasonable person in light of the malice and oppression underlying Defendants' motives, and the history of violence, harassment and oppression perpetrated by Defendants toward NAF members over time.

190.     Defendants' actions constitute malice and oppression, as defined under California Civil Code § 3294(c), as Defendants fraudulently induced NAF's consent and intentionally exceeded the scope of that consent to cause mental anguish, shame, mortification, and mental suffering to NAF members.  Punitive damages are appropriate to punish Defendants and deter others from engaging in similar misconduct.

**THIRTEENTH CAUSE OF ACTION**
**(Invasion of Privacy:  False Light)**
**(Against Daleiden, CMP, and Biomax)**

191.     Plaintiff incorporates and realleges paragraphs 1 through 190, inclusive, as though set forth in full herein.

192.     Plaintiff presents this claim for and on behalf of its members.  Plaintiff has associational standing to present this invasion of privacy claim on behalf of its members because: (1) its members would otherwise have standing to sue in their own right; (2) the privacy and safety issues NAF seeks to vindicate on behalf of its members are central to its core purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Plaintiff also has standing to bring this claim because it has diverted resources to combat Defendants' invasions, resources that would otherwise be dedicated to its core mission of ensuring access to safe, legal abortion care.

193.     On information and belief, after Defendants conspired to and did fraudulently gain access to NAF's annual meetings, they carried on their illegal videotaping campaign, which campaign is designed to intimidate and harass providers of abortion care, to harm the reputations of providers of abortion care, and to place them in harm's way.  Defendants have since released four heavily edited videos on July 14, 21, 28, and 30, 2015, which disclosures were (1) recorded without consent or authorization in violation of law, (2) false and highly misleading, and (3) which placed the victims (including those videotaped and those discussed in the videotape) in

1  a false light, thereby harming their professional reputations and placing them in harm's way. On

2  information and belief, Plaintiff alleges that Defendants will imminently release heavily edited

3  and highly misleading videos of NAF members from the 2014 and 2015 annual meetings which

4  were recorded without consent or authorization.

5  194.    In these heavily edited videos, Defendants' major misrepresentations of NAF

6  members' characters, activities, and beliefs will portray NAF members in a false light which

7  would be highly offensive to a reasonable person.

8  195.    Defendants' acts invaded NAF members' privacy interest in peace of mind and

9  freedom from public embarrassment and harassment.

10  196.    Defendants had knowledge of and/or acted in reckless disregard of the false and

11  highly misleading nature of Defendants' heavily edited videos and the false light in which NAF

12  members would be placed.

13  197.    As a direct and proximate result of Defendants' wrongful conduct, NAF's

14  members will suffer damage to their professional reputation and be placed in harm's way. Such

15  harm will continue and increase as Defendants continue their plan to release new, misleading

16  recordings every week unless the Court enjoins Defendants' acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    That judgment be entered in favor of Plaintiff and against Defendants on each and

every claim in this Complaint.

B.    Preliminarily and permanently enjoin Defendants and their officers, agents,

servants, employees, owners, and representatives, and all other persons, firms, or corporations in

active concert or participation with them, from doing the following:

- Publishing or otherwise disclosing to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned, at any NAF annual meetings;

- Publishing or otherwise disclosing to any third party the dates or locations of any future NAF meetings;

- Publishing or otherwise disclosing to any third party the names or addresses of any NAF members learned at any NAF annual meetings; and

1    • Attempting to gain access to any future NAF meetings.

2        C.      Defendants should also be subject to an injunction requiring them to (a) return to

3    NAF (i) any and all video, audio, photographic, or other recordings taken at any NAF annual

4    meetings, and (ii) any and all NAF Conference Information (i.e., information distributed or

5    otherwise made available at NAF annual meetings orally or visually through any written

6    materials, discussions, workshops, seminars, or other means); and (b) destroy any and all copies

7    of any such materials within their possession, custody, or control.

8        D.      Restitution of all monies expended by Plaintiff as a result of Defendant's unlawful,

9    unfair, and fraudulent business practices as provided by California Business and Professions Code

10   § 17203.

11       E.      Compensatory damages in such amounts as the Court deems just and proper.

12       F.      Statutory penalties and damages in such amounts as the Court deems just and

13   proper.

14       G.      On Plaintiff's Civil RICO claim, three times the damages Plaintiff has sustained as

15   a result of Defendants' conduct;

16       H.      Punitive damages pursuant to California Civil Code § 3294;

17       I.      That the Court award Plaintiff its costs and disbursements for this lawsuit,

18   including its reasonable attorneys' fees as provided by law; and

19       J.      That the Court grant such other and further relief as it deems just and proper.

20

21   Dated: July 31, 2015                          DEREK F. FORAN
22                                                  MORRISON & FOERSTER LLP

23

24                                           By:   _/s/ Derek F. Foran_____
25                                                  DEREK F. FORAN

26                                                 Attorneys for Plaintiff
                                                   NATIONAL ABORTION FEDERATION
27

28