1     LINDA E. SHOSTAK (CA SBN 64599)
      LShostak@mofo.com
2     DEREK F. FORAN (CA SBN 224569)
      DForan@mofo.com
3     CHRISTOPHER L. ROBINSON (CA SBN 260778)
      ChristopherRobinson@mofo.com
4     MORRISON & FOERSTER LLP
      425 Market Street
5     San Francisco, California  94105-2482
      Telephone: 415.268.7000
6     Facsimile: 415.268.7522

7     Attorneys for Plaintiff
      NATIONAL ABORTION FEDERATION (NAF)

8

9               UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| NATIONAL ABORTION FEDERATION (NAF), | Case No. 3:15-cv-3522 |
| Plaintiff, | Judge: |
| v. | **NATIONAL ABORTION FEDERATION (NAF)'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER; FOR AN ORDER TO SHOW CAUSE REGARDING A PRELIMINARY INJUNCTION; FOR A MOTION FOR PRELIMINARY INJUNCTION; AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| THE CENTER FOR MEDICAL PROGRESS; BIOMAX PROCUREMENT SERVICES LLC; DAVID DALEIDEN (aka "ROBERT SARKIS"), AND TROY NEWMAN, | |
| Defendant. | |
| | Hearing Date: Time: Location: |

## APPLICATION

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 31, 2015, or as soon thereafter as the matter may be heard, in Courtroom _____ of the Honorable _____ at the United States District Court for the Northern District of California, __th Floor, 450 Golden Gate Ave, San Francisco, CA 94102, Plaintiff National Abortion Federation ("NAF") shall and hereby does move the Court pursuant to Federal Rule of Civil Procedure 65 for **an *ex parte* temporary restraining order**, an order to show cause regarding a preliminary injunction, and **a preliminary injunction** against Defendants The Center for Medical Progress ("CMP"), Biomax Procurement Services LLC ("Biomax"), David Daleiden (aka "Robert Sarkis") ("Daleiden"), and Troy Newman ("Newman") (collectively "Defendants"), and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "the Enjoined Individuals") to:

(1)   prohibit the Enjoined Individuals from publishing or otherwise disclosing to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned, at any NAF annual meetings;

(2)   prohibit the Enjoined Individuals from publishing or otherwise disclosing to any third party the dates or locations of any future NAF meetings;

(3)   prohibit the Enjoined Individuals from publishing or otherwise disclosing to any third party the names or addresses of any NAF members learned at any NAF annual meetings; and

(4)   prohibit the Enjoined Individuals from attempting to gain access to any future NAF meetings.

This motion is based on this notice of motion and supporting memorandum of points and authorities; the supporting affidavits of Vicki Saporta, Mark Mellor, Jennifer Dunn, Matthew Reeves, and Derek Foran; and any other written or oral evidence or argument as may be presented at or before the time this motion is taken under submission by the Court.

Absent an *ex parte* temporary restraining order, NAF, its employees, and its members will suffer irreparable harm in the form of harassment, intimidation, violence, invasion of privacy, and injury to reputation, as further outlined in NAF's supporting memorandum of points and

1    authorities.  For the same reasons, NAF, its employees, and its members will suffer the same

2    irreparable harms absent a preliminary injunction following an order to show cause and expedited

3    briefing on the merits.

4                                **NOTICE OF APPLICATION**

5            Notice of the ex parte temporary restraining order was given in accordance with Civil

6    Local Rule 65-1(b), which states that, unless relieved by the Court for good cause shown, "on or

7    before the day of an ex parte motion for a temporary restraining order, counsel applying for the

8    temporary restraining order must deliver notice of such motion to opposing counsel or party."

9            As set forth in the Declaration of Derek Foran in Support of a Temporary Restraining

10   Order and Preliminary Injunction ("Foran Decl."), NAF took the following steps to notify each of

11   the Defendants that NAF would be applying for a temporary restraining order in the United States

12   District Court for the Northern District of California, San Francisco, on Friday, July 31, 2015:

13   
14   (1)   A letter was sent via email to the attorney identified as the registered agent for
           service of process (Catherine Short) for CMP.  (Foran Decl. ¶¶ 2-3, Ex.1.)

15   (2)   A voicemail was left for the attorney identified as the registered agent for service
           of process (Catherine Short) for CMP.  (*Id.* ¶ 5.)

16   (3)   Emails were sent to email addresses associated with CMP
           (info@centerformedicalprogress.org), Biomax (info@biomaxps.com), Daleiden
17         (info@centerformedicalprogress.org, david@centerformedicalprogress.org), and
           Newman (info.operationrescue@gmail.com).  (*Id.* ¶¶ 2-3, Ex. 1.)
18   
19   (4)   An email was sent to the email address of the lawyer (Paul N. Jonna, Esq.) who
           made a special appearance on behalf of CMP in response to an application for
20         temporary restraining order filed in the matter of *StemExpress, LLC et al. versus
           The Center for Medical Progress et al.* (Jul. 28, 2015), Case No. BC589145, in the
21         Superior Court of the State of California, County of Los Angeles, Central District.
           (*Id.* ¶¶ 2-3, Ex. 1.)

22   (5)   A voicemail was left for the lawyer (Paul N. Jonna, Esq.) who appeared specially
           on behalf of CMP in response to an application for temporary restraining order.
23         (*Id.* ¶ 5.)

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................3

      A.      The History of Violence, Intimidation, and Harassment Perpetrated
Against NAF's Members. .......................................................................3

      B.      NAF's Extensive Measures to Protect Its Members at Annual
Meetings. .................................................................................................5

      C.      Defendants Defrauded NAF and Infiltrated Its Annual Meetings
in 2014 and 2015.....................................................................................7

      D.      Defendants' Campaign to Harass and Intimidate NAF Members
Goes Public. ..........................................................................................10

      E.      The Effect of Defendants' Illegal Campaign on NAF and Its
Members..................................................................................................13

III.   ARGUMENT .......................................................................................................14

      A.      There is a High Degree of Likelihood that NAF Will Succeed on
the Merits. .............................................................................................15

      B.      NAF Will Suffer Irreparable Harm Without Immediate Temporary
and Preliminary Injunctive Relief. ........................................................19

      C.      The Balance of Hardships Tips Heavily in NAF's Favor ....................20

      D.      The Public Interest Favors Injunctive Relief ......................................21

      E.      NAF Should Not Be Required to Post a Bond .....................................22

IV.   CONCLUSION...................................................................................................23

1

## **TABLE OF AUTHORITIES**

2

Page(s)

3

CASES

4    *Am. Motorcyclist Ass'n v. Watt,*
5        714 F.2d 962 (9th Cir. 1983).................................................................................................. 21

6    *Arizona Dream Act Coal. v. Brewer,*
        757 F.3d 1053 (9th Cir. 2014).................................................................................................. 20

7    *Barahona-Gomez v. Reno,*
8        167 F.3d 1228 (9th Cir. 1999).................................................................................................. 23

9    *Boddie v. Connecticut,*
10       401 U.S. 371 (1971).................................................................................................................... 16

11   *Brooks v. Vallejo City Unified Sch. Dist.,*
        2:09-cv-1815 MCE JFM PS, 2009 U.S. Dist. LEXIS 101262 (E.D. Cal. Oct. 29, 2009) ...... 16

12   *Cohen v. Cowles Media Co.,*
13       501 U.S. 663 (1991).................................................................................................................... 17

14   *Diamond Multimedia Systems, Inc. v. Superior Court,*
        19 Cal. 4th 1036 (1999) ............................................................................................................ 22
15
16   *Dietemann v. Time, Inc.,*
        449 F.2d 245 (9th Cir. 1971)...................................................................................................... 21

17   *DISH Network L.L.C. v. Rios,*
18       2:14-cv-2549-WBS-KJN, 2015 U.S. Dist. LEXIS 18285 (E.D. Cal. Feb. 13, 2015)............. 21

19   *DVD Copy Control Assn., Inc. v. Bunner,*
        31 Cal. 4th 864 (2003) .............................................................................................................. 21
20
21   *United States EPA v. Environmental Waste Control, Inc.*
        917 F.2d 327, 332 (7th Cir. 1990)............................................................................................. 20

22   *Earth Island Inst. v. Carlton,*
23       626 F.3d 462 (9th Cir. 2010)..................................................................................................... 20

24   *Flanagan v. Flanagan,*
        27 Cal. 4th 766 (Cal. 2002) ...................................................................................................... 17
25
26   *Harris v. Bd. of Supervisors, Los Angeles Cnty.,*
        366 F.3d 754 (9th Cir. 2004)...................................................................................................... 20

27   *ITT Telecom Prods. Corp. v. Dooley,*
28       214 Cal. App. 3d 307 (1989).................................................................................................... 16

*Johnson v. Bank of Am., N.A.*,
    No.15-CV-03181-LHK, 2015 U.S. Dist. LEXIS 90765 (N.D. Cal. July 10, 2015) ............... 14

*Kight v. CashCall, Inc.*,
    231 Cal. App. 4th 112 (2014) ........................................................................ 17

*Mitchell v. Balt. Sun Co.*,
    164 Md. App. 497, 883 A.2d 1008 (2005) ........................................................ 18

*Monaco v. Liberty Life Assur. Co.*,
    No. C06-07021 MJJ, 2007 U.S. Dist. LEXIS 31298 (N.D. Cal. Apr. 17, 2007) ................... 16

*Perricone v. Perricone*,
    292 Conn. 187 (2009) ................................................................................ 16

*Regents of Univ. of California v. Am. Broad. Companies, Inc.*,
    747 F.2d 511 (9th Cir. 1984) ........................................................................ 20

*Reichert v. Gen. Ins. Co.*,
    68 Cal. 2d 822 (1968) ................................................................................ 15

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
    34 Cal. 4th 979 ........................................................................................ 22

*Rowe v. Exline*,
    153 Cal. App. 4th 1276 (2007) ...................................................................... 16

*Sanders v. Am. Broadcasting Co., Inc.*,
    20 Cal. 4th 907 (1999) ............................................................................... 18

*Shulman v. Grp. W Productions, Inc.*,
    18 Cal. 4th 200 (1998) ............................................................................... 18

*Still v. Norfolk & W. Ry. Co.*,
    368 U.S. 35 (1961) .................................................................................... 16

*Winter v. NRDC Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 15

**STATUTES**

18 U.S.C.
    § 248 .................................................................................................... 22

Cal. Civ. Code
    § 3427.3 ................................................................................................ 22

Cal. Pen. Code
    § 632(a) ........................................................................................... 15, 17

**OTHER AUTHORITIES**

Restatement 2d, Contracts § 7 (1981) ........................................................................... 16

## I.    INTRODUCTION

Plaintiff National Abortion Federation ("NAF") brings this emergency application for an *ex parte* temporary restraining order, an order to show cause, and a preliminary injunction.  The situation could not be more urgent.  This motion presents an essential, and time sensitive matter, for both NAF and its members, who will be irreparably harmed if relief is not granted.

NAF is a not-for-profit professional association of abortion providers.  One of NAF's most important roles is the responsibility to protect the safety and security of its members.  This is so because, despite the legality of abortion care, abortion providers are relentlessly targeted by anti-abortion extremists.  Many of the physicians and clinic staff at NAF meetings have been stalked, threatened, and intimidated, simply for ensuring the constitutional right of women in this country to make their own reproductive choices.  The harassment NAF members endure includes being picketed at their homes, churches, and children's schools.  Some NAF members have had death threats made against them, and bomb threats made against their clinics.  NAF members who attend NAF meetings have had their names put on threatening "wanted" posters and websites featuring their photos and personal information that are intended to incite violence against them.  Given the hostile climate and the history of violence, some NAF members go to great lengths to preserve their privacy and identity.  Many NAF members have security protocols in place to try and protect the identity of their physicians.  NAF's annual meetings – which are strictly confidential and highly secure – represent one of the only places where NAF members can come together to learn about the latest research in the field and network without fear or harassment.

Posing as representatives of a legitimate procurement organization, the Defendants in this case engaged in a fraudulent campaign to gain access to NAF's annual meetings.  Daleiden and his co-conspirators invented a fake company ("Biomax Procurement Services"), manufactured fake marketing materials, a fake website, and fake driver's licenses and business cards.  They fraudulently gained access to NAF annual meetings and breached confidentiality agreements to invade NAF's and its members' privacy.  Having illegally gained access, Defendants mingled freely with attendees, gathering identifying information and secretly recording members.  Their purpose:  to attack women's reproductive rights and smear all those who support these rights.

1   On July 14, Defendants went public with their conspiracy. They have openly boasted

2   about manufacturing a fake company in order to secretly videotape providers of abortion care,

3   tapes that are then heavily edited to purposely make it look as if these physicians are profiting

4   from lawful fetal tissue donation programs – programs that have led to life-saving medical

5   research breakthroughs – when in fact the exact opposite is true. The victims of this campaign

6   have had their professional reputations trashed. They have been called "evil," "vile," "inhuman,"

7   "baby butchers," and "a vicious demonic force" who deserve "no mercy" and "the hangman's

8   noose." Death threats have been leveled against them. One post stated: "I'll pay ten large to

9   whomever kills Dr. Deborah Nucatola. Anyone go for it." And the CEO of StemExpress, a

10  lawful tissue procurement company, has been labeled "a death-profiteer" who "should be hung by

11  the neck using piano wire and propped up on the lawn in front of the building with a note attached

12  . . . ." The person posting went on to identify where the CEO lives and stated: "I'm going there . .

13  . I'll pay ten grand to whomever beats me to [CEO] . . . [CEO] must die to save the innocents."

14  Three days ago, on July 28, 2015, lawyers for StemExpress sought and received a TRO in Los

15  Angeles County Superior Court enjoining Defendants from releasing any illegal video tapes of

16  meetings with StemExpress officials.

17  Defendants' brutally dishonest and illegal campaign to smear abortion providers and place

18  them in harm's way has only just begun. Daleiden has promised "a lot more to come."

19  Defendants claim to have hundreds if not thousands of hours of illegally taken tape. This week,

20  they released two more tapes, both of which include secret recordings from Planned Parenthood

21  conferences, similar to the NAF annual meetings Defendants fraudulently crashed. NAF's annual

22  meetings have already been referenced in the tapes released thus far, including references to

23  conversations the conspirators had with Dr. Matthew Reeves, NAF's Medical Director.

24  Numerous individual NAF members have been "outed," by name, in these videos. If Defendants

25  release tapes of NAF's annual meetings, NAF and its members will be the target of the same

26  smear campaign directed towards Defendants' victims thus far. Even more, Defendants know

27  about the dates and locations of NAF's next meetings, information that for safety reasons is not

28  disclosed publicly. NAF security has notified the locations that security has been compromised.

1    NAF now seeks immediate, emergency relief, enjoining Defendants from releasing to the

2    public any video or audio tapes, or any other information illegally obtained at NAF's annual

3    meetings in 2014 and 2015, from releasing to any third party the dates and locations of NAF's

4    future meetings, and from publishing or disclosing the names and addresses of its members

5    learned by Defendants at NAF's annual meetings.  NAF respectfully urges the Court to act.

6    Absent immediate injunctive relief, and continued preliminary injunctive relief through trial on

7    the merits, Defendants' conduct will cause irreversible harm to NAF, its employees', and NAF

8    members' safety, security, privacy, and reputations.

9    **II.    STATEMENT OF FACTS**

10    NAF is the professional association of abortion providers and plays a critical role in

11    promoting and preserving women's access to safe, legal abortion care.  (Decl. of Vicki Saporta

12    ISO NAF's Mot. for TRO and PI ("Saporta Decl."), ¶¶ 2-3.)  NAF members include individuals,

13    private and non-profit clinics, Planned Parenthood affiliates, women's health centers, physicians'

14    offices, and hospitals.  (*Id.*)  NAF's mission is to ensure safe, legal, and accessible abortion care,

15    which promotes health and justice for women.  (*Id.*)

16    **A.    The History of Violence, Intimidation, and Harassment Perpetrated Against
         NAF's Members.**

17

18    A critical but unfortunately necessary part of NAF's work is to assist its members in

19    preventing and coping with harassment, intimidation, and violence perpetrated by anti-abortion

20    extremists.  (*Id.* ¶ 4.)  For more than the last 30 years, anti-abortion extremists have perpetrated

21    tens of thousands of acts of violence and other criminal activities against NAF members and other

22    abortion providers, including murder, shootings, arson, bombings, chemical and acid attacks,

23    anthrax and bioterrorism threats, kidnapping, death threats, and other forms of violence.  NAF

24    compiles statistics on the violence against abortion providers, and those statistics are staggering.

25    (Foran Decl. ¶ 6, Ex. 2.)  Since 1977 there have been over **60,000** recorded instances of

26    harassment, intimidation, and violence perpetrated against abortion providers in this country.

27    (*Id.*)  Those figures, which are likely underreported, include the most heinous crimes imaginable.

28    One prominent example of the decades long hate campaign perpetrated against abortion

1   provider is the murder of Dr. George Tiller on May 29, 2009.  (Saporta Decl. ¶ 6; *see also* Decl.

2   of Dr. Matthew Reeves ISO NAF's Mot. for TRO and PI ("Reeves Decl."), ¶ 18; Foran Decl. ¶ 7,

3   Ex. 3.)  Dr. Tiller was gunned down by an anti-abortion extremist while attending church services

4   in Wichita, Kansas.  (Saporta Decl. ¶ 6; Foran Decl., Ex. 3.)  In the years leading up to his

5   assassination, Dr. Tiller had been the subject of a relentless campaign of harassment and

6   intimidation.   (Foran Decl. ¶ 8, Ex. 4.)  Since Dr. Tiller's murder, other anti-abortionist

7   extremists have attempted similar acts of violence against abortion providers.  In May 2011, for

8   example, Ralph Lang was arrested in his hotel room in Wisconsin after he accidentally fired his

9   gun while cleaning it.  (Saporta Decl. ¶ 7.)  When questioned by police, he revealed that he had

10  planned to go to two Planned Parenthood clinics and shoot the doctors.  He also said he wished he

11  could line up the rest of the clinic staff and "mow them down" with a machine gun.  (*Id.*)

12       Even today, there remains a part of the extreme anti-abortion movement who believe that

13  it is justifiable to use deadly force to stop abortion.  (*Id.* ¶ 9.)  The man convicted of murdering

14  Dr. Tiller tried to use a so-called "necessity defense" as justification for the crime.  (*Id.*)  And

15  Troy Newman—a Defendant in this action and the head of Operation Rescue and a Center for

16  Medical Progress (CMP) Board Member—has called the murder of an abortion provider a

17  "justifiable defensive action."  (*Id.*)

18       In light of this terrible reality, the safety and security of NAF's members is of the utmost

19  importance to the organization.  Many of NAF's members have themselves been targeted by anti-

20  abortion extremists.  (*Id.* ¶ 15.)  They have been stalked, threatened, and intimidated, including

21  being picketed at their homes, churches, and their children's schools.  (*Id.*)  Some NAF members

22  have had death threats made against them, and bomb threats made against their clinics.  (*Id.*)

23  Others are forced to wear bullet-proof vests to work.  (*Id.*)  NAF members who attend its

24  meetings have had their names put on threatening "wanted" posters and websites featuring their

25  photos and personal information that are intended to incite violence against them.  (*Id.*)  A

26  number of NAF's members try to remain under the radar in their communities, and do not speak

27  publicly about their work out of fear for their personal safety or the safety of their families.  (*Id.*)

28

### B.     NAF's Extensive Measures to Protect Its Members at Annual Meetings.

NAF's annual meetings, which it has held every year since 1977, are one of the only places where abortion providers can come together to learn about the latest medical research and network without fear of harassment or intimidation.  (Saporta Decl. ¶ 16.)  The annual meeting draws approximately 700-850 professional attendees each year, some of whom are high-profile targets of extremists.  (*Id.* ¶ 11.)  Because of the extreme violence perpetrated against it and its members, NAF has been forced to adopt extensive security and privacy measures at is annual meetings.  (*Id.* ¶ 12.)

This was not always the case.  (*Id.*)  In the early years, before the violence against providers had escalated, NAF had no security to speak of, and in fact, NAF allowed known anti-abortion protesters to attend its meetings.  (*Id.*)  However, by the early 1990s, with the escalation in violence and intimidation perpetrated against its members, NAF was forced to hire security professionals as well as off-duty police officers to secure its annual meetings and keep its members safe.  (*Id.* ¶ 12; *see also* Decl. of Mark Mellor ISO NAF's Mot. for TRO and PI ("Mellor Decl."), ¶ 6.)

These security measures begin long before the meeting itself.  (*Id.* ¶ 6.)  NAF's full-time security staff is involved in the selection process for hotels in order to ensure that conference sites meet their strict security guidelines.  (*Id.*)  Upon selection, NAF security staff meet with hotel staff, as well as local police officials, FBI and/or ATF agents, and fire and rescue personnel, to review security issues, potential threats, and the security needs of NAF members.  (*Id.* ¶ 8.)  NAF security staff then arrive prior to the beginning of each meeting to set up the security team and their assignments; orient security staff about procedures and protocols; arrange for the safe receipt of mail and packages at the hotel; and finalize the involvement of K-9 teams.  (*Id.* ¶ 9.)  During the conferences they supervise the security team and remain available on a 24/7 basis for any issues that occur.  (*Id.* ¶ 10.)

Throughout the entire conference, there are security officers posted at strategic locations throughout the meeting areas and outside entrances to meeting rooms.  (*Id.* ¶ 11.)  Security is primarily charged with ensuring that everyone entering a meeting room is wearing a NAF badge.

1   (Mellor Decl. ¶ 11.)  Security staff restrict access for anyone without a visible NAF badge.  (*Id.*)

2   K-9 security personnel patrol NAF's meeting space and exhibit hall with explosive-detector dogs.

3   (*Id.* ¶ 10.)

4          NAF also goes to great lengths to make sure that the dates and locations of their meetings

5   do not fall into the wrong hands.  (*Id.* ¶ 7.)  Unlike most organizations, NAF does not post

6   information about its annual meetings on its public website:  it only gives meeting information to

7   members and trusted others.  (*Id.*)  All emails about the conference remind recipients to: "Please

8   be mindful of security concerns and do not forward this email or share information about NAF

9   meetings."  (*Id.*)  During the conference, all signage must use a version of the NAF logo that

10  omits the words "National Abortion Federation" so that non-meeting attendees in the hotel are not

11  alerted to NAF's presence.  (*Id.* ¶ 12.)  Attendees and staff are advised to remove their conference

12  badges when they leave the meeting areas, including in elevators, in order to decrease the chances

13  of non-meeting attendees learning about the meeting.  (*Id.*)

14         NAF has had to continually increase precautions to secure a safe and intimidation-free

15  environment for annual meeting attendees.  (Saporta Decl. ¶ 11-12.)  After anti-abortion

16  extremists attempted to infiltrate NAF's meetings to identify providers in the late 1990s, NAF

17  was forced to begin labeling all annual meeting packets and materials as confidential, and started

18  requiring all meeting attendees to sign confidentiality agreements.  (*Id.* ¶ 13.)

19         **First**, exhibitors who wish to attend NAF's annual meeting must submit an Exhibitor

20  Agreement, which requires the proposed exhibitor to identify itself, its representatives, and the

21  products or services it wants to exhibit at the annual meeting.  (*See, e.g.*, Foran Decl. ¶ 9, Ex. 5.)

22  Moreover, as a condition of attending NAF's annual meeting, all exhibitors must:  (1) promise

23  and represent that they have a legitimate business interest in reaching reproductive health care

24  professionals (*id.* at p. 1 ¶ 1); (2) that they will "truthfully and accurately" represent their business

25  at NAF's meetings (*id.* at p. 1 ¶¶ 15, 19); and (3) that they will keep all information learned at the

26  meetings in confidence, and will not disclose that information to any third parties absent NAF's

27  consent.  (*Id.* at p. 1 ¶ 17.)

28         **Second**, all attendees must sign a non-disclosure agreement (NDA) to gain admittance to

1  the meeting.  (Saporta Decl. ¶ 13).  Under the terms of the NDA (Foran Decl. ¶ 10, Ex. 6):

2  (1) ***attendees must not videotape or record at the meeting*** (*id.* ¶ 1); (2) all information distributed

3  or otherwise made available at the meeting is confidential and may only be used "to help enhance

4  the quality and safety of services provided by NAF members and other participants" (*id.* ¶ 2);

5  (3) attendees "may not use NAF Conference Information in any manner inconsistent with these

6  purposes," (*id.*); and (4) attendees may not disclose any information learned at the meetings to

7  third parties, without NAF's consent.   (*Id.* ¶ 3.)  These practices and agreements are regrettable.

8  NAF's members cannot and should not be vilified simply for working to ensure the constitutional

9  right of women in this country to make their own reproductive choices.  Nevertheless, given the

10  decades long campaign of harassment and violence perpetrated against them, these practices and

11  agreements are vitally important to NAF's ability to protect the privacy, identity, and security of

12  its members.  (Saporta Decl. ¶ 13.)

13  **C.  Defendants Defrauded NAF and Infiltrated Its Annual Meetings in 2014 and 2015.**

15  In 2013, an organization holding itself out as "Biomax Procurement Services,"

16  approached NAF and sought access to NAF's annual meeting in San Francisco in 2014.  While

17  we now know Biomax was just a front for The Center for Medical Progress (CMP) and the

18  fraudsters behind it, including David Daleiden and Troy Newman, at the time it held itself out as

19  a legitimate fetal tissue procurement organization.  According to its website (now locked), the

20  company "provides tissue and specimen procurement for academic and private bioscience

21  researchers."  (Foran Decl. ¶¶ 11-12, Exs. 7, 8)  Daleiden – who has admitted publicly to

22  orchestrating this fraud – has stated that he worked with actors and "investigators" to carry out his

23  and Biomax's ends.  (*Id.* ¶ 13, Ex. 9.)

24  Individuals purporting to represent "Biomax" assumed fake names.  Biomax's CEO

25  adopted the fake name "Susan Tennenbaum."  (*Id.* ¶ 17, Ex. 13.)  Biomax's website described

26  "Tennenbaum," as "a passionate patient advocate and entrepreneur with a vision to bridge the gap

27  between routine medical practice and cutting-edge medical research."  (*Id.* ¶ 11, Ex. 7.)

28  "Tennenbaum's" supposed assistant assumed the fake name "Brianna Allen," "Rebecca Wagner"

1  signed contracts on Biomax's behalf, and "Adrian Lopez" claimed to be Biomax's "Procurement

2  Technician." (Foran Decl. ¶¶ 14-16, Exs. 10, 11, 12.)

3        Biomax officially contacted NAF on November 27, 2013, when "Brianna Allen" sent an

4  email to NAF, using a biomaxprocurementservices@gmail.com address, and introduced herself

5  as "assistant for Susan Tennenbaum at Biomax" (susan@biomaxps.com is cc'd), and highlighted

6  that she had met two members of the NAF staff at a previous professional meeting. (*Id.*, Ex. 10.)

7  "Allen" stated that Biomax wanted to "reserv[e] exhibitor space at the conference your

8  organization will have in San Francisco" in 2014. (*Id.*) Several communications, all of which

9  were designed to and did defraud and mislead NAF followed thereafter, (*id.*), and on February 5,

10  2014, "Biomax" entered into an Exhibitor Agreement with NAF, allowing Biomax the right to

11  exhibit at the upcoming annual meeting in San Francisco. (*Id.*, Ex. 5) In that agreement, Biomax

12  falsely represented that it was a "biological specimen procurement [and] stem cell research"

13  organization. (*Id.* at p. 2.) It further falsely represented that it had "an intended business interest"

14  in reaching reproductive healthcare professionals, including NAF provider members" that it

15  would display its business, products, or services "truthfully" and "accurately" at the meeting, and

16  that it would not disclose any information learned at the meeting to third parties absent NAF's

17  consent. (*Id.* at p. 1 ¶ 15.)

18        On April 5, 2014, the first day of the annual meeting in San Francisco, three individuals

19  presented themselves at registration as representatives of Biomax: "Robert Sarkis," "Susan

20  Tennenbaum," and "Brianna Allen." Robert Sarkis is the fake name Defendant David Daleiden

21  used. They presented fake California drivers' licenses to NAF's registration staff. (*Id.* ¶ 17, Ex.

22  13 ), and they all signed NDAs in which they promised: (1) not to make video or audio recordings

23  of the meetings or discussions; (2) to use information learned at the Annual Meeting only to

24  "enhance the quality and safety of services provided by NAF members and other participants,";

25  and (3) not to disclose information learned at the meeting to third parties without NAF's consent.

26  (*Id.*, Ex. 6.)

27        Once they fraudulently gained access to NAF's annual meeting, Biomax's agents set up a

28  "Biomax" booth replete with signage and brochures, touting itself to attendees and NAF staff as a

1   legitimate tissue procurement service organization.  (Foran Decl. ¶ 18, Ex. 14.)  Biomax agents

2   freely roamed the exhibit hall, mingling with attendees – among them high-profile targets of anti-

3   abortion extremists – and handed out their fake business cards.  (*Id.* ¶ 19, Ex. 15.)

4          There is also ample evidence to suggest that they surreptitiously taped conversations with

5   annual meeting attendees and NAF staff, and embarked on a campaign to collect identifying

6   information concerning NAF members who provide abortion care.  (*See, e.g.*, Reeves Decl. ¶¶ 8,

7   10; Decl. of Jennifer Dunn ISO NAF's Mot. for TRO and PI ("Dunn Decl."), ¶ 9.)  Certainly,

8   they were not at the meeting for any proper purpose.  Moreover, "Tennenbaum" and "Allen"

9   wore loose fitting scarves around their shoulders, scarves that could easily conceal recording

10  equipment.  (Foran Decl., Ex. 14.)  Dr. Matthew Reeves, NAF's Medical Director since April

11  2013, specifically remembers being approached by Daleiden at the annual meeting in San

12  Francisco.  (Reeves Decl. ¶ 8.)  Dr. Reeves remembers Daleiden being "pushy" and asking

13  "leading questions."  (*Id.* ¶¶ 8, 16.)  According to Dr. Reeves, Daleiden had an "unusual stiff

14  posture" and a "lack of movement," as well as a "strange face-forward stiffness when speaking,"

15  which Dr. Reeves attributed to a personality quirk at the time, but now realizes was likely because

16  Daleiden was carrying hidden equipment for recording their discussion.  (*Id.* ¶ 8.)

17         Daleiden and his cohorts repeated the same pattern of illegal conduct the following year,

18  at NAF's annual meeting in Baltimore, Maryland (in between the 2014 and 2015 annual

19  meetings, Biomax was busy perpetrating fraud against Planned Parenthood clinics and illegally

20  taping conversations with physicians).  Yet again, using emails, Daleiden and his cohorts

21  conspired to approach—and did approach—NAF to gain admittance.  (Foran Decl., Ex. 11.)

22  After Biomax agents issued multiple communications to NAF staff using the same aliases as in

23  2014, the parties ultimately entered into an Exhibitor Agreement that allowed Biomax to exhibit

24  at the upcoming annual meeting.  (*Id.*, Ex. 12.)  The 2015 Exhibitor Agreement contains the same

25  false and fraudulent promises and representations as the 2014 Agreement, i.e., that: Biomax was

26  in the business of "fetal tissue procurement" and "human biospecimen procurement," (*id.* at 2);

27  that it would represent its business "truthfully" and "accurately" at the annual meeting (*id.* at p. 3

28  ¶¶ 15, 19), and that it would refrain from disclosing information learned at the meeting absent

1    NAF's written consent.  (Foran Decl., Ex. 12 at p. 3 ¶ 17.)

2              On the first day of the meeting, four Biomax representatives—including Daleiden (again

3    using the "Sarkis" alias) showed up and presented fake IDs to gain admittance.  (Foran Decl., Ex.

4    13.)  As in the prior year, they also signed NDAs in which they promised: (1) they would not

5    make video or audio recordings of the meetings or discussions; (2) they would use information

6    learned at the annual meeting only to "enhance the quality and safety of services provided by

7    NAF members and other participants,"; and (3) would not disclose information learned at the

8    meeting to third parties without NAF's consent.  (*Id.* ¶ 20, Ex. 16.)

9              As in 2014, once inside the exhibit hall, Daleiden and his co-conspirators set up a

10   "Biomax" booth that again falsely touted the organization as a legitimate tissue procurement

11   service.  (*Id.*, Exs. 12, 14.)  And, consistent, with their previous behavior, Daleiden and his

12   cohorts roamed the exhibit hall, attempting to speak with meeting attendees, gathering

13   information about names and locations of abortion providers, and, as NAF now believes,

14   surreptitiously recording conversations at the meeting.  Multiple NAF staff recall Biomax's

15   agents approaching them.

16          **D.      Defendants' Campaign to Harass and Intimidate NAF Members Goes Public.**

17             On July 14, 2015 (one week after its registered agent for service of process resigned),

18   Biomax went public with its fraud.  Daleiden and The Center for Medical Progress publicly took

19   credit for the scheme.  (*See, e.g.*, *Id.*, Ex. 9.)  Daleiden has given multiple press interviews in

20   which he openly admitted to the conspiracy, a conspiracy he labeled the "Human Capital

21   Project."  (*See e.g.*, *Id.* ¶ 21, Ex. 17.)  In an interview with Bill O'Reilly on Fox News, he stated

22   that he and his co-conspirators had "spent three years with actors" who "pos[ed] as

23   representatives of a middleman biotech company" (i.e., Biomax) in order to fraudulently infiltrate

24   NAF members.  (*Id.*, Ex. 9.)

25             Also on July 14, Defendants began releasing secretly taped and highly misleading

26   videotapes of Planned Parenthood physicians.  (*Id.* ¶ 22, Ex. 18.)  Those videos – taken in

27   violation of law – are purposely edited to make it appear as if the physicians in question are

28   profiting from lawful fetal tissue donation programs and practices – practices that have led to life-

saving medical breakthroughs – when in fact the exact opposite is true.  (Reeves Decl. ¶ 11.)  The videos have incited a campaign of vitriol and bile against the victims in question.  (Saporta Decl. ¶ 19; Foran Decl. ¶ 23, Ex. 19.)

The first victim was Dr. Deborah Nucatola, the Senior Director of Medical Services for Planned Parenthood Federation of America (PPFA), which is itself an organizational member of NAF.  (Foran Decl., Ex. 18; Saporta Decl. ¶ 2.)  The video was secretly taken over lunch at a restaurant in California in July 2014 (just three months after Defendants infiltrated NAF's annual meeting).  (Foran Decl., Ex. 18.)  The "interviewer" (Daleiden), expressly references NAF's annual meeting, including specific meetings and panel presentations, multiple times, and *twelve separate NAF members are identified, by name, in the tape*.  (*Id.*)  Daleiden also *on multiple occasions references his conversations with NAF's Medical Director, Dr. Matthew Reeves, in the tape*.  (*See, e.g.*, *Id.* at pp. 17, 22; Reeves Decl. ¶¶ 14-15.)  Moreover, Defendants selectively edited the tape to make it look as if Dr. Nucatola was "selling" fetal tissue, when in fact the opposite was true.  During the illegally taped conversation, for example, Dr. Nucatola expressly stated that "nobody should be selling tissue.  That's just not the goal here."  (Foran Decl., Ex. 18 at p. 34.)  This statement was omitted by Defendants from their excerpted tape.  And ten times during the conversation Dr. Nucatola said Planned Parenthood would not sell tissue or profit in any way from tissue donations.  All ten instances were cut out of the video released by the Defendants.

But the damage to Dr. Nucatola's professional reputation was already done before the truth could be told.  Within an hour and a half of the posting, Dr. Nucatola was forced to shut down her Twitter account.  (*Id.* ¶ 24, Ex. 20.)  Inflammatory online comments directed to Dr. Nucatola have since proliferated.  (*See e.g.*, *Id.* ¶ 25, Ex. 21.)  Comments like "she deserves everything she has coming at her" and that she will "suffer for eternity in a roasting pit" are commonly directed to her.  (*Id.*)

One week later, Defendants' victimized another physician, this time Dr. Mary Gatter, Medical Director for Planned Parenthood Los Angeles.  (*Id.* ¶ 26, Ex. 22.)  In this conversation, *two NAF members are outed, by name*.  (*Id.*, Ex. 22.)  And as with Dr. Nucatola, Defendants'

1    excerpted tape also painted Dr. Gatter in a grossly false light, making it appear as if Dr. Gatter

2    was discussing the sale of fetal tissue for profit, when the opposite is true.  (Foran Decl., Ex. 22.)

3    In the unedited version, Dr. Gatter clearly states that any tissue donation program would have to

4    comply with federal law: "[I]t's absolutely a requirement that we use only the official federal

5    government form for tissue donation, that we don't modify it in any way."  (*Id.* at p. 6.)  She also

6    explained in the unedited version that tissue donation was not about profit, but "about people

7    wanting to see something good come out" of their situations, "they want to see a silver lining…"

8    (*Id.* at p. 17.)  These and other highly relevant statements were omitted by Defendants from the

9    selectively excerpted tape.

10       Once again, however, the damage was done before the truth could be told.  Dr. Gatter has

11   since been called a "baby butcher," "evil," and "a vicious demonic force" who deserves "no

12   mercy" and "the hangman's noose."  (*Id.*, Ex. 19.)

13       The hate campaign spawned by Defendants' videos is not limited to offensive name-

14   calling.  Since Defendants released the videos, cowardly and anonymous internet posts have

15   leveled death threats against Dr. Nucatola on right-wing internet comment threads: "I'll pay ten

16   large to whomever kills Dr. Deborah Nucatola.  Anyone go for it."  (Saporta Decl. ¶ 19.)  The

17   same poster is also personally threatening to murder the executive of a lawful tissue procurement

18   organization, StemExpress, named in the Nucatola video, stating that the person in question is a

19   "a death-profiteer" who "should be hung by the neck using piano wire and propped up on the

20   lawn in front of the building with a note attached . . . ."  (*Id.*)  The person posting went on to

21   identify where the CEO lives and stated: "I'm going there . . . I'll pay ten grand to whomever

22   beats me to [CEO] . . . [CEO] must die to save the innocents." (*Id.*)  On July 29, 2015,

23   StemExpress sought and received a TRO in Los Angeles County Superior Court enjoining

24   Defendants from releasing video tapes of meetings with StemExpress.  (Foran Decl. ¶ 27, Ex. 23.)

25       Defendants' brutally dishonest and illegal campaign to smear abortion providers has only

26   just begun.  Daleiden has promised "a lot more to come."  (*Id.*, Ex. 24.)  A cynical manipulator of

27   the news cycle, his stated goal is to release one selectively edited video per week.  (*Id.*, Ex. 17.)

28   Daleiden has boasted that he and his cohorts at CMP "probably have hundreds to even thousands

of hours total of videotape over the past two-and-a-half years," which would "continue to be released in the days and months to come." (Foran Decl. ¶ 29, Ex. 25 at p. 7.) Two more videos were released this week, one on July 28 and another just yesterday, on July 30. (*Id.* ¶¶ 30-31, Exs. 26, 27.) The third video Defendants released includes video of a national conference. (*Id.*, Ex. 26.)

When confronted by the *New York Times* about the fraud and illegal conduct that he and CMP orchestrated against Planned Parenthood, NAF, and others, he dismissed those concerns, saying "only Planned Parenthood or its supporters would object." (*Id.*, Ex. 17.) On Monday, July 20, 2015, CMP issued a press release stating that "The Center for Medical Progress follows all applicable laws in the course of" what it describes as "investigative journalism." (*Id.* ¶ 32, Ex. 28.) Nothing could be further from the truth.

### E. The Effect of Defendants' Illegal Campaign on NAF and Its Members.

Needless to say, the extraordinary invasion perpetrated by Defendants at NAF's annual meetings – meetings that are supposed to be secure and confidential – has shaken NAF and its members. NAF's security staff has seen an increase in "off hour" requests for security advice from its members, and NAF security personnel have advised members to be on heightened alert and to contact NAF's Security Department with any concerns. (Mellor Decl. ¶ 15.) Even more troubling, Defendants also know about the dates, times, and locations of NAF's next two meetings—information that NAF does not release publicly. (Saporta Decl. ¶ 18.) They learned of this information because NAF sends out save-the-date reminders to participants at prior meetings. (*Id.*) NAF is already in contact with the hotel management and hotel security staff for its next two meetings to alert them NAF's annual meeting dates and locations have been compromised. (*Id.*) NAF has a very legitimate concern that members will not feel safe and secure at these meetings.

But worse still, as a result of Defendants' extraordinarily callous conduct, NAF and its members now fear Defendants will release illegal video or audio tape of the annual meetings they fraudulently infiltrated, which will in turn render the organization and its members subject to the same hate campaign that has been waged against Drs. Nucatola and Gatter, and now Dr. Ginde.

1    Dr. Reeves, who was approached by Daleiden and his cohorts several times, is convinced he was

2    taped. (Reeves Decl. ¶ 16.) Daleiden *specifically referenced Dr. Reeves, by name, in the illegal*

3    *Nucatola tape*. (*Id.* ¶¶ 14-15.) NAF security personnel have conducted a site visit to his home,

4    and Dr. Reeves has been forced to hire a professional security firm to install a system at his home,

5    to protect himself and his family. (*Id.* ¶ 19.) If the Defendants are not stopped, he is terribly

6    concerned that he too will be smeared and vilified by Defendants, and that his professional

7    reputation will be trashed, and even he and his family's safety will be placed in jeopardy. (*Id.* ¶¶

8    17-19.)

9         Another example is Professor Jennifer Dunn, a member of UC Hastings faculty and

10   Lecturer in Law. (Dunn Decl. ¶ 2.) She is a member of NAF, and a faculty panel member on

11   Fetal Disposal Choices and Restrictions at NAF's 2014 Annual Meeting in San Francisco, *a*

12   *panel discussion that Defendants' attended, and which is specifically referenced in the*

13   *videotaped conversation with Dr. Nucatola*. (*Id.* ¶¶ 8-9.) Professor Dunn understandably

14   believes Defendants carried on their illegal videotaping scheme during the 2014 annual meeting,

15   and she is now concerned that Defendants will do the same thing that they did to Drs. Nucatola

16   and Gatter and now Dr. Ginde –release a videotape of her discussion that will portray her and

17   NAF in a false light, exposing her to the same character assassination, vitriol, and bile that have

18   been leveled at Defendants' victims thus far. (*Id.* ¶ 10.)

19        To prevent terrible harm to its members' reputation and safety, NAF sent a letter to

20   Defendants, on July 30, 2015, in which NAF demanded that Defendants provide an accounting of

21   any information in their possession – including any video or audio tapes that they obtained at

22   NAF's annual meetings as a result of their fraud and in violation of the Exhibitor Agreements and

23   NDAs. (Foran Decl. ¶ 2, Ex. 1.) As of the finalization of these papers, Defendants have ignored

24   that demand and otherwise failed to respond. (*Id.* ¶ 4.) NAF now seeks emergency relief from

25   the Court.

26   **III.    ARGUMENT**

27        As the Court is aware, "the standard for issuing a temporary restraining order is identical

28   to the standard for issuing a preliminary injunction." *Johnson v. Bank of Am., N.A.*, No.15-CV-

1   03181-LHK, 2015 U.S. Dist. LEXIS 90765, at *6 (N.D. Cal. July 10, 2015). "A plaintiff seeking

2   a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely

3   to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

4   his favor, and that an injunction is in the public interest." *Winter v. NRDC Inc.*, 555 U.S. 7, 20

5   (2008). NAF more than meets that standard here.

6         **A.        There Is a High Degree of Likelihood that NAF Will Succeed on the Merits.**

7              NAF is very likely to succeed on the merits of its claims against Defendants. In fact, this

8   is an understatement, because the fraud, breaches, and invasions that lie at the heart of NAF's

9   claims are largely admitted. Daleiden has given press interviews where he has openly boasted

10  about setting up a fake company (Biomax) and having "spent three years with actors" who

11  "pos[ed] as representatives of a middleman biotech company" to perpetrate his fraud. When

12  confronted by the *New York Times* about the fraud and illegal conduct that he and CMP

13  orchestrated against Planned Parenthood, NAF, and others, Daleiden dismissed those concerns,

14  saying "only Planned Parenthood or its supporters would object." Defendants outrageous

15  conspiratorial conduct gives rise to a host of federal and state legal claims against them, but for

16  present purposes, NAF need only show that it will succeed on any of three claims: breach of

17  contract, violation of Penal Code § 632, and violation of common law privacy.

18             <u>**First**</u>, Defendants have already breached their contracts. To establish breach of contract,

19  NAF must prove "(1) the contract, (2) [NAF's] performance or excuse for nonperformance, (3)

20  [Defendants'] breach, and (4) the resulting damages to [NAF]." *Reichert v. Gen. Ins. Co.*, 68 Cal.

21  2d 822, 830 (1968). Here, Biomax entered into Exhibitor Agreements with NAF which required

22  Biomax to "truthfully and accurately" represent its business at NAF's meetings, and which

23  required Biomax to keep all information learned at the meetings in confidence. Daleiden and his

24  cohorts at Biomax also signed NDAs in which they promised (1) not to videotape, (2) to only use

25  information learned at the meeting "to help enhance the quality and safety of services provided by

26  NAF members and other participants"; (3) to not disclose any information learned at the meetings

27  to third parties. Defendants have clearly already breached these agreements. Obviously, Biomax

28  misrepresented itself and its true purpose in attending the annual meeting. Moreover, there are

1    multiple express references to NAF's annual meeting in the first video released, including

2    passages where in Daleiden describes meetings and panel discussions he attended, and

3    conversations he had with Dr. Matthew Reeves, NAF's Medical Director.  Defendants have

4    *already disclosed* information that they promised to keep confidential.

5           That Biomax was a sham and that the agreements were entered into fraudulently, is of no

6    moment.   While the fraudulent contracts are voidable at NAF's election, the law is clear that

7    NAF also has the right to enforce them against the individuals behind the fraud.  *See also Rowe v.*

8    *Exline*, 153 Cal. App. 4th 1276, 1284 (2007) (trial court erred in refusing to enforce arbitration

9    clause against nonsignatory corporate directors where signatory company "was not intended to

10   have any true corporate existence"); *Still v. Norfolk & W. Ry. Co.*, 368 U.S. 35, 38-39 (1961)

11   (noting that use of a fictitious name would render an employment contract voidable rather than

12   void); Restatement 2d, Contracts § 7, comment b (1981) ("[t]ypical examples of voidable

13   contracts include those in which … the contract was induced by fraud").  On top of that, Biomax

14   was the alter ego of CMP and Daleiden – a fact Daleiden openly boasts about in press releases,

15   and the contracts may therefore be enforced against them on that basis too.  *Monaco v. Liberty*

16   *Life Assur. Co.*, No. C06-07021 MJJ, 2007 U.S. Dist. LEXIS 31298, *12 (N.D. Cal. Apr. 17,

17   2007) (denying motion to dismiss contract claim against nonsignatories based on alter ego and

18   agency theories).

19          And critically, Defendants in their fraudulently-executed Exhibitor Agreements *have*

20   *already agreed that money damages would not be a sufficient remedy for their breaches, and*

21   *that NAF would be "entitled to specific performance and injunctive relief as remedies for any*

22   *such breach*."[1]  It is almost certainly the case that Defendants also breached their agreements by

23

24          [1] Any potential argument based on the First Amendment is a nonstarter for Defendants.
     ***First***, they voluntarily and explicitly committed to be subject to an injunction to enforce a breach
25   of their contractual confidentiality obligations.  *See Boddie v. Connecticut*, 401 U.S. 371, 379
     (1971) (constitutional rights are subject to waiver); *Perricone v. Perricone*, 292 Conn. 187 (2009)
26   ("private parties who voluntarily enter into an agreement to restrict their own speech thereby
     waive their first amendment rights"); *ITT Telecom Prods. Corp. v. Dooley*, 214 Cal. App. 3d 307,
27   319 (1989) (First Amendment rights may be waived by contract); *Brooks v. Vallejo City Unified*
     *Sch. Dist.*, 2009 U.S. Dist. LEXIS 101262, *13 (E.D. Cal. Oct. 29, 2009) (individual claimants
28   "were entitled to bargain away their free speech rights by agreeing to confidentiality provisions"
     in a settlement agreement with defendant).  ***Second***, enforcement of private confidentiality

1  unlawfully videotaping or recording NAF's annual meetings. "Biomax" and Daleiden were not

2  there for any proper purpose. Daleiden and CMP have proclaimed that they have hundreds if not

3  thousands of hours of secretly procured videotape, and that there is "more to come." Daleiden

4  expressly referenced NAF's annual meetings in tapes already released. He has outed his

5  conversations with NAF's Medical Director, Dr. Matthew Reeves, in the tapes released thus far,

6  and he has identified NAF attendees *by name*, in those same tapes. And the third and fourth tapes

7  released this week include edited clips from a Planned Parenthood conference, similar to NAF's

8  annual meetings. NAF has demanded that Defendants account for their conduct and to turn over

9  any surreptitious records. As of the finalization of these papers, Defendants have not responded

10  to that request. The facts, very simply, speak for themselves.

11  **Second**, largely for the same reasons outline above, NAF and its members are also likely

12  to succeed on the merits of their claim for violation of California's Invasion of Privacy Act. *See*

13  Cal. Pen. Code § 632. The Act criminalizes the recording of a "confidential communication"

14  without the consent of all parties to the communication. Cal. Pen. Code § 632(a). Courts must

15  "liberally construe" the Act to effectuate California's important interest in protecting individual

16  privacy rights. *Kight v. CashCall, Inc.*, 231 Cal. App. 4th 112, 130 (2014). The Act authorizes

17  any person injured by a violation of Section 632 to bring "an action to *enjoin and restrain* any

18  violation." Cal. Pen. Code§ 637.2(b) (emphasis added). A "confidential communication" is one

19  in which "a party to that conversation has an objectively reasonable expectation that the

20  conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 768

21  (2002).

22  NAF and its members had an objectively reasonable expectation that conversations and

23  discussions at NAF annual meetings would not be surreptitiously recorded. The meetings are

24

25  agreements does not involve "state action" giving rise to First Amendment concerns because the
state is not imposing obligations on the parties beyond those they voluntarily assumed. *See*
26  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) (holding that a promissory estoppel claim
gave rise to "state action" because "if [plaintiff] could recover at all, it would be on the theory of
27  promissory estoppel, a state law doctrine which, *in the absence of a contract*, creates obligations
never explicitly assumed by the parties") (emphasis added).
28

1  subject to intense security, and every one gaining access must sign an NDA promising not to

2  video or audiotape and to hold information learned in confidence.  These measures are necessary

3  *precisely* to defend against the type of outrageous invasion mounted by Defendants in this case.

4  The whole point of the NAF annual meeting is to create a safe and secure environment for its

5  members, so that they may network and learn without fear of vilification or harassment.

6  **Third**, NAF and its members will also succeed on its common law tort claims for

7  invasion of privacy (intrusion), which it pleads on behalf of its members.  A common law

8  intrusion tort "has two elements: (1) intrusion into a private place, conversation or matter, (2) in a

9  manner highly offensive to a reasonable person."  *Sanders v. Am. Broadcasting Co., Inc.*, 20 Cal.

10  4th 907, 914 (1999); *see als*o *Mitchell v. Balt. Sun Co.*, 164 Md. App. 497, 522 (2005) (same

11  under Maryland law).

12  Here, Defendants clearly and obviously intruded into a private place that they had no right

13  to enter.  They gained access to NAF's annual meetings by false pretenses, and have since

14  published videos documenting, among other things, their fraudulent attendance at NAF's annual

15  meetings, including specific conversations at these meetings with NAF's Medical Director,

16  Dr. Reeves.  And as explained above, given the heightened security and the confidentiality

17  agreements in place with attendees, NAF and its members unquestionably had a reasonable

18  expectation of privacy in their attendance and discussions at the meetings.  *See Sanders*, 20 Cal.

19  4th at 914 ("[A] person who lacks a reasonable expectation of complete privacy in a conversation,

20  because it could be seen and overheard by coworkers (but not the general public), may

21  nevertheless have a claim for invasion of privacy by intrusion based on a television reporter's

22  covert videotaping of that conversation.").

23  Nor is there any question that Defendants' conduct was "highly offensive."

24  "[D]etermining offensiveness requires consideration of all the circumstances of the intrusion,

25  including its degree and setting and the intruder's 'motives and objectives.'"  *Shulman v. Grp. W*

26  *Productions, Inc.*, 18 Cal. 4th 200, 236 (1998).  Defendants broke multiple state and federal laws

27  in infiltrating NAF, setting up sham companies and using fake names and fake government

28  identification cards.  NAF's Medical Director Dr. Reeves now fears for himself and his family.

And Professor Jennifer Dunn – who was a member of a panel discussion Daleiden attended and that is expressly mentioned in the first tape Defendants released – is concerned that her reputation will be trashed by Daleiden and CMP. There is no question here that Defendants' intrusion into a national meeting of 700-850 professionals – some of whom fear for their safety and are forced to wear bullet-proof vests to work – was an outrageous intrusion.

Because Defendants' improper conduct is largely admitted, NAF and its members will prevail on their legal claims against them.

### B. NAF Will Suffer Irreparable Harm Without Immediate Temporary and Preliminary Injunctive Relief.

NAF and its members will suffer irreparable harm if the Court does not grant this request.

The Court need look no further than the extraordinary hate campaign directed to Defendants' victims thus far. Dr. Deborah Nucatola and Dr. Mary Gatter have been smeared. They have been called "evil," "vile," "inhuman," "baby butchers," and "a vicious demonic force" who deserves "no mercy" and "the hangman's noose." And death threats have been leveled against them. One poster stated: "I'll pay ten large to whomever kills Dr. Deborah Nucatola. Anyone go for it." (Saporta Decl. ¶ 19.) And the CEO of StemExpress, a lawful tissue procurement company, has been labeled "a death-profiteer" who "should be hung by the neck using piano wire and propped up on the lawn in front of the building with a note attached . . . ." The person posting went on to identify where the CEO lives and stated: "I'm going there . . . I'll pay ten grand to whomever beats me to [CEO] . . . [CEO] must die to save the innocents." (*Id.*)

NAF, its employees, and its members fear the same vitriolic campaign will be waged against them if Defendants were to release tapes of conversations that took place at NAF's annual meetings. Release of a video of Dr. Reeves, for example, would constitute a gross invasion of his privacy, smear his reputation, and even endanger his safety and the safety of his family. (*See* Reeves Decl. ¶¶ 19-21.) Since Defendants went public with their campaign, Dr. Reeves has been forced to hire a professional security firm to install a system at his home. And Professor Dunn is concerned that she too will be smeared and her professional reputation tarnished if Defendants were to release a tape of her from the 2014 NAF annual meeting. The pace with which

1   Defendants are releasing tapes is increasing. They released two more this week and a fifth is

2   expected **next Tuesday, if not sooner**. The situation is urgent.

3       Injunctive relief is designed precisely to prevent "intangible injuries" such as physical

4   harm pain, suffering, death, and injury to reputation. *Arizona Dream Act Coal. v. Brewer*, 757

5   F.3d 1053, 1068 (9th Cir. 2014) (because they lack adequate remedies, "intangible injuries"

6   constitute irreparable harm); *Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 766

7   (9th Cir. 2004) (physical harm including pain, suffering and death constitute irreparable injury for

8   purposes of injunctive relief); *Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747

9   F.2d 511, 520 (9th Cir. 1984) (harm to reputation is irreparable injury). The Los Angeles County

10  Superior Court has already entered a TRO enjoining Defendants from releasing any secretly

11  recorded videotapes of meetings they had with StemExpress, a lawful tissue procurement

12  organization. NAF respectfully asks this Court to do the same thing here, to protect the integrity

13  and confidentiality of its annual meetings, and those who attend them.

14      **C.      The Balance of Hardships Tips Heavily in NAF's Favor.**

15      "It is an accepted equitable principle that a court does not balance the equities in a case

16  where the defendant's conduct has been willful." *United States EPA v. Environmental Waste*

17  *Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) (affirming grant of injunctive relief) (citing

18  *Guam Scottish Rite Bodies v. Flores*, 486 F.2d 748, 749 (9th Cir. 1973)). The Court therefore

19  need not even reach the balance of hardships issue.

20      In any event, the potential injuries NAF and its employees and members may imminently

21  suffer at the hands of Defendants far outweighs any harm a preliminary injunction might cause

22  Defendants. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). As explained

23  above, those injuries include grave reputational harm – reputational harm Defendants have

24  already visited upon their initial victims – and even bodily injury. Moreover, NAF seeks to

25  enjoin the release of tapes and other information taken in violation of law and the agreements

26  Defendants signed or are otherwise responsible for. Defendants would therefore "suffer no

27  cognizable hardship" because they are "merely being prevented from engaging in unlawful

28  activity." *DISH Network L.L.C. v. Rios*, No. 2:14-cv-2549-WBS-KJN, 2015 U.S. Dist. LEXIS

18285, *17 (E.D. Cal. Feb. 13, 2015) (granting injunctive relief).

Further, Defendants cannot claim an overriding interest in publicizing material that they obtained through fraud, deceit, breach of contract, and privacy violations for multiple reasons. ***First***, Defendants committed fraudulent and illegal acts to make the recordings, and they have no right to distribute content that was "acquired by improper means."  *See, e.g.*, *DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 887 (2003) (approving injunction enjoining defendant from distributing content that was "acquired by improper means"); *see also Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office."); *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 242 (1998) ("[N]o constitutional precedent or principle . . . gives a reporter general license to intrude in an objectively offensive manner into private places, conversations or matters merely because the reporter thinks he or she may thereby find something that will warrant publication or broadcast.").  ***Second***, Defendants have no legitimate interest in engaging in conduct that results in direct, foreseeable, and imminent threats to the safety and security of NAF's members – like the death threats and harassment that would directly result from the conduct Plaintiffs seeks to enjoin.  *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1085-86 (9th Cir. 2002) (en banc) (conduct is "without First Amendment protection" where it targets specific abortion providers, foreseeably elicits the need for "extraordinary security measures," and makes it so providers "can no longer participate in the debate").  ***Third***, as noted above, Defendants voluntarily waived any interest they could possibly claim in disseminating this private and confidential material when they voluntarily agreed to restrict their own speech in the parties' confidentiality agreements.

### D.      The Public Interest Favors Injunctive Relief.

"[T]he public interest is a factor which courts must consider in any injunctive action in which the public interest is affected."  *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983).

Here, the challenged conduct poses significant reputational harm and potential safety risks to NAF employees and members which, in turn, would adversely affect the general public.  Both

state and federal law recognize a robust public policy in favor of protecting abortion providers from harassment, invasion of privacy, and threats to their safety.  For example, the Freedom of Access to Clinic Entrances Act of 1994 (FACE) prohibits using or threatening to use force to interfere with the provision of reproductive health services, and was adopted as a means to address "the systematic and nationwide assault that is being waged against health care providers and patients."  *See*, *e.g.*, Sen. Rep. No. 117, 103d Cong., 1st Sess., pp. 7, 14 (1993); 18 U.S.C. § 248; *see also* Cal. Civ. Code § 3427.3 (directing courts to "take all steps reasonably necessary to safeguard the individual privacy and prevent harassment of a . . . licensed health practitioner, or employee . . . of a health care facility" in cases involving access restrictions to abortion clinics).

The death threats against Dr. Nucatola are but the latest attack in Defendants systematic and nationwide assault on abortion providers.  The broader public interest can be served by preventing Defendants from harassing, intimidating, and inciting violence against NAF, its employees, and its members by enjoining the publication of video and audio recordings taken at NAF's annual meetings in violation of contract and privacy rights, and ordering other relief as necessary to safeguard NAF members from public ridicule, humiliation, and death-threats.

Further, NAF's proposed injunctive relief favors the "legitimate and compelling" public interest in enforcing privacy laws and maintaining "a business climate free of fraud and deceptive practices."  *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036, 1064 (1999); *see also Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 992 ("[F]raudulent conduct cannot be considered a 'socially useful business practice[]'" (alteration in original)). Daleiden has admitted to Defendants' fraud in a televised interview.  He makes no secret about Defendants' intent to release hundreds of hours of unlawfully recorded video content about the work of NAF and others, in express violation of their prior agreement with NAF.  To permit this behavior to continue, unchecked, would be contrary to the public interest.

### E.     NAF Should Not Be Required to Post a Bond.

Last, whether to impose a bond rests in the Court's sound discretion, and none should be required in this instance.  Courts in the Ninth Circuit have imposed only a nominal bond, or

1  dispensed with the requirement altogether, where, as here, there is little or no likelihood of harm

2  to the party enjoined.  *See, e.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)

3  (recognizing that Rule 65(c) "invest[s] the district court with discretion as to the amount of

4  security required, if any"); Civil L.R. 65-1(a) (a bond is required only "[u]pon demand of any

5  party, where authorized by law and for good cause shown).  Likewise, courts have declined to

6  require a security where the litigation serves a public interest.  *Barahona-Gomez*, 167 F.3d at

7  1237.  NAF's proposed injunction would only prevent Defendants from disseminating

8  unauthorized recordings or information unlawfully obtained at NAF's meetings.  Defendants

9  cannot show that any harm would result from enjoining their unlawful activity.  Accordingly, no

10  bond should be imposed on NAF.

11  **IV.      CONCLUSION**

12      For the foregoing reasons, NAF's motion for an ex parte temporary restraining order

13  should be granted, and an order to show cause why a preliminary injunction should not issue

14  should be set for hearing on an expedited schedule, but no later than the expiration of the

15  temporary restraining order.  A preliminary injunction should then issue to protect NAF from

16  irreparable harm through a trial on the merits.

17

18  Dated: July 31, 2015                    DEREK F. FORAN
                                            MORRISON & FOERSTER LLP
19

20

21                                   By:   */s/ Derek F. Foran*
                                            DEREK F. FORAN
22
                                            Attorneys for Plaintiff
23                                          NATIONAL ABORTION FEDERATION
                                            (NAF)
24

25

26

27

28