Brian R. Chavez-Ochoa (CA Bar 190289)
CHAVEZ-OCHOA LAW OFFICES, INC.
4 Jean Street, Suite 4
Valley Springs, CA 95252
Tel: (209) 772-3013; Fax: (209) 772-3090
brianr@chavezochoalaw.com

Jay Alan Sekulow (DC Bar 496335)
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 546-8890; Fax: (202) 546-9309
sekulow@aclj.org

(Other counsel listed on signature page)

*Attorneys for Defendants, The Center For Medical
Progress, Biomax Procurement Services, LLC,
David Daleiden, and Troy Newman*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ABORTION FEDERATION (NAF)<br><br>                              Plaintiff,<br><br>     v.<br><br>THE CENTER FOR MEDICAL PROGRESS, BIOMAX PROCUREMENT SERVICES LLC, DAVID DALEIDEN, and TROY NEWMAN,<br><br>                              Defendants. | Case No. 3:15-cv-3522<br><br>Judge William H. Orrick, III<br><br>DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE RE: PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER<br><br>Hearing: August 3, 2015 at 4:00 p.m. |

### Defendants' Evidentiary Objections

In support of its Motion for Temporary Injunction and Preliminary Injunction ("Motion for TRO") (Doc. 3), filed on July 31, 2015, Plaintiff has submitted numerous exhibits, together with the Declarations of Dr. Jennifer Dunn, Vicki Saporta, Dr. Matthew Reeves, and Mark Mellor, the majority of which are entirely irrelevant to the limited issues before this Court. Pursuant to Local Rule 7-3(a), Defendants submit the following evidentiary objections regarding the evidence and testimony submitted by Plaintiff, NAF, for purposes of the motion, reserving the right to raise objections to future uses of such evidence, including with respect to any future briefing relating to the preliminary injunction aspect of the motion:

| Doc. | Document | Objection(s) |
|------|----------|--------------|
| 3-4 | Exhibit 2 | Irrelevant (FRE 401, 402) |
| 3-5 | Exhibit 3 | Irrelevant (FRE 401, 402) |
| 3-6 | Exhibit 4 | Irrelevant (FRE 401, 402) |
| 3-21 | Exhibit 19 | Irrelevant (FRE 401, 402) |
| 3-22 | Exhibit 20 | Irrelevant (FRE 401, 402) |
| 3-25 | Exhibit 23 | Irrelevant (FRE 401, 402) |

| Doc. No. | Document | Paragraph/(Line(s)) | Objection(s) |
|----------|----------|---------------------|--------------|
| 3-31 | Declaration of Dr. Dunn | 5 (lines 3-5) | Speculative (FRE 403); Improper opinion (FRE 701); Lacks personal knowledge (FRE 602) |
| | | 9 (lines 5-10) | Misstates evidence (FRE 403); Cumulative (FRE 403) |
| 3-32 | Declaration of Dr. Reeves | 11, 18, 20 | Irrelevant (FRE 401, 402) |
| | | 12 | Improper opinion (FRE 701); Irrelevant (FRE 401, 402) |
| | | 14-15 | Cumulative (FRE 403) |
| | | 16 | Speculative (FRE 403) |
| | | 18 (lines 24-26) | Irrelevant (FRE 401, 402) |
| | | 19 (lines 2-4) | Improper opinion (FRE 701); Speculative (FRE 403) |
| | | 20 | Irrelevant (FRE 401, 402); Argumentative |

i

| | | | (FRE 403); Speculative (FRE 403) |
|---|---|---|---|
| | | 21 | Speculative (FRE 403); Argumentative (FRE 403); Improper opinion (FRE 701) |
| | | 22 | Irrelevant (FRE 401, 402); Argumentative (FRE 403); Improper opinion (701). |
| 3-33 | Declaration of Mark Mellor | 1-15 | Irrelevant (FRE 401, 402) |
| 3-34 | Declaration of Vicki Saporta | 5-9 | Irrelevant (FRE 401, 402) |
| | | 10 (lines 8-17) | Irrelevant (FRE 401, 402) |
| | | 12-13 | Irrelevant (FRE 401, 402) |
| | | 14-16 | Irrelevant (FRE 401, 402) |
| | | 19 | Irrelevant (FRE 401, 402) |

ii

# Table of Contents

Introduction...................................................................................................1

Defendants' Statement of Relevant Facts ..........................................................2

    I.     The released videos contain substantial evidence suggesting that

          the doctors shown, and other individuals and entities, have

          engaged in multiple violations of federal and state laws. .................................2

        A.     Relevant criminal statutes .............................................................2

        B.     Video of Deborah Nucatola .........................................................3

        C.     Video of Dr. Mary Gatter............................................................5

    II.    The various comments of Doctors Nucatola and Gatter indicating

          likely illegal conduct by them and others have sparked numerous

          investigations, a fact that NAF has conveniently ignored ...............................8

Statement of the Issues.................................................................................12

Argument ...................................................................................................12

    I.     Plaintiff lacks organizational standing in this case ........................................12

    II.    Plaintiff has not met the standards for a temporary restraining order..............14

        A.     The bar to receive a temporary restraining order is high ...........................14

        B.     There has been no showing whatsoever of irreparable harm.

           The injuries alleged are non-existent, not legally cognizable, and/or

           of Doctor Nucatola and Gatter's own making, and they also have

           nothing to do with NAF itself or any NAF meetings or agreement...........14

        C.     Plaintiff is not likely to succeed on the merits ...........................................15

            1.   NAF cannot overcome the First Amendment's heavy presumption

                against the validity of prior restraints. ...........................................15

            2.   Granting Plaintiff's motion would violate the important

                Constitutional principles of separation of powers

                and federalism. .............................................................................18

3.  Plaintiff is unlikely to prevail on the three claims it
    relies upon. ......................................................................19

    a.  Breach of contract ............................................19

        i.   Plaintiff has failed to demonstrate a breach
             of the NDA ........................................20

        ii.  Plaintiff has failed to prove damages resulting
             from the alleged breach.....................................21

    b.  Invasion of Privacy (Cal. Penal Code § 632)....................22

    c.  Invasion of Privacy (Intrusion Into a Private Place)..........23

D.  The public interest, and the balance of the equities,
    strongly favor denial of Plaintiff's motion................................24

Conclusion ................................................................................25

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

**Table of Authorities**

<u>**Cases**</u>

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .................................................16

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010)...............................16

*Allen v. Gardner*, 126 Cal App. 2d 335 (1954). ...........................................22

*Anhing Corp. v. Thuan Phong Co. Ltd.*, 2015 U.S. Dist. LEXIS 97019

    (C.D. Cal. July 24, 2015)................................................25

*Billiot v. Beavers*, 2015 U.S. Dist. LEXIS 90532 (E.D. La. June 17, 2015) ............... 24-25

*Blankenship v. Blackwell*, 341 F. Supp. 2d 911 (S.D. Ohio 2004) ...................................25

*Branzburg v. Hayes*, 408 U.S. 665 (1972)........................................................24

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).......................................................15

*Burstyn v. Wilson*, 343 U.S. 495 (1952) ........................................................16

*Citizens United Against Corrupt Government v. Johnson*,

    2015 U.S. Dist. LEXIS 728 (E.D. Mich. Jan. 6, 2015)...........................................25

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) .................................................24

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,

    F.3d 1269 (10th Cir. 2005) ............................................................... 21-22

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975)........................ 18-19

*Faulkner v. ADT Sec. Servs., Inc.* 706 F.3d 1017 (9th Cir. 2013) ....................................23

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .................................14, 17

*Hunt v. NBC*, 872 F.2d 289, 293 (9th Cir. 1989) .................................................16

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...................................12

*Julian Petroleum Corp. v. Courtney Petroleum Co.*, 22 F.2d 360

    (9th Cir. 1927).........................................................................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). .........................................12

*Med. Lab. Mgt. Consultants v. ABC*, 306 F.3d 806 (9th Cir. 2002) ..........................13, 23

*Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247 (E.D.N.Y. 2012)................. 17-18

*Nat'l Coalition of Latino Clergy, Inc. v. Henry*, 2007 U.S. Dist. LEXIS 91487

(N.D. Okla. Dec. 12, 2007)..........................................................................25

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976).......................................... 15-16

*Nicholson v. McClatchy Newspapers,* 177 Cal. App. 3d 509 (1986) ...............................24

*Northbay Wellness Group, Inc. v. Beyries*, 2015 U.S. App. LEXIS 9397

    (9th Cir. June 5, 2015) ..........................................................................25

*N.Y. Times v. Sullivan*, 373 U.S. 254 (1964) ...............................................16

*Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506 (1967) ...21

*People v. Pedersen*, 86 Cal. App. 3d 987 (1978)..............................................23

*Saad v. Am. Diabetes Ass'n*, 2015 U.S. Dist. LEXIS 21150 (D. Mass. Feb. 23, 2015) ....15

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002).........................24

*Sanders v. ABC, Inc.*, 20 Cal. 4th 907, 914 (1999)...........................................23

*SEC v. Small Bus.s Capital Corp.*, 2013 U.S. Dist. LEXIS 18239

    (N.D. Cal. Feb. 11,2013)..........................................................................16

*Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200 (1998) ......................................24

*United States v. Nixon*, 418 U.S. 683 (1974) ...............................................19

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State*,

    454 U.S. 464 (1982)..........................................................................13

*Wall Street Network, Ltd. v. N.Y. Times, Co.*, 164 Cal. App. 4th 1171 (2008)..................19

*Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7 (2008) ...........................................14

*Wilkins v. NBC*, 71 Cal. App. 4th 1066 (1999).......................................... 23-24

## **Statutes**

Cal. Penal Code § 632..........................................................................19, 22, 23

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

## Introduction

It is a federal crime to knowingly transfer tissue or cells obtained from an aborted fetus where any money in excess of "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage" is involved and the transfer affects interstate commerce, 42 U.S.C. § 289g-2, or to knowingly perform a partial-birth abortion, 18 U.S.C. § 1531. The impetus for this lawsuit is the release of two lawfully-obtained videos in which Drs. Deborah Nucatola and Mary Gatter—employed by Planned Parenthood affiliates, not Plaintiff National Abortion Federation (NAF)—expressly state, among other things: 1) a desire to "figure out what others are getting" for fetal organs because "I want a Lamborghini"; 2) if Planned Parenthood affiliates involved with the sale of fetal tissue "can do a little better than break even, and do so in a way that seems reasonable, they're happy to do that"; 3) better messaging concerning fetal tissue transfers would "drive demand" and be "a win-win"; and 4) in an effort to keep fetal organs intact so that they can be transferred, some doctors modify their abortion techniques in ways that may constitute a partial-birth abortion.[1]

The result has been justifiable widespread moral outrage and an array of federal and state investigations into the scope of the apparent illegal activities described in the videos. NAF's motion omits *all of these critical facts*; instead, it describes the doctors at issue as "victims" and attempts to string together a loose connection between the release of the videos and unrelated events at NAF meetings. The motion should be denied because: there is no legally cognizable harm to NAF, let alone irreparable harm justifying an injunction; NAF lacks organizational standing; the kind of prior restraint sought by NAF is highly disfavored under the First Amendment; separation of powers and federalism principles counsel against interference with the ongoing investigations into the apparent criminal activities shown in the videos; no breach of contract or violation of privacy relevant to the underlying facts occurred; and the public interest and the balance of the equities counsel in favor of denying NAF's motion.[2]

---

[1] The full-length videos are available online: https://www.youtube.com/ watch?v=H4UjIM9B9KQ; https://www.youtube.com/ watch?v=vwAGsjoorvk.

[2] It is Defendants' understanding that the August 3 hearing concerns *only* whether the Court will extend the TRO issued on the day this lawsuit was filed (three days ago), and that Defendants

**Defendants' Statement of Relevant Facts**

NAF's motion entirely ignores the most pertinent facts. Instead, it invokes an irrelevant (for purposes of this case) history of various acts of harassment, violence, or unkind words directed toward abortion providers at various times and places by miscellaneous people, which is a red herring intended to mask the weakness of NAF's case on all four factors of the test for motions seeking a temporary restraining order. As such, Defendants set forth a discussion of relevant facts that illustrates why NAF's motion should be denied.

**I.     The released videos contain substantial evidence suggesting that the doctors shown, and other individuals and entities, have engaged in multiple violations of federal and state laws.**

Although Plaintiff asserts that the videos at issue "are purposely edited to make it appear as if the physicians in question are profiting from lawful fetal tissue donation programs and practices," numerous things that Doctors Nucatola and Gatter said strongly indicate that 1) it is very likely that such unlawful profiting *does*, in fact, occur, and 2) in an effort to maximize such profiting, some doctors modify their abortion procedures in ways that likely violate the federal Partial Birth Abortion Ban Act. In light of these facts, Nucatola and Gatter's *own statements* have prompted numerous legislative and executive investigations, at the federal and state levels, into the legality of the behavior that they admitted that they, and their associates, engage in.

**A.     Relevant criminal statutes**

42 U.S.C. § 289g-2(a) states that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any fetal tissue for valuable consideration if the transfer affects interstate commerce."[3] The definition of "human fetal tissue" for purposes of this prohibition is "tissue or cells obtained from a dead human embryo or fetus after a spontaneous or induced abortion, or after a stillbirth," 42 U.S.C. § 289g-1(g), and "[t]he term 'valuable

---

will have an opportunity to contest NAF's request for a preliminary injunction in a future brief and hearing.

[3] This statue also makes it unlawful to "solicit or knowingly acquire, receive, or accept a donation of human fetal tissue knowing that a human pregnancy was deliberately initiated to provide such tissue" and also makes it unlawful, in most circumstances, "to solicit or knowingly acquire, receive, or accept a donation of human fetal tissue for the purpose of transplantation of such tissue into another person."

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

consideration' does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue." 42 U.S.C. § 289g-2(e)(3). Violations of this prohibition may result in imprisonment of up to ten years and/or a fine. 42 U.S.C. § 289g-2(d). Various state laws impose similar prohibitions.

In addition, the Partial-Birth Abortion Ban Act, 18 U.S.C. § 1531, states, in relevant part:

(a) Any physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both. . . .

(b) As used in this section--

(1) the term "partial-birth abortion" means an abortion in which the person performing the abortion--

(A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and

(B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus. . . .

After conducting extensive hearings, Congress issued a series of findings concerning partial-birth abortions, including findings that

[t]he gruesome and inhumane nature of the partial-birth abortion procedure and its disturbing similarity to the killing of a newborn infant promotes a complete disregard for infant human life that can only be countered by a prohibition of the procedure. . . .

Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life. Thus, Congress has a compelling interest in acting--indeed it must act--to prohibit this inhumane procedure.

Pub. L. 108-105, § 2, 117 Stat. 1201.

## B.     Video of Dr. Deborah Nucatola

NAF's claim that Defendants "selectively edited" the Nucatola video to make it appear as though Nucatola was selling fetal tissue is incorrect. Defendants have posted *the entire video*

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

(cited previously) and a transcript of it online.[4] In any event, Nucatola's seemingly incriminating comments *speak for themselves* and, as discussed later, were the impetus for numerous ongoing investigations. The existence of other comments she made during the video attempting to disclaim any wrongdoing do not, by any means, negate the weight of the incriminating comments. Here are direct quotes from the video (recorded at a restaurant), the vast majority of which are nowhere to be found in Plaintiff's papers:

> *Nucatola*: I think every provider has had patients who want to donate their tissue, and they absolutely want to accommodate them. They just want to do it in a way that *is not perceived as*, "This clinic is selling tissue, this clinic is making money off of this." I know in the Planned Parenthood world they're very very sensitive to that. And before an affiliate is gonna do that . . . they want to come to a number *that doesn't look like* they're making money. They want to come to a number *that looks like* it is a reasonable number for the effort that is allotted on their part. . . .

> I think for affiliates, at the end of the day, they're a non-profit, they just don't want to— they want to break even. And *if they can do a little better than break even, and do so in a way that seems reasonable, they're happy to do that*. Really their bottom line is, they want to break even. Every penny they save is a just pennies they give to another patient. To provide a service the patient wouldn't get. . . .

> I'd say a lot of people want liver. And for that reason, most providers will do this case under ultrasound guidance, so they'll know where they're putting their forceps. The kind of rate-limiting step of the procedure is the calvarium, the head is basically the biggest part. Most of the other stuff can come out intact. It's very rare to have a patient that doesn't have enough dilation to evacuate all the other parts intact.

> *Center for Medical Progress*: To bring the body cavity out intact and all that?

> *Nucatola*: Exactly. So then you're just kind of cognizant of where you put your graspers, you try to intentionally go above and below the thorax, so that, you know, we've been very good at getting heart, lung, liver, because we know that, so I'm not gonna crush that part, I'm going to basically crush below, I'm gonna crush above, and I'm gonna see if I can get it all intact. And with the calvarium, in general, some people will actually try to change the presentation so that it's not vertex, because when it's vertex presentation, you never have enough dilation at the beginning of the case, unless you have real, huge

---

[4] Center for Medical Progress, *Transcript of July 25, 2014 video*, http://www. centerformedicalprogress.org/wp-content/uploads/2015/05/PPFAtranscript072514_final.pdf.

amount of dilation to deliver an intact calvarium. So if you do it starting from the breech presentation, there's dilation that happens as the case goes on, and often, the last, you can evacuate an intact calvarium at the end. So I mean there are certainly steps that can be taken to try to ensure—

*Center for Medical Progress*: So they can convert to breach, for example, at the start of the—

*Nucatola*: Exactly, exactly. Under ultrasound guidance, they can just change the presentation. . . .

[A] lot of people want intact hearts these days, they're looking for specific nodes. AV nodes, yesterday I was like wow, I didn't even know, good for them. Yesterday was the first time she said people wanted lungs. And then, like I said, always as many intact livers as possible. . . .

Some people want lower extremities too, which, that's simple. That's easy. I don't know what they're doing with it, I guess if they want muscle. . . .

Even if there were people who weren't donating, you'd have huge business just for taking the tissue. People would pay you. They would just say, "Take my tissue!" . . .

*Center for Medical Progress*: Would there be a way, in the future maybe, if there's a way rather than having to deal with all the different affiliates, is there a way to partner with PPFA directly? To get some kind of pre clearance or something, so that we have-

*Nucatola*: So, we tried to do this, and at the national office we have a Litigation and Law Department that just really doesn't want us to be the middle people for this issue, right now. Because we were actually approached by StemExpress to do the same thing. One of the California affiliates said, "We're working with these people, we love it, we think every affiliate should work with them." And so we had a conversation, and we said, you know, what if we go out and find everyone who is doing this and *present everybody with a menu*, and at the end of the day they just decided that right now, it's just too touchy an issue for us to be an official middleman. . . . But I will tell you that behind closed doors, these conversations are happening with affiliates. . . .

If you maintain enough of a dialogue with the person who's actually doing the procedure, so they understand what the end-game is, *there are little things, changes they can make in their technique to increase your success*. . . .

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

Providers who use digoxin use it for one of two reasons. There's a group of people who use it so they have no risk of violating the Federal Abortion Ban. . . . [T]he Federal Abortion Ban is a law, and laws are up to interpretation. So there are some people who interpret it as intent. So if I say on Day 1 I do not intend to do this, what ultimately happens doesn't matter. Because I didn't intend to do this on Day 1 so I'm complying with the law. . . .

If you guys could come up with a way to message, it makes it easier for everyone at the end of the day. . . . It will make it easier for whoever actually does the consenting. *It'll drive demand, it's a win-win*.[5]

To summarize, Nucatola stated that, although affiliates want to "break even," and "want to come to a number that *looks* like it is a reasonable number for the effort that is allotted on their part," "if they can do *a little better than break even*, and do so in a way that seems reasonable, *they're happy to do that*." She also talked about "present[ing] everybody with a menu" and said that better messaging would "*drive demand*" and be "a win-win" for both sides of the transaction. In addition, Nucatola explained that she and others modify their abortion techniques to try to keep particular organs intact, including by converting a head-first presentation into a breech presentation, and later stated that "if I say on Day 1 I do not intend to do this, what ultimately happens doesn't matter" for purposes of the ban on partial-birth abortion.

### C.    Video of Dr. Mary Gatter

Similarly, the video of a lengthy discussion with Dr. Mary Gatter occurring at a restaurant contains ample indication of likely criminal activities. After detailed discussions about possible prices for fetal organs, the following discussion occurred near the end of the video:

*Gatter*: Outline this in the email you send, because I will forget as soon as I walk out.

*Center for Medical Progress*: And are we agreed that $100 would keep you happy. . . .

*Gatter*: Well let me agree to find out what other affiliates in California are getting, and if they're getting substantially more, then we can discuss it then.

*Center for Medical Progress*: Yes.

---

[5] *Id.* (emphasis added).

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

*Gatter*: I mean, the money is not the important thing, but it has to be big enough that it is worthwhile.

*Center for Medical Progress*: No, no, but it is something to talk about. I mean, it was one of the first things you brought up, right? So.

*Gatter*: Mhm.

*Center for Medical Progress*: Now here's another thought, is we could talk about specimen, per specimen per case, or per procured tissue sample.

*Gatter*: Mhm.

*Center for Medical Progress*: So if we're able to get a liver/thymus pair, maybe that is $75 per specimen, so that's a liver/thymus pair and that's $150.

*Gatter*: Mhm.

*Center for Medical Progress*: Versus if we can get liver, thymus, and a brain hemisphere, and all that, then that's—

*Gatter*: Okay.

*Center for Medical Progress*: So that protects us so that we're not paying for stuff we can't use. And I think it also maybe illustrates things—

*Gatter*: It's been years since I talked about compensation, so let me just figure out what others are getting, if this is in the ballpark, it's fine, if it's still low then we can bump it up. *I want a Lamborghini.* [laughs]

*Center for Medical Progress*: [Laughs] What did you say?

*Gatter*: *I said I want a Lamborghini!* [laughs]

*Center for Medical Progress*: Don't we all, right?

*Gatter*: [laughs] Exactly![6]

---

[6] Center for Medical Progress, *Transcript of February 6, 2015 video*, http://www. centerformedicalprogress.org/wp-content/uploads/2015/05/PPFA020615_transcript.pdf (emphasis added).

7

In sum, Gatter concluded her detailed haggling over the "compensation" to be gained from the sale of various fetal organs by saying that she wanted to "figure out what others are getting" so as to determine a fair market price, and then she joked, "I want a Lamborghini."

**II.    The various comments of Doctors Nucatola and Gatter indicating likely illegal conduct by them and others have sparked numerous investigations, a fact that NAF has conveniently ignored.**

NAF portrays Nucatola and Gatter as innocent "victims" while *entirely ignoring* a critical fact: in light of their many candid statements concerning likely illegal activities, numerous federal and state legislative and executive bodies throughout the country are currently investigating whether unlawful acts of this nature are being conducted within their jurisdictions. Numerous Members of the United States Congress and numerous state governors, attorneys general, and legislators have (quite correctly) concluded that the kind of behavior admitted in the videos is likely illegal under federal and/or state law. This fact weighs heavily against the granting of NAF's motion for reasons discussed herein.

Congressman Bob Goodlatte, Chairman of the House Committee on the Judiciary, and Congressman Trent Franks, Chairman of the House Subcommittee on the Constitution and Civil Justice, sent a letter to United States Attorney General Loretta Lynch noting that, in the first video, Doctor Nucatola described situations in which abortion providers intentionally manipulate the abortion process in order to keep fetal organs, such as the heart, liver, and lungs, intact so that they can be sold, under the theory that it would be difficult for someone to prove that they had an impermissible intent for purposes of the Partial-Birth Abortion Ban Act.[7] Their letter stated,

> [b]oth the references to the process of breech conversion and the interpretation of intent raise serious questions about whether abortionists and particularly abortionists in the Planned Parenthood organization are complying with the Partial-Birth Abortion Ban Act. . . . [W]e urge you to act swiftly to launch an investigation into any potential violations of the Partial-Birth Abortion Ban Act of which your Department has become aware, or does become aware, including potential violations by Planned Parenthood.

Additionally, the House Committee on Energy and Commerce sent a letter to Cecile Richards, President of Planned Parenthood Federation of America, requesting information about

---

[7] http://judiciary.house.gov/_cache/files/6476fb6f-d3ef-4b23-82b2-73e6826f5400/2829-001.pdf.

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

the organization's "practices relating to fetal tissue collection and sale or donation" in light of the Nucatola video.[8] The letter stated that "Dr. Nucatola's statements raise most troubling questions with regard to your organization's practices when performing abortions and whether those practices are consistent with federal law, including those laws restricting partial birth abortions and the sale of human fetal tissue."

Furthermore, 135 Members of the House of Representatives sent a letter to Attorney General Lynch that asked "the Department of Justice to conduct an immediate and thorough investigation into the practices of PPFA regarding the sale of fetal body parts."[9] The letter cited the first two videos and also cited 42 U.S.C. § 289g-2.

Additionally, Senator Charles Grassley, Chairman of the Senate Committee on the Judiciary, sent a letter to counsel for Defendants (submitted herewith) stating, in relevant part:

> In order for the Committee to further its inquiry into the provision and acquisition of fetal tissue, please provide the Committee the following by August 14, 2015, to the extent CMP may lawfully do so:
>
> 1. All video footage in CMP's possession relating to the provision, acquisition, preparation, transportation, and sale of fetal tissue, as well as all footage relating to associated training, advertising, contracts, consent forms, and certifications by PPFA, Planned Parenthood affiliates and associated clinics, intermediary businesses, end-users, as well any other individuals, entities, and organizations involved in these processes.
>
> 2. All documents and records in CMP's possession involving PPFA, Planned Parenthood affiliates and associated clinics, as well as any individuals or entities that acquire, provide, or resell fetal tissue, relating to the range of fetal tissue activities described in item 1.

Moreover, numerous legislative and executive investigations stemming from the likely illegal activities revealed in the videos are currently ongoing at the state level:

- **Arizona**: Governor Doug Ducey "call[ed] on the Department of Health Services to conduct a thorough review of the law and immediately promulgate emergency rules

---

[8] http://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/114/Letters/20150717PPFA.pdf.

[9] Letter from Representative Marsha Blackburn and 134 other Representatives to Attorney General Loretta Lynch, July 27, 2015, available at http://blackburn.house.gov/uploadedfiles/pp_doj_final.pdf.

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

designed to prohibit the illegal sale of any tissue from an unborn child. This is consistent with federal law and will deter action that we all agree is abhorrent."[10]

- **Florida**: Governor Rick Scott announced that he asked the state's Agency for Health Care Administration to immediately begin investigating Planned Parenthood's Florida abortion clinics "to ensure they are in full compliance with the law."[11]

- **Georgia:** Governor Nathan Deal issued a statement declaring, "[i]n light of recent revelations regarding alleged illegal Planned Parenthood activity and to ensure this horrific practice is not occurring here, the governor is directing the Department of Community Health and the Department of Public Health to conduct a joint review of the clinics run by Planned Parenthood Southeast in Georgia."[12]

- **Kansas:** Governor Sam Brownback has asked the Kansas State Board of Healing Arts to investigate the state's Planned Parenthood abortion clinics and to "address the issue of sale of tissue and organs from the unborn" when it conducts clinic inspections.[13]

- **Louisiana:** Governor Bobby Jindal directed the Louisiana Department of Health and Hospitals to launch an investigation into Planned Parenthood clinics in the state in light of the Nucatola video, and also requested the FBI's assistance with the investigation.[14] He issued a statement that declared, "[a] video surfaced showing a Planned Parenthood Federation of America senior director describing how some Planned Parenthood employees are actively engaging in illegal partial birth abortion procedures and attempting to conduct these abortions so that they leave body parts intact so that they can later be sold on the open market."

- **Missouri**: Attorney General Chris Koster has initiated an investigation in response to the Nucatola video, stating, "[r]egardless of whether one is pro-life or pro-choice, the questions raised by these videos require careful review. . . . My office will investigate whether the practices described have occurred within our state and whether Missouri law

---

[10] *Governor Doug Ducey's Statement on Planned Parenthood*, July 20, 2015, http://azgovernor.gov/news/governor-doug-duceys-statement-planned-parenthood.

[11] News release, *Governor Rick Scott: We Are Investigating Planned Parenthood Offices in Florida*, July 29, 2015, http://www.flgov.com/2015/07/29/governor-rick-scott-we-are-investigating-planned-parenthood-offices-in-florida/.

[12] Office of the Governor, *Deal orders review of Planned Parenthood clinics*, July 16, 2015, http://gov.georgia.gov/press-releases/2015-07-16/deal-orders-review-planned-parenthood-clinics. Indiana and Massachusetts looked into whether Planned Parenthood clinics in their state sold organs from aborted babies but concluded that none of them do so.

[13] Justin Wingerter, *Brownback calls on Kansas State Board of Healing Arts to investigate Planned Parenthood*, July 21, 2015, http://cjonline.com/news/2015-07-21/brownback-calls-kansas-state-board-healing-arts-investigate-planned-parenthood.

[14] Statement, *Governor Jindal Announces Investigation Into Planned Parenthood*, July 14, 2015, http://gov.louisiana.gov/index.cfm?md=newsroom&tmp=detail&articleID=5030.

10

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

has been violated."[15] The Missouri State House and Senate are also both going to initiate investigations.

- **Ohio**: Attorney General Mike DeWine has launched an investigation of the state's Planned Parenthood clinics and subpoenaed documents from them "to see whether they violated a state law banning the sale of body parts from aborted fetuses"[16] and "to ensure they're not 'profiting from the sale of aborted babies.'"[17] Referring specifically to the Nucatola video, Attorney General DeWine said, "[a]ny person or abortion clinic involved in such a practice described in the video may have violated specific state or federal laws."[18] In addition, "Gov. John Kasich called the video 'abhorrent' . . . and called for swift prosecution of those involved. He was joined by state Auditor Dave Yost, who said the video warranted a full state and federal investigation."

- **South Carolina**: Attorney General Alan Wilson has said that his office "would forward any complaint regarding criminal activity by Planned Parenthood to the State Law Enforcement Division for investigation."[19] A state Representative has "asked the state's Legislative Audit Council to investigate the state's abortion providers and the agencies that regulate them, such as the Department of Health and Environmental Control."

- **Tennessee**: Senate Operations Committee Chairman Mike Bell and House Operations Committee Chairman Jeremy Faison announced that their committees "will hold a 'fact-finding meeting' on Aug. 19 to examine enforcement of Tennessee's law banning sales of aborted fetuses."[20] Senator Bell said, "[w]e want the facts about who is watching to ensure that the trafficking of baby parts is not happening in Tennessee and whether or not we need additional rules and regulations to make sure federal and state laws against this horrific practice are enforced."

- **Texas**: Attorney General Ken Paxton is leading an "aggressive investigation" of Planned Parenthood, in coordination with Governor Greg Abbott and the Texas Health and

---

[15] Summer Ballentine, *Congress, at least 4 states now probing Planned Parenthood*, July 21, 2015, http://www.washingtontimes.com/news/2015/jul/21/missouri-attorney-general-to-investigate-planned-p/.

[16] *Mike DeWine to investigate Planned Parenthood in the wake of controversial video*, July 16, 2015, http://www.cleveland.com/open/index.ssf/2015/07/mike_dewine_to_investigate_pla.html.

[17] Emma Ockerman, *Attorney General Mike DeWine's office to investigate Planned Parenthood*, Columbus Dispatch, July 16, 2015, http://www.dispatch.com/content/stories/local/2015/07/16/mike-dewine-office-to-investigate-planned-parenthood.html.

[18] *Id.*

[19] Anna Lee, *Upstate lawmakers call for investigation into Planned Parenthood*, July 30, 2015, http://www.greenvilleonline.com/story/news/local/2015/07/30/upstate-lawmakers-investigation-planned-parenthood/30908923/.

[20] Andy Sher, *State lawmakers to hold fact-finding hearing on Tennessee Planned Parenthood fetus practices*, July 23, 2015, http://www.timesfreepress.com/news/politics/state/story/2015/jul/23/state-lawmakers-hold-fact-finding-hearing-tennessee-planned-parenthood-fetus-practices/316115/.

11

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

Human Services Commission, that will "be very focused on whether state laws and federal laws were broken as it relates to the sales and harvesting of baby body parts."[21] This investigation "is being considered both a civil and criminal investigation."[22] In addition, a committee of the Texas State Senate is investigating "whether state or federal laws have been broken by abortion providers" and "whether abortion procedures are being altered to harvest an asset that is valuable to the abortion industry, and the handling of the bodies of these children once procured."[23] Senator Donna Campbell, who is a practicing licensed physician, "mentioned that federal law prohibits the alteration, timing, or method of an abortion, and expressed concern whether baby body parts are being harvested through illegal abortion procedures."

### Statement of the Issues

The key issues raised by NAF's motion are whether NAF has established that 1) it has organizational standing and 2) the four TRO factors weigh in its favor.

### Argument

### I.    Plaintiff lacks organizational standing in this case.

Before considering the preliminary injunction factors, the Court should first address whether NAF has established associational standing, as a lack of standing implicates the court's subject matter jurisdiction. A "party invoking federal jurisdiction bears the burden' of establishing that he has standing to sue." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an organization attempting to sue on behalf of its members, without any of those members themselves being a plaintiff, NAF must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). This NAF cannot do.

NAF has only a tangential connection, at best, with the events at the heart of this matter,

---

[21] *Texas AG Vows 'Aggressive Investigation' of Planned Parenthood*, July 29, 2015, http://www.breitbart.com/texas/2015/07/29/texas-ag-vows-aggressive-investigation-of-planned-parenthood/.

[22] Alexa Ura, *Paxton: Texas Planned Parenthood video 'consistent' with others*, Texas Tribune, July 29, 2015, http://www.wfaa.com/story/news/health/2015/07/29/texas-lawmakers-set-to-scrutinize-planned-parenthood/30821593/.

[23] *Texas AG Vows 'Aggressive Investigation' of Planned Parenthood*, *supra*.

12

namely, the recording and release of the videos of Doctors Nucatola and Gatter, and the ensuing government investigations into their likely illegal activities and those of Planned Parenthood. NAF has produced no evidence of any link between these recordings and any NAF meeting.

Moreover, to the extent any of the alleged injuries asserted by NAF existed, they would be *personal in nature*. For instance, if, hypothetically, actual or possible "offensive namecalling" and "vilification" directed toward Doctors Nucatola or Gatter, relied upon extensively by NAF, could ever give rise to a legally actionable injury, the proper claimant would be the individual himself or herself, requiring their individual participation in the lawsuit. *Id.* at 343. Indeed, NAF is *two steps* removed from having standing here: the Complaint alleges that Nucatola's *employer*, like Gatter's *employer*, "is itself an organizational member of NAF." Cmplt. ¶¶ 30, 33. The Complaint does not appear to allege that Nucatola or Gatter are members of NAF. In other words, NAF contends that it can assert the rights of member organizations, who can assert the rights of individual employees, who have allegedly suffered injuries that are personal in nature. This is a bridge much too far for purposes of Article III standing.

Additionally, NAF fails to establish associational standing for its invasion of privacy (intrusion) claim because it cannot meet the third prong of the *Hunt* test; participation of the individual whose privacy is allegedly invaded is necessary. "Privacy is personal to individuals and does not encompass any corporate interest." *Med. Lab. Mgt. Consultants v. ABC*, 306 F.3d 806, 814 (9th Cir. 2002) (explaining that an invasion of privacy action redresses "injury to the person that is wholly personal in character" and cannot be asserted on behalf of a corporation or an organization). As such, NAF is not a proper plaintiff, and NAF cannot prove that it has been harmed (and certainly not that it has been *irreparably* harmed). *Cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (emphasis added) (a plaintiff must "show that *he personally* has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant").

13

II.     **Plaintiff has not met the standards for a temporary restraining order.**

    A.     **The bar to receive a temporary restraining order is high.**

"The Supreme Court has emphasized that preliminary injunctions [like TRO's] are an 'extraordinary remedy never awarded as of right.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). A temporary restraining order may be issued only if the movant demonstrates that "he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Plaintiff has not met the standards for receiving the "extraordinary remedy" of a temporary restraining order.

    B.     **There has been no showing whatsoever of irreparable harm. The injuries alleged are non-existent, not legally cognizable, and/or of Doctor Nucatola and Gatter's own making, and NAF has not demonstrated that they have anything to do with NAF itself or any NAF meetings or agreement.**

While NAF is required to establish that it would likely suffer *irreparable* harm in the absence of a temporary restraining order, here there is *no* legally cognizable harm to NAF, irreparable or otherwise, attributable to Defendants. NAF bases its attempt to prevent the release of any further videos lawfully obtained by Defendants that may shed light on other likely illegal activities concerning the sale of aborted fetal tissue and partial-birth abortions on three general categories of alleged harm: 1) actual, or potential, "offensive namecalling" and "vilification" directed toward doctors who appear to be involved with these activities; 2) one anonymous individual's over-the-top hyperbolic comments in an Internet forum; and 3) a non-existent connection between the production and release of the videos and NAF or its agreements. These alleged injuries do not form a sufficient basis for granting Plaintiff's motion.

The First Amendment's robust protection of the freedoms of speech and the press would be marred beyond recognition if the publication of accurate information about disturbing, likely illegal activities could be enjoined on the basis that some readers might, in response, voice their disgust or strong disagreement with those activities. Indeed, one's right to strongly express moral and/or religious indignation over particular practices, such as the sale of fetal parts, that one finds

14

to be abhorrent is fundamental. Additionally, that one anonymous person, out of the literally millions of people who have learned about Nucatola and Gatter's activities, made some hyperbolic comments strongly expressing his or her opinion cannot, in any way, be *attributed to Defendants*. Although the First Amendment does not protect "incitement to imminent lawless action," *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969), Defendants have done nothing of the sort. As explained later, imposing a prior restraint upon the publication of information on the basis of such specious arguments violates the First Amendment.

Furthermore, NAF has demonstrated no factual nexus between NAF meetings and the Nucatola and Gatter videos. As discussed herein, there is no evidence that any of Defendants' videos have been made in violation of any contract, or violate any privacy laws. Also, NAF has not shown that damages would be insufficient in the event of some unlikely, hypothetical future instance where the release of a video violates a contract.[24] There has been no showing that NAF will be irreparably harmed in the absence of preliminary relief.

### C. Plaintiff is not likely to succeed on the merits.

A TRO would violate Defendants' First Amendment rights, the separation of powers, and federalism principles. In addition, the three claims forming the basis of the motion lack merit. Therefore, Plaintiff has not met its burden of establishing a likelihood of success on the merits.

#### 1. NAF cannot overcome the First Amendment's heavy presumption against the validity of prior restraints.

"[T]he Supreme Court has observed that '[t]emporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints.'" *Saad v. Am. Diabetes Ass'n*, 2015 U.S. Dist. LEXIS 21150, *3 (D. Mass. Feb. 23, 2015) (quoting *Alexander v. U.S.*, 509 U.S. 544, 550 (1993)). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First amendment

---

[24] In addition, the second category of NAF's requested relief relates to "disclosing to any third party the dates or locations of any future NAF meetings," but NAF offers no evidence suggesting that Defendants have ever publicized such information. Furthermore, the fourth category of requested relief relates to any attempts "to gain access to any future NAF meetings," but it appears from the complaint that NAF's next annual meeting will not occur until April 2016, which undercuts any claim for an urgent need for a TRO.

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

rights. . . . The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559-60 (1976); *see also N.Y. Times v. Sullivan*, 373 U.S. 254, 270 (1964) (noting that the First Amendment's protections reflect a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Hunt v. NBC*, 872 F.2d 289, 293 (9th Cir. 1989) (stating that prior restraints present the "most serious and the least tolerable infringement on First Amendment rights").

In today's world, journalism encapsulates much more than major newspapers and network news; websites, blogs, and YouTube channels make it possible for anyone to become a journalist. The First Amendment's protections of speech and the press exist as strongly for the person speaking to five people as the person speaking to millions. Defendants are engaged in lawful 21st Century investigative journalism in the style of *Dateline NBC's To Catch a Predator*. "Audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are 'included within the free speech and free press guaranty of the First and Fourteenth Amendments.'" *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (citing *Burstyn v. Wilson*, 343 U.S. 495, 502 (1952)). "The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Id.*; *cf. Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (noting that the process of using a particular medium to express a message is "entitled to full First Amendment protection").

> [A] party seeking to impose a prior restraint must establish that: (1) the activity it seeks to restrain poses either a clear and present danger or a serious and imminent threat to a protected competing interest, (*United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978)); (2) the restraint is narrowly drawn, (*Carroll v. President & Commr's of Princess Anne*, 393 U.S. 175, 183-84, 89 S. Ct. 347, 21 L. Ed. 2d 325 (1968)); and (3) less restrictive alternatives are not available, (*Nebraska Press Ass'n*, 427 U.S. at 563).

*SEC v. Small Bus. Capital Corp.*, 2013 U.S. Dist. LEXIS 18239, *4-5 (N.D. Cal. Feb. 11, 2013).

Here, a temporary restraining order prohibiting the release of potential footage in documentary-style investigative journalism is an invalid prior restraint in violation of Defendants' freedoms of speech and the press. NAF has done nothing to prove a clear and present danger or a serious and imminent threat to a protected compelling interest attributable to Defendants' investigative journalism, which strives to inform the public of likely criminal wrongdoing. The requested order is not narrowly drawn, and there are less restrictive alternatives available, namely, the pursuit of a damages remedy in a hypothetical future instance in which the production or dissemination of Defendants' message is contrary to law.

Plaintiff's motion is undercut by *Garcia*. There, an actress was included, without her knowledge, in a trailer for the film "Innocence of Muslims," the release of which touched off fierce international controversy, violent protests, and even death threats directed toward her. 786 F.3d at 737-38. She sought a preliminary injunction that would prohibit Google from hosting the movie on YouTube or other Google sites. The Ninth Circuit held that "Garcia failed to muster a clear showing of irreparable harm," *id.* at 746, and a previous order requiring the video to be taken down "gave short shrift to the First Amendment values at stake" and "deprived the public of the ability to view firsthand, and judge for themselves, a film at the center of an international uproar." *Id.* at 747. Similarly, NAF's requested TRO would give "short shrift" to the freedoms of speech and the press, and would deprive the public and government investigators of the ability to judge for themselves matters at the center of a national controversy of serious public concern.

NAF largely ignores the important First Amendment issues raised by its motion, alleging in a footnote that Defendants "committed to be subject to an injunction to enforce a breach of their contractual confidentiality obligations." As discussed later, there has been no breach of contract here, and the videos NAF complains of have nothing to do with any NAF contract. In any event, NAF has failed to meet its high burden of demonstrating that any, or all, Defendants have waived any of their constitutional rights via any contract provision. As one court explained,

> [t]he Supreme Court has held, in a number of varying contexts, that a waiver of constitutional rights must be based upon clear and convincing evidence to demonstrate that the waiver is knowing, voluntary, and intelligent. . . .

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

> Waiver of federal remedial rights such as an action under 42 U.S.C. § 1983 will not be lightly inferred, and courts "must indulge every reasonable presumption against waiver." . . .
>
> These standards apply to contractual waivers of constitutional rights. In the civil context, "a party waiving constitutionally protected rights—even when doing so through the execution of a contract—must also be made aware of the significance of the waiver." . . .
>
> Defendants cannot point to any actual agreement signed by the Plaintiff that expressly relinquishes his right to bring the present claims. This is not the type of case where an agreement was signed by the Plaintiff that specifically forbids the assertion of any constitutional claims regarding his employment, or relinquishing, releasing, and waiving all possible claims and causes of action against the Town.

*Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 259-60 (E.D.N.Y. 2012). Similarly, NAF can point to no provision under which any, or all, of the Defendants clearly and expressly relinquished their ability to assert their First Amendment rights in any case that has anything to do with NAF contracts (which this case does not).

### 2. Granting Plaintiff's motion would violate the important constitutional principles of separation of powers and federalism.

As noted previously, there are numerous ongoing federal and state legislative and executive investigations into the likely illegal activities of NAF's members and their employees. Defendants have already been contacted by, and have acted in cooperation with, some of the officials involved with these investigations, and it is almost certain that they will receive further requests and/or subpoenas seeking videos and other information that may illustrate illegal acts by some abortion providers. An injunction that would keep this highly relevant information out of the hands of many legislative and executive investigators violates the separation of powers.

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975), illustrates that NAF's motion should be denied. The Court upheld a subpoena duces tecum requiring a bank to turn records pertaining to a particular organization over to a Senate subcommittee conducting a legislative investigation. *Id.* at 501. The Court noted a concern that private civil actions "may be used to delay and disrupt the legislative function," *id.* at 503, and stated,

> the power to investigate is inherent in the power to make laws because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the

18

conditions which the legislation is intended to affect or change." . . . Issuance of subpoenas such as the one in question here has long been held to be a legitimate use by Congress of its power to investigate. . . .

*Id.* at 504;[25] *see also United States v. Nixon*, 418 U.S. 683, 707 (1974) (courts should resolve competing interests of various government bodies "in a manner that preserves the essential functions of each branch.").

Similarly, NAF's motion improperly seeks to short-circuit the numerous federal and state legislative and executive branch investigations into likely illegal activities by silencing Defendants, who have already received requests for relevant information. This directly implicates the separation-of-powers. It also implicates federalism principles in that NAF asks the Court to hamper the investigative efforts of numerous state legislators, governors, and attorneys general. NAF has fallen far short of demonstrating any compelling need, or justification, for an order that raises these serious constitutional issues.

### 3. Plaintiff is unlikely to prevail on the three claims it relies upon.

NAF relies upon hyperbole, generalized statements, and sparse citation to case law in an attempt to persuade the Court that it is likely to succeed on three of its claims: (1) breach of contract, (2) violation of California Penal Code § 632 (hereinafter "Section 632"); and (3) violation of common law privacy. None of these claims is likely to succeed.

#### a. Breach of contract

To establish a breach of contract under California law, Plaintiff must prove "(1) the contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damage to plaintiff therefrom." *Wall Street Network, Ltd. v. N.Y. Times, Co.*, 164 Cal. App. 4th 1171, 1178 (2008). The allegations relied upon by NAF to prove a breach of contract fall significantly short of meeting all four elements of a breach of contract claim.

---

[25] The Court also held that it would be improper to quash the subpoena due to alleged privacy concerns or allegations that Congress was acting with improper motives, noting that "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed," *id.* at 508-09, and added that "[c]ollateral harm which may occur in the course of a legitimate legislative inquiry does not allow us to force the inquiry to 'grind to a halt.'" *Id.* at 511 (citation omitted).

1

        **i.**       **Plaintiff has failed to demonstrate a breach of the NDA.**

2

     Without referring to any specific allegations in the Complaint, and through broad

3

generalizations and even mischaracterizations of its own allegations, NAF argues that

4

Defendants entered into two contracts with NAF—an Exhibitor Agreement and a non-disclosure

5

agreement (hereinafter "NDA") signed by several of the Defendants on or around April 5, 2014,

6

and only one Defendant in April 2015—all of which, NAF contends, were breached by

7

Defendants. The applicable NDA provisions allegedly breached by Defendants include:

8

9
    1.   "Attendees are prohibited from making video, audio, photographic, or other recordings of the meetings or discussions at this conference";

10
    2.   "NAF Conference Information includes all information distributed or otherwise made

11
        available at this conference by NAF or any conference participants through all written

12
        materials, discussions, workshops, or other means. . . . Attendees may not use NAF Conference Information in any manner inconsistent with these purposes"; and

13
    3.   "Attendees may not disclose any NAF Conference Information to third parties

14
        without first obtaining NAF's express written consent. . . ."

15
*See* Cmplt., at ¶¶ 52, 54, and 136; Exhibits A-D, F.

16

     Based upon these provisions of the NDA, Plaintiff alleges that Defendant Daleiden

17

breached the contract when he (1) referenced in a video a discussion he had with Dr. Reeves at

18

an NAF meeting, *see* Cmplt., ¶ 71, and (2) mentioned in a video the names of several abortion

19

providers which NAF contends were obtained "upon information and belief" by Daleiden during

20

his attendance at an NAF conference 10 months prior, *see id.* at ¶¶ 72-73. To be clear, Plaintiff

21

does not argue that the videos themselves contain video footage of NAF annual meetings of

22

conference in breach of any contract – only that information obtained from the NAF conference

23

is discussed on these videos. NAF also alleges, but offers no proof to support, that Defendants

24

*may* have taken videos at the NAF meeting in violation of paragraph 1 of the NDA. *See id.* at ¶

25

69 (alleging only that NAF *believes* Defendant *may* have taken videos of the NAF annual

26

meeting). Notably, the NDA agreement *does not*, as Plaintiffs assert in paragraph 136 of the

27

Complaint, broadly prohibit individuals from making a recording *at* NAF annual meetings; it

28

only applies to videos or other recordings *of* conference "meetings" and conference

20

"discussions." Random conversations between conference attendees in a hallway or restaurant, which are the kind of conversations NAF speculates may have been recorded, are certainly not conference meetings or conference discussions under the NDA.

In addition, NAF's charge that the Defendants violated the NDA by releasing the names of doctors in attendance at the conference rests on an inaccurately sweeping reading of the contents of the NDA. The NDA prohibits releasing "Conference Information," defined as "information distributed or otherwise made available at th[e] conference by NAF or any conference participants;" it does not prohibit disclosing information gleaned from informal conversations with other attendees. Additionally, since the names of abortion doctors are readily available online, the speculative notion that Defendants must have been unaware of abortion doctor names until learning them at an NAF meeting is an exceedingly thin basis upon which to allege a breach of contract. As such, NAF's assertion that "Defendants have already disclosed information that they promised to keep confidential" in violation of ¶¶ 2-3 of the NDA, *see* Mot. for TRO, at 16, is not supported by facts alleged in NAF's complaint, and is purely speculative.

In sum, NAF's breach of contract claim relies solely on allegations that Defendants *might* have engaged in conduct that would violate the agreement. Conclusory allegations and mere speculation are not enough to establish a likelihood of success on the merits.

        **ii.**      **NAF has failed to prove damages resulting from the alleged breach.**

"A breach of contract without damages is not actionable." *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506 (1967). While it is Plaintiff's burden to demonstrate a likelihood of success on each element of a breach of contract claim, including damages, NAF is silent regarding any claim of damages it has suffered resulting from the alleged breach of the NDA. *See* Mot. for TRO at 15-17. Regarding damages stemming from the alleged breach of the Exhibitor Agreement, NAF simply presumes, without any legal support, that because "Defendants in their fraudulently-executed Exhibitor Agreements have already agreed that money damages would not be a sufficient remedy for their breaches, and that NAF would be entitled to specific performance and injunctive relief as remedies for any such breach," *id.* at 16

(internal quotations omitted), their burden to show damages has been met. This language does *not* absolve NAF of the burden to prove actual damages. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 430 F.3d 1269 (10th Cir. 2005) (rejecting the notion that a contract clause, by itself, provides sufficient evidence to support injunctive relief).

Importantly, California Civil Code § 3301 is clear that "no damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." "Remote, uncertain and speculative damages are not recoverable." *Julian Petroleum Corp. v. Courtney Petroleum Co.*, 22 F.2d 360, 362 (9th Cir. 1927); *Allen v. Gardner*, 126 Cal App. 2d 335, 340 (1954) ("Uncertainty as to the fact of damage, that is, as to nature, existence or cause of the damage, is fatal."). Review of NAF's Complaint reveals that the damages allegedly suffered by NAF as a direct result of Defendants' alleged breach(es) of contract are purely speculative. NAF asserts that two of its members, Drs. Reeves and Dunn, fear that they may suffer reputational harm as a result of Defendants' alleged breach, but these fears are based on nothing more than speculation, unsupported by any evidence, that Defendants may have videotaped meetings or discussions while attending the NAF conference, and that such recordings would actually violate a contract if released. NAF's extensive focus on miscellaneous harms suffered by abortion providers over the last few decades, and the negative publicity generated by released videos depicting conversations occurring at restaurants, does not meet its burden to establish damages from alleged breaches of the Exhibitor Agreement and the NDA.

### b.     Invasion of Privacy (Cal. Penal Code § 632).

California's Invasion of Privacy Act, Cal. Penal Code § 632, "bars the intentional recording of a 'confidential communication' without the consent of all parties." It is an essential element of a Section 632 claim that Plaintiffs prove that the conversations that were taped were "confidential." The definition of "confidential communication" "excludes a communication made in a public gathering . . . or in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." § 632(c).

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

NAF attempts to obtain a sweeping decision by this Court that any and all communications that took place at the NAF annual meetings, regardless of the circumstances, constitute "confidential communications." *See* Mot. for TRO at 17. It is a massive reach to suggest that *all* conversations taking place at a business conference held in a public place, consisting of over 700 participants, and spanning several days are categorically confidential in nature. Hotels and other venues where business conferences are held often have extensive video surveillance for security reasons. Numerous cases undercut NAF's wide-ranging argument. *See, e.g., Med. Lab. Mgt. Consultants*, 306 F.3d at 814 (finding no reasonable expectation of privacy where business topics were discussed in a professional setting); *Wilkins v. NBC*, 71 Cal. App. 4th 1066, 1079-80 (1999) (secret videotaping of a lunch meeting did not violate Section 632; plaintiffs could not have reasonably expected their conversation to be confidential where the conversation took place during a lunch meeting at a restaurant with four other individuals whom plaintiffs did not know personally); *People v. Pedersen*, 86 Cal. App. 3d 987, 994 (1978) (finding communications among six individuals (accountants, partners, and one other individual) behind closed doors at a place of business were not confidential).

Plaintiff's claim of invasion of privacy, which rests upon a single allegation in the complaint unsupported by the evidence, *see* Cmplt., at ¶ 69, falls significantly short of demonstrating a likelihood of success on the merits. *See Faulkner v. ADT Sec. Servs., Inc.* 706 F.3d 1017, 1020 (9th Cir. 2013) (invasion of privacy claim dismissed since it lacked the necessary details regarding the nature of the parties and circumstances of the call).

### c.   Invasion of Privacy (Intrusion into a Private Place)

In order to prove a claim of intrusion into a private place, NAF must demonstrate that the Defendants "(1) intruded into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Sanders v. ABC, Inc.*, 20 Cal. 4th 907, 914 (1999). Notably, Plaintiff's claim is void of any specific example of intrusion into a private place or conversation and, instead, alleges that Defendants intruded by attending "their NAF annual meetings." *See* Cmplt., ¶ 185; Mot. for TRO at 18. However, no intrusion into a private place, conversation, or matter occurs where, as here, the alleged intrusion occurs in a public place and involves matters

of business. In *Wilkins*, the court held that no intrusion occurred where plaintiffs "discussed business matters on the open patio of a public restaurant with four strangers," there was no entry into their homes, and no discussion regarding plaintiffs' personal lives, intimate relationships, or other private affairs took place. 71 Cal. App. 4th at 1079. Similarly, in *Medical Lab Management*, the court refused to find an intrusion of privacy where ABC representatives secretly recorded conversations with plaintiff that took place in a conference room and involved discussions of Medical Lab's business operations. 306 F.3d at 814.

Most importantly, an invasion of privacy action redresses "injury to the person' that is wholly personal in character'" and cannot be asserted on behalf of a corporation or an organization. *Id.*; Restatement (2d) of Torts § 652I (stating that "the right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded" and that "[a] corporation, partnership or unincorporated association has no personal right of privacy"). Simply put, NAF has no personal right to privacy implicated in this case, and cannot generally assert an interest of privacy on behalf of its members. *See* Mot. for TRO at 18 (noting that NAF's claim of intrusion is "pled on behalf of its members").

NAF's claim fares no better under the second prong. "[D]etermining offensiveness requires consideration of all the circumstances of intrusion, including its degree and setting and the intruder's 'motives and objectives.'" *Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 236 (1998) (citations omitted). Motive is particularly important "when the intrusion is by a member of the print or broadcast press in pursuit of news material." *Id.* "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972); *see also Nicholson v. McClatchy Newspapers,* 177 Cal. App. 3d 509, 519-520 (1986). Here, Defendants did not enter a home or tap a personal telephone line. Attending "a national meeting of 700-850 professionals," Mot. for TRO at 19, would not be highly offensive to a reasonable person. NAF's intrusion in violation of privacy claim fails.

    **D.**    **The public interest, and the balance of the equities, strongly favor denial of Plaintiff's motion.**

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522

A TRO would be contrary to the public interest, which "favors the exercise of First Amendment rights." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) ("recogniz[ing] the significant public interest in upholding First Amendment principles"). The public interest also favors the ability of the government to investigate likely illegal activities. *Billiot v. Beavers*, 2015 U.S. Dist. LEXIS 90532, at *9 (E.D. La. June 17, 2015) ("[T]he public interest in law enforcement efforts through criminal investigation and prosecution of alleged wrongdoing is substantial.").

Moreover, "[a] plaintiff asking a court for equitable relief 'must come with clean hands.'" *Northbay Wellness Grp., Inc. v. Beyries*, 2015 U.S. App. LEXIS 9397, at *5 (9th Cir. June 5, 2015) (citation omitted). The unclean hands doctrine applies where "the plaintiff's conduct is inequitable . . . [and] the conduct relates to the subject matter of [the] claims." *Anhing Corp. v. Thuan Phong Co. Ltd.*, 2015 U.S. Dist. LEXIS 97019, at *27 (C.D. Cal. July 24, 2015) (citations omitted). Here, NAF seeks a TRO in an attempt to shield the likely illegal actions of its members, and their employees, from public view, including the view of government investigators. Although it is not necessary to "show that the [plaintiff's] conduct was illegal or criminal" for the doctrine to apply, *id.*, here there is ample evidence suggesting that numerous violations of federal and state criminal law have occurred. This Court should not exercise its equitable power to aid NAF's efforts to shield these activities from scrutiny.[26]

### Conclusion

For the foregoing reasons, Plaintiff's motion for a temporary restraining order should be denied, and the temporary restraining order issued on July 31, 2015 should be dissolved.

---

[26] *See generally Citizens United Against Corrupt Gov't v. Johnson*, 2015 U.S. Dist. LEXIS 728 (E.D. Mich. Jan. 6, 2015) (dismissing a suit seeking injunctive relief where plaintiffs were a person found guilty of embezzlement and an organization that he controlled; the court noted that "[t]he doctrine of unclean hands bars a litigant who has committed an unconscionable act from seeking relief in equity related to that act"); *Nat'l Coalition of Latino Clergy, Inc. v. Henry*, 2007 U.S. Dist. LEXIS 91487, *23-25 (N.D. Okla. Dec. 12, 2007) (declining to recognize standing for plaintiffs clearly in violation of federal law, and noting that the unclean hands doctrine "is a judicial closing of the courthouse doors to those tainted with inequitableness or bad faith related to the matter in which they now seek relief"); *Blankenship v. Blackwell*, 341 F. Supp. 2d 911 (S.D. Ohio 2004) (denying a motion seeking a TRO that would require political candidates to be placed on an election ballot where there was evidence that Plaintiffs had engaged in fraud).

1

Dated August 3, 2015.                    Respectfully submitted,

2

3

/s/ Brian R. Chavez-Ochoa

4   Brian R. Chavez-Ochoa (CA Bar 190289)      Jay Alan Sekulow (DC Bar 496335)
    CHAVEZ-OCHOA LAW OFFICES, INC.             Stuart J. Roth* (DC Bar 475937)
5   4 Jean Street, Suite 4                      Andrew J. Ekonomou* (GA Bar 242750)
    Valley Springs, CA 95252                    Cecilia N. Heil* (CA Bar 165392)
6   Tel: (209) 772-3013; Fax: (209) 772-3090    Carly F. Gammill* (TN Bar 28217)
7   brianr@chavezochoalaw.com                   Abigail A. Southerland* (TN Bar 022608)
                                                Joseph Williams* (TN Bar 033626)
8   Catherine W. Short (CA Bar 117442)          AMERICAN CENTER FOR LAW & JUSTICE
9   LIFE LEGAL DEFENSE FOUNDATION               201 Maryland Avenue, NE
    Post Office Box 1313                        Washington, DC 20002
10  Ojai, California  93024-1313                Tel: (202) 546-8890; Fax: (202) 546-9309
11  Tel: (707) 337-6880; Fax: (805) 640-1940    sekulow@aclj.org
    LLDFOjai@earthlink.net
12                                              Edward L. White III* (MI Bar P62485)
                                                Erik M. Zimmerman* (MI Bar P78026)
13                                              AMERICAN CENTER FOR LAW & JUSTICE
                                                3001 Plymouth Road, Suite 203
14                                              Ann Arbor, Michigan 48105
15                                              Tel: (734) 680-8007; Fax: (734) 680-8006
                                                ezimmerman@aclj.org
16

17

18  *Attorneys for Defendants Center For Medical*
    *Progress, Biomax Procurement Services, LLC,*
19  *David Daleiden, and Troy Newman*

20

21  * Pro hac vice applications will be submitted

22

23

24

25

26

27

28

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2015, I caused the foregoing Response in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction to be filed with the United States District Court for the Northern District of California via the Court's CM/ECF system.


/s/ Brian R. Chavez-Ochoa
Brian R. Chavez-Ochoa

Defs.' response re: Pl.'s TRO application
Case No. 3:15-cv-3522