LINDA E. SHOSTAK (CA SBN 64599)
LShostak@mofo.com
DEREK F. FORAN (CA SBN 224569)
DForan@mofo.com
NICHOLAS S. NAPOLITAN (CA SBN 251762)
NNapolitan@mofo.com
CHRISTOPHER L. ROBINSON (CA SBN 260778)
ChristopherRobinson@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Plaintiff
NATIONAL ABORTION FEDERATION (NAF)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL ABORTION FEDERATION (NAF), <br><br> Plaintiff, <br><br> v. <br><br> THE CENTER FOR MEDICAL PROGRESS, BIOMAX PROCUREMENT SERVICES LLC, DAVID DALEIDEN (aka "ROBERT SARKIS"), and TROY NEWMAN, <br><br> Defendants. | Case No.         3:15-cv-3522-WHO <br> Judge: Hon. William H. Orrick, III <br><br> **NATIONAL ABORTION FEDERATION (NAF)'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date:  December 18, 2015 <br> Hearing Time:  10:00 a.m. <br> Location:  Courtroom 2 <br><br> Date Action Filed:      July 31, 2015 <br> Trial Date: |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    **TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

2    **PLEASE TAKE NOTICE** that on December 18, 2015, or as soon thereafter as the matter

3    may be heard, in Courtroom 2 of the Honorable William H. Orrick, III at the United States

4    District Court for the Northern District of California, 17th Floor, 450 Golden Gate Ave, San

5    Francisco, CA 94102, Plaintiff National Abortion Federation ("NAF") shall and hereby does

6    move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction

7    against Defendants The Center for Medical Progress ("CMP"), BioMax Procurement Services

8    LLC ("BioMax"), David Daleiden (aka "Robert Sarkis") ("Daleiden"), and Troy Newman

9    ("Newman") (collectively "Defendants"), and their officers, agents, servants, employees, and

10   attorneys, and any other persons who are in active concert or participation with them, including

11   specifically and without limitation the individuals purporting to be BioMax representatives who

12   gained access to NAF's Annual Meetings by false pretenses and the individuals and/or entities

13   who received NAF confidential information (collectively "the Enjoined Individuals and

14   Entities").  Defendants have refused to identify the individuals who gained access to NAF's

15   Annual Meetings and those who received NAF confidential information in discovery.  Once NAF

16   learns their true identities, it will seek to specifically identify them to the Court and serve them

17   with copies of the TRO and any Preliminary Injunction.  NAF respectfully moves the Court to

18   enter a preliminary injunction prohibiting the Enjoined Individuals and Entities from publishing

19   or otherwise disclosing to any third party:

20
21           (1)     any video, audio, photographic, or other recordings taken, or any confidential
                     information learned, at any NAF meetings;

22           (2)     the dates or locations of any future NAF meetings;

23           (3)     the names, addresses or any other contact information of any NAF members or
                     attendees learned at any NAF annual meetings;

24           (4)     any video, audio, photographic, or other recordings taken of members or attendees
25                   Defendants first made contact with at NAF meetings; and from

26           (5)     attempting to gain access to any future NAF meetings.

27

28

1    Absent a preliminary injunction, NAF, its employees, and its members will suffer

2    irreparable harm in the form of invasion of privacy, injury to reputation, harassment, intimidation,

3    and violence, as further outlined in NAF's supporting memorandum of points and authorities.

4    This motion is based on this notice of motion and supporting memorandum of points and

5    authorities, the supporting declaration of Derek Foran, the previously filed affidavits of Vicki

6    Saporta, Mark Mellor, Jennifer Dunn, Matthew Reeves and Derek Foran that were submitted in

7    support of NAF's Motion for a Temporary Restraining Order, the concurrently filed Motion for

8    an Order to Show Cause Why The Center For Medical Progress and David Daleiden (aka "Robert

9    Sarkis") Should Not Be Held In Contempt and the memorandum of points and authorities and

10   declaration of Derek Foran in support thereof ("Mot. for Contempt"), the papers, evidence and

11   records on file in this action, and any other written or oral evidence or argument as may be

12   presented at or before the time this motion is taken under submission by the Court.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ...........................................................................................................1

II.  STATEMENT OF FACTS ...........................................................................................2

    A.  The History of Harassment, Intimidation, and Violence Suffered by
NAF Members........................................................................................................ 2

    B.  The Security Measures and Confidentiality Agreements in Place to
Protect NAF Meetings From Infiltration and Its Members From
Harassment............................................................................................................. 3

    C.  The Center for Medical Progress and the Extremists Behind It............................ 5

    D.  Defendants Establish a "Front Organization" to Infiltrate NAF's
Meetings. ............................................................................................................... 6

    E.  Having Gained Access to NAF's Meetings by False Pretenses,
BioMax Agents Secretly and Illegally Record NAF's Members and
Meeting Attendees. ............................................................................................... 8

    F.  Defendants Target NAF Members and Attendees Following NAF
Meetings............................................................................................................... 10

    G.  Defendants' Campaign to Smear and Intimidate Abortion Providers
Goes Public. ........................................................................................................ 11

III.  ARGUMENT..............................................................................................................15

    A.  NAF Is Virtually Certain To Succeed on the Merits of Its Claims..................... 15

        1.  NAF Is Likely to Prevail on Its Breach of Contract Claim...................... 15

        2.  NAF Is Likely to Prevail on Its Claim for Violation of California
Penal Code § 632. ..................................................................................... 22

    B.  NAF and Its Members Will Suffer Irreparable Harm If the Court Does
Not Continue to Restrain Defendants. ................................................................ 23

    C.  The Balance of Hardships Tips Heavily in NAF's Favor. ................................... 23

    D.  The Public Interest Favors Injunctive Relief. ..................................................... 25

# TABLE OF AUTHORITIES

**Page (s)**

**CASES**

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011)................................................................................. 15

*Am. Motorcyclist Ass'n v. Watt,*
714 F.2d 962 (9th Cir. 1983)................................................................................... 25

*Ariz. Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014)................................................................................. 23

*Branzburg v. Hayes,*
408 U.S. 665 (1972)................................................................................................. 21

*Brooks v. Vallejo City Unified Sch. Dist.,*
No. 09-cv-1815, 2009 U.S. Dist. LEXIS 101262 (E.D. Cal. Oct. 29, 2009) .......................... 17

*Cafasso v. Gen. Dynamics C4 Sys.,*
637 F.3d 1047 (9th Cir. 2011)................................................................................. 21

*Cohen v. Cowles Media Co.,*
501 U.S. 663 (1991)................................................................................................. 17

*Diamond Multimedia Sys., Inc. v. Super. Ct.,*
19 Cal. 4th 1036 (1999) .......................................................................................... 25

*Dietemann v. Time, Inc.,*
449 F.2d 245 (9th Cir. 1971).................................................................................... 17

*DISH Network L.L.C. v. Rios,*
No. 14-2549, 2015 U.S. Dist. LEXIS 18285 (E.D. Cal. Feb. 13, 2015) ................................. 24

*Earth Island Inst. v. Carlton,*
626 F.3d 462 (9th Cir. 2010).................................................................................... 24

*EPA v. Envt'l Waste Control, Inc.,*
917 F.2d 327 (7th Cir. 1990).................................................................................... 24

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,*
109 Cal. App. 4th 944 (2003) .................................................................................. 18

*Griffin v. Payne,*
133 Cal. App. 363 (1933).......................................................................................... 18

*Guam Scottish Rite Bodies v. Flores,*
486 F.2d 748 (9th Cir. 1973).................................................................................... 24

*Harris v. Bd. of Supervisors, Los Angeles Cnty.,*
366 F.3d 754 (9th Cir. 2004).................................................................................... 23

*ITT Telecom Prods. Corp. v. Dooley*,
    214 Cal. App. 3d 307 (1989).................................................................. 17, 24

*Johnson v. Bank of Am., N.A.*,
    No. 15-03181, 2015 U.S. Dist. LEXIS 90765 (N.D. Cal. July 10, 2015)............................... 15

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993).................................................................. 17, 18, 19, 20

*Monaco v. Liberty Life Assur. Co.*,
    No. 06-07021, 2007 U.S. Dist. LEXIS 31298 (N.D. Cal. Apr. 17, 2007) ............................. 16

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ........................................................................... 20

*Ohno v. Yasuma*,
    723 F.3d 984 (9th Cir. 2013).................................................................... 17

*Perricone v. Perricone*,
    292 Conn. 187 (2009) ...................................................................... 17, 24

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*,
    290 F.3d 1058 (9th Cir. 2002).................................................................. 24

*Redke v. Silvertrust*,
    6 Cal. 3d 94 (1971) ........................................................................... 16

*Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*,
    747 F.2d 511 (9th Cir. 1984).................................................................... 23

*Reichert v. Gen. Ins. Co.*,
    68 Cal. 2d 822 (1968) ......................................................................... 15

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) ........................................................................ 25

*Roe v. Wade*,
    410 U.S. 113 (1973)........................................................................... 20

*Sanders v. Am. Broad. Cos.*,
    20 Cal. 4th 907 (1999) .................................................................... 19, 22

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 15

**STATUTES**

18 U.S. Code § 248 ............................................................................. 20

Cal. Civ. Code § 3427 *et seq.*................................................................. 20

Cal. Gov. Code § 6215(a) ...................................................................... 20

Cal. Gov. Code § 6218 *et seq.*................................................................. 20

Cal. Gov. Code § 6254.28 ............................................................................................. 20

Cal. Penal Code § 423 *et seq*. ..................................................................................... 20

Cal. Penal Code § 632 .............................................................................................. 15, 22

**OTHER AUTHORITIES**

Rest. (2d) of Contracts § 178 ....................................................................................... 20

Rule 30(b)(6) .................................................................................................................... 1

U.S. Const. Art. I .................................................................................................... passim

U.S. Const. Art. V ...................................................................................................... 5, 19

## I.   INTRODUCTION

The case for preliminary injunction is overwhelming and compelling.[1]  Defendants purposefully infiltrated NAF's meetings in order to secretly record NAF's members.  To accomplish their unlawful ends, they invented a fake company: ███████████ called BioMax, replete with a fake website and marketing materials.  Using false identities, fake "representatives" of BioMax approached NAF and sought entry into its highly secure and confidential annual meetings.  To gain access, they presented false California drivers' licenses, and knowingly and fraudulently entered into confidentiality agreements without any intention of honoring them.  At the meetings, they mingled with NAF members, some of whom are the highest profile targets of anti-abortion extremists in this country.  They hid recording devices everywhere—in purses, ties, on their persons, and even in water bottles—and taped everything they heard and saw without regard to subject matter, to the tune of 504 hours.  Following the NAF meetings, they ████████████████████████████████████████ ██████████████████████████████████████████████ ███████.  They arranged follow-up meetings with these targeted individuals at restaurants, where they continued their illegal, surreptitious video recording campaign.

As a direct result of Defendants' infiltration of NAF's meetings and their illegal videotaping campaign, physicians who provide constitutionally protected abortion services have been smeared, their professional reputations have been trashed, and death threats have been leveled against them.  Accordingly, to prevent further harm to its members and attendees, on July 31, NAF sought and the Court granted and subsequently extended a Temporary Restraining Order ("TRO").  (Dkt. 15; Dkt. 27.)  The Court found that the requirements for issuance of a TRO

---

[1] This is so despite the fact Defendants have used any and all means to block discovery into their unlawful conduct.  They have refused to comply with the Court's discovery orders, including orders requiring the disclosure of the identities of those who received NAF confidential information.  (*See* Dkt. No. 185 at 2-3.)  They have refused to provide unredacted interrogatory responses and documents per the Court's order.  (*Id.*)  They have refused to provide the names of the individuals who gained access to NAF's meetings by false pretenses.  (Dkt. No. 207-4 at 1.)  They have refused to make a corporate representative available to testify on Topics 2 & 3 of NAF's Rule 30(b)(6) Notice, and otherwise refused to answer numerous relevant questions on the basis of nonexistent rights and privileges asserted by Daleiden himself.  (Dkt. No. 199-4 at 3 n.1 & n.2.)

1

1   were easily met, that "the parties do not disagree about NAF's central allegations," that

2   Defendants "unquestionably breached their agreements with NAF," and that the evidence that

3   Defendants' dissemination of videos of abortion providers had led to harassment and death threats

4   was "sufficient to show irreparable injury." (Dkt. 27 at 2.) All of this remains true, except now

5   there is evidence—evidence that Defendants fought tooth and nail to conceal from the Court and

6   from NAF—as to the scope and content of Defendants' conspiracy. The 504 hours of illegal

7   recordings, the internal report and emails, and the testimony of Daleiden all speak for themselves.

8          Accordingly, NAF respectfully submits that Defendants should continue to be barred from

9   publishing material covered by the TRO. In addition, Defendants should be barred from

10  publishing recordings taken of attendees with whom Defendants first made contact at NAF

11  meetings, and from attending any future NAF meetings.

12  **II.     STATEMENT OF FACTS**

13         **A.     The History of Harassment, Intimidation, and Violence Suffered by NAF
               Members.**

14

15         Established in 1977, NAF is a not-for-profit professional association of abortion

16  providers. (Dkt. No. 3-34 ("Saporta Decl.") ¶¶ 2-3.) Its members include reproductive rights

17  organizations and individuals, private and non-profit clinics, Planned Parenthood affiliates,

18  women's health centers, physicians' offices, and hospitals. (*Id.*) NAF's mission is to ensure safe,

19  legal, and accessible abortion care, which promotes health and justice for women. (*Id.*) Its

20  meetings provide critical access to essential accredited continuing medical education and training

21  related to abortion care. (*Id.* ¶¶ 3, 11.)

22         A critical part of NAF's work is to assist its members in preventing and coping with

23  harassment, intimidation, and violence perpetrated by anti-abortion extremists. (*Id.* ¶ 4.) For

24  more than three decades, anti-abortion extremists have perpetrated over **60,000** recorded instances

25  of harassment, intimidation, and violence against abortion providers, including tens of thousands

26  of acts of violence and other criminal activities against NAF members including murder,

27  shootings, arson, bombings, chemical and acid attacks, bioterrorism threats, kidnapping, death

28  threats, and other forms of violence. (Dkt. No. 3-2 ("Foran TRO Decl.") ¶ 6, Ex. 2.)

One prominent example of this decades-long hate campaign is the assassination of NAF member Dr. George Tiller on May 29, 2009.  (Saporta Decl. ¶ 6; *see also* Dkt. No. 3-32 ("Reeves Decl.") ¶ 18; Foran TRO Decl. ¶ 7, Ex. 3.)  Dr. Tiller was gunned down by an anti-abortion extremist while attending church services in Wichita, Kansas.  (Saporta Decl. ¶ 6; Foran TRO Decl., Ex. 3.)  In the years leading up to his assassination, Dr. Tiller had been the subject of a relentless campaign of harassment and intimidation.  (Foran TRO Decl. ¶ 8, Ex. 4; App'x Ex. 2.)  Since Dr. Tiller's murder, other anti-abortionist extremists have attempted similar acts of violence against abortion providers, and many of NAF's members have themselves been targeted.  (Saporta Decl. ¶¶ 7, 15.)  They have been stalked, threatened, and intimidated, and picketed at their homes, churches, and their children's schools.  (*Id.*)  NAF members have had their names put on threatening "wanted" posters and websites featuring their photos and personal information that are intended to incite violence against them.  (*Id.*)

**B.     The Security Measures and Confidentiality Agreements in Place to Protect NAF Meetings From Infiltration and Its Members From Harassment.**

In light of this awful reality, NAF places the utmost importance on the safety and security of its members.  Accordingly, NAF has adopted extensive security and privacy measures for its long-running annual meetings.  (Saporta Decl. ¶¶ 11, 12, 16; Dkt. No. 3-33 ("Mellor Decl.") ¶ 6.)

NAF's full-time security staff is involved in the selection of hotels, in order to ensure that the venues meet NAF's strict security guidelines.  (Mellor Decl. ¶ 6.)  NAF security staff meet with hotel staff, as well as local police officials, FBI and/or ATF agents, and fire and rescue personnel, to review security issues and potential threats.  (*Id.* ¶ 8.)  NAF security staff arrive prior to the beginning of each meeting to set up the security team and their assignments, orient the security team about procedures and protocols, arrange for the safe receipt of packages at the hotel, and finalize the involvement of K-9 teams.  (*Id.* ¶ 9.)  During the meetings, they supervise the security team and remain available on a 24/7 basis for any issues that occur.  (*Id.* ¶ 10.)  Security officers stand posted at strategic locations throughout the meeting areas and outside entrances to meeting rooms, where they ensure that nobody enters a meeting room without a NAF badge.  (*Id.* ¶ 11.)  They patrol NAF's meeting space with bomb sniffing dogs.  (*Id.* ¶ 10.)

NAF also goes to great lengths to make sure that the dates and locations of its meetings do not fall into the wrong hands. (*Id.* ¶ 7.) All emails about the conference remind recipients to: "Please be mindful of security concerns and do not forward this email or share information about NAF meetings." (*Id.*) During the conference, all signage uses a version of the NAF logo that omits the words "National Abortion Federation" so that non-meeting attendees in the hotel are not alerted to NAF's presence. (*Id.* ¶ 12.) Attendees and staff are advised to remove their conference badges when they leave the meeting areas, including in elevators, to decrease the chances of non-meeting attendees learning about the meeting. (*Id.*)

Over the years, NAF has continually increased precautions to secure a safe environment for its meeting attendees. (Saporta Decl. ¶¶ 11-12.) After anti-abortion extremists attempted to infiltrate NAF's meetings to identify providers in the late 1990s, NAF was forced to begin labeling all annual meeting packets and materials as confidential, and started requiring all meeting attendees to sign confidentiality agreements. (*Id.* ¶ 13.) Exhibitors who wish to attend NAF's annual meetings are required to sign Exhibitor Agreements, which require a proposed exhibitor to identify itself, its representatives, and the products or services it wants to exhibit at the meeting. (*See, e.g.*, App'x Exs. 3, 4.) As a condition of attending NAF's annual meetings, all exhibitors must: (1) promise and represent that they have a legitimate business interest in reaching reproductive health care professionals (*id.* ¶ 1); (2) that they will "truthfully and accurately" represent their business at NAF's meetings (*id.* ¶¶ 15, 19); and (3) that they will keep all information learned at the meetings in confidence, and will not disclose that information to any third parties absent NAF's consent. (*Id.* ¶ 17.)

NAF also requires all attendees to sign Non-Disclosure Agreements ("NDAs") when they present themselves at NAF's registration desk prior to gaining admittance to the meeting. (Saporta Decl. ¶ 13.) Under the terms of the NDA (App'x Exs. 5-8): (1) attendees must not videotape or record at the meeting (*id.* ¶ 1); (2) all information distributed or otherwise made available at the meeting is confidential and may only be used "to help enhance the quality and safety of services provided by NAF members and other participants" (*id.* ¶ 2); (3) attendees "may not use NAF Conference Information in any manner inconsistent with these purposes" (*id.*); and

(4) attendees may not disclose any information learned at the meetings to third parties without NAF's consent (*id.* ¶ 3).  These practices and agreements are essential to NAF's ability to protect the privacy, identity, and security of its members.  (Saporta Decl. ¶ 13.)

      **C.**      **The Center for Medical Progress and the Extremists Behind It.**

      Established on March 7, 2013, The Center for Medical Progress ("CMP") held itself out to California authorities and the Internal Revenue Service as a not-for-profit entity, whose only purpose was to "monitor and report on medical ethics."  (App'x Exs. 9 at NAF0000533;10 at NAF0001789; 11.)  It further represented that it was a "nonpartisan" organization, and that "[n]o substantial part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation."  (App'x Exs. 9 at NAF0000535; 10 at NAF0001789; 12; 13; ███████████████████████████  These representations were false.  In reality, CMP's officers and directors are radicals whose sole aim is to end the constitutional right to safe and legal access to abortion in the United States.  (*See*, *e.g.*, App'x Exs. 14 at NAF0004475-76; 15; 16 at NAF0004494; 17.)

      CMP's CEO, David Daleiden, is the former "Director of Research" for the discredited anti-abortion group, Live Action.  (Daleiden Tr. at 19:23-20:1; 46:25-47:4; 48:17-49:10.)  As Live Action's "Director of Research," Daleiden oversaw projects involving the surreptitious videotaping of activities at Planned Parenthood clinics.  (Daleiden Tr. at 80:12-82:16.)  CMP's Secretary, Troy Newman, is the President of Operation Rescue, the discredited anti-abortion group with a history of surreptitiously taping providers of abortion care.  (App'x Exs. 18; 19 at NAF0003563, NAF0003585-86; 20.)  Newman is an advocate of publicly identifying physicians who provide abortions through websites like "AbortionDocs.org" (run by Operation Rescue) to stigmatize and intimidate them in an effort to put them out of business.  (App'x Ex. 19 at NAF0003559-61, NAF0003610; 21; 22.)[2]  He has written that the "responsibility" of the United States "includes executing convicted murderers, including abortionists, for their crimes in order to expunge bloodguilt from the land and people."  (App'x Ex. 23 at NAF00004082.)  CMP's Agent

[2] ███████████████████████████████████████████████████████
███████████████████████████████████████████

for Service of Process, Catherine Short, issued a press release on the day CMP went public with its conspiracy, calling abortion providers "contract killers."  (App'x Ex. 24-25.)

Thus, far from being "nonpartisan," CMP's true purpose was not just highly partisan, it was criminal: infiltrate NAF and its members in order to surreptitiously record them, then release those illegal recordings in order to "precipitate pro-life political and cultural ramifications." (App'x Ex. 26 at CMP-000001.)  Daleiden himself admitted in deposition that, to avoid revealing their true purpose, he "was conscious" from the beginning "not to discuss certain things either by e-mail or in any other online communication medium."  (Daleiden Tr. at 246:24-247:10.)  The conspiracy was conducted "on an extremely need to know basis with the other individuals who were involved, and particularly when . . . it came to . . . the NAF meetings."  (*Id.* at 247:11-24.) Thus the report Daleiden distributed to his funders and coconspirators following NAF's 2014 meeting is marked "Confidential," and Daleiden urges its recipients to keep the "highly sensitive" report "very confidential" and that all communications were to be "by phone . . . rather than FB or email . . . ."  (App'x Exs. 26; 27; *see also* Exs. 28-38.)  The recipients' response makes it very clear that they understood that they were engaged in an unlawful scheme:  "[B]e careful.  If your e-mails fall into the wrong hands, you are out of business."  (App'x Ex. 38.)

**D.**  **Defendants Establish a "Front Organization" to Infiltrate NAF's Meetings.**

In February 2014 Defendants received a grant to fund the "infiltration of the . . . NAF Annual Meeting" in San Francisco in April 2014.  (App'x Ex. 26 at CMP-000001.)  The purpose of this  "infiltration" was to "network with the upper echelons of the abortion industry to identify the best targets for further investigation."  (*Id.*; Daleiden Tr. at 213:14-214:6.)  To that end, CMP, Daleiden, and Newman "established a front organization (*Biomax Procurement Services*) that purportedly supplies medical researchers with human biological specimens."  (App'x Exs. 26 at CMP-000001; 40.)  According to its fake website (now locked) BioMax "provides tissue and specimen procurement for academic and private bioscience researchers."   (App'x Exs. 40-41.)

To gain access to NAF's meeting, Defendants sent NAF a series of emails starting on November 27, 2013, purporting to be from "Brianna Allen"—"assistant" to a fake BioMax CEO, "Susan Tennenbaum"—inquiring about "exhibitor space at the conference your organization will

have in San Francisco." (App'x Exs. 42, *see also* App'x Exs. 43-46.) In response to "Allen's" email inquiries, NAF staff sent a copy of the above-described Exhibitor Agreement on January 2, 2014. (App'x Ex. 43.) After more fake emails from "Allen," BioMax signed the Exhibitor Agreement on February 5, 2014, and "Brianna" sent the signed Exhibitor Agreement back to NAF on February 10, 2014. (App'x Ex. 44.)

While the Agreement was signed with the fake name "Susan Tennenbaum," ███████ ████████ ████ (App'x Ex. 33) ████████ ████████ He never told NAF that he had signed it himself. (Daleiden Tr. at 180:4-11.) Daleiden testified that he reviewed the Agreement before signing it, and discussed it with "Tennenbaum." (*Id.* at 154:20-22.) He testified that he had access to numerous attorneys and that he could easily "have picked up the phone and spoken to a lawyer" about the Exhibitor Agreement, but he chose not to. (*Id.* at 161:13-162:15.) This is because he had already reached the conclusion, prior to signing it, that the "agreement was invalid" and could not bind him. (*Id.* at 155:14-21.) He did not convey this opinion to NAF. (*Id.* at 157:16-158:2.) After he signed it with a fake name, he returned it to NAF because he concluded that "the most straightforward way to secure our exhibitor space would just be to—to go through with the agreement." (*Id.* at 158:4-15.)[3]

On the first day of registration at NAF's Annual Meeting at the St. Francis Hotel in San Francisco, Daleiden (pretending to be "Robert Sarkis") and "Tennenbaum" presented themselves at the registration desk to gain admittance to NAF's Annual Meeting. The entire episode is caught on tape. (Decl. of Derek Foran in Support of NAF's Mot. for Prelim. Injunction ("Foran PI Decl.") ¶¶ 79A.) They were asked to present valid photo identification, whereupon "Sarkis" and "Tennenbaum" presented fake California driver's licenses. (App'x Exs. 49-50; Daleiden Tr. at 165:1-173:6.) Both "Sarkis" and "Tennenbaum" were also asked to sign NDAs to gain access

---

[3] The same events occurred in advance of the NAF's 2015 meeting:  Defendants sent emails to NAF to secure space at NAF's 2015 meeting. (App'x Exs. 47-48.) ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

1    to NAF's meetings, and they did so.  (App'x Exs. 5-6.)  Daleiden understood that he "needed to

2    sign an NDA in order to gain access to the meeting" and so he felt "that the most clear-cut way to

3    complete the registration process was to sign the document," and "on that basis [he] signed it."

4    (Daleiden Tr. at 174:2-16.)[4]  Tennenbaum and Daleiden then returned to their hotel room where

5    "Brianna Allen" was waiting.  (Daleiden Tr. at 176:21-177:8.)  Daleiden instructed her to go to

6    registration and sign an NDA (App'x Ex. 7), and in reference to the NDA, "Tennenbaum" told

7    her that "[i]t shows how paranoid they are" and "wouldn't they love to expose that we're frauds?"

8    (Foran PI Decl. ¶¶ 79B.)

9          **E.      Having Gained Access to NAF's Meetings by False Pretenses, BioMax Agents
                     Secretly and Illegally Record NAF's Members and Meeting Attendees.**
10

11          Once inside NAF's meeting, BioMax's agents started handing out fake business cards

12   (App'x Exs. 51, 52, 53) and mingling with NAF members—some of whom are among the highest

13   profile targets of extremists in the United States.  (Saporta Decl. ¶ 11.)  The BioMax agents

14   proceeded to record everything.  They hid recording devices everywhere:  in purses, water bottles,

15   ties, glasses, and even shirt buttons.  (App'x Exs. 54, 55; Daleiden Tr. at 183:6-24.)  The

16   recordings show Daleiden and his cohorts concealing recording devices on their bodies and in

17   their belongings as they prepared for the meetings.  (App'x Ex. 56 at 1, 2, 3, 9; App'x Ex. 57 at 3,

18   4.)  Their rule was to record "from the moment we left the hotel room until the moment that we

19   returned."  (Daleiden Tr. at 121:24-122:22, 124:1-15.)  They thus recorded everything they

20   encountered, regardless of whether it was related to fetal tissue or supposed "illegal activity" (as

21   documented in NAF's concurrently filed Motion for Contempt).  Defendants secretly and illegally

22   recorded 257 hours and 49 minutes of material at NAF's San Francisco meeting and 246 hours

23   and 3 minutes at NAF's Baltimore meeting—nearly 504 hours in total.  (Foran PI Decl. ¶ 2.)

24          At the start of each day, Daleiden and his coconspirators would huddle to "discuss our . . .

25   strategy for . . . the project and for the meeting," including "specific strategies for specific

26   _____
     [4]  ██████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28                                          BioMax agent "Lopez" signed an NDA.  (App'x Ex. 8.)

individuals." (Daleiden Tr. at 134:15-135:6.)  Agents were given a "mark list" to identify their

targets.  (Foran PI Decl. ¶ 79D.)  The conspirators also picked targets opportunistically:  In one

instance, Daleiden tells "Tennenbaum" that it "would be really good to talk tonight" with a

particular physician "now that she's been drinking."  (*Id.* ¶ 79E.)  Another time, he instructs his

coconspirator to "have a little chat" with a physician who had a "little wine," and "invite her to

lunch in the next two days.  I think she's the one for our purposes."  (*Id.* ¶ 79F.)

        In approaching their targets, Daleiden used "sales pitches" that were purposeful attempts

to entrap individuals into saying something they had no intention of saying.  Daleiden told his

cohorts that their "goal" was to trap people into "saying something really like messed up, like

yeah, like, I'll give them, like, live everything for you.  You know.  If they say something like

that it would be cool."  (*Id.* ¶ 79G.)  Another "goal," Daleiden told his coconspirators, was to get

attendees to say the words "fully intact baby" on tape.  (*Id.* ¶ 79H.)  But these overtures of his

were demurred to or rejected outright.  In a telling example, when Daleiden met his "key target"

Deborah Nucatola for the very first time at NAF's 2014 meeting, Daleiden told her that

"StemExpress pays $50 per specimen and we could do $60."  (*Id.* ¶ 79I; Daleiden Tr. at 216:3-5.)

Dr. Nucatola's response is set forth below:



        Similarly, fake CEO "Tennenbaum" repeatedly insisted to providers that she "can make

[fetal tissue donation] extremely financially profitable for you" and that BioMax has "money that

is available" and is "sitting on a goldmine" as long as you're "willing to be a little creative with

[your] technique."  (*Id.* ¶ 79J.)  She constantly exhorted providers:  "what would make it

profitable for you?  Give me a ballpark figure . . . ."  (*Id.*)  In another example, "Tennenbaum"

asks "[i]f it was financially very profitable for you to perhaps be a little creative in your method,

would you be open to" providing patients with reimbursements for tissue donations.  (*Id.* ¶ 79K.)

She received another unequivocal response:  "Do the patients get any reimbursement?  No, you

1    can't pay for tissue, right.  You can't pay for tissue."  (*Id*.)  There are numerous other examples in

2    which the BioMax agents purposefully attempt to entrap people and get nowhere.[5]

3        Defendants did not stop at secretly recording attendees.  They also took advantage of their

4    presence at NAF's meetings to take flash drives full of sensitive and nonpublic information,

5    ranging from extensive lists and biographies of NAF faculty, to presentations about clinic

6    security.  (Foran PI Decl. ¶ 3; App'x Ex. 58.)  They took contact information, documents and

7    materials from attendees, and various items provided by other exhibitors.  (App'x Ex. 56 at 3;

8    App'x Ex. 57 at 1-2.)

9        **F.    Defendants Target NAF Members and Attendees Following NAF Meetings.**

10       Following the San Francisco meeting in 2014, CMP issued a report to the individuals and

11   entities who funded the infiltration of NAF, bragging that "the infiltration was successful" in its

12   objective "to identify the best targets for further investigation."  (App'x Ex. 26 at CMP-000001.)

13   This was because "BioMax is now a known and trusted entity to many key individuals in the

14   upper echelons of the abortion industry."  (*Id*.)  Daleiden gushed in multiple emails to his

15   coconspirators that they now "have our work cut out for us" to "follow-up [with] some of the best

16   targets."  (App'x Ex. 37.)

17       And so Daleiden (posing as Sarkis) sent numerous emails to the providers he first met at

18   NAF's annual meetings, with titles like "Nice meeting you at NAF" and "Hi from NAF!"  (App'x

19   Exs. 59-61; *see also* App'x Exs. 62-63.)  Dr. Nucatola was one such target, having been "one of

20   several top-level Planned Parenthood officials" he had hoped to, and did, meet at NAF's meeting.

21   (Daleiden Tr. at 253:13-254:26.)  A week after the NAF meeting, "Sarkis" sent Dr. Nucatola an

22   email entitled "NAF, Tissue Procurement," stating that he would "be in touch soon about the

23   parameters we might be looking at for procurement in the near future."  (App'x Ex. 64.)  More

24   _____

25   [5] *See e.g.,*



26

27

28

emails followed (App'x Ex. 65), which eventually led to a lunch meeting on July 25, 2014.
Unbeknownst to Dr. Nucatola, Daleiden and his coconspirator surreptitiously recorded the
meeting.  (App'x Ex. 66.)

In another example, BioMax leveraged its attendance at NAF's meetings to set up a lunch
with the CEO of StemExpress.  Daleiden first met Megan Barr, a representative from
StemExpress, at NAF's 2015 Annual Meeting.  (App'x Ex. 67 ¶¶ 3-4; ████████████████████
████████)  He told Barr that he wanted to set up a meeting with StemExpress's CEO, Cate Dyer.
(App'x Ex. 67 ¶ 5; ███████████████████████.)  He followed up via email.  (App'x Ex. 68.)
Barr and StemExpress ultimately agreed to meet "Sarkis" based on his attendance at NAF's
annual meeting, and the seal of trust that carried.  (App'x Ex. 67 ¶ 6.)  Again, Daleiden and his
coconspirators secretly and illegally recorded their meeting with Dyer.  (*Id.* ¶ 21; App'x Ex. 69;
███████████████████.)  After the meeting with Dyer, Daleiden recounted (with the camera
still running) why anyone was willing to meet with them in the first place:

> Look how we, we just drove up for an afternoon.  And they
> totally, they totally like are willing to do this with us
> because like we've been at NAF.  Like, we're so vetted and
> so like. . . .  It's like we could just go knock on the door of
> like the Sacramento Planned Parenthood tomorrow
> morning.

(Foran PI Decl. ¶ 12; App'x Ex. 70)  The episode concludes with Daleiden and "Tennenbaum"
laughing and applauding each other.  (Foran PI Decl. ¶ 12.)

### G.    Defendants' Campaign to Smear and Intimidate Abortion Providers Goes Public.

On July 14 of this year, CMP went public with its fraud, and Defendants began releasing
secretly taped and highly misleading videotapes of physicians.  (App'x Ex. 66; 69; 71-76.)  The
videos have incited a campaign of vitriol and bile against Defendants' victims.  (Saporta Decl.
¶ 19; Foran TRO Decl. ¶ 23, Ex. 19.)

The first victim was Dr. Nucatola, Daleiden's "key target" at NAF's 2014 meeting.
(App'x Ex. 26 at CMP-000001-02.)  Daleiden testified that he was "closely involved in the
editing of the video" of his follow up restaurant meeting with Dr. Nucatola (Daleiden's

1    euphemism is "professionally produced into a releasable format").  (Daleiden Tr. at 261:7–

2    262:21.)  Defendants edited the tape of their lunch with Dr. Nucatola to make it look as if she was

3    "selling" fetal tissue, when in fact she repeatedly said the exact opposite.  Dr. Nucatola expressly

4    stated, as she did at the NAF meeting when she first met Daleiden, that "nobody should be selling

5    tissue.  That's just not the goal here," but this statement was omitted by Defendants from their

6    excerpted tape.  (Foran TRO Decl. Ex. 18 at 34.)  Dr. Nucatola said Planned Parenthood would

7    not sell tissue or profit in any way from tissue donations ten separate times, and all ten instances

8    were cut out of the video released by the Defendants.  (*Id.* at 7, 21-22, 25-26, 34, 48, 52-54.)[6]

9           Within an hour and a half of the posting, Dr. Nucatola was forced to shut down her

10   Twitter account.  (Foran TRO Decl. Ex. 20.)  Inflammatory and threatening online comments

11   directed to Dr. Nucatola have since proliferated.  (*See e.g.*, *Id.* Ex. 21, App'x Ex. 80.)

12   Dr. Nucatola has been subject to death threats.  One internet poster offered:  "I'll pay ten large to

13   whomever kills Dr. Deborah Nucatola.  Anyone go for it," and followed with:  "Doctor Deborah

14   Nucatola should be summarily executed.  I'll do it myself if no one else does."  (App'x Ex. 81.)

15          Defendants next attacked Drs. Mary Gatter and Savita Ginde.  (App'x Exs. 71-73.)  As

16   with Dr. Nucatola, Defendants' excerpted tapes of these physicians painted them in a grossly

17   false light and made it appear as if they wanted to profit from the sale of fetal tissue, when the

18   opposite was true.  In the unedited version of the lunch meeting with Dr. Gatter, for example, she

19   clearly explained that tissue donation was not about profit, but "about people wanting to see

20   something good come out" of their situations, "they want to see a silver lining . . . ."  (App'x Ex.

21   82 at NAF0001395.)  These and other highly relevant statements were omitted from the

22   selectively excerpted tape.  But again, the damage was done before the truth could be told.

23   Dr. Gatter was called a "baby butcher," "evil," and "a vicious demonic force" who deserves "no

24   mercy" and "the hangman's noose."  (Foran TRO Decl. Ex. 19.)  One commenter threatened:

25   _____

26   [6] An expert analysis of the early videos released by Defendants—including both the short video
     segments and the supposedly "full footage" versions of these videos—"conclude[d] that CMP
     edited content out of the alleged 'full footage' videos, and heavily edited the short videos so as to
27   misrepresent statements made by Planned Parenthood representatives," and found that the videos
     ultimately "have no evidentiary value" and "also lack credibility as journalistic products."
28   (App'x Exs. 77 at NAF0001851; *see also* App'x Exs. 78-79.)

1   "FILTHY OLD ROACH!!!!! PLANNED PARENTHOOD NEEDS TO BE BLOWN INTO

2   HELL!!!!!"  (App'x Ex. 83.)

3       And less than two weeks after Dr. Ginde was victimized by Defendants' "web series," she

4   was met by a group of 50 extremists at her home, holding signs stating "Planned Parenthood sells

5   baby parts,"  and leaving fliers around her neighborhood claiming in massive print that "Savita

6   Ginde Murders Children."  (App'x Ex. 84.)  Comments on Defendants' YouTube page for their

7   fifth installment included statements like:  "They need to be executed!!!!!!!!!!!" and "Abortionists

8   deserve death, just like any murderer!"  (App'x Ex. 85 at NAF0003353-54.)  Another commenter

9   stated:  "I really hope it gets bombed and every abortion supporter gets publicly lynched by lynch

10  mobs."  (*Id*. at NAF0003357.)  And another:  "they need to be rounded up and executed because

11  they are vile subhuman cockroaches."  (*Id*. at NAF0003356.)  The same campaign of harassment

12  and intimidation has been leveled against StemExpress CEO, Cate Dyer.  One website promised

13  to "be out in front of your bloody business Cate.  [This] county  does not need you and your ilk."

14  (App'x Ex. 86.)

15      The extremists' vitriol has not lessened over time.  Following the supposed "leak" from

16  Congress to Daleiden's "great friend" and internet troll, Charles C. Johnson (*see* Mot. for

17  Contempt at 6-7), Johnson published another ten hours of material that Defendants' illegally

18  obtained at NAF's meetings.  Predictably, the attendees featured in those videos have been

19  harassed and threatened.  One Facebook poster announced "I'll roast marshmallows on the fires

20  of a burned down PP!"  (App'x Ex. 87.)  Another reacted with the post:  "These peoples names

21  and info need to start going viral publicly.. [I]t wasn't that long ago in this country that we hung

22  murders in the spot.. That's all these people are are murders. [sic]"  (App'x Ex. 88.)  Another:  "I

23  wonder if these abortionists would enjoy being drawn and quartered."  (App'x Ex. 89.)  In a

24  separate post, a user stated of one of the doctors:  "I'd personally support that we execute her in

25  the same manner."  (*Id*. Ex. 90.)  Another post, with respect to another doctor:  "She should be

26  skinned alive!!"  (*Id*. Ex. 91.)

27      Moreover, incidents of harassment at Planned Parenthood facilities increased **nine fold** in

28  July, compared to reported incidents in June, and the reported incidents of harassment were even

1    more numerous in August.  (*Id.* Ex. 92, 93.)  The FBI reported seeing an uptick in attacks on

2    reproductive health care facilities (App'x Ex. 94), and NAF's security staff observed a sharp

3    increase in "off hour" requests for security advice from its members (Mellor Decl. ¶ 15).  As

4    NAF's President and CEO testified, "[t]here has been a dramatic increase" in harassment "since

5    July 14th, 2015," and "the volume of hate speech and threats are nothing I have ever seen in 20

6    years."  (App'x Ex. 95 at 16:17-23, 39:13-20.)   She recounted that there "have been phone-call[s]

7    into clinics. We have on recordings of some of those threats they are going to kill every doctor at

8    the facility. 'Let's pull a Columbine.'  One guy went through a plate glass window recently at a

9    clinic."  (*Id.* at 42:17-43:1.)  There have been no fewer than four incidents of arson at abortion

10   care facilities in the wake of Defendants' campaign:  an attempt at a Planned Parenthood facility

11   in Aurora, Illinois on July 19, 2015; another arson at the facility of a NAF member in New

12   Orleans on August 3, 2015; another at a Planned Parenthood facility in Pullman, Washington on

13   September 4, 2015; and a fourth at a Planned Parenthood facility in Thousand Oaks, California.

14   (App'x. Exs. 96-99.)

15          Just as troubling, Defendants have learned the nonpublic dates, times, and locations of

16   NAF's upcoming meetings.  (Mellor Decl. ¶ 15.)  After this suit was filed, Newman announced

17   that Defendants' infiltration of NAF was "just the beginning, we have moles and spies deep

18   inside the abortion cartel" and "at a time of our choosing, we will release more damning evidence

19   of the abortion cartel's illegal, ghastly, and repugnant butchery."  (App'x Ex. 100 at

20   NAF0002269.)   NAF has been forced to take increased security measures at increased cost, has

21   been forced to limit its communication with NAF members, and has contacted hotel management

22   and hotel security staff for its upcoming meetings to alert them that the meetings have been

23   compromised.  (Mellor Decl. ¶ 15; App'x Ex. 101 at 9-11.)

24          Meanwhile, Daleiden admits that he continues the "work of curating" what he calls "raw

25   investigative materials" (in reality the video/audio he criminally obtained at NAF's meetings),

26   "for release of [the] videos to the public."  (Dkt. 195 at 2.)  If the Court does not enjoin

27   Defendants, they will release these illegal recordings, which will subject NAF, its members and

28   its attendees subject to the same hate campaign that has been waged against Drs. Nucatola,

1    Gatter, Ginde, Cate Dyer, and all the other victims of Defendants' smear campaign to date.

2    **III.     ARGUMENT**

3           The standard for issuing a preliminary injunction is "identical to the standard" the Court

4    applied to NAF's request for a temporary restraining order. *Johnson v. Bank of Am., N.A.*, No.

5    15-03181, 2015 U.S. Dist. LEXIS 90765, at *5 (N.D. Cal. July 10, 2015).  A plaintiff must show

6    that "[1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the

7    absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an

8    injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

9    1131 (9th Cir. 2011) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20

10   (2008)).  This test is more than met given the facts of this case.

11          **A.     NAF Is Virtually Certain To Succeed on the Merits of Its Claims.**

12          Given that the bulk of the conduct at issue here is admitted, NAF is not just "likely" to

13   succeed on the merits, it is virtually certain to do so.  While NAF's First Amended Complaint

14   contains eleven separate state and federal causes of action supported by over 70 pages of detailed

15   factual allegations, the Court need address only two of those claims for the purposes of this

16   preliminary injunction motion:  breach of contract and violations of California Penal Code § 632.

17          **1.     NAF Is Likely to Prevail on Its Breach of Contract Claim.**

18          **First**, there is no question that NAF is likely to prevail on its breach of contract claims.

19   *See Reichert v. Gen. Ins. Co.*, 68 Cal. 2d 822, 830 (1968) (plaintiff in breach of contract action

20   must establish "(1) the contract, (2) plaintiff's performance or excuse for nonperformance,

21   (3) defendant's breach, and (4) the resulting damages to plaintiff").  Here, the preliminary

22   injunction discovery that the Court ordered only confirms the correctness of the Court's prior

23   ruling that Defendants "unquestionably breached their agreements with NAF."  (Dkt. 27 at 2.)

24          Among other things, the Exhibitor Agreements[7] required Defendants to represent

25   themselves and their business truthfully and accurately.  (*See* Part II.B, *supra*.)  Nevertheless, in

26   order to infiltrate NAF's annual meetings without raising suspicion, Defendants engaged in an

27
28   ---
     [7] While the contract analysis is focused on the Exhibitor Agreements, the same analysis pertains
     to the NDAs that Defendants fraudulently signed.

1    elaborate fraud.  They "established a front organization"—BioMax—to pose as a legitimate

2    exhibitor.  (*See supra* Section II.D; App'x Ex. 26.)  They registered BioMax with the California

3    Secretary of State.  They created a fake company website.  They hired "actors" to "pose" as

4    company officers and employees.  They set up a fake Facebook page for its "CEO."  They created

5    fake business cards and signage.  They even went so far as to procure fake California driver's

6    licenses for their operatives.  (*See* Part II.D, *supra*; App'x Exs. 49-53, 102-104.)

7            The Exhibitor Agreements also imposed strict confidentiality obligations on Defendants.

8    (*See* Part II.B, *supra*.)  BioMax expressly agreed to "hold in trust and confidence any confidential

9    information received in the course of exhibiting at the NAF Annual Meeting and agree[d] not to

10   . . . disclose confidential information without express permission from NAF."  (*See,* App'x Exs.

11   3, 4 ¶ 17 ("In connection with NAF's Annual Meeting . . . **all information is confidential and**

12   **should not be disclosed** to any other individuals or third parties.").)  Daleiden admitted at his

13   deposition, however, that he signed the Exhibitor Agreements in 2014 and 2015 without any

14   intention of honoring them.  (*See supra* Section II.D; Daleiden Tr. 155:14-21 ("I did form that

15   conclusion [that the contracts were invalid] before—before we signed this document.").)  He did

16   not communicate his true intentions to NAF.  (Daleiden Tr. 157:16-19.)  Instead, he secretly took

17   over 500 hours of audio and video recordings at NAF's annual meetings and has asserted, in no

18   uncertain terms, that he will publish those recordings if the TRO is dissolved.  (Dkt. 195 at 2.)

19           That Defendants entered into these agreements fraudulently and with no intention of

20   honoring them does not undermine their enforceability.  *See Redke v. Silvertrust*, 6 Cal. 3d 94,

21   104 (1971) ("A party who makes . . . a bargain in furtherance of [a] wrongful purpose can not

22   enforce it, even though it is enforceable against him by the other party if the latter is innocent of

23   such a purpose.").  On top of that, BioMax, ███████████████████ was and is the

24   agent and alter ego of CMP and Daleiden.  (*See* Part II.D, *supra*.)  The contracts may be enforced

25   against Defendants on that basis, too.  *Monaco v. Liberty Life Assur. Co*., No. 06-07021, 2007

26   U.S. Dist. LEXIS 31298, *12 (N.D. Cal. Apr. 17, 2007) (denying motion to dismiss contract

27   claim against nonsignatories based on alter ego and agency theories).

28           **Second**, Defendants' repeated assertion throughout this case—that they are "citizen

journalists" with a First Amendment "license" to engage in a three-year crime spree, and then publish the fruits of their criminal conduct in violation of NAF's contracts—has no basis in law. Anyone with an iPhone and access to the internet can label themselves a "journalist," and in any event the Supreme Court has unequivocally stated that "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 672 (1991).  Rather, it is "beyond dispute that 'the publisher of a newspaper has no special immunity from the application of general laws.  He has no special privilege to invade the rights and liberties of others.'"  *Id.* at 670; *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office.").

Beyond that, it is black-letter law that a party may waive its First Amendment rights by knowingly, voluntarily, and intelligently entering into a confidentiality agreement. *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) ("First Amendment rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent."); *ITT Telecom Prods. Corp. v. Dooley*, 214 Cal. App. 3d 307, 317, 319 (1989) (parties may "waive even First Amendment speech rights by contract" by entering into "an express contract of confidentiality or nondisclosure"); *Perricone v. Perricone*, 292 Conn. 187, 202 (2009) ("[P]rivate parties who voluntarily enter into an agreement to restrict their own speech thereby waive their first amendment rights."); *Brooks v. Vallejo City Unified Sch. Dist.*, No. 09-cv-1815, 2009 U.S. Dist. LEXIS 101262, at *13 (E.D. Cal. Oct. 29, 2009) (parties "were entitled to bargain away their free speech rights by agreeing to confidentiality provisions").[8]

As the Court previously observed, Defendants' waiver of any First Amendment rights entails an inquiry into "what information defendants obtained, where and how they obtained it, the circumstances in which the confidentiality agreements were signed, the reasonableness of

---

[8] In addition, many courts have concluded that judicial enforcement of a private confidentiality agreement does not involve "state action" that would give rise to First Amendment scrutiny. *Ohno v. Yasuma*, 723 F.3d 984, 998-99 & n.16 (9th Cir. 2013) ("In the context of First Amendment challenges to speech-restrictive provisions in private agreements or contracts, domestic judicial enforcement of terms that could not be enacted by the government has not ordinarily been considered state action").

1   various expectations, and the intent of both parties and of third parties." (Dkt. No. 95 at 14.) We

2   now know the answers to these questions.

3      As to "what information defendants obtained" and "where and how they obtained it" (*id.*),

4   Defendants indiscriminately recorded over 500 hours of video and audio recordings at NAF's

5   annual meetings in 2014 and 2015, in direct violation of the Exhibitor Agreements and NDAs.

6   (*See* Part II.E, *supra*.) Given NAF's strict security measures, Defendants would not have

7   obtained that information absent their entry into confidentiality agreements under false pretenses.

8      As to "the circumstances in which the confidentiality agreements were signed" (Dkt. No.

9   95 at 14), Daleiden testified that he reviewed the Exhibitor Agreement and discussed its contents

10   with "Tennenbaum" before signing it (using her fake name). (*See* Part II.D, *supra*.) He further

11   testified that he had access to a "dozen" lawyers who provided legal expertise throughout his

12   scheme to infiltrate NAF's meetings, and that "he could easily have picked up the phone" to seek

13   legal advice in connection with the Exhibitor Agreements, but chose not to. (Daleiden Tr. at

14   88:7-89:17.) He also subjectively believed at the time he signed the Exhibitor Agreements that

15   they were unenforceable, but he voluntarily signed them anyway without disclosing his subjective

16   beliefs to NAF, because that was "the most straightforward way to secure our exhibitor space

17   would just be to—to go through with the agreement."[9] (*Id.* at 157:16-158:15.)

18      The fact that Daleiden incorrectly (and self-servingly) concluded that the Exhibitor

19   Agreements and NDAs were not enforceable is irrelevant.  It has long been the rule that "[a]

20   secret intent to violate the law, concealed in the mind of one party to an otherwise legal contract,

21   cannot enable such party to avoid the contract and escape his liability under its terms." *Griffin v.*

22   *Payne*, 133 Cal. App. 363, 373 (1933); *Founding Members of the Newport Beach Country Club v.*

23   *Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) ("The parties' undisclosed

24   intent or understanding is irrelevant to contract interpretation"). The Ninth Circuit's decision in

25   *Leonard* is directly on point. In that case, the Ninth Circuit held that the "[t]he fact that the Union

26

27   [9] ███████████████████████████████████████████

28   ███████████████████████████████████████████

1  informed the City of its view that Article V was 'unconstitutional, illegal, and unenforceable'

2  does not make the Union's execution of the agreement any less voluntary.  If the Union felt that

3  First Amendment rights were burdened by Article V, it should not have bargained them away and

4  signed the agreement."  12 F.3d at 890.  The same is true here.

5      As to "the reasonableness of various expectations" (Dkt. No. 95 at 14), here again, the

6  evidence conclusively establishes that NAF members can and did expect that they would not be

7  illegally videotaped by anti-abortion extremists.  NAF holds to extensive security and privacy

8  measures at its long-running annual meetings.  (*See* Part II.B, *supra*.)  Everyone who attends

9  NAF's annual meetings must sign NDAs promising not to videotape or record the meetings, or

10  otherwise disclose any information learned at the meetings to third parties.  (*Id*.)  NAF's meeting

11  attendees therefore had a reasonable expectation that their conversations and interactions would

12  not be secretly recorded by anti-abortion extremists.  (*See* Dkt. No. 3-31 ("Dunn Decl.") ¶¶ 5-6;

13  Reeves Decl. ¶ 7; App'x Ex. 95 at 83:12-18; App'x Ex. 105 at 65:2-13.)  *See also Sanders v. Am.*

14  *Broad. Cos.*, 20 Cal. 4th 907, 911 (1999) (If a communication takes place in a "workplace to

15  which the general public does not have unfettered access, employees may enjoy a limited, but

16  legitimate, expectation that their conversations and other interactions will not be secretly

17  videotaped by undercover television reporters, even though those conversations may not have

18  been completely private from the participants' coworkers.").

19      Finally, as to "the intent of both parties" (Dkt. No. 95 at 14), NAF's intent, as expressed in

20  the Exhibitor Agreements and NDAs, was to keep its meetings secure and its attendees safe from

21  intimidation and harassment.  Defendants' intent, by contrast, was fraudulent:  to gain access to

22  NAF meetings by false pretenses.  (*See* Parts II.D, II.G, *supra*.)  Indeed, Defendants' own actions

23  speak to their fraudulent intent to deceive NAF.  Knowing their actions were illegal, Defendants

24  adopted special protocols at NAF's annual meetings to avoid detection by NAF security and NAF

25  attendees.  (*See* Part II.E, *supra*.)  They also repeatedly expressed fears of being caught.  (*See*

26  Foran PI Decl. ¶¶ 79O (Daleiden says he is "worried that they're suspicious").)

27      Accordingly, there is no question that Defendants knowingly waived any "right" to mount

28  a criminal scheme to infiltrate NAF and smear its members.

**Third**, on the merits Daleiden's claim that the agreements he fraudulently entered into on BioMax's behalf are void for public policy is so specious that it is difficult to know where to begin.  Under the Restatement of Contracts, "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."  Rest. (2d) of Contracts § 178(1); *Leonard*, 12 F.3d at 890.

Here, the California legislature has expressly acknowledged that abortion providers "are often subject to harassment, threats, and acts of violence."  Cal. Gov. Code § 6215(a).  The State has enacted multiple statutes protecting abortion providers from harassment and harm.  *See* Cal. Civ. Code § 3427 *et seq.*; Cal. Gov. Code § 6218 *et seq.*; Cal. Gov. Code § 6254.28; Cal. Penal Code § 423 *et seq.*; *see also* Rest. (2d) of Contracts § 178(3)(a) ("the strength of [a] policy as manifested by legislation and judicial decisions" is relevant to analysis).  Congress has enacted similar laws to protect people who exercise their reproductive rights.  18 U.S. Code § 248.

NAF's agreements were put in place precisely to defend against the kind of attack launched by CMP, and to prevent its members from being harassed and smeared.  Refusing to give effect to those agreements would effectively render NAF members defenseless in the face of even the most outrageous fraud by anti-abortion extremists.  This, in turn, would cripple NAF's ability to associate in furtherance of its mission to ensure that women receive the highest standards of medical care when exercising their constitutional right to obtain abortion services.  *See Roe v. Wade*, 410 U.S. 113 (1973); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("This Court has recognized the vital relationship between freedom to associate and privacy in one's associations . . . .  Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.").  Indeed, were Defendants' arguments accepted, businesses would be powerless to enforce confidentiality agreements to stop the dissemination of trade secrets, while courts and litigants would be powerless to prevent the disclosure of confidential discovery obtained under Protective Orders routinely entered into in the Northern District of California.  (*See* Dkt. No. 128 at 6 n.4.)  That is not and never has been the law.

Conversely, there is no public policy that weighs against enforcement of NAF's confidentiality agreements.  Defendants engaged in a criminal scheme to defraud NAF, resulting in the violation of multiple statutes such as California's criminal anti-wiretapping law and federal anti-racketeering statutes, and multiple civil laws such as fraud, breach of contract, tortious interference, trespass, and civil conspiracy.  Such gross misconduct, directed toward individuals who are vilified for working to ensure the constitutional rights of others, cannot be justified by reference to any public policy exception.  *See Branzburg v. Hayes*, 408 U.S. 665, 691 (1972) ("It would be frivolous to assert . . . that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.  Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news.").

Moreover, Daleiden's "public policy" argument would sanction wholesale larceny any time a thief falsely insinuates that he found evidence of a crime.  For good reason, therefore, the Ninth Circuit has rejected this exact argument in closely analogous circumstances.  *See Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1062 (9th Cir. 2011).  In *Cafasso*, the Ninth Circuit affirmed judgment for an employer for breach of a confidentiality agreement, and rejected the employee's "public policy" argument that would have excused her wholesale theft of confidential information based on her claim that it was evidence of a crime that she intended to provide to the government.  *Id.* at 1062 & n.15.  The Ninth Circuit rejected this argument, holding that the employee's desire to "provid[e] information to government investigators . . . neither explains nor excuses the overbreadth of her seizure of documents."  *Id.* at n.15.  The employee's wholesale theft of confidential information in violation of her agreement "cannot be sustained by reference to a public policy exception."  *Id.* at 1062.  Precisely the same thing is true here.  No public policy exception could plausibly justify CMP's unlawful, fraudulent acts, especially in view of the legislature's express policy of protecting abortion providers from actors like CMP.

1

**2.     NAF Is Likely to Prevail on Its Claim for Violation of California Penal Code § 632.**

2

3     For the same reasons, NAF is also very likely to succeed on the merits of its claim for

4     violation of California Penal Code § 632.  The statute makes it a crime to "record[] [a]

5     confidential communication" "intentionally and without the consent of all parties to [the]

6     confidential communication."  Cal. Pen. Code § 632(a).  A "confidential communication"

7     "includes any communication carried on in circumstances as may reasonably indicate that any

8     party to the communication desires it to be confined to the parties thereto."  *Id.* § 632(c).  The

9     California Supreme Court has held that a "confidential communication" need not occur in a

10    private setting.  *Sanders*, 20 Cal. 4th at 911.  Rather, if the communication takes place in a

11    "workplace to which the general public does not have unfettered access, employees may enjoy a

12    limited, but legitimate, expectation that their conversations and other interactions will not be

13    secretly videotaped by undercover television reporters, even though those conversations may not

14    have been completely private from the participants' coworkers."  *Id.*

15    Here, Defendants recorded "confidential communications" of NAF meeting attendees who

16    reasonably expected that their conversations and interactions would not be covertly recorded by

17    antiabortion extremists.  Given the extensive security measures NAF is forced to take, and the

18    Exhibitor Agreements and NDAs that must be signed to gain admittance to its meetings, there is

19    no question that NAF meeting attendees reasonably expected their interactions with other NAF

20    meeting attendees would not be covertly recorded by anti-abortion extremists without their

21    knowledge.  *Sanders*, 20 Cal. 4th at 911. (Dunn Decl. ¶¶ 5-6; Reeves Decl. ¶ 7.)

22    That Defendants "intentionally and without the consent of all parties to [the] confidential

23    communication" illegally recorded those communications is beyond dispute.  Cal. Pen. Code

24    § 632(a).  Defendants never told any NAF meeting attendees that they were secretly recording

25    their conversations with them.  (Daleiden Tr. at 118:6-19, 120:23-121:2.)  Further, Defendants

26    purposely hid their recording devices under scarves, in water bottles, in purses, and in other

27    locations so that attendees would not know they were being recorded.  (App'x Ex. 54-55.)

28

1

2

**B.      NAF and Its Members Will Suffer Irreparable Harm If the Court Does Not Continue to Restrain Defendants.**

3      The "intangible injuries" that NAF's Exhibitor Agreements, NDAs, and extensive security

4   measures were designed to protect against constitute precisely those injuries that courts hold

5   constitute irreparable harm.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir.

6   2014) (because they lack adequate remedies, "intangible injuries" constitute irreparable harm);

7   *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (harm to

8   reputation is irreparable injury); *Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754,

9   766 (9th Cir. 2004) (physical harm including pain, suffering and death constitute irreparable

10   injury for purposes of injunctive relief).  For this reason, Defendants contractually agreed that

11   NAF was entitled to injunctive relief in the event of any breaches of the Exhibitor Agreements

12   CMP fraudulently entered into.  (App'x Exs. 3-4 ¶ 18 (BioMax "agrees that monetary damages

13   would not be a sufficient remedy for any breach of this agreement . . . and that NAF will be

14   entitled to specific performance and injunctive relief as remedies for any such breach.").)

15      In issuing and extending the TRO, the Court held that NAF "would be likely to suffer

16   irreparable injury" because "the evidence presented by NAF, including that defendants' recent

17   dissemination of videos . . . has led to harassment and death threats for the individuals in those

18   videos, is sufficient to show irreparable injury for the purposes of the temporary restraining

19   order."  (Dkt. No. 15 at 2; Dkt. No. 27 at 3.)  This continues to be true.  That the publication of

20   illegal videos taken of Drs. Nucatola, Gatter, Cate Dyer, and others led directly to harassment,

21   reputational injury, and death threats, can hardly be gainsaid.  (*See* Part II.G, *supra*.)  As

22   explained above, the threats and violence against abortion providers—including arson and

23   vandalism—has only increased in the wake of CMP's deceptive video smear campaign,

24   prompting recent FBI warnings about future attacks on Planned Parenthood employees.  (*Id*.)

25   Given this indisputable showing, and Defendants' agreement that NAF is entitled to injunctive

26   relief in the event of any breach, NAF has established a likelihood of irreparable harm.

27      **C.      The Balance of Hardships Tips Heavily in NAF's Favor.**

28      "It is an accepted equitable principle that a court does not have to balance the equities in a

1    case where the defendant's conduct has been willful."  *EPA v. Envt'l Waste Control, Inc.*, 917

2    F.2d 327, 332 (7th Cir. 1990) (affirming grant of injunctive relief) (citing *Guam Scottish Rite*

3    *Bodies v. Flores*, 486 F.2d 748, 749 (9th Cir. 1973)).  To describe Defendants' conduct here as

4    willful hardly does it justice.  The Court therefore need not even reach the balance of hardships

5    factor.  If it is inclined to do so, however, the balance of hardships easily weighs in NAF's favor

6    because the potential harm that NAF's members and meeting attendees may suffer if an

7    injunction does not issue far outweighs any harm a preliminary injunction may cause Defendants.

8    *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("The assignment of weight

9    to particular harms is a matter for district courts to decide.").

10           As explained above, NAF and its members are potentially subject to grave injury if an

11   injunction does not issue.  (*See* Part II.G, *supra*.)  Conversely, Defendants suffer no **cognizable**

12   harm if an injunction does issue.  Because the injunctive relief NAF seeks is grounded in

13   violations of the Exhibitor Agreements that Defendants signed or are otherwise responsible for,

14   an injunction would "merely . . . prevent[] [them] from engaging in unlawful activity" and they

15   would therefore "suffer no cognizable hardship."  *DISH Network L.L.C. v. Rios*, No. 14-2549,

16   2015 U.S. Dist. LEXIS 18285,  at*17 (E.D. Cal. Feb. 13, 2015) (granting injunctive relief).)  And

17   because Defendants voluntarily (indeed, fraudulently) entered into express confidentiality

18   agreements, they have no First Amendment rights to weigh against the clear and obvious

19   irreparable harm that NAF's members may be subject to.  *ITT Telecom Prods.*, 214 Cal. App. 3d

20   at 317 (parties may "waive even First Amendment speech rights by contract" by entering into "an

21   express contract of confidentiality or nondisclosure"); *Perricone*, 292 Conn. at 202 ("[P]rivate

22   parties who voluntarily enter into an agreement to restrict their own speech thereby waive their

23   first amendment rights."); *see also Planned Parenthood of the Columbia/Willamette, Inc. v. Am.*

24   *Coalition of Life Activists*, 290 F.3d 1058, 1085-86 (9th Cir. 2002) (en banc) (conduct is "without

25   First Amendment protection" where it targets specific abortion providers, foreseeably elicits the

26   need for "extraordinary security measures," and makes it so providers "can no longer participate

27   in the debate").

28           In the meantime, Defendants are free to make whatever case they wish against the

1    constitutional right of women in the United States to make their own reproductive choices (███

2    ████████████████████████████████████████████████.)  Defendants continue

3    to release videos they claim are not covered by the TRO, and continue to press their radical case

4    for defunding Planned Parenthood and for the dismantling of laws ensuring access to safe and

5    legal abortions.  All NAF seeks to enjoin is further breaches of the Exhibitor Agreements and

6    NDAs that Defendants voluntarily entered into in order to gain access to NAF's meetings, and its

7    members, by false pretenses.

8              **D.      The Public Interest Favors Injunctive Relief.**

9              "[T]he public interest is a factor which courts must consider in any injunctive action in

10    which the public interest is affected."  *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th

11    Cir. 1983).  Here, for reasons already discussed above, the challenged conduct poses significant

12    reputational harm and potential safety risks to NAF employees and members which, in turn,

13    would adversely affect the general public.  Both state and federal law recognize a robust public

14    policy in favor of protecting abortion providers from harassment, invasion of privacy, and threats

15    to their safety.  (*See* Part III.A.2, *supra*.)  The broader public interest is served by preventing

16    Defendants from harassing, intimidating, and inciting violence against NAF, its employees, and

17    its members by enjoining the publication of video and audio recordings fraudulently obtained at

18    NAF's annual meetings in violation of contract and privacy rights.  *See Diamond Multimedia*

19    *Sys., Inc. v. Super. Ct.*, 19 Cal. 4th 1036, 1064 (1999) (there is a "legitimate and compelling"

20    public interest in enforcing privacy laws and maintaining "a business climate free of fraud and

21    deceptive practices"); *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 992

22    (2004)("[F]raudulent conduct cannot be considered a 'socially useful business practice[]'"

23    (alteration in original)). It is also served by ensuring that NAF can continue to provide a critical,

24    safe and secure venue for medical education and for the exercise of its members' and attendees'

25    associational rights.  (App'x Exs. 106-108.)

26    **IV.    CONCLUSION**

27              For the foregoing reasons, NAF respectfully requests that the Court grant in full NAF's

28    Motion for Preliminary Injunction.

1

2    Dated:

3                                    MORRISON & FOERSTER LLP

4                                    By: */s/ Derek F. Foran*

5                                        Derek F. Foran

6                                    Attorneys for Plaintiff
                                     NATIONAL ABORTION FEDERATION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28