LINDA E. SHOSTAK (CA SBN 64599)
LShostak@mofo.com
DEREK F. FORAN (CA SBN 224569)
DForan@mofo.com
NICHOLAS S. NAPOLITAN (CA SBN 251762)
NNapolitan@mofo.com
CHRISTOPHER L. ROBINSON (CA SBN 260778)
ChristopherRobinson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Plaintiff
NATIONAL ABORTION FEDERATION (NAF)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ABORTION FEDERATION (NAF),<br><br>Plaintiff,<br><br>v.<br><br>THE CENTER FOR MEDICAL PROGRESS, BIOMAX PROCUREMENT SERVICES LLC, DAVID DALEIDEN (aka "ROBERT SARKIS"), and TROY NEWMAN,<br><br>Defendants. | Case No. 3:15-cv-3522<br><br>Judge: William H. Orrick, III<br><br>**NAF'S OPPOSITION TO SECOND MOTION TO QUASH THE SUBPOENA OF CHARLES C. JOHNSON (DKT. 230)**<br><br>Hearing Date: Dec. 23, 2015<br>Hearing Time: 2:00 p.m.<br>Location: Courtroom 2 |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 1

III. ARGUMENT ........ 6

A. Federal Law, Not State Law, Applies to Johnson's Motion to Quash ........ 6

B. Under Federal Law, Johnson Has No Right To Refuse To Comply With NAF's Subpoena ........ 8

CONCLUSION ........ 13

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andrews v. Holloway*,
256 F.R.D. 136 (D.N.J. 2009) .......... 7

*Ashcroft v. Conoco, Inc.*,
218 F.3d 282 (4th Cir. 2000) .......... 8

*Ayala v. Ayers*,
668 F.Supp.2d 1248 (S.D. Cal. 2009) .......... 12, 13

*Chevron Corp. v. Berlinger*,
629 F.3d 297 (2d Cir. 2011) .......... 8, 10

*Crowe v. Cnty. of San Diego*,
242 F.Supp.2d 740 (S.D. Cal. 2003) .......... 11

*Dangerfield v. Star Editorial, Inc.*,
817 F.Supp. 833 (C.D. Cal. 1993) .......... 11

*Delaney v. Superior Court*,
50 Cal.3d 785 (1990) .......... 8

*Grand Jury Proceedings of John Doe v. U.S.*,
842 F.2d 244 (10th Cir. 1988) .......... 7

*In re Madden*,
151 F.3d 125 (3d Cir. 1998) .......... 9

*In re Sealed Case (Medical Records)*,
381 F.3d 1205 (D.C. Cir. 2004) .......... 7

*KSDO v. Superior Court*,
136 Cal.App.3d 375 (1982) .......... 8

*Lee v. Dept. of Justice*,
401 F.Supp.2d 123 (D.D.C. 2005) .......... 11

*Lee v. Dept. of Justice*,
413 F.3d 53 (D.C. Cir. 2005) ("*Lee I*") .......... 8

*Lewis v. U.S.*,
517 F.2d 236 (9th Cir. 1975) .......... 7

*New York Times Co. v. Superior Court*,
51 Cal.3d 453 (1990) .......... 7, 8

*Schiller v. City of New York*,
245 F.R.D. 112 (S.D.N.Y. 2007) ........................................ 12, 13

*SCI-Sacramento, Inc. v. Superior Court*,
54 Cal.App.4th 654 (1997) ........................................ 8

*Shoen v. Shoen*,
48 F.3d 412 (9th Cir. 1995) ("*Shoen II*") ........................................ 9, 10

*Shoen v. Shoen*,
5 F.3d 1289 (9th Cir. 1993) ("*Shoen I*") ........................................ 8, 9

*U.S. v. Cuthbertson*,
630 F.2d 139 (3d Cir. 1980) ........................................ 13

*U.S. v. LaRouche Campaign*,
841 F.2d 1176 (1st Cir. 1988) ........................................ 13

*United States v. Treacy*,
603 F. Supp. 2d 670 (S.D.N.Y. 2009) ........................................ 11

*Von Bulow by Auersperg v. Von Bulow*,
811 F.2d 136 (2d Cir. 1987) ........................................ 9, 10

*Wilcox v. Arpaio*,
753 F.3d 872 (9th Cir. 2014) ........................................ 7

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) ........................................ 11

**OTHER AUTHORITIES**

Federal Rule of Evidence 501 ........................................ 6

Cal. Const. Article 1, § 2(b) ........................................ 7

Cal. Evid. Code § 1170 ........................................ 7

## I. INTRODUCTION

Charles C. Johnson's cursory, two-page second motion to quash is an attempt on the part of a friend of David Daleiden's to suppress evidence critical to the Court's determination of whether a violation of its TRO has occurred. It is meritless and should be denied. Johnson should be compelled to produce the information sought by NAF's subpoena and complete his deposition—which the Court has already ordered should proceed.

For starters, Johnson's second motion to quash is based entirely on the mistaken premise that California's shield law provides him with an "absolute" privilege to refuse to testify. To the contrary, the California shield law is not a privilege at all, applies only to contempt proceedings, and is inapplicable here. Instead, the proper test is one applying a "partial" or "qualified" privilege attributed to journalists under the First Amendment of the U.S. Constitution, and that privilege is of no help to Johnson, for three reasons. First, he has failed to carry his burden of presenting evidence that he had a legitimate, journalistic purpose at the time that he knowingly and purposely disclosed information covered by the TRO. Second, Courts routinely compel journalists to comply with subpoenas where the information sought is relevant to an important issue in the case and there is no other source from which it can be obtained. That is exactly the case here. Third, in selectively disclosing information about his sources publicly, and in selectively invoking the privilege at his deposition to refuse to answer some questions but not others, Johnson has waived any entitlement to refuse to answer questions concerning the source of the leak of TRO materials.

## II. FACTUAL BACKGROUND

On September 15, Congressman Jason Chaffetz, of the House Committee on Oversight and Government Reform, issued a subpoena to CMP seeking the production of "unedited video footage relating to the acquisition, preparation, and sale of fetal tissue," including all such footage "referring or relating to the involvement of Planned Parenthood and its affiliates in the sale of fetal tissue, manipulation of abortion procedures, and or related conversations." (Dkt. 152-1 at 2.) Two days later, CMP's and Daleiden's then-counsel represented that they would "await the Court's ruling on the pending motion to clarify re subpoenas before providing materials covered

by the TRO in response to this subpoena." (*See* Dkt. 154-1.) The lawyer who made these promises on Daleiden's behalf withdrew a week later. (Dkt. 141.) On October 2, Daleiden's new counsel (not counsel for CMP), informed the Court that Daleiden "believe[d] himself compelled" to respond to the subpoena, and "unless th[e] Court instructs otherwise," Daleiden "intend[ed] to respond to the subpoena" by the following Wednesday. (Dkt. 152 at 2.)

On October 6, the Court issued an order allowing CMP to respond to the subpoena. (Dkt. 155.) The Court's order expressly stated, however, that "CMP shall not provide to Congress any footage, documents or communications that have not been specifically requested by the subpoena." (*Id.* at 3.) Two days later, on October 8, **all 504 hours of illegal audio and video footage and hundreds of pages of documents that he and other "Biomax" agents procured at NAF's annual meetings were turned over to Congress**. The scale and scope of the overbroad production to Congress is described in NAF's pending contempt motion. (Dkt. 221-4.)

Twelve days after Daleiden forced through this disclosure of TRO materials to the Congressional subcommittee, an individual named Charles C. Johnson began publishing those materials on a website called "GotNews.com." (Dkt. 171-3 at 1.) Charles C. Johnson is notorious for openly courting controversy. He publishes, for example, the names and photographs of rape victims on his website. (*See* Dkt. 222-12.) He has been labeled the "web's worst journalist" and is "well-known for publishing stories that fall apart under the slightest scrutiny." (Dkt. 171-3 at 2.) The New York Times has described his "journalism" as internet bullying: "Most of what he publishes is either wrong or tasteless," but "that matters little to Mr. Johnson or his audience," the Times explained. (Declaration of Derek F. Foran in Support of NAF's Opposition to Second Motion to Quash Subpoena of Charles C. Johnson ("Foran Decl.") Ex. 1 at 1.)

In a statement accompanying the clip he posted of TRO materials, Johnson claimed that he received "all of the videos" covered by this Court's TRO "from a source on Capitol Hill." (Foran Decl. Ex. 2 at 2.) Johnson stated his intent to disregard the Court's TRO and that he would be "publishing the rest of the videos . . . over the coming days." (*Id.*) On October 22

(after Johnson was served with the TRO) he caused to be published another five hours of video illegally taken at NAF's conferences, except this time on the website of a hacker and white supremacist named Weev Auernheimer, who is currently believed to be living in Macedonia. (Foran Decl. Ex. 1 at 2.) [redacted]

While all of this was occurring, counsel for Daleiden wrote to the Court stating that "Daleiden and CMP were in no way involved in this disclosure and have no idea how this happened." (Dkt. 169 at 1.) It turns out, however, that Daleiden and Johnson are close personal friends and have been since 2007, when they met at Claremont McKenna College. They lived in the same dorm room, were debate partners, and worked together on articles for the Claremont Independent. (Dkt. 171-3 at 2.) [redacted] Johnson has referred to physicians who provide abortions as "baby butchers," (Foran Decl. Ex. 3), [redacted]

Moreover, Johnson knew about Daleiden's plan to infiltrate Planned Parenthood. [redacted]

Thereafter, **we now know that Johnson and Daleiden were in frequent contact**.

Moreover, while Johnson initially claimed to have received the TRO materials "from a source on Capitol Hill" (Foran Decl. Ex. 2), he backed off that story in an extensive interview he gave to the Washington Post. (Foran Decl. Ex. 1.) Johnson told the Post that "he received an anonymous e-mail . . . from someone with the username 'patriotgeist'" and that he has enough information about Patriotgeist to form "a good guess" as to who Patriotgeist is. (*Id.* at 4.) When Johnson tracked Patriotgeist's IP address, "it came back as Washington D.C." (*Id.*)

"Patriotgeist" emailed Johnson a Google Drive link that had "all these documents on it, as well as video." (Foran Decl. Ex. 1 at 4.) Johnson "immediately recognized it as one of

---

[1] Neither Daleiden nor CMP produced this memo in discovery.

Daleiden's videos since it was his friend's voice and the same style of surreptitious filming." (*Id.*) When he emailed Patriotgeist to ask who they were, Patriotgeist "replied that he was someone who felt 'morally interested in having this material come out.'" (*Id.*)

On these facts it is impossible to believe that, without Daleiden's involvement, the Congressional Subcommittee that subpoenaed CMP would have provided materials covered by a federal court order to Daleiden's "great friend" Charles C. Johnson. [redacted]

Accordingly, NAF served Johnson with a copy of the TRO on October 21 (Dkt. 176), and with a subpoena duces tecum for deposition testimony on documents on October 30, setting Johnson's deposition for November 6. (Dkt. 194). Johnson filed a motion to quash that subpoena and refused to show up for the deposition or produce documents. (Dkt. 193.) The Court denied Johnson's motion to quash and ordered him to comply with the subpoena and attend his deposition by November 20. (Dkt. 201.) Two days before the deposition was scheduled to proceed, Johnson filed a "second motion to quash the subpoena." (Dkt. 230.) In his motion, Johnson claims he has an "absolute privilege" to refuse to comply with the subpoena to the extent it seeks information about his "confidential source" and "the material he received from his confidential source" under California's shield law. (*Id.* at 5.)

At his deposition and on the basis of the motion filed two days before the deposition, [redacted]

[redacted] He did produce a privilege log showing multiple communications with Patriotgeist leading up to Johnson's disclosure of TRO materials. (Foran Decl. Ex. 9.) Also on the basis of California's shield law, [redacted]

## III. ARGUMENT

For the reasons explained below, Johnson's reliance on California's shield law is misplaced. Federal law applies here, not state law. While federal courts recognize a qualified journalistic privilege to withhold sources under the First Amendment to the U.S. Constitution, it is of no assistance to Johnson in this case because: (1) Johnson fails to make the required showing to establish the federal qualified privilege; (2) NAF's need for the testimony, documents, and information at issue overcomes the qualified privilege; and (3) Johnson's numerous self-serving and selective disclosures have resulted in a waiver of any right to cloak himself in journalistic privilege. Johnson should be ordered to comply with the subpoena, to produce the documents and information sought in that subpoena concerning Patriotgeist, and to re-appear so that NAF may complete the deposition the Court already ordered should take place.

### A. Federal Law, Not State Law, Applies to Johnson's Motion to Quash

Johnson's exclusive reliance in his second motion to quash on California's shield law is misplaced. Federal law applies here, not state law, for two reasons.

First, under Rule 501 of the Federal Rules of Evidence, the federal law of privilege applies

in all cases except those in which state law supplies the rule of decision. State law does not supply the "rule of decision" here. The Court denied Johnson's first motion to quash the subpoena and ordered his deposition to proceed in order to determine whether Johnson and Daleiden have acted in concert to violate this Court's TRO. (Dkt. 201.) Whether a party has properly invoked a privilege to block discovery concerning a potential violation of a federal court order is an issue of federal law, not state law. *See, e.g.*, *Grand Jury Proceedings of John Doe v. U.S.*, 842 F.2d 244, 247-248 (10th Cir. 1988) (applying federal "family" testimonial privilege to question whether witness who refused to testify should be held in contempt); *Andrews v. Holloway*, 256 F.R.D. 136, 146 (D.N.J. 2009) (applying federal spousal privilege law to determine compliance with a federal protective order); *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1218 (D.C. Cir. 2004) (considering appellant's invocation of psychotherapist privilege in response to federal discovery order under federal law).

Moreover, this case arises under the Court's federal question jurisdiction. NAF's First Amended Complaint pleads causes of action for RICO and federal wiretapping violations, in addition to state law claims. (*See* Dkt. 131, ¶¶ 24-25 (statement of jurisdiction); ¶¶149-161 (RICO claim); ¶¶ 162-169 (wiretapping claim).) In cases asserting both federal and state claims, "federal privilege law governs." *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014); *see also Lewis v. U.S.*, 517 F.2d 236, 237 (9th Cir. 1975) ("In federal question cases the clear weight of authority and logic supports reference to federal law on the issue of the existence and scope of an asserted privilege.")

Second, California's shield law is not a "privilege," and it applies only in contempt proceedings, not to motions to quash a subpoena. The plain language of both the California Constitution and Evidence Code make this clear. *See* Cal. Const. Art. 1, § 2(b) ("A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication [. . . ] **shall not be adjudged in contempt** by a judicial . . . body . . . for refusing to disclose the source of any information."); Cal. Evid. Code § 1170 (same).

Accordingly, the California Supreme Court has held that the shield law "does not create a privilege for newspeople, rather it provides an immunity from being adjudged in contempt." *New*

*York Times Co. v. Superior Court*, 51 Cal.3d 453, 458 (1990); *Delaney v. Superior Court*, 50 Cal.3d 785, 797, fn. 6 (1990) ("the law provides only an immunity from contempt," it is "not a privilege"). Thus, California's shield law has no application unless and until Johnson is threatened with or held in contempt, neither of which is true here. *Id.* at 459 ("Allowing relief" under the Shield Law "before a judgment of contempt would violate the unambiguous language of the shield law"); *see also KSDO v. Superior Court*, 136 Cal.App.3d 375, 384 (1982) ("[T]he California shield law does not apply since petitioner has not been threatened with or cited for contempt."); *SCI-Sacramento, Inc. v. Superior Court*, 54 Cal.App.4th 654, 661 (1997) (holding that there was no shield law question "ripe for review" because "the shield law merely provides immunity from contempt (not a privilege against disclosure), and there is no order of contempt in this case"). Moreover, because "the shield law provides only an immunity *from contempt*," *New York Times Co.*, 51 Cal. 3d at 463 (original emphasis), "[i]t necessarily follows from that conclusion that other sanctions," including monetary sanctions for discovery violations, "are not precluded." *Id.* The California shield law has no application here.

**B. Under Federal Law, Johnson Has No Right To Refuse To Comply With NAF's Subpoena.**

Federal courts have recognized a limited privilege under the First Amendment to the United States Constitution that applies to journalists seeking to protect confidential materials or information from disclosure in litigation. *KSDO*, 136 Cal.App.3d at 384 (applying the federal qualified privilege after finding the California shield law was not applicable since there was no contempt citation at issue). The privilege is not absolute. *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("*Shoen I*"); *see also Lee v. Dept. of Justice*, 413 F.3d 53, 59 (D.C. Cir. 2005) ("*Lee I*") ("the court must keep in mind that this privilege is not absolute" when considering its application); *Ashcroft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) (the reporter's privilege "is not absolute and will be overcome whenever society's need for the confidential information in question outweighs the intrusion on the reporter's First Amendment interests").

"The burden is on the person who claims the privilege to show entitlement." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308-309 (2d Cir. 2011) (refusing to apply federal qualified

privilege). To invoke the privilege, the party claiming the privilege must prove that he or she (1) had "'the intent to use material—sought, gathered or received—to disseminate information to the public'", and (2) that "'such intent existed at the inception of the newsgathering process.'" *Shoen I*, 5 F.3d at 1293 (quotation omitted). This showing must be supported by competent evidence. *Von Bulow by Auersperg v. Von Bulow*, 811 F.2d 136, 145 (2d Cir. 1987) (holding that the "individual claiming the privilege must demonstrate, through competent evidence, the intent to use the material" which "requires an intent-based factual inquiry to be made by the district court"). Even if the moving party makes this initial showing, the party seeking discovery can nevertheless overcome it by showing that the material sought is: "(1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*").

Here, Johnson cannot rely on the federal qualified privilege as a means of avoiding discovery for three separate reasons.

**First**, Johnson makes no showing to support his claim that he was acting in a legitimate journalistic capacity when he purposely published materials stolen by his "great friend" Daleiden and covered by the Court's TRO.

To support his claim to journalistic privilege, Johnson must demonstrate by competent evidence an "'intent to use material—sought, gathered or received—to disseminate information to the public,'" nor that "'such intent existed at the inception of the newsgathering process.'" *Shoen I*, 5 F.3d at 1293 (quoting *Von Bulow*, 811 F.2d at 144). Johnson's motion to quash fails to even reference these requirements, let alone present evidence of Johnson's intent at the relevant time. Instead, Johnson's motion includes one conclusory sentence setting forth his bona fides as a "journalist": "According to his web site www.gotnews.com, 'Gotnews.com founder and editor-in-chief Charles C. Johnson is an investigative journalist, author, and sought after researcher.'" (Dkt. 230, at 4:27-28.) Courts routinely reject assertions of the federal privilege where would-be journalists fail to meet this test. *See, e.g.*, *In re Madden*, 151 F.3d 125, 129-30 (3d Cir. 1998) (overruling claim of journalist privilege because party invoking was "an entertainer, not a reporter, disseminating hype, not news," and the "test does not grant status to any person with a

manuscript, a web page or a film"); *Berlinger*, 629 F.3d at 308-309 (overruling assertion of privilege due to moving party's failure to make requisite showing); *von Bulow by Auersperg*, 811 F.2d at 145 (same).

Rather, what evidence there is suggests Johnson was motivated exclusively by an intent to publish materials ***he knew were covered by a TRO entered in a case involving his "great friend" David Daleiden.*** He indisputably published the majority of the content he has disclosed thus far ***after*** he was served with the TRO. He unquestionably was aware of the TRO at the time of the disclosure, he knew the tapes were made by Daleiden, and he fed these materials to a hacker in Macedonia in order to make sure that [redacted] (Foran Decl. Ex. 1; Foran Decl. Ex. 2; [redacted] Auernheimer himself boasted that the videos were published "[i]n defiance of a federal court order," and that "it feels f_____ great to be circumventing the orders of a federal court again." (Foran Decl. Ex. 1 at 6.) Johnson cites no case, and we are aware of none, that suggests an intent to publish material "in defiance of a federal court order" constitutes legitimate, journalistic conduct sufficient to trigger application of a privilege to refuse to testify about where that material came from. If that were the rule, courts would be helpless to investigate the source of a leak of materials covered by its orders anytime a friend of a party with access to the Internet decides to publish them. Johnson has wholly failed to make any showing in support of his privilege claim.

<u>**Second**</u>, even if Johnson did make a prima facie showing that the federal qualified privilege might apply (he did not), NAF is entitled to discover information that is "(1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen II*, 48 F.3d at 416.

That test is satisfied here. The information NAF seeks – the true identity of "Patriotgeist" and those behind the supposed leak from Congress to the personal friend of Daleiden – is unavailable to NAF from anyone except Johnson.[2] Courts do "not require proof positive that the

---

[2] When NAF deposed Daleiden, [redacted]

knowledge exists nowhere else on earth but in the minds of the journalists and their anonymous confidants." *Lee v. Dept. of Justice*, 401 F.Supp.2d 123, 135 (D.D.C. 2005) (*Lee II*) (quotation omitted). Rather, courts look at whether the requesting party has "other means to discover the identity of a confidential source." *Dangerfield v. Star Editorial, Inc.*, 817 F.Supp. 833, 838 (C.D. Cal. 1993); *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) (finding that plaintiff satisfied the "exhaustion" prong even though he had not deposed every possible source of information).

Moreover, the information NAF seeks is clearly noncumulative and directly relevant to an important issue in the case. NAF is seeking to discover if Johnson, in concert with Daleiden, violated this Court's TRO, and whether they will do so again. Johnson's testimony regarding the identity of "Patriotgeist" is unique, and is critical to answering the question of the source of the leak of materials covered by this Court's TRO. *See e.g., Crowe v. Cnty. of San Diego*, 242 F.Supp.2d 740, 751 (S.D. Cal. 2003) (videotapes of defendant's allegedly defamatory statements relevant to determining defamation); *Lee II, supra*, 401 F.Supp. 2d at 134 (testimony of reporter regarding leaked information was relevant, because "[w]ithout obtaining truthful testimony from journalists concerning the identities of the Government sources who allegedly leaked information to the press, [plaintiff] cannot proceed with his lawsuit"). Johnson's testimony is critical for another reason: [redacted] Put simply, if Johnson is permitted to cloak his misdeeds in a journalistic privilege, the Court will be unable to get to the bottom of whether Daleiden was behind these disclosures, or to enforce its TRO to prevent future disclosures. NAF's need for this discovery therefore more than outweighs any supposed entitlement Johnson claims to publishing materials covered by a Federal Court TRO.[3]

---

[3] [redacted] Courts routinely compel journalist to testify concerning statements they themselves made in published newspaper articles. *See, e.g., United States v. Treacy*, 603 F. Supp. 2d 670, 672 (S.D.N.Y. 2009) (collecting cases enforcing subpoenas that sought "to have the reporters testify that the defendants made the statements reported in the newspapers").

**Third**, even if Johnson had made a showing in support of the federal qualified privilege (he did not), and even if NAF did not overcome this showing (it did), Johnson still could not rely on the federal privilege, because he has waived it by selectively, and self-servingly, disclosing information concerning the source of the leak. "In the interests of fairness, a journalist/author should not be permitted to disclose information to advance the interests of one litigant and then invoke the journalist's privilege to prevent discovery of this same information by another litigant." *Ayala v. Ayers*, 668 F.Supp.2d 1248, 1250 (S.D. Cal. 2009) (finding waiver were journalist was biased toward and shared information with plaintiff but refused to provide it to defendant); *Schiller v. City of New York*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007) ("Under the fairness doctrine, a party that discloses some privileged information cannot thereafter rely on the privilege to withhold related information necessary to gain a complete picture of the facts").

Here, there is no question Johnson's selective disclosures were calculated to assist Daleiden in this litigation. He testified that [redacted]

Moreover, at multiple times during his deposition, [redacted]

Invocation of privilege to prevent discovery into a major violation of this Court's TRO is a serious matter, not a game of cat-and-mouse. In making selective disclosures to benefit Daleiden, and in selectively invoking the federal privilege when it suited his purposes at deposition, Johnson has waived it. *Ayala*, 668 F.Supp.2d at 1250; *Schiller*, 245 F.R.D. at 120.[4]

**CONCLUSION**

For these reasons, NAF respectfully submits that Johnson's Second Motion to Quash should be denied. Johnson should be ordered to produce his communications with "Patriotgeist" as well as a complete set of any materials received from "Patriotgeist." Last, he should also be ordered to complete the deposition that the Court already ordered take place.

Dated: November 30, 2015

LINDA E. SHOSTAK
DEREK F. FORAN
NICHOLAS S. NAPOLITAN
CHRISTOPHER L. ROBINSON
MORRISON & FOERSTER LLP

By: */s/ Derek F. Foran*
Derek F. Foran

Attorneys for Plaintiff
NATIONAL ABORTION FEDERATION

[4] If the Court is in any doubt about ordering discovery, it can order *in camera* review of the communications and files Johnson received from Patriotgeist to assist in its decision. *U.S. v. Cuthbertson*, 630 F.2d 139, 144, 148 (3d Cir. 1980) (affirming district court order requiring in camera review of material claimed to be privileged under qualified federal journalistic privilege); *U.S. v. LaRouche Campaign*, 841 F.2d 1176, 1181-1182 (1st Cir. 1988) (same).