1   LINDA E. SHOSTAK (CA SBN 64599)
    LShostak@mofo.com
2   DEREK F. FORAN (CA SBN 224569)
    DForan@mofo.com
3   NICHOLAS S. NAPOLITAN (CA SBN 251762)
    NNapolitan@mofo.com
4   CHRISTOPHER L. ROBINSON (CA SBN 260778)
    ChristopherRobinson@mofo.com
5   Morrison & Foerster LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone: 415.268.7000
7   Facsimile: 415.268.7522

8   Attorneys for Plaintiff
    NATIONAL ABORTION FEDERATION (NAF)

9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

| | |
|---|---|
| 14  NATIONAL ABORTION FEDERATION (NAF), | Case No.       3:15-cv-3522-WHO |
| 15           Plaintiff, | Judge: Hon. William H. Orrick, III |
| 16      v. | **NATIONAL ABORTION FEDERATION (NAF)'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| 17  THE CENTER FOR MEDICAL PROGRESS, BIOMAX PROCUREMENT SERVICES LLC, DAVID DALEIDEN (aka "ROBERT SARKIS"), and TROY NEWMAN, | |
| 18 | Hearing Date:  December 18, 2015 |
| 19           Defendants. | Hearing Time:  9:00 a.m. Location:  Courtroom 2 |
| 20 | |
| 21 | Date Action Filed:    July 31, 2015 Trial Date: |

22

23

24

25              REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................ii

I.      INTRODUCTION ...................................................................................................... 1

II.     ARGUMENT ............................................................................................................. 1

      A.      NAF Is Likely to Succeed on the Merits of Its Contract Claims. ........................ 1

            1.      The NDAs and Exhibitor Agreements Are Valid and
                Enforceable. ........................................................................................... 2

            2.      Defendants Waived Any First Amendment Right to
                Disclose Information Obtained in Violation of the
                Agreements. ........................................................................................... 6

            3.      The Agreements Are Not Voidable on Public Policy
                Grounds. ................................................................................................. 8

                  a.      Defendants' Claim That Lawful Providers of
                        Abortion Care Are "Callous" Is Specious. .................................... 9

                  b.      Defendants' Claim That the Agreements Are Invalid
                        Agreements to Suppress Evidence of Crime Is
                        Legally and Factually Baseless. ................................................... 11

      B.      NAF Is Likely to Succeed on the Merits of Its Penal Code § 632
                Claims. .............................................................................................................. 17

      C.      NAF Established a Likelihood of Irreparable Harm If Defendants
                Are Not Enjoined. ............................................................................................. 20

      D.      The Balance of Hardships Favors Maintenance of an Injunction. ...................... 23

      E.      The Public Interest Favors Maintenance of an Injunction Through
                Trial. .................................................................................................................. 24

      F.      The Preliminary Injunction Requested Is Not Vague or Overbroad. .................. 25

      G.      The Court Should Overrule Defendants' Objections to NAF's
                Evidence. ........................................................................................................... 28

      H.      Defendants Are Barred by Statute From Introducing Recordings
                Obtained at NAF's Meetings. ............................................................................ 29

III.    CONCLUSION ........................................................................................................ 30

1

## <u>TABLE OF AUTHORITIES</u>

2

3                                                                                          <u>Page (s)</u>

4   CASES

5   *Alliance for the Wild Rockies v. Cottrell*,
        632 F.3d 1127 (9th Cir. 2011)................................................................................ 1
6

7   *Animal Legal Defense Fund v. Otter*,
        No. 14-0104, 2015 WL 4623943 (D. Idaho Aug. 3, 2015)...................................... 7

8   *Bacheller v. Maryland*,
9       397 U.S. 564 (1970) ............................................................................................. 21

10  *Bank of the West v. Super. Ct.*,
        2 Cal.4th 1254 (1992) ............................................................................................. 5
11

12  *Bd. of Trs. of the Leland Stanford Junior Univ. v. Chi-Yi*,
        No. 13-04383, 2015 WL 5158749 (N.D. Cal. Sept. 2, 2015) ............................... 29

13  *Bischoff v. Brittain*,
14      No. 14-01970, 2014 WL 5106991 (E.D. Cal. Oct. 10, 2014)............................... 12

15  *Blasiar, Inc. v. Fireman's Fund Ins. Co.*,
        76 Cal. App. 4th 748 (1999) ................................................................................... 5
16

17  *Brandenburg v. Ohio*,
        395 U.S. 444 (1969) ............................................................................................. 21

18  *Burton v. Sosinsky*,
19      203 Cal. App. 3d 562 (1988)................................................................................... 5

20  *CBS Outdoor LLC v. Cal. Mini Storage, LLC*,
        No. 14-1598, 2014 WL 5282088 (N.D. Cal. Oct. 15, 2014) ............................. 5, 6
21

22  *Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*,
        83 Cal. App. 4th 677 (2002) ............................................................................... 4, 5

23  *Cohen v. Cowles Media Co.*,
24      501 U.S. 633 (1991)................................................................................................ 7

25  *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
        321 F.3d 878 (9th Cir. 2003)................................................................................. 30
26

27  *Cox v. Louisiana*,
        379 U.S. 536 (1965) ............................................................................................. 21

28

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Co. Sheriff Dep't*,
  533 F.3d 780 (9th Cir. 2008) ................................................................................. 21

*De Guere v. Universal City Studios*,
  56 Cal. App. 4th 482 (1997) ..................................................................................... 5

*DISH Network L.L.C. v. Rios*,
  No. 14-2549, 2015 WL 632242 (E.D. Cal. Feb. 13, 2015) ..................................... 23

*DMC Closure Aversion Comm. v. Goia*,
  No. 14-03636, 2014 WL 4446831 (N.D. Cal. Aug. 29, 2014) ............................... 29

*DVD Copy Control Ass'n, Inc. v. Bunner*,
  31 Cal. 4th 864 (2003) .............................................................................................. 7

*Evangelista v. Inlandboatmen's Union of Pac.*,
  777 F.2d 1390 (9th Cir. 1985) ................................................................................ 13

*Feldman v. Allstate Ins. Co.*,
  322 F.3d 660 (9th Cir. 2003) .................................................................................. 30

*Flanagan v. Flanagan*,
  27 Cal. 4th 766 (2002) ............................................................................................ 19

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ................................................................................ 29

*Fomby-Denson v. Dep't of the Army*,
  247 F.3d 1366 (Fed. Cir. 2001) .............................................................................. 11

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................................................ 21

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
  109 Cal. App. 4th 944 (2003) ................................................................................... 5

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .................................................................................. 22

*Gardner Denver Drum LLC v. Goodier*,
  No. 06-4, 2006 WL 1005161 (W.D. Ky. Apr. 2006) .............................................. 23

*Hennighan v. Insphere Ins. Solutions, Inc.*,
  38 F. Supp. 3d 1083 (N.D. Cal. 2014) ................................................................... 28

*ITT Telecom Prods. Corp. v. Dooley*,
  214 Cal. App. 3d 307 (1989) ..................................................................................... 7

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009).......................................................................... 29

*Kight v. CashCall, Inc.*,
    200 Cal. App. 4th 1377 (2011) ...................................................................... 18

*Kyles v. Baker*,
    72 F. Supp. 3d 1021 (N.D. Cal. 2014) ........................................................... 28

*Lachman v. Sperry-Sun Well Surveying Co.*,
    457 F.2d 850 (10th Cir. 1972)........................................................................ 11

*Leiva-Perez v. Holder, Jr.*,
    640 F.3d 962 (9th Cir. 2011)............................................................................ 2

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993)............................................................................. 8

*Lieberman v. KCOP Television, Inc.*,
    110 Cal. App. 4th 156 (2003) ........................................................................ 18

*Marsh v. Zaazoom Solutions, LLC*,
    No. 11-05226, 2012 WL 952226 (N.D. Cal. Mar. 20, 2012)............................ 27

*Meyers v. Guarantee Sav. & Loan Assn.*,
    79 Cal. App. 3d 307 (1978)............................................................................. 5

*Mostovoy v. Sec'y of HHS*,
    No. 02-10V, 2013 WL 3368236 (Fed. Cl. June 12, 2013)................................ 16

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
    Case No. 15-17318 (9th Cir. Dec. 3, 2015) ................................................... 16

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
    762 F.2d 1374 (9th Cir. 1985)........................................................................ 12

*Ohno v. Yasuma*,
    723 F.3d 984 (9th Cir. 2013)........................................................................... 7

*Or. State Pub. Interest Research Group v. Pac. Coast Seafoods Co.*,
    374 F. Supp. 2d 902 (D. Or. 2005) ................................................................ 23

*Palmer v. Truck Ins. Exch.*,
    21 Cal. 4th 1109 (1999) ................................................................................. 4

*Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*,
    143 F.3d 800 (3d Cir. 1998)........................................................................... 23

*People ex rel. Babbitt v. Herndon*,
    581 P.2d 688 (Ariz. 1978)............................................................................. 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
   107 Cal. App. 4th 516 (2003) ................................................................... 4

*Perricone v. Perricone*,
   292 Conn. 187 (2009) ............................................................................ 7

*Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*,
   747 F.2d 511 (9th Cir. 1984) ................................................................ 21

*Sanchez v. Cnty. of San Bernardino*,
   176 Cal. App. 4th 516 (2009) ................................................................ 3

*Sanders v. Am. Broadcasting Cos.*,
   20 Cal. 4th 907 (1999) ............................................................. 17, 18, 19

*Standiford v. Standiford*,
   89 Md. App. 326, 598 A.2d 495 (1991) ............................................... 29

*State ex rel. Corbin v. Goodrich*,
   151 Ariz. 118 (Ariz. Ct. App. 1986) ................................................... 26

*StemExpress LLC v. Center for Medical Progress et al.*,
   LA Super. Ct. No. BC589143 (Aug. 21, 2015) ................................... 12

*Tompkins v. Cyr*,
   995 F. Supp. 664 (N.D. Tex. 1998) ..................................................... 22

*United States v. Marine Shale Processors*,
   81 F.3d 1329 (5th Cir. 1996) ............................................................... 23

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) ............................................................................. 29

*Vringo, Inc. v. ZTE Corp.*,
   No. 14-4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015) ............ 11, 25

*Zoom Elec., Inc. v. Int'l Broth. Of Elec. Workers, Local 595*,
   2013 WL 192515 (N.D. Cal. Jan. 17, 2013) ....................................... 13

**STATUTES**

18 U.S.C.
    § 2511 ................................................................................................................. 30
    § 2515 ................................................................................................................. 30

28 U.S.C.
    § 1746 ................................................................................................................. 29

42 U.S.C.
    § 289g-1 ............................................................................................................. 13
    § 289g-2 ............................................................................................................. 13

Cal. Civ. Code
    § 3427 ................................................................................................................... 9

Cal. Gov. Code
    § 6215 ................................................................................................................... 9
    § 6218 ................................................................................................................... 9
    § 6254.28 .............................................................................................................. 9

Cal. Penal Code
    § 423 ..................................................................................................................... 9
    § 632 ............................................................................................................ *passim*
    § 637.2 ................................................................................................................ 18

Md. Code Ann., Cts. & Jud. Proc. § 10-405 ................................................................ 29

**RULES**

Local Rules
    Rule 7-3(a) ........................................................................................................ 28
    Rule 7-5 .............................................................................................................. 13
    Rule 7-5(b) ......................................................................................................... 13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(d)(2) .............................................................................................. 19

Restatement (Second) of Contracts,
    § 178 ................................................................................................................ 3, 9
    § 307 ................................................................................................................... 27

1    **I.      INTRODUCTION**

2           As NAF set out in its opening brief, this Court should issue a preliminary injunction

3    because there is overwhelming, unrebutted evidence that Defendants fraudulently misrepresented

4    themselves, deliberately violated agreements designed to protect physicians from harm, and

5    violated clear statutory law when they surreptitiously recorded over 500 hours of material from

6    NAF's annual meetings.  The events of recent weeks confirm what NAF has already established:

7    That its members will be irreparably harmed if Defendants are permitted to proceed with their

8    averred course of smearing NAF and its members with their illegally obtained material.

9           More than four months into this case, Defendants still cannot legitimately justify their

10   blatantly unlawful conduct.  Despite 60 pages of effort, Defendants utterly fail to find a loophole

11   in the plain language of NAF's deliberately broad confidentiality agreements, nor can they find a

12   way around the statutes that plainly prohibit their illegal recording spree.  They still present no

13   factual or legal basis for their repeated assertion that "[t]he National Abortion Federation is a

14   criminal enterprise," relying instead on the self-appointed "expert" David Daleiden's conclusory

15   assertion that NAF and its members welcomed a "business model" that was "plainly illegal."

16   Defendants' only response to NAF's showing of direct and irreparable harm is to trivialize it

17   cynically, as the work of mere "hecklers" making "hyperbolic comments."  Ultimately,

18   Defendants' arguments boil down to their view that the First Amendment gives them an absolute

19   right to do and say whatever they want, no matter what agreements and statutes they violated to

20   obtain their illegal recordings.   But they fail to distinguish their conduct from settled law holding

21   that confidentiality agreements are enforceable over First Amendment objections.  This Court

22   should accordingly order Defendants to comply with their commitments—and with statutory law

23   that forbids their illegal recording campaign—during the pendency of this action.

24   **II.     ARGUMENT**

25          **A.      NAF Is Likely to Succeed on the Merits of Its Contract Claims.**

26          In its opening brief, NAF made a clear showing that it was "likely to succeed on the

27   merits" of its contract claims. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th

28   Cir. 2011).  That showing was supported by overwhelming evidence, including the 504 hours of

surreptitious recordings made at NAF's meetings, the executed Exhibitor Agreements and NDAs, David Daleiden's admissions, and CMP's corporate records.  (NAF's Mot. for Prelim. Inj., Dkt. No. 228-4 ("Mot.") at 16-22.)  NAF has therefore shown a "reasonable probability" or "fair prospect" of succeeding on its claims.  *Leiva-Perez v. Holder, Jr.*, 640 F.3d 962, 967-68 (9th Cir. 2011).

### 1.    The NDAs and Exhibitor Agreements Are Valid and Enforceable.

Defendants' primary argument is that the Exhibitor Agreements and NDAs are unenforceable. They cite no authority (because none exists) for the proposition that a fake and fraudulent company that enters into a confidentiality agreement, through agents acting under false names and false pretenses, may avoid its obligations and set aside the agreement as unenforceable.  Beyond that, Defendants' arguments concerning the enforceability of the agreements they knowingly entered into are meritless.

**First**, Defendants claim that the NDAs that the Biomax agents signed at registration for NAF's annual meetings in 2014 and 2015 are "not supported by consideration."  (Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., Dkt. No. 265-1 ("Opp'n") at 19.)  This is so, they claim, because the executed Exhibitor Agreements already gave them "the right to enter the NAF meetings" and therefore "NAF already had a legal obligation to permit them to access the NAF meetings."  (*Id.*)[1] This argument ignores the plain language of the Exhibitor Agreements, which states that the signor will be subject to additional requirements to gain access to NAFs meetings.  In particular, the Exhibitor Agreements state that, as a condition of gaining access to NAF meetings, Exhibitors "shall fully comply with all . . . further rules and regulations NAF adopts."  (App'x Ex. 3 ¶¶  8, 9.)[2]  This includes going through the meeting registration process, and obtaining and wearing an identifying name badge.  (*Id.* ¶ 8.)  The "rules and regulations NAF adopts" also include the rule "that all people attending its conferences (Attendees) sign [a] confidentiality agreement."  (App'x

---

[1] This argument necessarily concedes that the Exhibitor Agreements are valid and enforceable.

[2] Throughout this brief, NAF relies both on the evidence attached to the Appendix of Exhibits (Dkt. No. 225-3) ("App'x"), and to NAF's concurrently filed Supplement Appendix of Exhibits ("Supp. App'x").

1   Ex. 5.)

2          **Second**, Defendants argue that NAF cannot show a likelihood of success on its claim that

3   Defendants violated the provision in the Exhibitor Agreement that required Biomax to "represent

4   [its] businesses, products, and/or services truthfully [and] accurately." (App'x Ex. 3 ¶ 15.)  This

5   is not a serious argument.  Defendants concede in the same brief that Biomax "was not what NAF

6   thought it was," that it "conceal[ed] [its] true purpose" by creating a "new identity" and used

7   "props and costumes" to gain access to NAF's meetings.  (Opp'n at 1-2.)  Defendants also claim

8   that the only remedy for a violation of this provision is cancellation of the Exhibitor Agreement.

9   (Opp'n at 21.)  Once again, this ignores the agreements' clear terms, which state that "the remedy

10  for any breach" is "specific performance and injunctive relief" (which "shall not be deemed

11  exclusive").  (App'x Ex. 3 ¶ 18.)

12         **Third**, Defendants claim that the confidentiality provisions in the Exhibitor Agreements

13  are "ambiguous, irrational, contradictory, and unenforceable."  (Opp'n at 21.)  The premise of this

14  argument (which Defendants fail to support with California law) is that "broadly defined"

15  confidentiality agreements are disfavored.  (*Id.* at 21.)  Defendants reason from this incorrect

16  premise that the agreements are "poorly suited," "grossly overbroad," "irrational," "imprecise,"

17  and therefore they must be construed "narrowly."  (*Id.* at 22, 25.)

18         These claims are meritless.  California courts routinely enforce confidentiality agreements

19  broader than the type at issue to protect important privacy interests.  *See e.g., Sanchez v. Cnty. of*

20  *San Bernardino*, 176 Cal. App. 4th 516, 518, 527 (2009) (upholding provision that prohibits

21  disclosure of all "facts, events and issues which gave rise to this Agreement" because the "broad,

22  general public policy in favor of privacy" favored enforcement).  There are especially compelling

23  policy reasons to uphold the agreements here, given the interests they were designed to protect

24  and the California legislature's repeatedly expressed concern for the privacy, safety and security

25  of physicians who provide abortion care.  *See* Cal. Gov. Code § 6215(a) (abortion providers "are

26  often subject to harassment, threats, and acts of violence"); Restatement (Second) of Contracts

27  § 178(3)(a) ("the strength of [a] policy as manifested by legislation and judicial decisions" is

28  relevant to policy analysis).  Defendants' arguments would stand these principles on their head.

1    Contrary to Defendants' assertions, the agreements are plain on their face.  Under

2  California law, the Court is "bound to give effect to the plain and ordinary meaning of the

3  language used by the parties."  *Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th

4  677, 684 (2002).  Court's "must give a reasonable and commonsense interpretation of a contract

5  consistent with the parties' apparent intent."  *People ex rel. Lockyer v. R.J. Reynolds Tobacco*

6  *Co.*, 107 Cal. App. 4th 516, 526 (2003) (quotation omitted).  Moreover, the "mere fact that a

7  word or phrase in a [contract] may have multiple meanings does not create an ambiguity."

8  *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1118 (1999).

9    Paragraph 17 of the Exhibitor Agreement provides in full:

10
11
12
13
14
15

> In connection with NAF's Annual Meeting, Exhibitor understands that any information NAF may furnish is confidential and not available to the public.  Exhibitor agrees that all written information provided by NAF, *or any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee*, will be used solely in conjunction with Exhibitor's business and will be made available only to Exhibitor's officers, employees, and agents. Unless authorized in writing by NAF, *all information is confidential* and should not be disclosed to any other individual or third parties.

16  (Ex. 3 ¶ 17 (emphasis added).)  Immediately before the signature block, the Exhibitor Agreement

17  provides:

18
19
20

> I also agree to hold in trust and confidence *any confidential information received in the course of exhibiting at the NAF Annual Meeting* and agree not to reproduce or disclose confidential information without express permission from NAF.  Violation of this paragraph could result in civil and/or criminal penalties.

21  (*Id.* (emphasis added).)  This language is unambiguous.  If you come to NAF's meetings as an

22  Exhibitor, you expressly promise, as a condition of entry, to keep "any information disclosed

23  orally or visually to Exhibitor" confidential, and also "agree to hold in trust and confidence any

24  confidential information received in the course of exhibiting at the NAF Annual Meeting."  (*Id.*)

25  The "plain and ordinary meaning of the language used" in this agreement is that "any"

26  information means "any" information.  *Coast Plaza Drs. Hosp. v. Blue Cross of Cal.*,

27  83 Cal.App.4th 677, 684 (2000) (the term "any problem" is "both clear and plain.  It is also very

28  broad.  In interpreting an unambiguous contractual provision we are bound to give effect to the

1   plain and ordinary meaning of the language used by the parties" (citing *Bank of the West v. Super.*

2   *Ct.*, 2 Cal.4th 1254, 1264 (1992)).  If this language seems broad, it is not because it is

3   "imprecise."  It is because it is intended to create broad nondisclosure obligations  *Id.*

4         In contrast, Defendants' interpretation reads critical language out of the contracts—

5   language that was designed to protect NAF members from the precise conduct that Defendants

6   engaged in.  *See Founding Members of the Newport Beach Country Club v. Newport Beach*

7   *Country Club, Inc.*, 109 Cal. App. 4th 944, 957 (2003) ("An interpretation rendering contract

8   language nugatory or inoperative is disfavored."); *CBS Outdoor LLC v. Cal. Mini Storage, LLC*,

9   No. 14-1598, 2014 WL 5282088, at *3 (N.D. Cal. Oct. 15, 2014) (same).[3]

10        **Fourth**, Defendants characterize the Exhibitor Agreements as "contracts of adhesion,"

11  which should be "construed against NAF and in favor of Defendants" because NAF had "superior

12  bargaining power."  (Opp'n at 25-26.)  The Court should reject this appeal to its equitable

13  discretion.  *See De Guere v. Universal City Studios*, 56 Cal. App. 4th 482, 501 (1997) ("[t]he

14  question of whether a particular contract is one of adhesion and, if so, whether it is enforceable,

15  are equitable issues to be resolved by the trial court").  Defendants cannot enter a contract in bad

16  faith, and then appeal to this Court's equitable discretion for leniency in the application of its

17  plain terms.  *See Burton v. Sosinsky*, 203 Cal. App. 3d 562, 573 (1988) ("a court will neither aid

18  in the commission of a fraud . . . nor relieve one of two parties to a fraud from its consequences").

19  In any event, the agreements are clear on their face—there is no "ambiguity" to interpret "against

20  NAF."  *Meyers v. Guarantee Sav. & Loan Assn.*, 79 Cal. App. 3d 307, 312 (1978) (characterizing

21  contract as "an adhesion contract" is "of no avail" where defendant "read and understood" the

22  contract).

23        **Last**, Defendants argue that the Exhibitor Agreements should be construed to "at most"

24

25  ---
    [3] As for Defendants' hypothetical concerns that the contracts might hamper the interests of
26  legitimate attendees, these arguments have no application whatsoever to the facts of this case.
    *Blasiar, Inc. v. Fireman's Fund Ins. Co.*, 76 Cal. App. 4th 748, 754-755 (1999) (refusing to find
27  contract ambiguous based on "a hypothetical ambiguity unrelated to the facts of this case"
    because "[l]anguage in a contract must be construed . . . in the circumstances of that case, and
28  cannot be found to be ambiguous in the abstract" (citation omitted)).

apply to "information provided by NAF itself, not by conference attendees in informal conversations."  (Opp'n at 26.)  Once again, Defendants ignore the plain language of the agreements, which expressly require them to keep "any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee" confidential, and to "agree to hold in trust and confidence any confidential information received in the course of exhibiting at the NAF Annual Meeting."  (App'x Ex. 3 ¶ 17.)  In focusing exclusively on provisions concerning "information NAF may furnish" (*id.*), Defendants impermissibly read out of the contracts the foregoing promises and obligations.  *CBS Outdoor LLC*, 2014 WL 5282088, at *3 ("The Court must not interpret contracts in a way that renders some clauses nugatory, inoperative or meaningless.").

Moreover, Defendants completely ignore language in the NDAs that reinforce (and independently support) the broad confidentiality obligations that serve as a precondition to gaining entry into NAF's meetings.  Attendees must keep confidential "all information distributed or otherwise made available at this conference by NAF or any conference participants through all written materials, discussions, workshops, or other means." (App'x Ex. 5 ¶ 2.)  Contrary to the lawyer arguments now being made to the Court, ███████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

**2.    Defendants Waived Any First Amendment Right to Disclose Information Obtained in Violation of the Agreements.**

In its opening brief, NAF demonstrated that Defendants knowingly and voluntarily waived any "right" to fraudulently gain access to NAF's meetings, tape its members and later publish those tapes.  (Mot. at 17-19.)  Specifically, NAF analyzed each of the factors this Court identified as relevant to a waiver analysis:  "what information defendants obtained," "the circumstances in which the confidentiality agreements were signed," the "reasonableness of various expectations," "the intent of both parties," and the evidence that shows how each factor points to a knowing and voluntary (indeed fraudulent) waiver.  (*Id.*)

1         In response, Defendants repeat their "prior restraint" essay from earlier briefs and then

2    claim that the Court's TRO and any Preliminary Injunction would constitute an unconstitutional

3    restraint.  (Opp'n at 32-35.)  Defendants claim that they were engaging in "lawful political

4    speech," and that "NAF's novel theory" would have a "devastating impact upon freedoms of

5    speech and the press."  (*Id.*)[4]  This argument ignores, as it always has, black letter law that "the

6    first amendment does not confer on the press a constitutional right to disregard promises that

7    would otherwise be enforced under state law."  *Cohen v. Cowles Media Co.*, 501 U.S. 633, 672

8    (1991).  "[P]rivate parties who voluntarily enter into an agreement to restrict their own speech

9    thereby waive their first amendment rights."  *Perricone v. Perricone*, 292 Conn. 187, 202 (2009).

10   The cases on this point are legion, and Defendants cite to nothing that would distinguish their

11   conduct from cases finding such a waiver.  *See id.* at 204 ("The defendant has not cited, however,

12   and our research has not revealed, a single case in which a court has held that a judicial

13   restraining order that enforces an agreement restricting speech between private parties constitutes

14   a per se violation of the first amendment's prohibition on prior restraints on speech."); *DVD Copy*

15   *Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 873, 887 (2003) (rejecting First Amendment

16   challenge to injunction because defendants obtained information in violation of license

17   agreement); *Ohno v. Yasuma*, 723 F.3d 984, 999 & n.16 (9th Cir. 2013) (collecting cases that

18   "enforce restrictions on speech arising from domestic contracts that could not have been enacted

19   into law due to the First Amendment"); *ITT Telecom Prods. Corp. v. Dooley*, 214 Cal. App. 3d

20   307, 317, 319 (1989) (parties may "waive even First Amendment speech rights by contract" by

21   entering into "an express contract of confidentiality or nondisclosure").

22        Thus, what was true at the outset of this case remains true today:  Defendants cannot cite a

23   single case in which a court found a prior restraint where, as here, a party gains access to

---

[4] Defendants' reliance on *Animal Legal Defense Fund v. Otter*, No. 14-0104, 2015 WL 4623943 (D. Idaho Aug. 3, 2015) is woefully misplaced.  That case concerned a facial challenge to a state criminal statute making it a felony to take undercover videos at agricultural facilities, which the district court found to be a content-based restriction that contravened the First Amendment and Equal Protection Clause.  The decision has no relevance to Defendants' criminal and fraudulent activity, and it expressly avoided addressing cases, like this one, that are based on laws of general applicability like prohibitions against fraud, theft, and contract law.  *Id*. at *4.

1    confidential information by false pretenses, promises to keep that information confidential, and

2    agrees that breach of his agreement would subject him to injunctive relief.  (*See* Dkt. No. 27 at

3    2:21-26 (noting that "Defendants' counsel candidly agreed" that he knew of no such case).)

4          As to the waiver issue, Defendants fail to mention (let alone analyze) the factors this

5    Court identified as relevant to a waiver analysis, and otherwise have little to say.  First, they claim

6    that the "purported non-disclosure provisions of NAF's contracts" are "ambiguous and unclear"

7    and that Daleiden found the language "confusing."  (Opp'n at 36-37.)  Not only is this argument

8    wrong for the reasons discussed above, it boggles the mind that someone could claim that the

9    phrase "[a]ttendees are prohibited from making video, audio, photographic, or other recordings of

10   the meetings or discussions at this conference" (App'x Ex. 5 ¶ 2) is "confusing."  Second,

11   Defendants claim that the contracts are "contracts of adhesion" and therefore they should be

12   interpreted against NAF, "the party of superior bargaining strength."  (Opp'n at 37.)  This

13   frivolous argument requires no further response in light of Defendants' admitted fraud upon NAF.

14   Third, and most remarkably, Defendants claim that Daleiden "did not believe" that the contract

15   constituted "an enforceable waiver of constitutional rights."  (Opp'n at 37.)  Daleiden's subjective

16   beliefs concerning the enforceability of the confidentiality agreements are irrelevant.  *Leonard v.*

17   *Clark*, 12 F.3d 885, 890 (9th Cir. 1993).  Defendants do not distinguish the on-point authority that

18   explicitly rejects Defendants' argument.  (Mot. at 18-19.)

19         NAF's detailed evidentiary showing of waiver in light of the factors identified by this

20   Court as relevant to the analysis is unrebutted.  Accordingly, NAF has established a knowing,

21   voluntary, and intelligent waiver.  *See Leonard*, 12 F.3d at 890.

22              **3.     The Agreements Are Not Voidable on Public Policy Grounds.**

23         Alternatively, Defendants claim that the agreements at issue are unenforceable as a matter

24   of public policy.  Defendants offer two arguments for this point, neither of which holds water. [5]

25

26

_____

27   [5] Although NAF addresses the arguments regarding clips cited by Defendants, these clips are
     inadmissible because Defendants violated Cal. Penal Code § 632, as explained in Part II.H, *infra*.

28

1

           **a.**      **Defendants' Claim That Lawful Providers of Abortion Care Are "Callous" Is Specious.**

2

3          Defendants claim that the agreements should not be enforced because doing so would

4 "prevent Defendants from speaking publicly on matters of enormous public interest and

5 importance." (Opp'n at 52.) The only matter that is supposedly of "enormous public interest"

6 that Defendants identify is a set of seven clips that they assert show "members of the abortion

7 industry discussing the harvesting of fetal organs in moments of great candor . . . revealing a

8 disturbingly callous attitude toward highly developed human fetuses." (*Id.*)

9          This outrageous claim, which is a continuation of Defendants' smear campaign against

10 NAF's members, has no basis in law. There is no "abortion doctors are callous" exception to the

11 enforcement of contracts. Instead, a contract is only unenforceable if "the interest in its

12 enforcement is clearly outweighed in the circumstances by a public policy against the

13 enforcement of such terms." Restatement (Second) of Contracts, § 178(1). In weighing the

14 interest in enforcing a contract, courts consider: "(a) the parties justified expectations, (b) any

15 forfeiture that would result if enforcement were denied, and (c) any special public interest in the

16 enforcement of the particular term." *Id*. § 178(2). In weighing the interest against enforcement in

17 light of a public policy, courts consider "(a) the strength of that policy as manifested by

18 legislation or judicial decisions, (b) the likelihood that a refusal to enforce the term will further

19 that policy, (c) the seriousness of any misconduct involved and the extent to which it was

20 deliberate, and (d) the directness of the connection between that misconduct and the term." *Id*.

21          Each of these factors weighs in favor of enforcing NAF's agreements. There is no

22 recognized public policy against confidentiality or nondisclosure agreements. In contrast, time

23 and again, the California legislature has acknowledged that the public policy of this state favors

24 protecting abortion providers, who put their own privacy and safety at risk to ensure the

25 constitutional rights of others, and who "are often subject to harassment, threats, and acts of

26 violence." Cal. Gov. Code § 6215(a). Multiple laws have therefore been enacted for their

27 benefit. *See* Cal. Civ. Code § 3427 *et seq.*; Cal. Gov. Code § 6218 *et seq.*; Cal. Gov. Code §

28 6254.28; Cal. Penal Code § 423 *et seq.* Beyond that, to declare NAF's confidentiality agreements

NAF's Reply iso Motion For Preliminary Injunction
Case No. 3:15-cv-3522-WHO
sf-3603657         9

1   unenforceable would be effectively to declare open season on its members, and render them

2   helpless against further infiltrations, without a safe and secure venue for networking and

3   furthering their medical education.

4        Defendants, in contrast, are arguing for a public policy that would allow radicals to

5   commit fraud and multiple other criminal acts (including tax fraud) in order to infiltrate

6   organizations of abortion providers to reveal to the public "a disturbingly callous attitude toward

7   highly developed human fetuses."  (Opp'n at 52.)  It would encourage the kind of odious behavior

8   proven here, where individuals falsely represent themselves, wear wires and ████████████████

9   ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████   And this entire argument

12  is based on Defendants' self-serving characterization of a sum total of seven clips cherry-picked

13  from 504 hours of illegal tape taken at NAF's meetings.  (Mot. at 14-15 and materials cited

14  therein.)  Defendants' ideological commitment to their cause, their fanatical animus toward

15  Planned Parenthood, and their moral outrage at the fact that abortion is legal in this country does

16  not give them the right to disregard the law.

17       Last, the whole point of NAF's confidentiality agreements is to create a safe space for

18  NAF members to come together, and to mingle and communicate freely in "moments of great

19  candor" (Opp'n at 52) without fear of being infiltrated and misrepresented by the Troy Newmans

20  and David Daleidens of this world.  (Saporta Decl., Dkt. No. 3-34 ¶ 16 (quoting meeting attendee

21  as saying "It is great to be in a place where I can say 'abortion' out loud and be supported.").)

22  Physicians have clinical jobs and they speak in clinical terms.  A gathering of cardiologists or

23  gastroentologists discussing medical procedures at a conference would sound no different, but

24  because of the subject matter, NAF members, who sacrifice their own privacy and safety every

25  day in order to care for their patients, are derided by these Defendants as "callous."  Defendants'

26  galling, offensive and shameful argument may find traction with a different audience, but

27  provides no legal basis to void NAF's agreements.

28

**b.      Defendants' Claim That the Agreements Are Invalid Agreements to Suppress Evidence of Crime Is Legally and Factually Baseless.**

Defendants' only other argument is that the agreements are unenforceable "to the extent" that they would "prevent disclosure of criminal activity" or a "willingness to engage in criminal activity."  (Opp'n at 52.)

This claim has no legal basis.  The cases Defendants cite address clearly illegal agreements, are not remotely on point, and require no response.[6]  There is nothing against "public policy" about NAF's confidentiality agreements.  *See, e.g.*, *Vringo, Inc. v. ZTE Corp.*, No. 14-4988, 2015 WL 3498634, at *8 (S.D.N.Y. June 3, 2015) (rejecting argument that NDA was "an agreement to suppress evidence" where NDA contemplated receipt of subpoenas, and required notice and efforts to obtain confidential treatment in response to such subpoenas).  It is simply not credible to argue that they are agreements to suppress evidence within the meaning of the cases Defendants rely on.

More importantly, this argument has no evidentiary support.  The only "evidence" submitted is the declaration of David Daleiden, together with 21 audio/video clips taken from NAF's meetings.  In his declaration, Daleiden states that CMP "carries out its work by means of investigative journalism that complies with all applicable laws."  (Decl. of David Daleiden in Opp'n to Mot. for Prelim. Inj. (Dkt. No. 265-3) ("Daleiden Decl.") ¶ 2.)  He avers that his "work" has been informed by conversations with (unidentified) "attorneys" and (unidentified) "scientists, researchers, abortion providers" and "procurement specialists, among others."  (*Id.* ¶¶ 6, 12.)  He also states that "in addition to [his] own reading and research, [he] consulted with attorneys on various legal issues," including "the legality, or lack thereof, of the abortion and fetal tissue procurement practices I learned about."  (*Id.* ¶ 7.)

Daleiden then states that Biomax agents told NAF representatives that "BioMax planned to give clinics some of the fees that it received from researchers for providing fetal tissue—***an***

---

[6] *See, e.g.*, *Fomby-Denson v. Dep't of the Army*, 247 F.3d 1366, 1378 (Fed. Cir. 2001) (settlement agreement precluding reporting of forged documents void); *Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850, 853 (10th Cir. 1972) (agreement prohibiting disclosure of unlawful misappropriation of natural gas void under the circumstances).

1   ***action that would be plainly illegal***.” (*Id.* ¶ 10 emphasis added).)  This is so, he claims, because

2   “there is usually no cost to the abortion provider,” so “no reimbursement is allowed by law.” (*Id.*

3   ¶ 14.)  Then, when Daleiden attended NAF’s meetings, he “took every opportunity” to describe

4   this “plainly illegal” “business model,” and “at no time did any industry participants raise

5   concerns about BioMax’s stated business plan.” (*Id.* ¶ 14.)  To the contrary, “most attendees,

6   including NAF personnel, appeared to welcome BioMax’s presence at the conference.” (*Id.*)  He

7   had “many conversations with NAF attendees and personnel about paying abortion providers $50,

8   $60, or more for desired fetal tissue specimens.” (*Id.*)

9          In sum, Defendants’ entire argument boils down to the assertion that NAF is preventing

10  “disclosure of criminal activity” because David Daleiden says criminal activity is afoot.

11  Daleiden’s declaration of conclusory legal assertions has no evidentiary value, and is entitled to

12  no weight whatsoever.[7]  *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377

13  (9th Cir. 1985) (affirming trial court’s decision to disregard “conclusory” declarations and

14  holding on preliminary injunction that the “weight to be given each [affiant’s] statement is in the

15  discretion of the trial court”); *Bischoff v. Brittain*, No. 14-01970, 2014 WL 5106991, at *3 (E.D.

16  Cal. Oct. 10, 2014) (“[T]he weight to be given such evidence is a matter for the court’s discretion,

17  upon consideration of the competence, personal knowledge and credibility of the affiant.”)

18  (internal quotation marks omitted).  In *StemExpress LLC v. Center for Medical Progress et al.*,

19  LA Super. Ct. No. BC589143 (Aug. 21, 2015), for example, the Los Angeles Superior Court held

20  that Daleiden’s testimony was not “worthy of credence,” and that his “apparent ideological

21  conviction” does not establish a “reasonable belief” of evidence of a crime under Penal Code

22  § 632.  (Supp. App’x  Ex. No. 134 at 8.)  If Daleiden’s “apparent ideological conviction” does not

23  establish a “reasonable belief” of evidence of a crime in the LA Superior Court action (*id.*), it

24  most certainly does not establish that NAF’s confidentiality agreements seek to suppress evidence

25  of a crime in this case.  There are multiple reasons why this is so.

26

27  _____
    [7] Like Daleiden’s declaration, Defendants’ brief simply rests on conclusory assertions that
    Daleiden uncovered “criminal behavior.”  (Opp’n at 1-2, 3, 16-17, 37, 49, 50-51, 52-54.)

28

1       **First**, Daleiden's statements about what is "illegal" do not constitute evidence of

2    anything.  *See* Civil Local Rule 7-5(b) (a declaration "may contain only facts . . . and must avoid

3    conclusions and argument"); *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398

4    fn. 3 (9th Cir. 1985) (lay witness declarations containing "legal conclusion[s]" are

5    "inadmissible"); *Zoom Elec., Inc. v. Int'l Broth. Of Elec. Workers, Local 595*, 2013 WL 192515,

6    at *4 (N.D. Cal. Jan. 17, 2013) (striking declaration "that consist of legal conclusions and

7    argument, in violation of Civil Local Rule 7-5").

8       Nevertheless, it is worth noting that Daleiden gets the law completely wrong.  The

9    National Institutes of Health Revitalization Act of 1993 expressly allows a woman to consent to

10    donating fetal tissue after an abortion.  *See* 42 U.S.C. § 289g-1(a)(1) ("The Secretary [of Health]

11    may conduct or support research on the transplantation of human fetal tissue for therapeutic

12    purposes"); *id.* § 289g-1(a)(2) ("Human fetal tissue may be used in research . . . regardless of

13    whether the tissue is obtained pursuant to a spontaneous or induced abortion . . . .").  Clinics who

14    offer this option to their patients are entitled under the law to recoup "reasonable payments" for

15    the service "associated with the transportation, implantation, processing, preservation, quality

16    control, or storage of human fetal tissue."  *Id.* § 289g-2(e)(4).[8]

17       Thus Daleiden's bald assertion that a "business model" allowing a tissue procurement

18    company "to give clinics some of the fees that it received from researchers for providing fetal

19    tissue" is "plainly illegal" (Daleiden Decl. ¶ 10) ignores the fact that clinics are entitled to

20    "reasonable payments" to cover their costs.  42 U.S.C. § 289g-2(e)(4).  And while he asserts that

21    there is "usually no cost to the abortion provider" when dealing with a fetal tissue procurement

22    company (Daleiden Decl. ¶ 14), he provides no support of any kind for this statement; he simply

23    asserts it.  Nor does he explain how his conclusory contention makes sense:  Procurement

24

25     [8] NAF's Guidelines Relating to Fetal Tissue Donation reflect these requirements.  (App'x Ex. 110

26    at 2 ("Clinics and providers cannot financially gain from their participation in fetal tissue donation.  Remuneration is limited to 'reasonable payments associated'" with costs).  So does the guidance Planned Parenthood provides to its affiliates.  (App'x Ex. 78 at 6 (clinics only allowed

27    to be "reimburse[d] for actual expenses (e.g., storage, processing, transportation etc.) of the tissue").)

28

organizations are not on hand every minute of every day to collect tissue, and tissue must be stored correctly and clinic staff diverted to deal with the procurement organization.  (*See*, *e.g.*, App'x Ex. 78 at 7 ($60 reimbursement fee received by affiliates in California covered "only their costs, as allowed under federal law").)  All of Daleiden's other assertions about supposed evidence of criminal conduct flow from his *ipse dixit* that a "business model" offering clinics "$50, $60, or more" is "plainly illegal."  (Daleiden Decl. ¶¶ 10, 14.)  This simply is not so.

**Second**, largely for the reasons explained above, Defendants do not point to a shred of evidence in the 21 cited audio/video clips in support of their claim that NAF's members evidenced "willingness to engage in criminal activity."  (Opp'n at 52.)[9]

NAF will not dignify Defendants' continued smear campaign in court filings with a point-by-point response, except to say that this handful of clips simply show more of the same.  ███████████████████████████████████████████████████████████████  ███████████████████████████████████████████████████████████  ██████████████████████████████████████████████████████████  ███████████████████  Nor is there the requisite foundation for showing that any of these individuals knew anything about federal requirements regarding fetal tissue procurement.  Why would they?  Only a handful of Planned Parenthood affiliates (less than 1%) had fetal tissue programs.  (App'x Ex. 78 at 6.)  ████████████████████████████████████████████████  ████████████████████████████████████████████████████████████  ████████████████████████████████████████████████████████████  ████████████████████████████████████████████████████████████  ████████████████████████████████████████████████████████████

There are countless other examples in the record that Defendants fail to address.  (*See* Mot. at 10 n.5.)

**Third**, Daleiden has no credibility when he accuses lawful providers of abortion care of

---

[9] To put Defendants' citations in context, the "many conversations" of "criminal activity" (Daleiden Decl. ¶¶ 12, 14) cited by Defendants amount to *0.69% of the 504 hours of tapes taken at NAF's meetings* (based on the times set forth in Defendants' exhibits.)

1    being criminals.  Not only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but he has openly boasted about committing fraud on NAF and its

3    members, and has admitted to illegally taping 504 hours of NAF's meetings.  (*See* Supp. App'x

4    Ex. 134 at 7 (disregarding Daleiden's testimony because of "admission" that he "surreptitiously

5    taped" individuals).)  Daleiden also has stated under penalty of perjury to the United States

6    government and the State of California that CMP was a "nonpartisan" organization and that "no

7    substantial part of the activities of the Corporation . . . consist of carrying on propaganda, or

8    otherwise attempting to influence legislation."  (App'x Exs. 9 at NAF0000535; 10 at

9    NAF0001789.)

10          We now know these claims are false. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In even more vivid terms, CMP's agent,

20   Catherine Short, issued a press release on July 14 calling abortion doctors "contract killers" and

21   expressly asking "why a penny of taxpayer money is going to fund any part of Planned

22   Parenthood."  (App'x Exs. 24; 25 at NAF0002011.)  And Troy Newman recently stated that

23   Defendants' goal all along was to "completely destroy the entity called Planned Parenthood."

24   (Supp. App'x Ex. 136.)  Far from seeking evidence of actual crimes, Defendants' motives are

25   plain as day.

26

---

27   [10] This report  was produced to NAF not by CMP or Daleiden, but rather by his friend Charles C.
     Johnson.  Daleiden's attorneys quickly designated it Confidential under the Protective Order.

28

**Fourth**, Daleiden exclusively bases his views concerning "the legality, or lack thereof, of the abortion and fetal tissue procurement practices [he] learned about" on his "own reading and research" and consultations with "attorneys on various legal issues," as well as "experts." (Daleiden Decl. ¶¶ 7, 6.)  Conspicuously, Daleiden does not identify a single "expert" or attorney that he relied upon.  The Court should disregard Daleiden's claimed expertise for this reason alone.  But NAF now knows the identities of individuals who were "intimately involved in the planning and funding of [CMP's] alleged conspiracy," ███████████████████████ ████████████████████████████  *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, Case No. 15-17318 (9th Cir. Dec. 3, 2015). █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ Daleiden also consulted with Theresa Deisher (Supp. App'x Ex. 149 ¶¶ 6-12), a well-known anti-vaccination advocate whose work has been rejected by courts because of "her own lack of demonstrated scientific research."  *Mostovoy v. Sec'y of HHS*, No. 02-10V, 2013 WL 3368236 (Fed. Cl. June 12, 2013).  The sources for Daleiden's knowledge of "the abortion and fetal tissue procurement practices" that he was "investigating" speak volumes about his credibility and qualifications.

**Fifth** and finally, Daleiden's claim that his videotaping campaign has uncovered evidence of criminal practices has been thoroughly debunked.  While he continues to insist that statements by Dr. Deborah Nucatola,████████████████████████████████████, featured in the very

1    first video he released "contain[] statements . . . reflecting a clear willingness to profit from the

2    sale of fetal tissue" and who "admitt[ed] to alteration of abortion methods to procure fetal tissue"

3    (Opp'n at 16), not a single state has found any wrongdoing on the part of Dr. Nucatola or Planned

4    Parenthood.  To the contrary, nine states have concluded investigations of Planned Parenthood,

5    finding no basis for wrongdoing (not to mention the many states that declined to investigate

6    Planned Parenthood in the first place).  (App'x Exs. 112; 116; 118; 119; 122; 123; *see also* Supp.

7    App'x Exs. 140; 141; 143.)  The Washington AG's findings are especially instructive, because

8    Washington is only one of two states in which Planned Parenthood affiliates were actually

9    involved in fetal tissue donation programs.  (App'x Ex. 78 at NAF0001864.)  The Washington

10   AG found "no indication that procedures performed by Planned Parenthood are anything other

11   than performance of a legally authorized medical procedure."  (Supp. App'x Ex. 141 at 1).  To the

12   contrary, the Washington AG found that Planned Parenthood does not "sell fetal tissue," nor does

13   it "perform partial-birth abortions."  (*Id*.)  CMP responded by calling for the Attorney General to

14   be impeached.  (Dkt. No. 263-4 at 1.)

15          Daleiden's false and self-serving claims that the confidentiality agreements seek to

16   suppress evidence of criminal conduct provide no grounds to void NAF's contracts.

17          **B.    NAF Is Likely to Succeed on the Merits of Its Penal Code § 632 Claims.**

18          In its opening brief, NAF also established that it was likely to succeed on the merits of its

19   Penal Code § 632 claims.  Specifically, under the California Supreme Court's decision in

20   *Sanders*, individuals in a "workplace to which the general public does not have unfettered access"

21   enjoy a legitimate "expectation that their conversations and other interactions will not be secretly

22   videotaped by undercover television reporters."  *Sanders v. Am. Broadcasting Cos.*, 20 Cal. 4th

23   907, 911 (1999).  Here, given the history of violence and attempted infiltrations of NAF's

24   meetings, the Exhibitor Agreements and NDAs, the other prerequisites for gaining access to

25   NAF's meetings, and the extensive security measures in place, NAF's members had a legitimate,

26   objectively reasonably expectation that they would not be secretly recorded by those opposed to

27   the lawful provision of abortion care while in the safe haven of NAF's meetings.  *See id.*  The

28   sweeping and indiscriminate nature of Defendants' videotaping campaign speaks for itself in this

1    regard.

2           **First**, Defendants' claim that section 632 does not support a request to enjoin the

3    publication of tapes taken in violation of that provision is irrelevant.  NAF's Exhibitor

4    Agreements and NDAs support NAF's request to enjoin the publication of those tapes.  But

5    section 632 supplements NAF's request to enjoin Defendants from *future* violations of that

6    provision, and from "attempting to gain access to any future NAF meetings" in order to tape its

7    members.  *See* Cal. Penal Code § 637.2 (b) (any person may "bring an action to enjoin and

8    restrain any violation of" the chapter containing California Penal Code section  632).  That

9    request is especially critical in light of Defendants' admitted record, and extensive history, of

10   making surreptitious recordings of abortion providers.  (*See*, *e.g.* App'x Exs. 18; 19 at

11   NAF0003563, NAF0003585-86; 20.)  Indeed, in their Opposition, Defendants expressly reserve

12   the right to invade NAF's meetings in the future, claiming NAF has no "special privilege" to

13   avoid "further investigative journalist projects by Defendants or someone acting in concert with

14   them."  (Opp'n at 59.)  By their own admission, Defendants will not be deterred absent an

15   injunction.

16          **Second**, Defendants argue that NAF has failed to prove any "confidential

17   communications" occurred at its meetings, because meeting attendees should have expected their

18   communications to be "overheard" by "another attendee or venue staff."  (Opp'n at 29-31.)  This

19   argument runs headlong into the California Supreme Court's holding in *Sanders*, which squarely

20   rejected the notion that a reasonable expectation of privacy "must be of ***absolute*** or ***complete***

21   privacy."  20 Cal. 4th at 915, 917-18 (original emphases).[11]  *Sanders* considered secret recordings

22   made of people in "a large room with rows of cubicles, about 100 total," each of which was only

23   "enclosed on three sides by five-foot-high partitions," in an office that "was unlocked during

---

[11] Defendants also argue that *Sanders*'s analysis does not apply because it addressed an invasion
of privacy claim rather than a claim under section 632.  This is an irrelevant distinction because
the "reasonable expectation of privacy" analysis is the same whether in the context of an invasion
claim or a Penal Code § 632 claim.  *See*, *e.g.*, *Kight v. CashCall, Inc.*, 200 Cal. App. 4th 1377
(2011) (applying *Sanders*' reasonable expectation of privacy analysis to a Section 632 claim);
*Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 168 (2003) (same).  The other cases
Defendants rely on in their argument are from other jurisdictions and are irrelevant.

business hours." *Id*. at 912.  Occupants could "easily overhear conversations conducted in surrounding cubicles or in the aisles . . . ." *Id*.  Nevertheless, because privacy "is not a binary, all-or-nothing characteristic," the court ruled that the occupants "have a reasonable expectation of visual or aural privacy against electronic intrusion by a stranger to the workplace, despite the possibility that the conversations and interactions at issue could be witnessed by coworkers or the employer." *Id*. at 918.  Similarly, the *Sanders* court brushed off the Defendants' proposed distinction between "personal" and "professional" conversations (Opp'n at 32), because what mattered was that the recorded conversations "could not have been witnessed by the general public, although they could have been overheard or observed by other employees in the shared workplace." *Id*. at 922; *see also Flanagan v. Flanagan*, 27 Cal. 4th 766, 774 (2002) (remanding ruling in favor of defendant, and because section 632 claims turn on whether a plaintiff has an "objectively reasonable expectation that they were not being recorded").

Of particular importance here is the principle that the existence of a privacy expectation "must be evaluated with respect to the identity of the alleged intruder and the nature of the intrusion." *Sanders*, 20 Cal. 4th at 918.  Here, NAF meeting attendees knew that NAF went to great lengths to vet attendees as to the nature of their business, to secure multiple layers of confidentiality agreements, to make sure that the meetings were not being filmed, photographed or recorded, to ensure physical security, to work with hotel staff to make sure that the premises were secure, and to keep the contents of the meetings confidential with respect to the general public.  (*See* Dkt. No. 228-4 at 3-6.)  Defendants cannot seriously argue that attendees did not hold an objectively reasonable expectation that anti-abortion extremists (or other analogs to "stranger[s] to the workplace," *Sanders*, 20 Cal.th at 918) would not be recording or listening in on their conversations.[12]

---

[12] Separately, Troy Newman claims NAF is not likely to succeed on the merits of its claims against him "as an individual defendant," and argues that NAF should dismiss such claims "as a needless redundancy."  (Opp'n at 38-43.)  As an officer of CMP, Newman is automatically bound by any injunction that issues against it by virtue of Federal Rule of Civil Procedure 65(d)(2). (App'x Ex. 9 at 3 (listing Troy Newman as CMP's Secretary).)  Newman offers no basis to argue that NAF must establish "stand alone" grounds in order to bind him to the injunction.  And his claim that there is "no evidence" to support claims against him is not serious in light of his

(Footnote continues on next page.)

1
2

**C.     NAF Established a Likelihood of Irreparable Harm If Defendants Are Not Enjoined.**

3

4
5
6
7
8
9
10

In its opening brief, NAF demonstrated that CMP's campaign against its members has caused significant irreparable harm to its initial victims, and that absent a preliminary injunction, its members will be subject to the same treatment.  (Mot. at 11-14.)  The recent leak of TRO materials by Charles Johnson demonstrates the compelling reasons why an injunction is necessary.  Following his disclosures, NAF members and meeting attendees have once again had their faces widely published on the internet, while commentators call for their "names and info . . . [to go] viral" and that they be "drawn and quartered," "skinned alive," and "execut[ed]."  (*Id.* at 13.)

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Even more gut-wrenching, the mass shooting that took place at a NAF member clinic after NAF filed its motion vividly demonstrates the wisdom of preliminarily enjoining these Defendants from violating their confidentiality obligations to NAF.  On November 28, 2015, a Colorado gunman stormed into a Planned Parenthood clinic in Colorado Springs—for which Dr. Ginde is the medical director—and engaging in a 5-hour armed standoff with police that left one police officer and two civilians dead.  (Supp. App'x Ex. 145.)  After his capture, the gunman echoed the precise words Defendants leveled against Dr. Ginde and the other victims of their campaign: "no more baby parts."  (*Id.*)  Dr. Ginde's picture, the address for the clinic that was the target of this attack, and Defendants' surreptitious videos of her are all posted on the website of Newman's organization, which they credit as the "largest collection of documents on America's abortion cartel."  (App'x Ex. 22 at NAF0004426; Supp. App'x Ex. 148.)  And after the murders, Newman had the gall to state that they were "exactly what [Planned Parenthood had] been hoping for" because it could now play the "poor victim."  (Supp. App'x Ex. 144.)  Defendants' vile comments aside, their claims that NAF has not shown a likelihood of irreparable harm are meritless.

26

(Footnote continued from previous page.)

27
28

multiple public statements touting his involvement in the conspiracy, and his invocation of the Fifth Amendment to avoid self-incrimination in his deposition.  (*See*, *e.g.*, App'x Exs. 100, 127.)

1    **First**, Defendants claim that NAF's irreparable harm showing relies "virtually

2    exclusively" on the "purported" risk of "threats, harassment, and violence by ***unrelated third***

3    ***parties***" which is insufficient to "constitute irreparable harm" in "the context of free speech

4    claims."  (Opp'n at 43-44 (original emphasis).)

5         This argument utterly ignores the overwhelming evidence presented by NAF concerning

6    the reputational injuries suffered by the initial victims of Defendants' campaign.  Reputational

7    harm by itself is sufficient to sustain the request for injunctive relief.  *Regents of Univ. of Cal. v.*

8    *Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (harm to reputation is irreparable

9    injury).  Moreover, many of the most repugnant accusations leveled against those victims came

10   from the Defendants' themselves.  Newman, Daleiden, and CMP's agent Catherine Short have

11   variously described Dr. Nucatola and others as "repulsive," "satanic," "Dr. Frankenstein," and

12   "contract killers" engaged in "baby parts trafficking," "barbaric practices," and "human rights

13   abuses."  (App'x Exs. 16 at NAF0004493, NAF0004496; 74; 75; 128; 24 at 1.)

14        Beyond misrepresenting NAF's position and the evidence presented, CMP's claim that

15   threats of harassment and violence by "unrelated third parties" is insufficient "in the context of

16   free speech claims" necessarily supposes that Defendants have a "free speech" right to illegally

17   tape NAF's meetings and publish those tapes after-the-fact. For reasons already discussed at

18   length, they have no such right.  Defendants' reliance on "heckler's veto" cases therefore

19   completely misses the mark.[13]

20        **Second**, Defendants argue that NAF cannot show a causal connection between

21   Defendants' breaches and any "concrete acts of violence."  (Opp'n at 44-45.)  The argument has

---

[13] The "heckler's veto" line of cases all involve unconstitutional bans against peaceful protests that had been imposed because some bystanders were upset by the protestors' message.  *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Co. Sheriff Dep't*, 533 F.3d 780, 789 (9th Cir. 2008) (peaceful pro-life protest could not be banned because some bystanders were upset by graphic images of aborted fetuses); *Cox v. Louisiana*, 379 U.S. 536, 550 (1965) (arrest of black students peacefully protesting racial segregation could not be upheld on ground that some white citizens were angered by message); *Bacheller v. Maryland*, 397 U.S. 564, 567 (1970) (same in context of peaceful Vietnam war protests); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (parade fees could not be imposed based on content of protestors' message); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (arrest of Ku Klux Klan member could not be upheld on ground that his speech referred to possibility of "revengeance" against black and Jewish citizens).

1   no legal support.  *See e.g., Tompkins v. Cyr*, 995 F. Supp. 664, 687-688 (N.D. Tex. 1998)

2   (entering injunction against anti-abortion protestors based on "substantial threat of future harm"

3   to physician posed by third parties because "Defendants' past actions indicate that they have little

4   or no regard for plaintiffs' rights") *aff'd in part and rev'd in part on other grounds by* 202 F.3d

5   770 (5th Cir. 2000); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 744-46 (9th Cir. 2015)

6   (assuming that third party death threats constitute irreparable harm).  Beyond that, it ignores the

7   multitude of death threats that specifically call out Defendants' videos as their inspiration, as well

8   as the concrete link between Defendants' campaign and the spike in incidents of intimidation,

9   harassment, and violence perpetrated against providers of abortion care since July 14.  The notion

10  that there is no "nexus" between Defendants' false claims of criminality and "baby parts"

11  trafficking and the vitriol leveled at NAF's members since July 14 is not a serious argument.

12       **Third**, Defendants argue that the death threats directed against abortion providers in the

13  wake of CMP's video campaign constitute mere "common" and "political hyperbole."  (Opp'n at

14  44-45).  The vitriolic abuse hurled at NAF's members, in the context of the history of violence,

15  death threats, and extreme harassment that they have suffered for decades, is not so easily

16  dismissed, and is anything but ordinary.  To take just one example, in the weeks before the

17  massacre at a clinic for which Dr. Ginde is the medical director, protesters descended on

18  Dr. Ginde's front lawn holding signs that said "Planned Parenthood sells baby parts" and leaving

19  fliers that said "Savita Ginde Murders Children."  (App'x Ex. 84.)  Online commentators publicly

20  called for her clinic to "get[] bombed" and for "every abortion supporter" to be "publicly

21  lynched" and "executed" like "vile subhuman cockroaches."  (App'x Ex. 85.)  Just a few weeks

22  later, a Colorado gunman descended on the clinic that Newman's organization identifies as

23  Dr. Ginde's workplace, and then repeated Defendants' credo to police after killing three people.

24  (Supp. App'x Exs. 148; 142.)  Yesterday, while he was being charged, the gunman announced to

25  the courtroom that "I am a warrior for the babies," and "protect the babies!"  (Supp. App'x

26  Ex. 147.)  Not only is the causal link obvious, these results are utterly and tragically predictable in

27  this climate.  Defendants' cynical argument requires no further response.

28

**Fourth**, and finally, Defendants claim that NAF's assertion of increased "harassment" at clinics is artificially inflated.  (Opp'n at 46-47.)  But Defendants ignore that not only has NAF and Planned Parenthood seen a dramatic increase in hate speech, harassment, and violence against Planned Parenthood clinics in the wake of CMP's video smear campaign (App'x Ex. 95 at 16:17-23, 39:13-20; *see also* App'x Exs. 92; 93), **the FBI** has reported an increase in attacks on reproductive health care facilities.  (App'x Ex. 94.)  Indeed, there have been at least four arsons and one massacre at Planned Parenthood clinics that have been tied to anti-abortion extremists since CMP's video campaign.  (App'x. Exs. 96-99; Supp. App'x Ex. 142.)

### D.    The Balance of Hardships Favors Maintenance of an Injunction.

As NAF explained in its opening brief, it is an "accepted equitable principle that a court does not have to balance the equities in a case," like this one, "where the defendant's conduct has been willful."  (Mot. at 23-24 (quoting *EPA v. Envt'l Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990).)  Defendants do not contest this point, nor do they offer any reason why this traditional principal of equity should not apply to them.  Accordingly, Defendants' cited "hardships" cannot pose a barrier to NAF's requested injunction.  *See also*, *e.g.*, *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-9 (5th Cir. 1996) ("a court need not balance the hardship when a defendant's conduct has been willful"); *Or. State Pub. Interest Research Group v. Pac. Coast Seafoods Co.*, 374 F. Supp. 2d 902, 908 (D. Or. 2005) (same).

Moreover, because Defendants voluntarily waived their First Amendment rights with respect to information obtained at NAF's meetings, any "harm" to their First Amendment rights is not cognizable in the Court's weighing of hardships.  *DISH Network L.L.C. v. Rios*, No. 14-2549, 2015 WL 632242,  at*6-7 (E.D. Cal. Feb. 13, 2015); *see also Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 806 (3d Cir. 1998) ("self-inflicted nature of any harm suffered by" a defendant "weighs in favor of granting preliminary injunctive relief"); *Gardner Denver Drum LLC v. Goodier*, No. 06-4, 2006 WL 1005161 at *11(W.D. Ky. Apr. 2006) (issuing preliminary injunction because defendant "cannot now claim that the harm from enforcing the Covenant he agreed to would be too great a hardship on him").  Defendants therefore point to no other "harm" that might weigh in their favor.

1    In contrast, NAF has demonstrated time and again that it has a strong interest in enforcing

2    its contracts and protecting its members from harassment and worse.  While Defendants

3    cavalierly dismiss this as mere "negative public attention" (Opp'n at 48), this hardly does justice

4    to the extreme history of violence, death threats and harassment that has increased substantially

5    since Defendants started their campaign.  (*See* Part II.C, *supra*.)  Defendants should not be

6    permitted to continue making targets of NAF's members during the pendency of this litigation.[14]

7    **E.    The Public Interest Favors Maintenance of an Injunction Through Trial.**

8    The harm to public safety that has resulted from Defendants' conduct is self-evident, and

9    Defendants fail to rebut NAF's showing that the public interest is served by preventing the

10   harassment and violence against NAF's members, and by enjoining the publication of recordings

11   fraudulently obtained in violation of contract and privacy rights.  (*See* Mot. at 25.)

12   Instead, Defendants recycle their arguments that the disclosure of the tapes would serve

13   the public interest because the public has an "extraordinary interest" in this information.

14   Defendants cite no authority whatsoever for the proposition that this supposed "interest"—the

15   disclosure of illegal tapes taken in violation of confidentiality agreements that are designed to

16   protect physicians who work to ensure the constitutional rights of women in this country—can

17   trump the other interests that NAF has established.  Whatever the public's interest in this

18   information may or may not be, it is not as great as the public's clear interest in upholding valid

19   and enforceable nondisclosure agreements, in deterring fraud and other criminal and civil wrongs,

20   and in ensuring the safety and security of physicians who provide abortion services to women.

21   (*See* Parts II.A.3.a, II.A.3.b, II.C, *supra*.)

22   As for the argument that NAF is trying to keep Defendants out of the "marketplace of

23   ideas," this is emphatically not the case.  Defendants can and will continue to disseminate their

24   

---

25   [14] Defendants argue that there will be no irreparable harm because some abortion providers make the decision to keep a public profile.  (Opp'n at 48.)   This is an extremely personal decision, and those who make it do not do so lightly.  As one publicly identified provider told a reporter :  "I

26   think we're always very aware of our surroundings as we move about the city.  I think about the possibility that there's going to be a bomb in my car every time I turn the ignition.  And there's a

27   split second where I think about it.  And then the car starts, and it's OK.  But I – it's ever-present." (Supp. App'x Ex. 146.)  Defendants presume to make this decision for all of their victims.

28

1   belief that NAF "is a criminal enterprise and a key partner in Planned Parenthood's late-term

2   abortion and baby body parts business." (Supp. App'x Ex. 145.) They can still announce their

3   wishes to "completely destroy" Planned Parenthood, and make vile comments about their beliefs

4   that the "execution" of abortion providers should be legal. (Supp. App'x Ex. 144; App'x Ex. 23

5   at NAF00004082.) What they cannot do is release footage or information that they expressly

6   contracted to keep confidential as a precondition for entering NAF's meetings.

**F.      The Preliminary Injunction Requested Is Not Vague or Overbroad.**

8          Last, Defendants argue that the specific relief NAF seeks on Preliminary Injunction is

9   "vague, overbroad, and not supported by the evidence or the law." (Opp'n at 56.) This argument

10  consists of pages of meandering observations devoid of citation to legal authority. (Opp'n at 56-

11  59.) In contrast, NAF has provided extensive evidence to support its Motion, showing that it is

12  likely to succeed on the merits of its claims, and that if a preliminary injunction does not issue,

13  NAF and its members would suffer irreparable harm that cannot be remedied. NAF responds to

14  address just two points.

15         **First**, Defendants (and the Arizona AG that supports them) renew their argument that the

16  term "third party" should be interpreted to exclude "law enforcement, state officials,

17  Congressional committees, and similar governmental bodies." (Opp'n at 56.)

18         The Court has heard this argument multiple times and should reject this latest request to

19  change its approach. NAF has never asserted that Defendants should be prohibited from

20  providing compelled responses to lawful subpoenas issued by governmental entities. Indeed, the

21  NDAs that NAF seeks to enforce expressly contemplate such disclosures. (*See, e.g.*, App'x Ex. 5

22  ¶ 4.) The Court has rejected Defendants' repeated assertion that those provisions are

23  unenforceable, and has ordered Defendants to engage in the meet-and-confer process mandated

24  by the contracts. (Dkt. Nos. 162 at 4-5.) *See, e.g.*, *Vringo*, 2015 WL 3498634, at *8. Moreover,

25  NAF has designated the materials Confidential under the Court's Protective Order, which requires

26  notice in the event that either party receives a subpoena, and gives NAF the right to "protect its

27  confidentiality interests in the court or tribunal from which the subpoena or order issued." (Dkt.

28  No. 92 ¶ 9.) The proposed carve out would eviscerate NAF's rights under both the NDAs and

1   this Court's Protective Order.  (*See* Dkt. No. 112 at 8-12.)

2          Rather than giving these Defendants *carte blanche* to disclose whatever they want to

3   "governmental bodies," the Court should instead maintain control and provide a process to ensure

4   that its orders are followed.  The avalanche of subpoenas boldly predicted at the outset of this

5   case has never materialized.  Just two states have subpoenas outstanding:  Arizona and

6   Louisiana.[15]  As explained, enforcement officials have either refused to open investigations on the

7   basis of Daleiden's false accusations, or they have opened and closed investigations finding no

8   evidence of wrongdoing by Planned Parenthood or any other providers.  (*See* Part II.A.3.b,

9   *supra*.)  More to the point, the meet-and-confer process is effective.  For example, NAF has met

10  and conferred directly with counsel for the Louisiana Inspector General, who informed NAF that

11  they were only interested in investigating a discrete subject matter that implicated a fraction of the

12  504 hours.  (Rebuttal Decl. of D. Foran in Supp. of NAF's Reply in Supp. of Its Mot. for Prelim.

13  Inj. ¶ 18.)  This is in stark contrast to the position taken by counsel for David Daleiden, who

14  stated (after interjecting himself into a meet and confer that NAF sought to initiate with counsel

15  for CMP) that "all" 504 hours of recordings were responsive to the Louisiana subpoena.  (*Id*.)

16         The Arizona AG's brief simply recycles arguments the Court has considered already in

17  connection with the TRO.  The only new element in Arizona's argument is the extraordinary

18  assertion that NAF should be granted no injunction whatsoever.  (Dkt. No. 285 at 15.)  Arizona's

19  claim that NAF has "not shown the required likelihood of irreparable harm" in order to prevent

20  "disclosures to law enforcement agencies," and is otherwise against the "public interest" (Dkt.

21  No. 285 at 10-15) utterly ignores the recent fiasco surrounding Daleiden's disclosure to Congress

22  and the subsequent "leak" to his "great friend" Charles C. Johnson of those materials, ***which***

23  ***resulted directly in irreparable harm to NAF's members***.  (Mot. at 13.)  And if Arizona really

24  believes, contrary to its own laws,[16] that it is entitled to hundreds of hours of sensitive materials

25  _____

26  [15]None of the other amici joining in Arizona's brief (Alabama, Arkansas, Michigan, Montana, Nebraska, and Oklahoma), have issued subpoenas to CMP.

27  [16] *See People ex rel. Babbitt v. Herndon*, 581 P.2d 688, 690 (Ariz. 1978) (civil subpoenas "not

28  within the agency's scope of authority" are "odious and oppressive and should not be tolerated by law"); *State ex rel. Corbin v. Goodrich*, 151 Ariz. 118, 122, 124 (Ariz. Ct. App. 1986) (Consumer

(Footnote continues on next page.)

1  covered by the Court's TRO without regard to "relevance" to any lawful investigation (Dkt.

2  No. 285 at 9),  NAF will  contest this amazing claim in the appropriate venue.  That is precisely

3  how the process set forth in the NDAs and Protective Order is intended to work.  The Court

4  should order Defendants to continue to abide by their obligations.

5  **Second**, Defendants argue that they should be free to publish videos of individuals that

6  they first met at NAF's meetings and followed up with afterwards.  In light of the evidence

7  adduced in discovery, NAF's Motion seeks to expand the TRO order to enjoin Defendants and

8  those acting in concert with them from publishing tapes of "recordings taken of members or

9  attendees Defendants first made contact with at NAF meetings."  (Mot. at 2.)  Defendants'

10  arguments that NAF lacks standing to make this request, and that "the contracts provide no basis"

11  for such a term are meritless.  (Opp'n at 58.)

12  Of course NAF has standing to enforce its own contracts, even if those contracts were

13  entered into for the benefit of third parties.  Restatement (Second) of Contracts § 307, cmt. b

14  ("Even though a contract creates a duty to a beneficiary, the promisee has a right to

15  performance.").  And Defendants' claim that there is "no basis" in the contracts for this request is

16  simply wrong.  The Exhibitor Agreements and NDAs expressly limit the "use" of information

17  obtained at NAF's meetings.  (*See*, *e.g.*, App'x Ex. 3 at 2 ¶ 17 (information "will be used solely in

18  conjunction with Exhibitor's business"); 5 at 2 ("Attendees may not use NAF Conference

19  Information in any manner inconsistent with these purposes.").

20  ████████████████████████████

21  ████████████████████████████

22  ████████████████████████████

23  ████████████████████████████

24  ████████████████████████████

25

(Footnote continued from previous page.)

26  Fraud Act only reaches acts "committed within Arizona in violation of its provisions"); *Marsh v. Zaazoom Solutions, LLC*, No. 11-05226, 2012 WL 952226, at *16 (N.D. Cal. Mar. 20, 2012)

27  (dismissing Consumer Fraud Act claim because plaintiff "failed to identify any connection between Arizona" and the claims).

28

1 ███████████████████████████████████████████████████████████,

2 made possible only by the "use" of information obtained at NAF's meetings.  NAF's evidence

3 also shows that Defendants leveraged NAF's meetings to gain access to abortion providers,

4 because they were ███████████████████████████████████████████

5 ████.  The follow-on sting operations that resulted in the vicious smear campaigns against

6 Dr. Nucatola and StemExpress's CEO were possible, in Daleiden's own words, because "we've

7 been at NAF" and "we're so vetted."  (*See* Mot. at 11.)  Because the contracts prohibit

8 Defendants from misusing information learned at its meetings for Defendants' wrongful

9 purposes, the Court should enjoin any further such publications.

10      **G.      The Court Should Overrule Defendants' Objections to NAF's Evidence.**

11          Separate and apart from its 60-page opposition (in response to a 25-page Motion),

12 Defendants also filed twenty-nine pages of evidentiary objections.  The Court should disregard

13 these for several reasons.

14          **First**, Defendants have failed to comply with this Court's Local Rules, which require that

15 "evidentiary or procedural objections to the motion must be contained within the brief or

16 memorandum."  *See* Civil Local Rule 7-3(a).  By ignoring the Local Rules, Defendants have

17 effectively filed a 90-page brief.  Courts in this district routinely disregard evidentiary objections

18 on this basis.  *See, e.g.*, *Kyles v. Baker*, 72 F. Supp. 3d 1021, 1033 n.3 (N.D. Cal. 2014) (Orrick,

19 J.) (overruling objections filed in "plain violation" of Local Rules); *Hennighan v. Insphere Ins.*

20 *Solutions, Inc.*, 38 F. Supp. 3d 1083, 1095 (N.D. Cal. 2014) (Orrick, J.) (same).

21          **Second**, Defendants' objections ignore the fact that NAF's Motion is overwhelmingly

22 based on competent and admissible evidence in support of its claims.  That evidence (much of

23 which Defendants repeatedly hid behind a "shell game" with the Court, followed by multiple

24 "emergency" applications to the Ninth Circuit and the Supreme Court to stay this Court's

25 discovery orders) includes the 504 hours of video/audio illegally obtained at NAF's meetings,

26 David Daleiden's sworn testimony, and CMP's own internal reports and emails showing its true

27 criminal intent.  As to this core evidence, Defendants largely say nothing.

28

1    **Third**, Defendants' objections fundamentally misconstrue the evidentiary standard at the

2    preliminary injunction stage.  A "preliminary injunction is customarily granted on the basis of

3    procedures that are less formal and evidence that is less complete than in a trial on the merits."

4    *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Thus, it is well-settled that a district

5    court may "consider hearsay in deciding whether to issue a preliminary injunction."  *Johnson v.*

6    *Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (affirming grant of preliminary injunction based

7    in part on hearsay evidence).  The Ninth Circuit has expressly held that hearsay evidence is

8    properly admitted "when to do so serves the purpose of preventing irreparable harm before trial."

9    *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  Accordingly, federal courts

10   routinely consider evidence that would otherwise by inadmissible at trial in ruling on a

11   preliminary injunction motion.  *See, e.g.*, *DMC Closure Aversion Comm. v. Goia*, No. 14-03636,

12   2014 WL 4446831, at *6 n.7 (N.D. Cal. Aug. 29, 2014) (Orrick, J.) (considering hearsay evidence

13   on preliminary injunction).  Defendants' objections should be overruled.[17]

14          **H.      Defendants Are Barred by Statute From Introducing Recordings Obtained at**
                      **NAF's Meetings.**
15

16          Ironically, while Defendants complain about NAF's evidence, the main evidence that

17   Defendants submitted (apart from Daleiden's declaration) are the 28 video and audio clips

18   illegally obtained at NAF's meetings, all of which are inadmissible.

19          Defendants are statutorily barred from introducing those clips as evidence.  Under

20   California Penal Code § 632, "no evidence obtained as a result of . . . recording a confidential

21   communication in violation of this section shall be admissible in any judicial . . . proceeding"

22   except "as proof in an action or prosecution for violation of this section."  The same strict

23   evidentiary bar applies to Maryland's statute.  *See* Md. Code Ann., Cts. & Jud. Proc. § 10-405;

24   *Standiford v. Standiford*, 89 Md. App. 326, 346, 598 A.2d 495, 505 (1991) (tapes obtained in

25   _____

26   [17] As to Defendants' objection that the declaration of undersigned counsel did not comply with
     28 U.S.C. § 1746, that was an inadvertent error which has now been corrected by resubmitting the
     declaration.  *See Bd. of Trs. of the Leland Stanford Junior Univ. v. Chi-Yi*, No. 13-04383, 2015
27   WL 5158749, at *4 (N.D. Cal. Sept. 2, 2015) (allowing party to remedy technical 28 U.S.C.
     § 1746 defect in attorney declaration on reply).

28

1  violation of Maryland statute may only be "introduced in evidence for the narrow purpose of

2  proving a violation of the Act in such a civil action").  These evidentiary bars apply in federal

3  court to claims arising under state law.  *See Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667 (9th

4  Cir. 2003) (Section 632's evidentiary bar is an "integral component of California's substantive

5  state policy of protecting the privacy of its citizens, and it's properly characterized as substantive

6  law within the meaning of *Erie*").

7         Moreover, the illegal videos were obtained in violation of the federal wiretapping statute,

8  and for that separate reason Defendants are barred from relying on them.  *See* 18 U.S.C. § 2515

9  ("no part of the contents" of any communication which if disclosed would violate 18 U.S.C.

10  § 2511 "may be received in evidence in any trial, hearing, or other proceeding in or before any

11  court"); Dkt. No. 131 ¶¶ 162-169 (asserting claims for violation of federal wiretapping statute,

12  18 U.S.C. § 2511 *et seq.*).  These are statutory bars on admissibility, and they preclude

13  Defendants' use of this evidence in any judicial proceeding.

14  **III.    CONCLUSION**

15         For the foregoing reasons, NAF respectfully requests that the Court grant in full NAF's

16  Motion for Preliminary Injunction.[18]

17

18  Dated:  December 10, 2015

19                                                    MORRISON & FOERSTER LLP

20

21                                                    By: */s/ Derek F. Foran*
                                                         Derek F. Foran

22
                                                      Attorneys for Plaintiff
23                                                    NATIONAL ABORTION FEDERATION

24

25

26
_____
27  [18] Defendants did not "ask the court to set a bond or submit any evidence as to what damages [they] might incur as a result of the injunction," so the Court need not set a bond.  *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

28