United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL ABORTION FEDERATION, et al.,

Plaintiffs,

v.

CENTER FOR MEDICAL PROGRESS, et al.,

Defendants.

Case No. 15-cv-03522-WHO

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. Nos. 3, 109, 222, 225, 287, 298, 310, 320, 322, 346, 352

On July 31, 2015, plaintiff National Abortion Federation (NAF) filed this lawsuit and sought a Temporary Restraining Order to prohibit defendants David Daleiden, Troy Newman, and the Center for Medical Progress from publishing recordings taken at NAF Annual Meetings. NAF alleged, and it has turned out to be true, that defendants secured false identification and set up a phony corporation to obtain surreptitious recordings in violation of agreements they had signed that acknowledge that the NAF information is confidential and agreed that they could be enjoined in the event of a breach. In light of those facts, because the subjects of videos that defendants had released in the previous two weeks had become victims of death threats and severe harassment, and in light of the well-documented history of violence against abortion providers, I issued the TRO.

The defendants' principal arguments against injunctive relief rest on their rights under the First Amendment, a keystone of our Constitution and our democracy. It ensures that the government may not – without compelling reasons in rare circumstances – restrict the free flow of information to the public. It provides that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). But Constitutional rights are not absolute. In rare circumstances, freedom of speech must be balanced against and

give way to the protection of other compelling Constitutional rights, such as the First Amendment's right to freedom of association, the Fifth and Fourteenth Amendments' protection of liberty interests, and the right to privacy. After fully considering the record before me, I conclude that NAF has made such a showing here.

Discovery has proven that defendants and their agents created a fake company and lied to gain access to NAF's Annual Meetings in order to secretly record NAF members for their Human Capital Project. In furtherance of that Project, defendants released confidential information gathered at NAF's meetings and intend to release more in contravention of the confidentiality agreements required by NAF. Critical to my decision are that the defendants agreed to injunctive relief if they breached the agreements and that, after the release of defendants' first set of Human Capital Project videos and related information in July 2015, there has been a documented, dramatic increase in the volume and extent of threats to and harassment of NAF and its members.

Balanced against these facts are defendants' allegations that their video and audio recordings show criminal activity by NAF members in profiteering from the sale of fetal tissue. I have reviewed the recordings relied on by defendants and find no evidence of criminal activity. And I am skeptical that exposing criminal activity was really defendants' purpose, since they did not provide recordings to law enforcement following the NAF 2014 Annual Meeting and only provided a bit of information to law enforcement beginning in May, 2015. But I have not interfered with the Congressional committee's subpoena to obtain the recordings to make its own evaluation, nor with the subpoenas from the states of Arizona and Louisiana (although I have approved a process to insure that only subpoenaed material is turned over).

Defendants also claim that the injunction is an unconstitutional prior restraint. They ignore that they agreed to keep the information secret and agreed to the remedy of an injunction if they breached the agreement. Confidentiality agreements are common to protect trade secrets and other sensitive information, and individuals who sign such agreements are not free to ignore them because they think the public would be interested in the protected information.

There is no doubt that members of the public have a serious and passionate interest in the debate over abortion rights and the right to life, and thus in the contents of defendants' recordings.

United States District Court
Northern District of California

It should be said that the majority of the recordings lack much public interest, and despite the misleading contentions of defendants, there is little that is new in the remainder of the recordings. Weighed against that public interest are NAF's and its members' legitimate interests in their rights to privacy, security, and association by maintaining the confidentiality of their presentations and conversations at NAF Annual Meetings. The balance is strongly in NAF's favor.

Having fully reviewed the record before me, I GRANT NAF's motion for a preliminary injunction to protect the confidentiality of the information at issue pending a final judgment in this case.

## BACKGROUND

### I. THE CENTER FOR MEDICAL PROGRESS AND THE HUMAN CAPITAL PROJECT

In 2013, defendant David Daleiden founded the Center for Medical Progress ("CMP") for the purpose of monitoring and reporting on medical ethics, with a focus on bioethical issues related to induced abortions and fetal tissue harvesting. Declaration of David Daleiden (Dkt. No. 265-3, "Daleiden PI Decl.") ¶ 2. CMP is incorporated in California as a nonprofit public benefit corporation, with a stated purpose "to monitor and report on medical ethics and advances." NAF Appendix of Exhibits in Support of Motion for Preliminary Injunction ("Pl. Ex.") 9 (at NAF0000533).[1] In order to obtain CMP's tax-exempt status, in its registration with the California Attorney General and in its application with the Internal Revenue Service Daleiden certified, among other things, that "[n]o substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and this corporation shall

[1] Defendants raise a number of objections to NAF's evidence. *See* Dkt. No. 265-7. These evidentiary objections were submitted as a separate document in violation of this Court's Local Rules. Civ. L. R. 7-3(a). Recognizing that error, defendants filed a motion asking for leave to file an amended Opposition or for relief therefrom. Dkt. No. 298. That motion is GRANTED and I will consider defendants' evidentiary objections. *See also* Dkt. No. 301. To the extent I rely on evidence to which defendants object, I will address the specific objection, bearing in mind that on a motion for preliminary injunction evidence is not subject to the same formal procedures as on a motion for summary judgment or at trial and that a court may consider hearsay evidence. *See, e.g., Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). To the extent I do not rely on specific pieces of evidence, defendants' objections to that evidence are overruled as moot. These evidentiary rulings apply only to the admissibility of evidence for purposes of determining the motion for a preliminary injunction.

not participate or intervene in any political campaign." Pl. Ex. 9 (at NAF0000535); Pl. Ex. 10 (at NAF0001789).

As part of CMP's work, Daleiden created the "Human Capital Project" ("Project") to "investigate, document, and report on the procurement, transfer, and sale of fetal tissue." Daleiden PI Decl. ¶ 3. The Project's goal is to uncover evidence regarding violations of state and/or federal law due to the sale of fetal tissue, the alteration of abortion procedures to obtain fetal tissue for research, and the commission of partial birth abortions. *Id.* Putting the Project into action, Daleiden created a fake front company that purportedly supplies researchers with human biological specimens and specifically secured funding from supporters in order to infiltrate NAF's 2014 Annual Meeting. Pl. Ex. 26. The express aim of that infiltration was to: "1) network with the upper echelons of the abortion industry to identify the best targets for further investigation and ultimate prosecution, and 2) gather video and documentary evidence of the fetal body parts trade and other shocking activities in the abortion industry." *Id.*

Defendant Troy Newman was, until January 2016, a board member and the secretary of CMP. He counseled Daleiden on the efforts to set up the fake company, to infiltrate meetings, and to secure recordings in support of the Project. Pl. Ex. 14 (at NAF0004475-76); Pl. Ex. 16 (at NAF0004493-94); *see also* Dkt. No. 344.[2] The result of the Project, Newman hoped, would be prosecution of abortion providers, state and Congressional investigations, the defunding of Planned Parenthood by the government, and the closure of abortion clinics. Pl. Ex. 16 (at NAF0004494, 4496); Pl. Ex. 136 at 16.[3] Defendant Newman is President of Operation Rescue, an anti-abortion group that posts the names and work addresses of abortion providers on its website and manages another website that lists every abortion facility and all known abortion providers. Pl. Exs. 18, 20, 21, 22.[4]

---

[2] Defendants object to Exhibits 14 and 16 for lack of foundation and authentication. Defendants do not contend these transcripts do not accurately represent the contents of the recordings attached as Exhibits 15 and 17. Defendants' objections are overruled.

[3] Defendants object to Exhibit 136 on the grounds of relevance, lack of foundation, and lack of authentication. Defendants to not contend the transcript does not accurately represent the contents of the recording identified. Defendants' objections are overruled.

[4] After the public launch of the Project on July 15, 2015, counsel for CMP and Daleiden, Life Legal Defense Foundation, explained that it had also been involved in the Project as a legal



United States District Court
Northern District of California

United States District Court
Northern District of California

## II. THE CREATION OF BIOMAX AND INFILTRATION OF NAF'S 2014 AND 2015 ANNUAL MEETINGS

In September 2013, Daleiden directed "investigators" on the Project (known by the aliases Susan Tennebaum and Brianna Allen) to attend a conference of the Association of Reproductive Health Professionals (ARHP) as a representative of a fake business, BioMax Procurement Services. That business did not exist, other than to be a "front" for the Project. Daleiden PI Decl. ¶ 8; Pl. Ex. 26. Daleiden's associates spoke with representatives from NAF, and BioMax was invited to apply to attend the NAF Annual Meeting in San Francisco, California the following April. Daleiden PI Decl. ¶ 10.

In February 2014, defendant CMP received a grant to fund the "infiltration of the . . . NAF Annual Meeting." Pl. Exs. 26, 36; Deposition Transcript of David Daleiden (Dkt. No. 187-3) 213:14-214:6. To that end, Daleiden followed up with the NAF representatives – posing as Brianna Allen on behalf Tennenbaum and BioMax – and received a copy of the 2014 NAF Annual Meeting Exhibitor Prospectus and Exhibitor Application for the upcoming meeting. Daleiden PI Decl. ¶ 11; Pl. Ex. 43. Daleiden filled out the Exhibitor Application packet – comprised of the "Exhibit Rules and Regulations" ("Exhibit Agreement" or "EA"), the "Application and Agreement for Exhibit Space," and the "Annual Meeting Registration Form." Daleiden signed Susan Tennenbaum's name to the EA, and returned the Application packet. Daleiden PI Decl. ¶ 11; PL. Ex. 3; Daleiden Depo. at 160:8-18.

In February 2015, Daleiden contacted NAF seeking information about BioMax exhibiting at NAF's 2015 Annual Meeting in Baltimore, Maryland. Pl. Ex. 47. Daleiden again filled out the "Application Agreement for Exhibit Space," "Exhibit Rules and Regulations," and "Registration Form," signing Susan Tennenbaum's name to the EA. Pl. Exs. 4, 47; Daleiden Depo. at 287:5-22.[5]

---

advisor "since its inception" and were committed to defunding "contract killer" Planned Parenthood. Pl. Ex. 24. Defendants object to Exhibits 18, 20, 21 and 22 as irrelevant and inadmissible hearsay. Those objections are overruled.

[5] On the 2014 EA, Daleiden listed the "exhibitor representatives" as Brianna Allen a Procurement Assistant, Susan Tennenbaum the C.E.O., and Robert Sarkis a V.P. Operations. Pl. Ex. 3. On the 2015 EA, Daleiden listed the exhibitor representatives as Susan Tennenbaum the C.E.O., Robert Sarkis the Procurement Manager, and Adrian Lopez the Procurement Technician. Pl. Ex. 4.

United States District Court
Northern District of California

Both the 2014 and 2015 EAs contain confidentiality clauses:

> In connection with NAF's Annual Meeting, Exhibitor understands that any information NAF may furnish is confidential and not available to the public. Exhibitor agrees that all written information provided by NAF, or any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee, will be used solely in conjunction with Exhibitor's business and will be made available only to Exhibitor's officers, employees, and agents. Unless authorized in writing by NAF, all information is confidential and should not be disclosed to any other individual or third parties.

Pl. Exs. 3 & 4 at ¶ 17. Above the signature line, the EAs provide: "*I also agree to hold in trust and confidence any confidential information received in the course of exhibiting at the NAF Annual Meeting and agree not to reproduce or disclose confidential information without express permission from NAF*." Pl. Exs. 3, 4 (emphasis in originals).

The EAs required Exhibitor representatives to "be registered" for the NAF Annual Meeting and wear badges in order to gain entry into exhibit halls and meeting rooms. *Id.* ¶ 8. The EAs also provide that "[p]hotography of exhibits by anyone other than NAF or the assigned Exhibitor of the space being photographed is strictly prohibited." *Id.* ¶ 13. The EAs required an affirmation: "[b]y signing this Agreement, the Exhibitor affirms that all information contained herein, contained in any past and future correspondence with either NAF and/or in any publication, advertisements, and/or exhibits displayed at, or in connection with, NAF's Annual Meeting, is truthful, accurate, complete, and not misleading." *Id.* ¶ 19. Finally, the EAs provide that breach of the EA can be enforced by "specific performance and injunctive relief" in addition to all other remedies available at law or equity. *Id.* ¶ 18.

In order to gain access to the NAF Annual Meetings, Exhibitor representatives also had to show identification and sign a "Confidentiality Agreement" ("CA"). Declaration of Mark Mellor (Dkt. No. 3-33) ¶ 11.[6] For the 2014, Annual Meeting Daleiden (as Sarkis) and the individuals

---

[6] NAF has identified copies of two drivers licenses it claims were used by Daleiden and Tennenbaum to access the NAF meetings. Pl. Exs. 49-50. During his deposition, Daleiden asserted his Fifth Amendment rights and refused to testify about the licenses. Foran PI Decl. ¶¶ 31-32. Defendants object to Exhibits 49 and 50 for lack of personal knowledge. Those objections are overruled.

Relatedly, NAF filed a motion to supplement the Preliminary Injunction record, to include a press release from the Harris County District Attorney's office in Houston Texas. Dkt. No. 346. That motion is GRANTED. In the press release, the District Attorney explained that a grand jury

pretending to be Tennenbaum and Allen, each signed a CA. Pl. Exs. 5, 6; Daleiden PI Decl. ¶ 13. For the 2015 Annual Meeting, the individual pretending to be Adrian Lopez, signed the CA. Pl. Ex. 8.[7] Daleiden (as Sarkis), Tennenbaum, and Allen did not sign the 2015 CAs. When Daleiden, Tennenbaum, and Allen were at the registration table, they were met by a NAF representative. A NAF representative asked Daleiden to confirm that the sign-in staff had checked their identifications and that they had signed the confidentiality forms. Daleiden responded "Yeah yeah yeah. Excellent. Thank you so much . . . ." Declaration of Derek Foran in Support of Preliminary Injunction (Dkt. No. 228-6) ¶ 79C[8]; Daleiden Decl. ¶ 17; Daleiden Depo. 290:2 -291:14. Daleiden testified that it was his "preference" to avoid signing the 2015 CA. Daleiden Depo. at 291:15-25. The CAs provide:

> It is NAF policy that all people attending its conferences (Attendees) sign this confidentiality agreement. The terms of attendance are as follows:
>
> 1. **Videotaping or Other Recording Prohibited**: Attendees are prohibited from making video, audio, photographic, or other recordings of the meetings or discussions at this conference.
> 2. **Use of NAF Conference Information**: NAF Conference Information includes all information distributed or otherwise made available at this conference by NAF or any conference participants through all written materials, discussions, workshops, or other means. . . .
> 3. **Disclosure of NAF Materials to Third Parties**: Attendees may not disclose any NAF Conference Information to third parties without first obtaining NAF's express written consent . . . .

Pl. Exs. 5-8.

---

had cleared a local Planned Parenthood affiliate of wrongdoing, but indicted Daleiden and the person posing as Susan Tennenbaum for tampering with governmental records, presumably related to their use of false identification to gain access to meetings in Texas. *Id.*

In his deposition, Daleiden testified that he created false business cards to use at the ARHP meeting and the NAF Meetings for Susan Tennenbaum, Robert Daoud Sarkis, and Brianna Allen. Pl. Ex. 51; Daleiden Depo. at 200:2 – 201:6 (business cards used at the 2014 Meeting); *see also* Pl. Exs. 51, 52 & Daleiden Depo. at 315:23 – 316:19 (business cards for Adrian Lopez and Susan Wagner used at the 2015 Annual Meeting); Declaration of Megan Barr (Dkt. No. 226-27) ¶¶ 4-5 (use of business card at 2015 Meeting).

[7] Daleiden testified that all of the "investigators" involved in the Project were CMP "contractors" acting under Daleiden's specific direction. Daleiden Depo. Trans. at 131:7-24, 135:21-136:11, 194:1, 194:10-195:6; *see also* Daleiden Supp. Resp. to NAF Interrogatories (Dkt. No. 227-18) Nos. 2, 6.

[8] ¶ 79(C) refers to a specific excerpt of a recording taken by Daleiden. Sub-Bates 15-062; Time stamp: 14:56:02-14:56:50. The Court has reviewed all recording excerpts or transcripts of recording excerpts cited in this Order.

United States District Court
Northern District of California

At the 2014 and 2015 Annual Meetings, Daleiden and his associates wore and carried a variety of recording devices that they did not disclose to NAF or any of the meeting attendees. Daleiden Depo. at 118-121; 255; 292-93. Daleiden and his associates did not limit their recording to presentations or conversations regarding fetal tissue, but instead turned on their recording devices before entering the meetings each day and only turned them off at the end of the day. Daleiden Depo. at 121:24-122:22, 124:1-15. In the end, they recorded approximately 257 hours and 49 minutes at NAF's 2014 Annual Meeting and 246 hours and 3 minutes at NAF's 2015 Annual Meeting. They recorded conversations with attendees at the BioMax Exhibitor booths, the formal sessions at the Meetings, and interactions with attendees during breaks. Foran PI Decl. ¶ 2 & Pl. Ex. 1[9]; Daleiden PI Decl. ¶ 18; Daleiden Depo. at 122:18-123:25; 293:4-25. The interactions with individuals were recorded in exhibit halls, hallways, and reception areas where Daleiden contends hotel staff were "regularly" present. Daleiden PI Decl. ¶ 18. Hotel staff were also present in the rooms during presentations and talks, but hotel staff did not sign confidentiality agreements. *Id.* ¶ 19; Deposition of Vicki Saporta (Defendants' Ex. 7) at 33:10-23. Broadly speaking, the majority of the recordings lack any sort of public interest and consist of communications that are tangential to the ones discussed in this Order.

During the Annual Meetings, Daleiden and his associates would meet to "discuss our . . . strategy for . . . the project and for the meeting," including "specific strategies for specific individuals." Daleiden Depo. at 134:15-135:6. The associates were given a "mark list" to identify their targets. Foran PI Decl. ¶ 79D (Sub-Bates: 15-145; Time stamp: 14:56:02-14:56:50). The group also picked targets based on circumstance: in one instance, Daleiden tells "Tennenbaum" that it "would be really good to talk tonight" with a particular doctor "now that she's been drinking." *Id.* ¶ 79E (Sub-Bates: 15-225; Time stamp 15:33:00 - 15:34:00).

In approaching these individuals, the group used "pitches" in their efforts to capture NAF members agreeing to suggestions and proposals made by the group about the "sale" of fetal tissue

9 Plaintiff's Exhibit 1 is a copy of the hard drive produced by defendants containing the audio and video recordings made by Daleiden and his associates at the 2014 and 2015 NAF Annual Meetings.

or other conduct that might suggest a violation of state or federal law. Daleiden told his associates that their "goal" was to trap people into "saying something really like messed up, like yeah, like, I'll give them, like, live everything for you. You know. If they say something like that it would be cool." *Id.* ¶ 79G (Sub-Bates: 15-021; Time Stamp: 5:13-5:49). Daleiden also instructed his group to attempt to get attendees to say the words "fully intact baby" on tape. *Id.* ¶ 79H (Sub-Bates: 15-152; Time Stamp: 16:06:50-16:07:00). As part of their efforts, "Tennenbaum" would explain to providers that she "can make [fetal tissue donation] extremely financially profitable for you" and that BioMax has "money that is available" and is "sitting on a goldmine" as long as you're "willing to be a little creative with [your] technique." Foran PI Decl. ¶ 79J (Sub-bates: 15-152 Time Stamp: 15:48:00 - 15:52:00). She asked NAF attendees: "what would make it profitable for you? Give me a ballpark figure . . . ." *Id.* Or "[i]f it was financially very profitable for you to perhaps be a little creative in your method, would you be open to" providing patients with reimbursements for tissue donations. *Id.* ¶ 79K (Sub-bates: 15-203; Time Stamp: 12:09:00 - 12:10:21).

The parties dispute whether these goals were met and if defendants' traps worked.[10] Defendants argue that they captured NAF attendees agreeing to explore, or at least expressing interest in exploring, being compensated for the sale of fetal tissue at a profit, which defendants contend is illegal under state and federal laws. Defendants' Opposition to Motion for Preliminary Injunction (Dkt. No. 262-4) at 10-14. However, they tend to misstate the conversations that occurred or omit the context of those statements. For example, defendants rely on a conversation

[10] NAF argues that defendants cannot rely on any portion of the recordings to oppose NAF's motion for a preliminary injunction. NAF Reply Br. at 29-30. NAF is correct that under California and Maryland law, recordings taken in violation of state laws prohibiting recordings of confidential communications are not admissible in judicial proceedings, except as proof of an act or violation of the state statutes. *See* Cal. Penal Code § 632(d); *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667 (9th Cir. 2003) (concluding that § 632(d) is a substantive law, applicable in federal court on state law claims); *see also* Md. Code Ann., Cts. & Jud. Proc. § 10-405; *Standiford v. Standiford*, 89 Md. App. 326, 346 (1991). Because the accuracy of defendants' allegations of criminal conduct are central to this decision, however, I discuss the portions of the recordings relied upon by plaintiff and defendants in some detail in this section. To place this discussion under seal would undermine my responsibility to the public as a court of public record to explain my decision. Consistent with the TRO and the reasoning of this Order, in describing the protected conversations I balance the interests of the providers' privacy, safety and association by omitting names, places, and other identifying information.

with a clinic owner where Daleiden suggests BioMax could pay $60 per sample instead of $50 per sample. Defs. Ex. 8. The clinic owner doesn't respond to that suggestion, or give any indication about the actual costs to the clinic of facilitating outside companies to come in and collect fetal tissue. *Id.* Instead, the clinic owner responds that providing tissue to outside companies "is a nice way to get extra income in a very difficult time, and you know patients like it." *Id.*[11] Defendants point to another conversation where a provider asks what the "reimbursement rate" is for the clinic, and was told "it varies" by Tennenbaum. Defs. Ex. 9 (Dkt. No. 266-4) at p. 18. Then, in response to Tennenbaum's suggestion about whether she'd "be open to maybe being a little creative in the procedure," the provider responds that she was not sure and would have to discuss it and run it by the doctors. Defs. Ex. 9 (Dkt. No. 266-4) at p. 18. Tennenbaum explains that specimens "go for" anywhere from "500 up to 2,000" and so "you can see how profitable" it would be for clinics, to which the provider says "Yeah, absolutely" and a different provider says "that would be great" in response to comments about having further discussions. *Id.* at p. 19.

Another provider responded to defendants' suggestion of financial incentives by indicating that the clinic would be "very happy about it," but admitted others would have to approve it and it wasn't up to her. *Id.*, Dkt. No. 266-4 at p.8. Defendants point to a conversation with a provider who discusses the "fine line" between an illegal partial birth abortion and the types of abortion that they perform, and the techniques that they employ to ensure that they do not cross that line. Defs. Ex. 10, Dkt. No. 266-5 at p. 4. That conversation, however, does not indicate that any illegal activity was occurring. Similarly, defendants contend that a provider stated that he ordinarily minimizes dilation, since that is what is safest for the women, but that if he had a reason to dilate more (such as tissue procurement), he might perform abortions differently. Oppo. Br. at 11. But that is not what the provider said. After acknowledging tissue donation was not allowed in his state, he stated that "I could mop up my technique if you wanted something more intact. But right now my only concern is the safety of the woman" and there was no reason to further dilate a

[11] Defendants do not suggest the "patients like it" is a suggestion that patients are being paid for the fetal tissue. Instead, in the context of that conversation, it refers to patients that like providing fetal tissue for research purposes.

woman. Defs. Ex. 11, Dkt. No. 266-6 at p. 5.

Defendants rely on another conversation where an abortion provider explains that how intact aborted fetuses are depends on the procedure used and that she does not ordinarily use digoxin to terminate the fetus before performing 15-week abortions. Defs. Ex. 12, Dkt. No. 266-7, pgs. 1-8. She goes on to say that if there was a possibility of donating the tissue to research, women may choose that, and with the consent of the woman she would be open to attempting to obtain intact organs for procurement. *Id*. Again, this is not evidence of any wrongdoing.

In another conversation, a provider states that his/her clinic has postponed the stage at which digoxin is used and that as a result they can secure more and bigger organs for research so the tissue "does not go to waste," to which the vast majority of women using their facility consent. Defs. Ex. 13, Dkt. No. 266-8 pgs. 1-8.[12] Defendants contend that a provider commented that he/she may be willing to be "creative" on a case-by-case basis, but the provider was responding to a question about doctors using digoxin in general. Defs. Ex. 9, Dkt. No. 266-4 pg. 13. And while defendants characterize that provider as assenting to being "creative," so that BioMax could "keep them happy financially" (Oppo. Br. at 11-12), the actual discussion was about off-setting the disruption that third-party technicians can have on clinic operations and keeping those disruptions to a minimum. *Id*. at p. 14.

In a different conversation, defendants characterize a provider as agreeing to discuss ways in which a financial transaction would be structured to make it look like a clinic was not selling tissue. Oppo. Br. at 12. The unidentified female (there is no indication of where she works or what role she plays) simply responds to Tennenbaum's suggestions that in response to payment for tissue from BioMax the clinic could offer its services for less money or provide transportation for the patients, with an interested but non-committal response and clarified "that's something we'd have to figure out how to do that." Defs. Ex. 14, Dkt. No. 266-9 pgs. 1-4. Another provider admits that doing intact D&Es for research purposes would "be challenging" and explained that there are layers of people and approvals at the clinic before any agreements to work with a

---

[12] There is no evidence that a desire to secure more fetal tissue samples caused the clinic to alter its procedures.

United States District Court
Northern District of California

bioprocurement lab could be reached. Defs. Ex. 9, Dkt. No. 266-4 pgs. 8-9.

Defendants state that a provider responded to Tennenbaum's comment that with the right vision an arrangement can be "extremely financially profitable," with "we certainly do" have that vision. Oppo. Br. at 12. But defendants omit that the context of the conversation was the "waste" of fetal tissue that could otherwise be going to research. Defs. Ex. 9, Dkt. No. 266-4 pgs. 2-3. In the excerpt relied on by defendants, after Tennenbaum mentioned the profit she went onto describe tissue donation working for those that have the "vision and the passion for research." The provider responded, "Which we certainly do." *Id*. p. 2. Similarly, while defendants are correct that a provider did say, "if guys it looks like you'd pay me for [fetal tissue], that would be awesome," but omit that the provider preceded that comment with "I would love to have it [the fetal tissue] go somewhere" and that the provider was excited about the possibility of the tissue going to be used in research to be "doing something." Defs. Ex. 15, Dkt. No. 266-10. pgs. 1-2.

Defendants cite a handful of similar discussions – where "profit" "sale" or "top dollar" are terms used by Daleiden or Tennenbaum and then providers at some point following that lead in the conversation express general interest in exploring receiving payment for tissue – but those conversations do not show that any clinic is making a profit off of tissue donations or that the providers are agreeing to a profit-making arrangement.[13] Defendants are correct that one provider indicates it received $6,000 a quarter from a bioprocurement lab, but there is no discussion showing that amount is profit (in excess of the costs of having third-party technicians on site and providing access and storage for their work). Defs. Ex. 21, Dkt. No. 267-2 p.2. An employee of a bioprocurement lab also agrees in response to statements from Tennenbaum that the clinics know it is "financially profitable" for them to work with bioprocurement labs and that arrangement helps

[13] Some of defendants' citations are to comments about providers performing abortions differently, not in terms of gestational timing, but in terms of attempting to keep tissue samples more intact during the procedure if those samples might be of use for research. Oppo. Br. at 12-13. There is no argument that taking those steps violates any law. Defendants also cite provider comments – for example, an abortion provider engaging in conduct "under the table" to get around restrictions – which do not show up in the transcript excerpts they refer to. Oppo. Br. at 13. Finally, defendants rely on comments – from panel presentations and individual conversations – where providers express the personal and societal difficulties they face in performing abortions. There is no indication in those comments of any illegal conduct. Oppo. Br. at 12, 14-15.

the clinics "significantly." Defs. Ex. 23, Dkt. No. 267-4 p. 2.

Having reviewed the records or transcripts in full and in context, I find that no NAF attendee admitted to engaging in, agreed to engage in, or expressed interest in engaging in potentially illegal sale of fetal tissue for profit. The recordings tend to show an express rejection of Daleiden's and his associates' proposals or, at most, discussions of interest in being paid to recoup the costs incurred by clinics to facilitate collection of fetal tissue for scientific research, which NAF argues is legal. *See, e.g.*, Foran PI Decl. ¶ 79(I) (Sub-bates: 14-147; Time Stamp 05:56:00 - 05:57:00 (Dr. Nucatola identifying an "ethical problem" with Daleiden's payment proposal: "We just really want the affiliates to be compensated in a way that is proportionate to the amount of work that's required on their end to do it. In other words, we don't see it as a money making opportunity. That's not what it should be about."); Foran PI Decl. ¶ 79(K) (Sub-bates: 15-203; Time Stamp: 12:09:00 - 12:10:21) (NAF attendee responding to Tennenbaum's proposal" "Do the patients get any reimbursement? No, you can't pay for tissue, right. You can't pay for tissue."); Foran PI Decl. ¶ 79(M) (Sub-bates: 15-010; Time Stamp: 24:29 - 25:43) (NAF attendee responds that "we cannot have that conversation with you about being creative," because it "crosses the line."); Foran PI Decl. ¶ 79(N) (Sub-Bates: 15-010; Time Stamp: 59:18-1:04:32) (NAF attendee responding to Tennenbaum with, "No profiteering or appearance of profiteering . . . we need it to be a donation program rather than a business opportunity.").

Defendants also gathered confidential NAF and NAF-member materials at the Annual Meetings, including lists and biographies of NAF faculty and contact information for NAF members. Foran PI Decl. ¶ 3; Pl. Ex. 56 at 3; Pl. Ex. 58.

Following the 2014 Annual Meeting, Daleiden followed up with the "targets" he met at the Meeting, in part to set up meetings with abortion providers, including Dr. Deborah Nucatola.[14] Pl. Exs. 26 (list of "targets"), 36, 59-61, 64-65, 67-69; Daleiden Depo. 257-259, 265-269. As he explained to his supporters and funders in a report prepared following the 2014 Meeting – in which he shared some of the confidential NAF information that had been collected at that meeting

---

[14] Dr. Nucatola was identified by defendants as a key target and the Senior Director of Medical Services for Planned Parenthood. Pl. Ex. 26.

– he was able to secure the follow up meetings because, following its attendance at the 2014 Annual Meeting, "BioMax is now a known and trusted entity to many key individuals in the upper echelons of the abortion industry." Pl. Ex. 26; *see also* Pl. Exs. 59-63 (emails to targets referencing their meeting at NAF); Pl. Ex. 64 (email to Dr. Nucatola); Daleiden Depo. at 253-259 (Daleiden's follow up with Dr. Nucatola); Pl. Ex. 67 ¶¶ 3-4 (StemExpress representative explaining her initial meeting with Daleiden at the NAF 2014 Annual Meeting, as the reason a subsequent meeting was arranged); Daleiden Tr. at 271-274 (discussing his follow up communications with StemExpress representatives). In a recording following Daleiden and Tennenbaum's meeting with StemExpress representatives, Daleiden credited the ability to secure that meeting to "because like we've been at NAF. Like, we're so vetted and so like." Foran PI Decl. ¶ 12; Pl. Ex. 70 at FNPB029820150522190849.avi at 19:13:00-19:15:00).

**III. DEFENDANTS RELEASE HUMAN CAPITAL PROJECT VIDEOS**

On July 14, 2015, CMP released two videos of a lunch meeting that Daleiden had with Dr. Nucatola, a "key" target from the 2014 NAF Annual Meeting. Daleiden PI Decl. ¶ 25; Pl. Ex. 26. Daleiden testified that one of the videos "contained the entire conversation with Nucatola" and the other was "a shorter summary version of the highlights from the conversation." *Id*. CMP issued a press release in conjunction with the release of these videos entitled "Planned Parenthood's Top Doctor, Praised by CEO, Uses Partial-Birth Abortion to Sell Baby Parts." Pl. Ex. 66. NAF counters that the "highlights" video was misleadingly edited and omits Dr. Nucatola's comments that "nobody should be selling tissue. That's just not the goal here," and her repeated comments that Planned Parenthood would not sell tissue or profit in any way from tissue donations. Foran TRO Decl. Ex. 18 at 7, 21-22, 25-26, 34, 48, 52-54.

On July 21, 2015, CMP released two more videos: a 73-minute video and a shorter "highlights summary" from Daleiden's lunch meeting with Planned Parenthood "staff member" Dr. Mary Gatter. Daleiden PI Decl. ¶ 26. CMP issued a press release in conjunction with the release of these videos entitled "Second Planned Parenthood Senior Executive Haggles Over Baby Parts Prices, Changes Abortion Methods." Pl. Ex. 71. NAF again contends the "highlight" video was misleadingly edited, including the omission of Dr. Gatter's comments that tissue donation was

United States District Court
Northern District of California

not about profit, but "about people wanting to see something good come out" of their situations, "they want to see a silver lining . . . ." Pl. Ex. 82 at NAF0001395.

CMP has continued to release other videos as part of the Project, including one featuring a site visit to Planned Parenthood Rocky Mountains, where Savita Ginde is Medical Director. Daleiden PI Decl. ¶ 27. On July 30, 2015, CMP issued a press release in conjunction with the release of this video entitled "Planned Parenthood VP Says Fetuses May Come Out Intact, Agrees Payments Specific to the Specimen." Pl. Ex. 74.[15]

Daleiden asserts that when CMP released the "highlight" or summary videos, CMP also released "full" copies of the underlying recordings. Daleiden PI Decl. ¶¶ 25-27. NAF has submitted a report by Fusion GPS, completed at the request of counsel for Planned Parenthood, analyzing the videos released by CMP and concluding that there is evidence that CMP edited content out of the "full" videos and heavily edited the short videos "so as to misrepresent statements made by Planned Parenthood representatives." Pl. Ex. 77; *see also* Pl. Exs. 78-79.[16]

The day before the first set of videos was released, CMP put together a press kit with "messaging guidelines" that was circulated to supporters. Pl. Ex. 135; Deposition Transcript of Charles C. Johnson (Dkt. No. 255-11) 70:22-71:19. In those guidelines, defendants assert that their aim for the Project is to create "political pressure" on Planned Parenthood, focusing on "Congressional hearings/investigation and political consequences for" Planned Parenthood such as defunding and abortion limits. Pl. Ex. 135.

To be clear, the videos released by CMP as part of the Project to date do not contain information recorded during the NAF Annual Meetings.[17] With respect to the NAF material

[15] *See also* Pl. Ex. 74 (CMP press release on fifth Project video; "'Intact Fetal Cadavers' at 20 Weeks 'Just a Matter of Line Items' at Planned Parenthood TX Mega-Center; Abortion Docs Can 'Make it Happen.'"); Pl. Ex. 69 (CMP press release on eighth Project video; "Planned Parenthood Baby Parts Buyer StemExpress Wants 'Another 50 Livers/Week,' Financial Benefits for Abortion Clinics."); Pl. Ex. 75 (CMP press release on ninth Project video; "Planned Parenthood Baby Parts Vendor ABR Pays Off Clinics, Intact Fetuses 'Just Fell Out.'"); Pl. Ex. 76 (CMP press release on tenth Project video; "Top Planned Parenthood Exec Agrees Baby Parts Sales 'A Valid Exchange,' Some Clinics 'Generate a Fair Amount of Income Doing This.'").

[16] Defendants object to Exhibits 78-79 as inadmissible hearsay, for lack of personal knowledge and authentication, and improper expert testimony. Those objections are overruled.

[17] NAF contends that the meetings Daleiden had with Doctors Nucatola, Gatter, and Ginde that resulted in the CMP videos would not have been possible without BioMax having fraudulently

covered by the TRO and at issue on the motion for a preliminary injunction, Daleiden affirms that other than: (i) providing a StemExpress advertisement from the NAF 2014 Annual Meeting program to law enforcement in El Dorado County, California in May 2015; (ii) short clips of video to law enforcement in Texas in June or July 2015; (iii) providing the 504 hours of recordings in response to the Congressional subpoena; and (iv) providing a short written report to CMP donors in April 2014, "Daleiden and CMP have made no other disclosures of recordings or documents from NAF meetings." Daleiden PI Decl. ¶ 24. However, a portion of the NAF materials were leaked and posted on the internet on October 20 and 21, 2015.[18]

## IV. IMPACT OF DISCLOSURES ON NAF AND ITS MEMBERS

NAF is a not-for-profit professional association of abortion providers, including private and non-profit clinics, Planned Parenthood affiliates, women's health centers, physicians' offices, and hospitals. Declaration of Vicki Saporta (Dkt. No. 3-34) ¶ 2. It sets standards for abortion care through Clinical Policy Guidelines (CPGs) and Ethical Principles for Abortion Care, and develops continuing medical education and training programs and educational resources for abortion providers and other health care professionals. *Id.* ¶ 3. NAF also implemented a multi-faceted security program to help ensure the safety of abortion providers by putting in place reference, security, and confidentiality requirements for its membership and for attendance at its Meetings. *Id.* ¶¶ 10-14; Declaration of Mark Mellor (Dkt. No. 3-33) ¶ 5-12. NAF tracks security threats to abortion providers and clinics, and offers technical assistance, on-site security training, and

gained access to NAF's Annual Meetings and, thereby, appearing to be a legitimate operation.

[18] This leak occurred after defendants produced NAF materials covered by the TRO to Congress. NAF argues – and moves for an Order to Show Cause asking me to sanction defendants – that defendants violated my order and the TRO by producing to Congress NAF audio and video recordings that were not directly responsive to the Congressional subpoena. *See* Dkt. Nos. 155, 222. NAF complains that as a result of this "over production," the subsequent leak included NAF Materials that had nothing to do with alleged criminal activity. I heard argument on this motion on December 18, 2015. Dkt. No. 310. Having considered the representations of defense counsel, I DENY the motion for an order to show cause. Defendants did produce materials that were not covered by the subpoena, but were covered by the TRO, contrary to my Order allowing a response to the subpoena. Dkt. No. 155. Defense counsel did so because in light of their conversations with Congressional staffers, they believed Congress wanted "unedited" recordings, which defense counsel interpreted to mean the whole batch of recordings, even those where fetal tissue was not being discussed. At the hearing I cautioned defense counsel that in the future, before they take it upon themselves to arguably violate an order from this Court – even if in good faith – they should seek clarification from me first.

assessments at facilities and homes of clinic staff, as well as 24/7 support to its members when they are "facing an emergency or are targeted. *Id*. ¶ 10, 15; *see also* Declaration of Derek Foran in Support of TRO (Dkt No. 3-2) ¶ 6 & Ex 2 (NAF statistics documenting more than 60,000 incidents of harassment, intimidation, and violence against abortion providers, including murder, shootings, arson, bombings, chemical and acid attacks, bioterrorism threats, kidnapping, death threats, and other forms of violence between 1997 and 2014).

Following the release of the videos in July 2015, the subjects of those videos (including Doctors Nucatola, Gatter, and Ginde), have received a large amount harassing communications (including death threats). Pl. Exs. 80-81 (internet articles and threats by commentators), 83-91; *see also* Saporta Decl. ¶ 19. Incidents of harassment and violence directed at abortion providers increased nine fold in July 2015, over similar incidents in June 2014. Pl. Ex. 92. The incidents continued to sharply rise in August 2015. Pl. Ex. 93. The FBI has also reported seeing an increase in attacks on reproductive health care facilities. Pl. Ex. 94.[19] Since July 2015, there have also been four incidents of arson at Planned Parenthood and NAF-member facilities. Saporta Depo. at 42:1-10; Pl. Exs. 96-99.[20] Most significantly, the clinic where Dr. Ginde is medical director – a fact that was listed on the AbortinDocs.org website operated by defendant Newman's Operation Rescue group – was attacked by a gunman, resulting in three deaths. Pl. Exs. 18, 20, 21, 22, 148.[21]

NAF's President and CEO testified that there "has been a dramatic increase" in harassment since July 14, 2015, and the "volume of hate speech and threats are nothing I have ever seen in 20 years." Pl. Ex. 95 (Deposition Transcript of Vicki Saporta) at 16:17-23, 39:13-20; *see also id*. at 43:15-18 ("We have uncovered many, many direct threats naming individual providers. Those

[19] Defendants object to Exhibits 92 - 94 on the grounds that Foran lacks personal knowledge and cannot authenticate the exhibits, as hearsay, and on relevance. Those objections are overruled.
[20] Defendants object to Exhibits 96 - 99 as inadmissible hearsay, lack of personal knowledge, lack of authentication, irrelevant and prejudicial. Those objections are overruled. Defendants also filed a motion to supplement the Preliminary Injunction record with a news article indicating the individual arrested in connection with the fire at the Thousand Oaks Planned Parenthood office was not motivated by politics, but by a "domestic feud." Dkt. No. 322. That motion is GRANTED.
[21] Defendants object to Exhibit 148 as irrelevant and inadmissible hearsay. Those objections are overruled.

providers have had to undergo extensive security precautions and believe they are in danger."). In response, NAF hired and committed additional staff to monitoring the internet for harassment and threats. Saporta Depo. at 38:2-20. NAF's security team has also seen an increase in off-hour communications from members about security. Mellor Decl. ¶ 15. As a result, NAF has been forced to take increased security measures at increased cost, has cut back on its communications with members, and alerted hotel staff and security for its upcoming events that those meetings have been "compromised." *Id.* ¶ 15.

Two NAF members also submit declarations in support of NAF. Jennifer Dunn, a law professor, submits a declaration explaining her expectation that she was filmed during the 2014 Annual Meeting during a panel presentation and that following the release of the CMP videos, she took steps to protect the safety and privacy of her family. Declaration of Jennifer T. Dunn (Dkt. No. 3-31) ¶ 10.[22] She explains that she is fearful that CMP may release a misleading and highly edited video featuring some or all of her panel presentation that would open her up to the sort of public disparagement and intimidation she saw directed towards Doctors Nucatola and Gatter after the CMP videos were released. *Id.* ¶¶ 9-10.

Dr. Matthew Reeves, the medical director of NAF, submits a declaration explaining his understanding that Daleiden filmed conversations with him during the 2014 Annual Meeting. Declaration of Dr. Matthew Reeves (Dkt. No.) ¶¶ 12-16.[23] Dr. Reeves explains that he has witnessed "the terrible reaction towards the prior doctors" who were featured in CMP's videos and he expects he "will suffer similar levels of reputational harm should a heavily edited and misleading video of me be released." *Id.* ¶ 17. Because of his expectation that defendants could "target" him, since the release of the videos, he had his home inspected by NAF's security team and is installing a security system, but given the current atmosphere he remains fearful for his safety and that of his family. *Id.* ¶¶ 19, 21.

---

[22] Defendants object to paragraph 10 of Dunn's declaration as lacking in personal knowledge, improper expert testimony, inadmissible hearsay, and improper opinion. Those objections are overruled.

[23] Defendants object to paragraph 12 of Dr. Reeves declaration as speculative, improper expert testimony, improper opinion testimony, and for lack of personal knowledge. Those objections are overruled.



United States District Court
Northern District of California

**V. TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

On July 31, 2015, based on an application from NAF and after reviewing the preliminary evidentiary record, I granted NAF's request and entered a Temporary Restraining Order that restrained and enjoined defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them from:

(1) publishing or otherwise disclosing to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned, at any NAF annual meetings;

(2) publishing or otherwise disclosing to any third party the dates or locations of any future NAF meetings; and

(3) publishing or otherwise disclosing to any third party the names or addresses of any NAF members learned at any NAF annual meetings.

Dkt. No. 15. On August 3, 2015, after reviewing the arguments and additional evidence submitted by defendants, I issued an order keeping the TRO in place pending the hearing and ruling on NAF's motion for a preliminary injunction. Dkt. No. 27. On August 26, 2015, I entered a stipulated Protective Order, which provided that before responding to any subpoenas from law enforcement entities for information designated as confidential under the Protective Order, the party receiving the subpoena must notify the party whose materials are at issue and inform the entity that issued the subpoena that the materials requested are covered by the TRO. Dkt. No. 92 ¶ 9. The purpose of the notice provision is to allow the party whose confidential materials are sought the opportunity to meet and confer and, if necessary, seek relief from the subpoena in the court or tribunal from which the subpoena issued. *Id*.

In NAF's motion for preliminary injunction, NAF asks me to continue in effect the injunction provided in the TRO, but also to expand the scope to include the following:

(4) enjoin the publication or disclosure of any video, audio, photographic, or other recordings taken of members or attendees Defendants first made contact with at NAF meetings; and publishing or otherwise disclosing to any third party the dates or locations of any future NAF meetings; and

(5) enjoin the defendants from attempting to gain access to any future NAF meetings.

Motion (Dkt. No. 228-4) at i.

**LEGAL STANDARD**

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7 (2008)). Where an injunction restrains speech, a showing of "exceptional" circumstances may be required, as the Reporters Committee for Freedom of the Press pointed out.[24] *See, e.g., Bank Julius Baer & Co. Ltd v. Wikileaks*, 535 F. Supp. 2d 980, 985 (N.D. Cal. 2008). On this record, I conclude that exceptional circumstances exist, meriting the continuation of injunctive relief pending final resolution of this case.

**DISCUSSION**

## I. LIKELIHOOD OF SUCCESS

NAF's Amended Complaint asserts eleven different causes of action against the three defendants. Dkt. No. 131. In moving for a preliminary injunction, NAF rests on only two – breach of contract and violation of California Penal Code section 632 – to argue its likelihood of success on the merits.

### A. Breach of Contract

Under California law, to succeed on a breach of contract claim, a plaintiff must prove: (1) the existence of a contract, (2) plaintiff performed or is excused for nonperformance, (3) defendant's breach, and (4) resulting damages to plaintiff. *See, e.g., Reichert v. Gen. Ins. Co. of Am*., 68 Cal. 2d 822, 830 (1968). NAF argues that defendants' conduct: (i) breached the EAs, by misrepresenting BioMax and their own identities; (ii) breached the EAs and CAs by secretly recording during the Annual Meetings; and (iii) breached the EAs and CAs by disclosing and publishing NAF's confidential materials.

---

[24] The Reporters Committee for Freedom of the Press resubmitted their motion asking the Court to consider their *amici curiae* letter brief. Dkt. No. 287. I GRANT that motion and consider the Reporters Committee letter, as well as NAF's response, and the Reporters Committee's reply. Dkt. Nos. 109, 111, 114, 287.

United States District Court
Northern District of California

**1. Existence of a Contract; Consideration for the Confidentiality Agreements**

Defendants argue that NAF cannot enforce the CA because that particular agreement was not supported by consideration for the 2014 or 2015 Meetings. *See Chicago Title Ins. Co. v. AMZ Ins. Servs., Inc.*, 188 Cal. App. 4th 401, 423 (2010) ("Every executory contract requires consideration, which may be an act, forbearance, change in legal relations, or a promise.").[25] They contend that the only document that needed to be signed to gain access to the NAF Meetings was the EA. Therefore, according to defendants, there was no separate consideration given with respect to the CAs that were signed by or sought from the attendees at the NAF registration tables because NAF already had a legal obligation to permit them access to the meetings. Oppo. Br. at 19-20.

Defendants' argument is not supported by the facts. The EAs on their face provided access to the exhibition area ("Exhibit Rules and Regulations") *and also* required that any exhibitor's representatives be registered for the NAF Annual Meetings. Pl. Exs. 3,4. The CAs were required as part of the registration for the NAF Annual Meeting, and NAF's evidence demonstrates that no one was supposed to be allowed into the Meetings unless their identification was checked and they signed a CA. Declaration of Mark Mellor (Dkt. No. 3-33) ¶ 11; Dunn Decl. ¶ 6; *see also* Foran PI Decl. ¶ 79(C) (Sub-Bates 15-062; Time stamp: 14:56:02-14:56:50) (NAF representative confirming that Daleiden and associates had their identification checked and signed confidentiality agreements). Nothing in the language of the EAs or CAs, or the other facts in the record, support defendants' argument that upon signing the EAs, NAF had the legal obligation to permit Daleiden's group access to the meetings without further requirement.

Other than lack of consideration, the only other argument defendants appear to make with respect to the CA is that the CA cannot be enforced against Daleiden and two of his associates (Tennenbaum and Allen) because they did not execute CAs for the 2015 NAF Annual Meeting. Oppo. Br. at 19-20 & fn. 7. As an initial matter, there is no dispute that everyone in Daleiden's group signed the CAs for the 2014 Meeting. There is also no dispute that the reason Daleiden and

[25] Defendants make no argument that the EA was not supported by consideration. It plainly was; access to the exhibition hall in exchange for submission of the Application and payment of the exhibitor fee.

two of his associates did not sign the CAs for the 2015 Meeting is that Daleiden lied about it to a NAF representative. Foran PI Decl. ¶ 79(C) (Sub-Bates 15-062; Time stamp: 14:56:02-14:56:50). There is likewise no dispute that at least one of the CMP associates working at Daleiden's direction, "Lopez," signed the 2015 CA. Given these facts, on this record, the 2015 CA can be enforced against defendants for purposes of determining likelihood of success on NAF's breach of contract claim.

I find that NAF has shown a likelihood of success on their breach of contract claim based on the 2014 and 2015 CAs.

**2. Whether Defendants' Conduct Breached the EA**

Defendants argue that NAF cannot prevail on its claim that defendants misrepresented themselves in violation of the EA because Paragraph 15 of the EA only requires Exhibitors to "identify, display, and/or represent their business, products, and/or services truthfully, accurately, and consistently with the information provided in the Application." Defendants contend that this requirement applies only to BioMax, not Daleiden and his associates "individually," and that NAF is attempting to base its breach claim on representations defendants made about BioMax and/or CMP outside of the NAF Annual Meetings. Oppo. Br. at 20-21.

By signing the EA on behalf of a fake company, defendants CMP and Daleiden necessarily violated paragraph 19 of the EA, which required the signatory's affirmation that the information in the Agreement, as well as any information displayed at the Meetings, was "truthful, accurate, complete, and not misleading." Pl. Exs. 3,4. Similarly, by signing the EA and then displaying and representing false and inaccurate information about BioMax at the Meetings, defendants CMP and Daleiden violated paragraph 15 as well.[26] Defendants' conduct with respect to the information they conveyed in the EA and their conduct at the NAF meeting is sufficient – on this record – to

[26] Defendants assert in their brief, without any citation to evidence, that BioMax's "business" was to "assess the market for clinics and abortion providers willing to partner with it in buying and selling fetal tissue." Oppo. Br. at 21. This post-hoc rationalization is contrary to the defendants' own contemporaneous statements and their statements on the EAs themselves which required the applicant to "5. List the products or services to be exhibited" and which Daleiden filled out as "biological specimen procurement, stem cell research" and "fetal tissue procurement, human biospecimen procurement." Pl. Exs. 3,4; *see also* Pl. Ex. 26 (describing BioMax as a "front organization.").

show a violation of that agreement, regardless of how defendants may have portrayed BioMax outside of the NAF Meetings.

Defendants' argument that paragraph 15 of the EA restricts the remedies NAF can seek for breach to cancellation of the EA and removal of exhibits at the Meetings, and excludes the injunctive relief sought in this motion is likewise without support. Defendants continue to ignore paragraphs 18 and 19, which provide that if there is a breach of the EA, NAF is entitled to seek specific performance, injunctive relief and "all other remedies available at law or equity." Pl. Exs. 3,4.

On the record before me, NAF has a strong likelihood of success on its argument that defendants breached the EA for the 2014 and 2015 NAF Annual Meetings.[27]

**3. Scope and Reasonableness of the EA**

Defendants argue that the EA is unenforceable because it is overbroad, imprecise, and unreasonable. Specifically, they rely on NAF's characterization of the EA (and presumably the CA as well) as "broad" and encompassing all NAF communications and things learned at the NAF Meetings to argue that the EA's breadth is problematic.

That a confidentiality provision is broad does not mean it is unenforceable. The cases cited by defendants on this point are not to the contrary.[28] For example, in *Wildmon v. Berwick Universal Pictures*, 803 F. Supp. 1167, 1178 (N.D. Miss.) *aff'd*, 979 F.2d 209 (5th Cir. 1992), after applying Mississippi's contract interpretation doctrine and determining that the contract language was ambiguous, the Court concluded that "an ambiguous contract should be read in a

---

[27] Defendants also argue that their recordings could not have violated the EA because the EA did not prohibit audio and video recording, it only prohibited photography. Oppo. Br. at 19-20; EA at ¶ 13. Disputes over whether a ban on "photography" would prohibit video and audio recording aside, the CAs clearly prohibited all forms of recording and are enforceable against defendants, even for the 2015 meeting as discussed above. In a footnote, defendants assert that the CAs should be read as limiting the prohibition on recording to only formal sessions at the Meetings and not informal discussions. Oppo. Br. at 20, fn. 8. That argument is not supported. There is nothing in the text of the CA that indicates that "discussions" is limited to formal panel or workshop presentations and does not encompass information that is conveyed outside of those "formal" events.

[28] *Cf. Coast Plaza Doctors Hosp. v. Blue Cross of California*, 83 Cal. App. 4th 677, 684 (2000), *as modified* (Sept. 7, 2000) (giving full effect to "contractual language [that] is both clear and plain. It is also very broad. In interpreting an unambiguous contractual provision we are bound to give effect to the plain and ordinary meaning of the language used by the parties.").

way that allows viewership and encourages debate." The problem in *Wildmon* was not breadth, but ambiguity.

In *In re JDS Uniphase Corp. Sec. Litig*., 238 F. Supp. 2d 1127 (N.D. Cal. 2002), a securities class action, the state of Connecticut moved the court to limit the scope of a confidentiality agreement the employer imposed on its employees so that the employees could respond to a state investigation. The court concluded, to "the extent that those agreements preclude former employees from assisting in investigations of wrongdoing that have nothing to do with trade secrets or other confidential business information, they conflict with the public policy in favor of allowing even current employees to assist in securities fraud investigations." *Id*. at 1137. The considerations the court addressed in *In re JDS Uniphase Corp. Sec. Litig* that led it to limit the scope of the employee confidentiality agreement may have some persuasive value with respect to the interests of the Attorney General *amici* discussed below, but do not weigh against enforcement of NAF's confidentiality agreements against defendants generally. This is especially true considering that there are significant, countervailing public policy arguments weighing in favor of enforcing NAF's confidentiality agreements. *See, e.g.*, Cal. Govt. Code § 6215(a) (recognizing that persons working in the reproductive health care field, specifically the provision of terminating a pregnancy, are often subject to harassment, threats, and acts of violence by persons or groups).

The final case relied on by defendants in support of their argument that the EA should be interpreted narrowly, consistent with the public's interest in hearing speech on matters of public concern, did not address a confidentiality agreement at all. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 145 (1967). The *Curtis* case found that absent clear and compelling circumstances, the Court would not find that a defendant had waived a First Amendment defense to libel (where that specific defense had not been established by the Supreme Court at the time of defendants' libel trial).

Defendants also rely on established case law directing courts to interpret ambiguous contracts in a manner that is reasonable and does not lead to absurd results. Oppo. Br. at 22-23. Defendants argue that the broad coverage NAF contends the EA imposes on defendants is

unreasonable and absurd because NAF's interpretation of the broad scope of the EA would cover all information discussed at NAF's Meetings, even publicly known information. Oppo. at 22-23. Defendants' argument might have some merit if it was made concerning a challenge to the application of the EAs' confidentiality provisions with respect to specific pieces or types of information that are otherwise publicly known or intended by NAF to be shared with individuals not covered by the EA. Defendants do not make that type of "as applied," narrow argument. Instead, they argue that the whole EA is unenforceable. There is no legal support for that result or for defendants' speculation that the EA might be enforced in an unreasonable manner against other NAF attendees.[29]

**4. What Information is Covered by EA**

Defendants argue that even if enforceable, the EA should be read to create confidentiality only for the information *provided* by NAF in formal sessions and should not be construed to cover information provided by conference attendees in informal conversations. Oppo. Br. at 26-27. Defendants rely on the two portions of paragraph 17 of EA for their restrictive interpretation of its coverage; they argue that paragraph 17 only restricts disclosure of information "NAF may furnish" and "written information provided by NAF." Those provisions, defendants say, should be read to modify "any information which is disclosed orally or visually." Taken together, defendants argue, this language "connotes formality" and therefore should cover only oral and visual information provided in formal sessions at the Meetings. Oppo. Br. at 26.

As an initial matter, defendants wholly ignore the provision in the EAs that signatories agree – on behalf of entities and their employees and agents – to "hold in trust and confidence any confidential information received in the course of exhibiting at the NAF Annual Meeting and agree not to reproduce or disclose confidential information without express permission from NAF." Pl. Exs. 3,4. The only reason defendants gained access to the NAF Annual Meetings was

[29] I agree with defendants that NAF's intent with respect to the EA and CA is irrelevant for purposes of this motion. Under California contract law, intent comes into play only when contract language is ambiguous. There is no ambiguity concerning meaning of the EA or CA with respect to defendants' conduct here and, therefore, no need to construe otherwise ambiguous terms against the drafter. *But see Rebolledo v. Tilly's, Inc.*, 228 Cal. App. 4th 900, 913 (2014) ("ambiguities in standard form contracts are to be construed against the drafter.").

under their guise as exhibitors and all information they received was in the course of that role, even if gathered in places other than the exhibition hall. Moreover, defendants' constrained reading of paragraph 17 is illogical. The text of paragraph 17, when read as a whole, covers all written, oral, and visual information, and the "formality" of the language does not restrict its requirements to only the "formal" workshops and presentations as argued by defendants. [30]

In sum, on the record before me, NAF has demonstrated a strong likelihood of success on its breach of contract claims both with respect to the EAs that were signed by all CMP operatives in 2014 and 2015, and with respect to the CAs that were signed by Daleiden and his associates in 2014 and signed by Lopez in 2015.

**B. California Penal Code section 632**

NAF also contends that it has demonstrated a likelihood of success on its claim that defendants violated California Penal Code section 632. That provision makes it a crime to, "without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device." Cal. Penal Code § 632(a). "The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication . . . in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." *Id*. § 632(c). And "[e]xcept as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding." *Id*. § 632(d).

Defendants argue that because section 632 does not prohibit publication of recordings made in violation of the statute, NAF cannot justify an injunction against defendants based upon

---

[30] The same is true of defendants "implications of formality" argument made with respect to the CAs in a footnote. *See* Oppo. Br. at 27, n.12.

an alleged violation of that statute. Indeed, California courts have held that "Penal Code section 632 does not prohibit the disclosure of information gathered in violation of its terms." *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 167 (2003); *cf. Kight v. CashCall, Inc.*, 200 Cal. App. 4th 1377, 1393 (2011) ("Although a recording preserves the conversation and thus could cause greater damage to an individual's privacy in the future, these losses are not protected by section 632.").

In reply, NAF argues that its section 632 claim is not being asserted as a basis for enjoining release of the recordings already made, but in support of its request that defendants be enjoined from "attempting to gain access to any future NAF meetings in order to tape its members, a form of relief specifically provided under § 637.2(b) ("Any person may . . . bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a).").

Penal Code section 632, therefore, is not relevant to NAF's chances of success on the merits, but only with respect to the appropriate scope of injunctive relief, discussed below.[31]

**C. The First Amendment and Public Policy Implications of the Requested Injunction**

Defendants argue that, assuming NAF demonstrates a likelihood of success on the breach of contract claim, the EAs and CAs should not be enforced through an injunction prohibiting defendants from publishing the recordings because that is an unjustified prior restraint and against public policy. NAF counters that even if First Amendment issues are raised by the injunction it seeks, any right to speech implicated by publishing the NAF recordings has been waived by defendants knowing agreement to the EAs and CAs.

NAF relies primarily on a line of cases holding that where parties to a contract agree to restrictions on speech, those restrictions are generally upheld. For example, in *Leonard v. Clark*, the Ninth Circuit addressed a union and union members' challenge to a Collective Bargaining

[31] Both sides spend much time arguing whether section 632 prohibits recording panel presentations as opposed to conversations between individuals, because section 632's protections only extend to information as to which the speaker has a "reasonable expectation" of privacy. I need not reach these arguments as NAF no longer asserts section 632 as a ground for its likelihood of success on this motion.

Agreement that arguably restricted their First Amendment rights to petition the government. 12 F.3d 885, 886 (9th Cir. 1993), *as amended* (Mar. 8, 1994). The court, following Supreme Court precedent, recognized that "First Amendment rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent," and concluded that in negotiating the CBA the union knowingly waived any First Amendment rights that may have been implicated. *Id*. at 890.

Other cases have likewise found that speech rights can be knowingly waived. *ITT Telecom Prod. Corp. v. Dooley*, 214 Cal. App. 3d 307, 317, 319 (1989) (recognizing, in a case determining the scope of California's litigation privilege, that "it is possible to waive even First Amendment free speech rights by contract."); *Perricone v. Perricone*, 292 Conn. 187, 202 (2009) (Supreme Court of Connecticut enforced non-disclosure agreement as knowing and voluntary waiver of First Amendment rights and enjoined ex-wife from "appearing on radio or television" for purposes of discussing her former marriage or spouse); *Brooks v. Vallejo City Unified Sch. Dist*., No. 2:09-CV-1815 MCE JFM, 2009 WL 10441783, at *5 (E.D. Cal. Oct. 30, 2009) (recognizing, in denying a third-party's attempt to secure a copy of a public entities' settlement agreement with two individual plaintiffs, that individuals "were entitled to bargain away their free speech rights by agreeing to confidentiality provisions or other contractual provisions that restrict free speech").

Defendants respond that NAF has not shown that Daleiden knowingly and intelligently waived his First Amendment rights by signing the NAF confidentiality agreements, resting their argument on Daleiden's position that he believed the agreements were unenforceable and void. Daleiden PI Decl. ¶ 12 ("I understood that no nondisclosure agreement is valid in the face of criminal activity. In the course of my investigative journalism work, I have seen other confidentiality agreements, all of which were far more specific and detailed in terms of what the protected information was. I believed the working of the nondisclosure portions of the Exhibit Agreement was too broad, vague, and contradictory to be enforced."). However, even if Daleiden honestly believed he had *defenses* to the enforcement of the confidentiality agreements, there is no argument – and no case law cited – that his signature on them and his agreement to them was not "knowing and voluntary." Daleiden and his associates *chose* to attend the NAF Annual Meetings

and voluntarily and knowingly signed the EAs and CAs.

Daleiden's argument would vitiate the enforceability of confidentiality agreements based on an individual's correct *or mistaken* belief as to the enforceability of those agreements. It is contrary to well-established law. *See, e.g., Leonard v. Clark*, 12 F.3d at 890 ("The fact that the Union informed the City of its view that Article V was 'unconstitutional, illegal, and unenforceable' does not make the Union's execution of the agreement any less voluntary."); *see also Griffin v. Payne*, 133 Cal. App. 363, 373 (Cal. Ct. App. 1933) ("A secret intent to violate the law, concealed in the mind of one party to an otherwise legal contract, cannot enable such party to avoid the contract and escape his liability under its terms.").

Defendants contend that the public policy at issue – allowing free speech on issues of significant public importance – weighs against finding a waiver and/or enforcing the confidentiality agreements. The Ninth Circuit has recognized that courts should balance the competing public interests in determining whether to enforce confidentiality agreements that restrict First Amendment rights. *Leonard*, 12 F.3d at 890 ("even if a party is found to have validly waived a constitutional right, we will not enforce the waiver 'if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement.'") (quoting *Davies v. Grossmont Union High Sch. Dist*., 930 F.2d 1390, 1394 (9th Cir.1991)); *see also Perricone v. Perricone*, 292 Conn. 187, 221-22 (in weighing the public interests as to whether to enforce the agreement, the court observed: "The agreement does not prohibit the disclosure of information concerning the enforcement of laws protecting important rights, criminal behavior, the public health and safety or matters of great public importance, and the plaintiff is not a public official.").

On the record before me, balancing the significant interests as stake on both sides supports enforcement of the confidentiality agreements at this juncture. As the Supreme Court recognized in *Cohen v. Cowles Media Co*., 501 U.S. 663, 672 (1991), "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law." *Id*. at 672. "'[T]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of

United States District Court
Northern District of California

others.'" *Id*. at 7670 (quoting *Associated Press v. NLRB*, 301 U.S. 103 (1937)); *see also Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office. It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime."). That defendants intended to infiltrate the NAF Annual Meetings in order to uncover evidence of alleged criminal wrongdoing that would "trigger criminal prosecution and civil litigation against Planned Parenthood and to precipitate pro-life political and cultural ramifications when the revelations become public," does not give defendants an automatic license to disregard the confidentiality provisions. Pl. Ex. 26.

Defendants passionately contend that public policy is on their side (and the side of public disclosure) because the recordings show criminal wrongdoing by abortion providers – a matter that is indisputably of significant public interest. *Cf. Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 358 (2004) (approving judicial notice "of the fact that abortion is one of the most controversial political issues in our nation.").[32] I have reviewed the recordings relied on by defendants and find no evidence of criminal wrongdoing. At the very most, some of the individuals expressed an interest in exploring a relationship with defendants' fake company in response to defendants entreaties of how "profitable" it can be and how tissue donation can assist in furthering research. There are no express agreements to profit from the sale of fetal tissue or to change the timing of abortions to allow for tissue procurement.[33]

[32] Defendants ask for leave to supplement the record to include the January 20, 2016 Order in the *StemExpress LLC, Inc. v. Center for Medical Progress* case pending in Los Angeles Superior Court. Dkt. No. 352. Defendants ask me to take notice that the Superior Court found defendants' Project video regarding StemExpress was "constitutionally protected activity in connection with a matter of public interest" under California's anti-SLAPP statute. That motion is GRANTED.

[33] The first piece of evidence that defendants repeatedly point to show "illegality" is an advertisement by StemExpress that was in both of the NAF 2014 and 2015 Meeting brochures. That ad states that clinics can "advance biomedical research," that partnering with StemExpress can be "Financially Profitable*Easy to Implement Plug-In Solution*Safeguards You and Your Donors" and that the "partner program" "fiscally rewards clinics." *See* Dkt. No. 270-1 at p. 3 of 10. However, the ad explains that StemExpress is a company that provides human tissue products "ranging from fetal to adult tissues and healthy to diseased samples" to many of the leading research institutions in the world. *Id*. The ad, therefore, is a general one and not one aimed solely at providers of fetal tissue. The ad does not demonstrate that StemExpress was engaged in illegal conduct of paying clinics at a profit for fetal tissue.

I also find it significant that while defendants' repeatedly assert that their primary interest in infiltrating NAF was to uncover evidence of criminal wrongdoing, and that the NAF recordings show such wrongdoing, defendants *did not* provide any of the NAF recordings to law enforcement following the 2014 Annual Meeting. Nor did defendants provide any of the NAF recordings to law enforcement immediately following the 2015 Annual Meetings. Instead, defendants decided it was more important to "curate" and release the Project videos starting in July 2015. Sworn testimony from Daleiden establishes that the only disclosure of NAF materials he made to law enforcement officers was: (i) providing a StemExpress advertisement from the NAF 2014 Annual Meeting program to law enforcement in El Dorado County, California in May 2015; and, providing (ii) "short clips" of video to law enforcement in Texas in June or July 2015. Daleiden PI Decl. ¶ 24. If the NAF recordings truly demonstrated criminal conduct – the alleged goal of the undercover operation – then CMP would have immediately turned them over to law enforcement. They did not.

Perhaps realizing that the recordings do not show criminal wrongdoing, defendants shift and assert that there is a public interest in the recordings showing "a remarkable de-sensitization in the attitudes of industry participants." Oppo. Br. at 14. As part of that shift, defendants' opposition brief highlights portions of the recordings where abortion providers comment candidly about how emotionally and professionally difficult their work can be. Oppo. Br. at 14-15. I have reviewed defendants' transcripts of these portions of the recordings. Some comments can be characterized as callous and some may show a "de-sensitization," as defendants describe it. They can also be described as frank and uttered in the context of providers mutually recognizing the difficulties they face in performing their work. However they are characterized, there issome public interest in these comments. But unlike defendants' purported uncovering of criminal activity, this sort of information is already fully part of the public debate over abortion. Oppo. Br. at 49-50 (citing *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 962 (2000)); *see also* VALUE OF HUMAN LIFE, 162 Cong Rec S 162, 163 (January 21, 2016); PROVIDING FOR CONSIDERATION OF H.R. 1947, FEDERAL AGRICULTURE REFORM AND RISK MANAGEMENT ACT OF 2013, 159 Cong Rec H 3708, 3709 (June 8,

2013 testimony on the PAIN-CAPABLE UNBORN CHILD PROTECTION ACT). The public interest in additional information on this issue cannot, standing alone, outweigh the competing interests of NAF and its members' expectations of privacy, their ability to perform their professions, and their personal security.

It is also this very information that could – if released and taken out of the context that it was shared in by NAF members – result in the sort of disparagement, intimidation, and harassment of which NAF members who were recorded during the Annual Meetings are afraid. Dunn Decl. ¶ 10; Reeves Decl. ¶ 17. In sum, the public interest in these comments is certainly relevant, but does not weigh heavily against the enforcement of the NAF confidentiality agreements.

On the other side, public policy also supports NAF's position. NAF has submitted extensive evidence that in order to fulfill its mission and allow candid discussions of the challenges its members face – both professional and personal – confidentiality agreements for NAF Meeting attendees are absolutely necessary. Dunn Decl. ¶¶ 5-6; Reeves Decl. ¶ 7; Saporta Decl. ¶¶ 11, 13-16; Mellor Decl. ¶¶ 7, 10-14. Release of the recordings procured by fraud and taken in violation of NAF's stringent confidentiality agreements, which disclose the identities of NAF members and compromise steps NAF members take to protect their privacy and professional interests, is also contrary to California's recognition of the dangers faced by providers of abortion, as well as California's efforts to keep information regarding the same shielded from public disclosure and protect them from threats and harassment. *See* Cal. Govt. Code § 6215(a) ("(a) Persons working in the reproductive health care field, specifically the provision of terminating a pregnancy, are often subject to harassment, threats, and acts of violence by persons or groups."); Cal. Civ. Code § 3427 *et seq*. (creating cause of action to deter interference with access to clinics and health care); Cal. Govt. Code § 6218 ("Prohibition on soliciting, selling, trading, or posting on Internet private information of those involved with reproductive health services"); Cal. Govt. Code § 6254.28; Cal. Penal Code § 423 ("California Freedom of Access to Clinic and Church Entrances Act."). As noted above, since defendants' release of the Project videos (as well as the leak of a portion of the NAF recordings), harassment, threats, and violent acts taken against NAF members and facilities have increased dramatically. It is not speculative to expect that harassment, threats,

and violent acts will continue to rise if defendants were to release NAF materials in a similar way. Weighing the public policy interests on the record before me, enforcement of the confidentiality agreements against defendants is not contrary to public policy.

That said, public policy may well support the release of a small subset of records – those that defendants believe show criminal wrongdoing – to law enforcement agencies.[34] Defendants rely on a line of cases where courts have refused to enforce, or excused compliance with, otherwise applicable confidentiality agreements for the limited purpose of allowing cooperation with a specified law enforcement investigation. *See, e.g., Alderson v. United States*, 718 F. Supp. 2d 1186, 1200 (C.D. Cal. 2010); *In re JDS Uniphase Corp. Sec. Litig*., 238 F. Supp. 2d 1127 (N.D. Cal. 2002); *Lachman v. Sperry-Sun Well Surveying Co*., 457 F.2d 850, 854 (10th Cir. 1972); *see also United States ex rel. Green v. Northrop Corp*., 59 F.3d 953, 965 (9th Cir. 1995) (refusing to enforce a prefiling release of a False Claims Act claim); *Siebert v. Gene Sec. Network, Inc*, No. 11-CV-01987-JST, 2013 WL 5645309, at *8 (N.D. Cal. Oct. 16, 2013) (declining to enforce a nondisclosure agreement with respect to documents relevant to a FCA claim because application of the NDA to those documents would "would frustrate Congress' purpose in enacting the False Claims Act—namely, the public policy in favor of providing incentives for whistleblowers to come forward, file FCA suits, and aid the government in its investigation efforts."); *but see Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1062 n.15 (9th Cir. 2011) (upholding breach of confidentiality claim, despite plaintiff's attempt to "excuse her conduct on the grounds that she was in contact with, and providing information to, government investigators," in part because that justification "neither explains nor excuses the overbreadth of her seizure of documents.").[35]

I do not disagree with the analysis and results in those cases, but note that the posture of

[34] As I have said, my review of the recordings relied on by defendants does not show criminal conduct, but I recognize that law enforcement agencies may want to review the information at issue themselves in order to make their own assessment.

[35] Defendants also rely on a related line of cases holding that contracts which expressly prohibit a signatory from reporting criminal behavior to law enforcement agencies are void as against public policy. *See, e.g.*, Oppo. Br. at 52-55 (citing *Fomby-Denson v. Dep't of the Army*, 247 F.3d 1366, 1376 (Fed. Cir. 2001); *Bowyer v. Burgess*, 54 Cal. 2d 97, 98 (1960)). Those cases are inapposite.

this case is different. Defendants' purported desire to disclose the NAF recordings to law enforcement does not obviate the confidentiality agreements *for all purposes*. At most, defendants might have a defense to a breach of contract claim based on production of NAF materials to law enforcement. However, the question of whether defendants should be excused from complying with NAF's confidentiality agreements in order to provide NAF materials to law enforcement has not been placed directly at issue. In this case, Attorney General *amici* have appeared (with leave of court) to present their arguments on the scope of the TRO and the requested preliminary injunction.[36] They have not directly sought relief from the confidentiality agreements, the TRO, or the requested preliminary injunction by intervening and moving for declaratory relief in this Court or by seeking enforcement of their subpoenas in the courts of their own states. And contrary to their assertion, the TRO in place and the Preliminary Injunction requested do not prevent law enforcement officials from investigating defendants' claims of criminal wrongdoing. For example, law enforcement agencies from the states of Arizona and Louisiana have instituted formal efforts to secure the NAF recordings. Under procedures outlined in the Protective Order in this case, NAF and defendants have been and continue to meet and confer with those state authorities about the scope of the subpoenas and defendants' responses.[37]

The record before me demonstrates that defendants infiltrated the NAF meetings with the intent to disregard the confidentiality provisions and secretly record participants and presentations at those meetings. Defendants also admit that only a small subset of the total material gathered implicate any potential criminal wrongdoing. Oppo. Br. at 10-14. I have reviewed those transcripts and recordings and find no evidence of actual criminal wrongdoing. That defendants did not promptly turn over those recordings to law enforcement likewise belies their claim that

---

[36] I have granted the Attorneys General of the states of Alabama, Arizona, Arkansas, Michigan, Montana, Nebraska, and Oklahoma leave to participate as *amici curiae* in this matter. Dkt. Nos. 99, 100, 285. As represented by the office of the Attorney General of Arizona, the *amici* filed a brief and argued in court during the hearing on the Motion for a Preliminary Injunction.

[37] There have only been three subpoenas served on CMP for NAF materials; the Congressional subpoena that has been complied with, as well as subpoenas from Louisiana and Arizona. Negotiations between NAF, CMP, and the states of Louisiana and Arizona are ongoing. While NAF and the defendants have repeatedly stipulated to extend the timeframe for NAF to file a challenge to the state subpoenas in state court (*see* Dkt. Nos. 246, 300), those were decisions reached by the parties and not imposed by the Court.



United States District Court
Northern District of California

United States District Court
Northern District of California

they uncovered criminal wrongdoing, and instead supports NAF's contention that defendants' goal instead is to falsely portray the operations of NAF's members through continued release of its "curated" videos as part of its strategy to alter the political landscape with respect to abortion and the public perception of NAF's members.[38] I conclude that NAF has shown a strong likelihood of success on its breach of contract claims against CMP and Daleiden. Enforcement of NAF's confidentiality provisions for purposes of continuing the injunction prohibiting defendants from releasing the NAF materials is not against public policy.

**D. Claims Against Newman**

Defendant Newman argues that NAF has failed to show a likelihood of success against him because there is no evidence of his role in the NAF infiltration and no argument that Newman breached any of NAF's agreements. Newman's argument would be more relevant if this were a motion for summary judgment. However, it is not. The only question is whether NAF has made a strong showing of the likelihood of success on its contract claim against CMP and Daleiden, which it has. NAF submitted evidence of Newman's own admissions that he advised Daleiden on how to infiltrate the NAF meetings as part of the Project, which is relevant to the appropriate scope of an injunction. Pl. Ex. 14 (at NAF0004475-76); Pl. Ex. 16 (at NAF0004493-94). That evidence makes clear that Newman should remain covered by the Preliminary Injunction, even if he is no longer serving as a board member of CMP. Dkt. No. 344.

**II. IRREPARABLE INJURY**

To sustain the request for a preliminary injunction, NAF must demonstrate that "irreparable injury is likely in the absence of" the requested injunction" and establish a "sufficient causal connection" between the irreparable harm NAF seeks to avoid and defendants' intended conduct – release of the NAF materials. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008); *Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976, 982 (9th Cir. 2011).

[38] In opposing NAF's request that the Court order Daleiden to turn over the NAF materials to his outside counsel, Daleiden's counsel explained that Daleiden needed access to the NAF materials because "Mr. Daleiden continues to work on the Human Capital Project, including the work of curating available raw investigative materials for disclosure to law enforcement and for release of videos to the public." Dkt. No. 195.

Defendants argue that NAF has not shown that it will suffer irreparable injury to justify a preliminary injunction. However, as detailed above, the release of videos as part of defendants' Human Capital Project has directly led to a significant increase in harassment, threats, and violence directed not only at the "targets" of CMP's videos but also at NAF and its members more generally. This significant increase in harassment and violent acts – including the most recent attack in Colorado Springs at the clinic where "target" Dr. Ginde is the medical director – has been adequately linked to the timing of the release of the Project videos by CMP. Saporta Decl. ¶ 19; Saporta Depo. 42:1-10; Pl. Exs. 92, 93, 96-99.[39] If the NAF materials were publicly released, it is likely that the NAF attendees shown in those recordings would not only face an increase in harassment, threats, or incidents of violence, but also would have to expend more effort and money to implement additional security measures. *See, e.g,*. Dunn Decl. ¶ 10; Reeves Decl. ¶ 19.[40] The same is true for NAF itself, which provides security assessments and assistance for its members. Mellor Decl., ¶ 15; Saporta Decl. ¶ 10.

Defendants contend that they cannot be held responsible for the threats, harassment, and violence caused by "third-parties" in response to the release of the Project videos, and that defendants' ability to publish the NAF materials cannot be prevented when defendants have not themselves been linked to the threats, harassment, and violence. Oppo. Br. at 43-44. But they fail to contradict NAF's evidentiary showing that a significant increase in these acts followed CMP's release of its Project videos. Moreover, a report submitted by NAF of an analysis of many of the "highlight" and "full" videos released by CMP concluded that the "curated" or highlight Project videos were "misleading" and suggests that the "full" videos defendants released along with their "highlights" were also edited. Pl. Ex. 77. Defendants do not counter this evidence, other than pointing to Daleiden's assertion that the highlight videos were accompanied by the release of the "full" recordings. Given the evidence of defendants' past practices, allowing defendants to use the NAF materials in future Project videos would likely lead to the same result – release of misleading

[39] Defendants object to Exhibits 98 and 99 as inadmissible hearsay, for lack of personal knowledge, lack of authentication, and as irrelevant. Those objections are overruled.

[40] Defendants object to paragraph 19 of Dr. Reeves' declaration as speculative, improper expert testimony, and for lack of foundation. Those objections are OVERRULED.

United States District Court
Northern District of California

"highlight" videos disclosing the identity and comments of NAF members and meeting attendees, resulting in further harassment and incidents of violence against the individuals shown in those recordings. The NAF members and attendees in the recordings have a justifiable expectation that release of the materials – in direct contravention of the NAF confidentiality agreements – will result not only in harassment and violence but reputational harms as well. *See, e.g.*, Dunn Decl. ¶¶ 9-10;[41] Reeves Decl. ¶ 17.

Defendants miss the point in their attempt to shift the responsibility to overly zealous third-parties for the actual and likely injury to NAF and its members that would stem from disclosure of the NAF materials. If defendants are allowed to release the NAF materials, NAF and its members would suffer immediate harms, including the need to take additional security measures. The "causal connection" between NAF's and its members' irreparable injury and the conduct enjoined (release of NAF materials) has been shown on this record.[42]

On the other side of the equation is defendants' claim of irreparable injury. They focus on their First Amendment right to disseminate the information fraudulently obtained at the NAF Meetings, and the injury to the public of being deprived of the NAF recordings. But freedom of speech is not absolute, especially where there has been a voluntary agreement to keep information confidential. While the disclosure of evidence of criminal activity or evidence of imminent harm to public health and safety could outweigh enforcement of NAF's confidentiality agreements (as discussed above), there is no such evidence in defendants' recordings. Viewed in a light most favorable to defendants, what does appear is information that is already in the public domain that defendants characterize as showing a "de-sensitization" as to the work performed by abortion

[41] Defendants object to paragraph 9 of the Dunn Declaration as lacking in personal knowledge, improper expert testimony, inadmissible hearsay, improper opinion testimony, and under the best evidence rule. Those objections are overruled.

[42] The sum of defendants' argument and evidence on this point is that they cannot be blamed for the "hyperbolic comments of anonymous Internet commenters" and that "hyperbolic 'death threats' on the Internet and through social media has become an ubiquitous feature of online discourse." Oppo. Br. at 44-45. But the misleading nature of the Project videos that they have produced – reflective of the misleading nature of defendants' repeated assertions that the recordings at issue show significant evidence of criminal wrongdoing – have had tragic consequences, including the attack in Colorado where the gunman was apparently motivated by the CMP's characterization of the sale of "baby parts."

providers. The balance of NAF's strong showing of irreparable injury to its members' freedom of association (to gather at NAF meetings and share their confidences), to its and its members' security, and to its members' ability to perform their chosen professions against preventing (through trial) defendants from disclosing information that is of public interest but which is neither new or unique, tilts strongly in favor of NAF.

## III. BALANCE OF EQUITIES

Similar to the discussion of competing claims of irreparable injury, the balance of equities favors NAF. Defendants will suffer the hardship of being restricted in what evidence they can release to the public in support of their ongoing Human Capital Project, at least through a final determination at trial. However, the hardships suffered by NAF and its members are far more immediate, significant, and irreparable.

## IV. PUBLIC INTEREST

I fully recognize that there is strong public interest on the issue of abortion on both sides of that debate, and that members of the public therefore have an interest in accessing the NAF materials. I also recognize that this case impinges on defendants' rights to speech and the public's equally important interest in hearing that speech. But this is not a typical freedom of speech case.[43] Nor is this a typical "newsgathering" case where courts refuse to impose prior restraints on speech, leaving the remedies for any defamatory publication or breach of contract to resolution

---

[43] None of the "prior restraint" cases defendants rely on address the types of exceptional facts established here: (i) enforceable confidentiality agreements, knowingly and voluntarily entered into, in which defendants agreed to the remedy of injunctive relief in the event of a breach; (ii) extensive and repeated fraudulent conduct; (iii) misleading characterizations about the information procured by misrepresentation; and (iv) a strong showing of irreparable harm if the confidentiality agreements are not enforced pending trial. *See* Oppo. Br. at 32-35. Several of defendants' prior restraint cases expressly left open the possibility of limits on speech where "private wrongs" and "clear evidence of criminal activity" occurred. *See, e.g., Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971) (overturned broad injunction prohibiting "peaceful" pamphleteering across a city where injunction was not necessary to redress a "private wrong"); *CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (emergency stay overturning prior restraint where damage to meat packing company was readily remedied by post-publication damages action and "the record as developed thus far contains no clear evidence of criminal activity on the part of CBS, and the court below found none."); *see also Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001) (striking down wiretap statutes to extent they penalized the publishing of secretly recorded phone conversations by reporters who played no role in the illegal interception; rejecting proposition that "speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.").

post-publication. *See, e.g., CBS, Inc. v. Davis,* 510 U.S. 1315, 1318 (1994); *see also Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

Instead, this is an exceptional case where the extraordinary circumstances and evidence to date shows that the public interest weighs in favor of granting the preliminary injunction. Weighing against the public's general interest in disclosure of the recordings showing the "de-sensitization" of abortion providers, is the fact that there is a constitutional right to abortions and that NAF members also have the right to associate in privacy and safety to discuss their profession at the NAF Meetings, and need that privacy and safety in order to safely practice their profession. On the record before me, NAF has demonstrated the release of the NAF materials will irreparably impinge on those rights.

The context of how defendants came into possession of the NAF materials cannot be ignored and directly supports preliminarily preventing the disclosure of these materials. Defendants engaged in repeated instances of fraud, including the manufacture of fake documents, the creation and registration with the state of California of a fake company, and repeated false statements to a numerous NAF representatives and NAF members in order to infiltrate NAF and implement their Human Capital Project. The products of that Project – achieved in large part from the infiltration – thus far have not been pieces of journalistic integrity, but misleadingly edited videos and unfounded assertions (at least with respect to the NAF materials) of criminal misconduct. Defendants did not – as Daleiden repeatedly asserts – use widely accepted investigatory journalism techniques. Defendants provide no evidence to support that assertion and no cases on point.[44]

[44] Defendants rely on cases where reporters misrepresented themselves in the course of undercover investigations, but those cases do not show the level of fraud and misrepresentation defendants engaged in here. For example, in *Med. Lab. Mgmt. Consultants v. A*BC, 306 F.3d 806, 812 (9th Cir. 2002), reporters posed as employees of fictitious labs, in order to investigate whether an existing lab was violating federal regulations and misreading pap smear tests. There is no evidence that the reporters in the *Med. Lab.* case did anything other than verbally misrepresent themselves to the lab owner; the reporters did not create fictitious documents, register a fictitious company, or intentionally agree to confidentiality agreements before making their undercover recordings. *Id*. at 814 n.4 (noting the plaintiffs failed to obtain confidentiality agreements from defendants). It is also important to note that while the Ninth Circuit affirmed the district court's order granting summary judgment to defendants on plaintiffs' intrusion on seclusion, trespass, and tortious interference claims under Arizona law, the district court denied in part defendants' motion

## V. SCOPE OF INJUNCTION

### A. Coverage of Third Party Law Enforcement Entities and Governmental Officials

Defendants and the Attorney Generals of the states of Alabama, Arizona, Arkansas, Michigan, Montana, Nebraska, and Oklahoma (AG *Amici*) argue that any continuing injunction on the release of the NAF materials should not run to third-party law enforcement entities or government officials because NAF has not shown that disclosure of the NAF materials to law enforcement entities or government officials will result in irreparable harm and the public interest strongly favors governments being free to exercise their investigatory powers. *See* AG *Amici* Brief (Dkt. No. 285).

The Protective Order and the injunction in this case do not hinder the ability of states or other governmental entities from conducting investigations. Nor do they bar defendants from disclosing materials in response to subpoenas from law enforcement or other government entities. Instead, those orders simply impose a notice requirement on defendants; requiring them to notify NAF prior to defendants' production of the NAF materials so that NAF may (if necessary) challenge the subpoenas in the state court at issue. Contrary to the AG *Amici* position, these limited procedures do not purport to bind the states or prevent them from conducting investigations or seeking relief in their own courts. The Protective Order and injunction simply create an orderly procedure to allow production of relevant information to state law enforcement

---

as to plaintiffs' fraud claim. *Id*. at 812. In *J.H. Desnick v. Am. Broad. Cos*., 44 F.3d 1345, 1348 (7th Cir. 1995), the reporters posed as patients of an eye center and secretly recorded their eye exams. The misrepresentations in that case simply do not rise to the level of the misrepresentations here or the fraudulent lengths defendants went through to secure their recordings. Also, in that case, the Court of Appeals remanded the defamation claim for further proceedings, and affirmed the dismissal of the trespass, privacy, wiretapping, and fraud claims based on an analysis of the facts under the state and federal laws at issue. The district court did not dismiss the breach of contract claim. *Id*. at 1354. Finally, defendants' citation to *Animal Legal Def. Fund v. Otter*, No. 1:14-CV-00104-BLW, 2015 WL 4623943 (D. Idaho Aug. 3, 2015), for the proposition that using deceptive tactics to conduct an undercover investigation "is not 'fraud' and is fully protected by the First Amendment," is not supported. In that case, the district court struck down a state law that criminalized the use of "misrepresentation" to gain access to and record operations in an agricultural facility. In striking down the law as a content-based regulation of protected speech which failed strict scrutiny, the court noted that the law did not "limit its misrepresentation prohibition to false speech amounting to actionable fraud," and any harm from the speech at issue would not be compensable as "harm for fraud or defamation" because the harm did not stem from the misrepresentation made to access the facility. *Id*. at * 5-6. That case *did not* hold that undercover operations could not result in actionable fraud, breach of contract, or libel.



United States District Court
Northern District of California

United States District Court
Northern District of California

or other governmental entities. As far as I am aware, that procedure has worked well and negotiations are ongoing between NAF, defendants, and the two states that have issued subpoenas to CMP, Arizona and Louisiana.[45]

**B. Expansion of Injunctive Relief**

NAF also seeks to expand the injunctive relief to prevent defendants and those acting in concert with them from publishing or disclosing "any video, audio, photographic, or other recordings taken of members or attendees Defendants first made contact with at NAF meetings" and "enjoin the defendants from attempting to gain access to any future NAF meetings." Motion at i, 2.

On this record, NAF has not demonstrated that an expansion of the injunction is warranted. NAF does not identify (under seal or otherwise) the NAF members or attendees whom it believes have been recorded and whom defendants "first made contact with" at a NAF Annual Meeting. A request for injunctive relief must be specific and reasonably detailed, but NAF's request would import ambiguity into the scope of the injunction. Absent a more specific showing supported by evidence, I will not expand the preliminary injunction to ban CMP from releasing unspecified recordings of unspecified NAF members or attendees defendants "first made contact with" at the NAF Meetings.

Similarly, NAF has not shown that an "open-ended" expansion of the injunction to prohibit the "defendants from attempting to gain access to any future NAF meetings," is necessary. Defendants and their agents are now well known to NAF and its members and absent evidence that defendants intend to continue to attempt to infiltrate NAF meetings, there is no need to extend the preliminary injunction at this juncture.

---

[45] Similarly defendants appropriately notified the Court that CMP was subpoenaed to testify in front of a grand jury, and explained that if Daleiden was called upon to disclose information he learned at the NAF Annual Meetings in responding to the grand jury's questions, Daleiden intended to do so absent further order from this Court. Dkt. No. 323-5. This Court did nothing to prevent Daleiden from testifying fully in front of that grand jury.

**CONCLUSION**

Considering the evidence before me, and finding that NAF has made a strong showing on all relevant points, I GRANT the motion for a preliminary injunction. Pending a final judgment, defendants and those individuals who gained access to NAF's 2014 and 2015 Annual Meetings using aliases and acting with defendant CMP (including but not limited to the following individuals/aliases: Susan Tennenbaum, Brianna Allen, Rebecca Wagner, Adrian Lopez, and Philip Cronin) are restrained and enjoined from:

(1) publishing or otherwise disclosing to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned, at any NAF annual meetings;

(2) publishing or otherwise disclosing to any third party the dates or locations of any future NAF meetings; and

(3) publishing or otherwise disclosing to any third party the names or addresses of any NAF members learned at any NAF annual meetings.

**IT IS SO ORDERED**.

Dated: February 5, 2016

WILLIAM H. ORRICK
United States District Judge