1  DEREK F. FORAN (CA SBN 224569)
   DForan@mofo.com
2  SPENCER MCMANUS (CA SBN 322824)
   SMcManus@mofo.com
3  KAREN LEUNG (CA SBN 323029)
   KLeung@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California  94105-2482
   Telephone: 415.268.7000
6  Facsimile: 415.268.7522

7  Attorneys for Plaintiff
   NATIONAL ABORTION FEDERATION (NAF)
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  NATIONAL ABORTION FEDERATION (NAF), | Case No. 3:15-cv-3522-WHO |
| 13  Plaintiff, | Judge William H. Orrick, III |
| 14  v. | **NOTICE OF MOTION AND MOTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NATIONAL ABORTION FEDERATION'S MOTION FOR SUMMARY JUDGMENT AND ENTRY OF A PERMANENT INJUNCTION** |
| 15  THE CENTER FOR MEDICAL PROGRESS, BIOMAX PROCUREMENT SERVICES LLC, DAVID DALEIDEN (aka "ROBERT SARKIS"), and TROY NEWMAN | |
| 16 | |
| 17  Defendants. | |
| 18 | Date:    February 3, 2021 |
| 19 | Time:    2:00 p.m. |

20         **REDACTED COPY OF DOCUMENT SOUGHT TO BE SEALED**

21

22

23

24

25

26

27

28

1

### NOTICE OF MOTION AND MOTION

2

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

3

**PLEASE TAKE NOTICE THAT** on February 3, 2021, or as soon thereafter as the

4 matter may be heard, in the United States District Court, Northern District of California, San

5 Francisco Division, located at 450 Golden Gate Avenue, San Francisco, CA 94102, before the

6 Honorable William H. Orrick III, plaintiff National Abortion Federation ("NAF") will, and

7 hereby does, move for summary judgment on its breach of contract claim and entry of a

8 permanent injunction pursuant to Federal Rules of Civil Procedure 56 and 65, against Defendants

9 David Daleiden, the Center for Medical Progress, and BioMax Procurement Services

10 (collectively, "Defendants").

11

NAF brings this motion on the ground that there is no genuine dispute of material fact that

12 Defendants breached the NAF Non-Disclosure Agreements and Exhibitor Agreements (the "NAF

13 Agreements") in 2014 and 2015 because Defendants are precluded by this Court's judgment in

14 *Planned Parenthood Federation of America v. Center for Medical Progress et al.*, No. 3:16-cv-

15 00236 (N.D. Cal.) ("*Planned Parenthood*" or "*PP*") from relitigating their breach of the NAF

16 Agreements.  NAF is entitled to a permanent injunction because absent a permanent injunction,

17 NAF and its members will suffer irreparable harm for which the remedies at law are inadequate,

18 the balance of hardships weighs heavily in NAF's favor, and the public interest favors a

19 permanent injunction, as described herein.

20

This motion is based on this Notice of Motion and Motion; the accompanying

21 Memorandum of Points and Authorities; the accompanying Appendix of Exhibits; the

22 accompanying Request for Judicial Notice; the accompanying declarations of Melissa Fowler,

23 Michelle Davidson, and Derek Foran; the records and files in this action and the related *Planned

24 Parenthood* litigation; and on such other written and oral argument as may be presented.

25 / / /

26 / / /

27 / / /

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: October 23, 2020

DEREK F. FORAN
SPENCER MCMANUS
KAREN LEUNG
MORRISON & FOERSTER LLP

By:   /s/ Derek F. Foran
        DEREK F. FORAN

Attorneys for Plaintiff
NATIONAL ABORTION FEDERATION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ...................................................................................................1

    A.    NAF Seeks to Ensure Safe, Legal, and Accessible Abortion Care. .......................1

    B.    Defendants' Fraudulent and Illegal Scheme to Infiltrate NAF's Annual Meetings. ..............................................................................................4

    C.    Defendants' Smear Campaign Goes Public, Resulting in Harassment and Violence Directed at Abortion Providers. ...................7

    D.    NAF Obtains a Temporary Restraining Order, Which Daleiden Promptly Flouts Through an Overbroad Disclosure to Congress. .......................11

    E.    Defendants and Daleiden's Attorneys Violate this Court's Preliminary Injunction. .......................................................................................12

    F.    Defendants Have Threatened to Release the Illegal Videos at Any Opportunity. .........................................................................................................13

    G.    This Court Enters Judgment Against Defendants on Breach of the NAF Agreements. ................................................................................................14

ARGUMENT .....................................................................................................................14

I.    NAF Is Entitled to Summary Judgment on Its Breach of Contract Claim. .....................14

    A.    Under Federal Law, Defendants Are Barred From Relitigating NAF's Breach of Contract Claim. .......................................................................15

    B.    Under California Law, Defendants Are Barred from Relitigating NAF's Breach of Contract Claim. .......................................................................17

II.    NAF is Entitled to Entry of a Permanent Injunction. .....................................................19

    A.    Absent a Permanent Injunction, NAF and Its Members Will Suffer Irreparable Injury for Which the Remedies at Law are Inadequate. ...................20

    B.    The Balance of Hardships Weighs Heavily in NAF's Favor. ..............................21

    C.    The Public Interest Favors a Permanent Injunction. ...........................................23

III.    The Court Should Enter Judgment in NAF's Favor on the Breach of Contract Claim to Accelerate an Appeal. ...................................................................24

CONCLUSION ..................................................................................................................25

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

*Alberto-Culver Co. v. Trevive, Inc.*,
    199 F. Supp. 2d 1004 (C.D. Cal. 2002) ...................................................................................15

6

7

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)..............................................................................................................20

8

*Ariz. Dream Act Coalition v. Brewer*,
    855 F.3d 957 (9th Cir. 2017)...............................................................................................20

9

10

*Burdette v. Carrier Corp.*,
    158 Cal. App. 4th 1668 (2008), *as modified on denial of reh'g* (Feb. 14, 2008) ..................18

11

12

*Calhoun v. Franchise Tax Bd.*,
    20 Cal. 3d 881 (1978) ..........................................................................................................18

13

*Cont'l Airlines, Inc. v. Intra Brokers, Inc.*,
    24 F.3d 1099 (9th Cir. 1994)...............................................................................................21

14

15

*Dauven v. U.S. Bancorp*,
    390 F. Supp. 3d 1262 (D. Or. 2019) ......................................................................15, 16, 17

16

17

*Diamond Multimedia Sys., Inc. v. Super. Ct.*,
    19 Cal. 4th 1036 (1999) ......................................................................................................23

18

*DISH Network L.L.C. v. Rios*,
    No. 14-2549, 2015 WL 632242 (E.D. Cal. Feb. 13, 2015).....................................................22

19

20

*DKN Holdings LLC v. Faerber*,
    61 Cal. 4th 813 (2015) ........................................................................................................18

21

22

*E. Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020)............................................................................................20

23

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010)...............................................................................................22

24

25

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)............................................................................................................21

26

27

*EPA v. Envt'l Waste Control, Inc.*,
    917 F.2d 327 (7th Cir. 1990)...............................................................................................22

28

*Gelboim v. Bank of Am. Corp.*,
   574 U.S. 405 (2015) ...................................................................................................24

*Gilliam v. Am. Cas. Co.*,
   735 F. Supp. 345 (N.D. Cal. 1990) ............................................................................14

*Grimes v. Ayerdis*,
   No. 16-CV-06870-WHO, 2018 WL 3730314 (N.D. Cal. Aug. 6, 2018) ....................16

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
   366 F.3d 754 (9th Cir. 2004) .....................................................................................20

*Hately v. Watts*,
   917 F.3d 770 (4th Cir. 2019) .....................................................................................17

*Howard v. City of Coos Bay*,
   871 F.3d 1032 (9th Cir. 2017) ...................................................................................17

*Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*,
   559 F.3d 985 (9th Cir. 2009) .....................................................................................23

*In re Berge*,
   953 F.3d 907 (6th Cir. 2020) ...............................................................................17, 18

*ITT Telecom Prods. Corp. v. Dooley*,
   214 Cal. App. 3d 307 (1989) .....................................................................................22

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) ...................................................................................22

*Littlejohn v. United States*,
   321 F.3d 915 (9th Cir. 2003) .....................................................................................15

*Martin v. Martin*,
   2 Cal. 3d 752 (1970) .................................................................................................18

*Masson v. New Yorker Magazine, Inc.*,
   85 F.3d 1394 (9th Cir. 1996) .....................................................................................15

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ..................................................................................................23

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) ..................................................................................................15

*Performance Plus Fund, Ltd. v. Winfield & Co.*,
   443 F. Supp. 1188 (N.D. Cal. 1977) .....................................................................16, 18

*Phonetele, Inc. v. Am. Tel. & Tel. Co.*,
   No. CV-74-3566-MML, 1984 WL 2943 (C.D. Cal. Jan. 19, 1984) ..........................16

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists,*
    290 F.3d 1058 (9th Cir. 2002) (en banc)................................................................22

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
    No. 3:16-cv-00236-WHO, 2020 WL 2065700 (N.D. Cal. Apr. 29, 2020)...................... *passim*

*Robi v. Five Platters, Inc.,*
    838 F.2d 318 (9th Cir. 1988)...................................................................................17

*Robinson Helicopter Co. v. Dana Corp.,*
    34 Cal. 4th 979 (2004) ...........................................................................................23

*Roe v. Wade,*
    410 U.S. 113 (1973) ...............................................................................................2

*SEC v. Alexander,*
    115 F. Supp. 3d 1071 (N.D. Cal. 2015) ..................................................................15

*Taylor v. Sturgell,*
    553 U.S. 880 (2008)..........................................................................................15, 17

*Tripati v. Henman,*
    857 F.2d 1366 (9th Cir. 1988)................................................................................18

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir. 2010)...........................................................................16, 17

**Constitutions**

U.S. Const.
    amend. I...................................................................................................................23

**Statutes**

18 U.S.C.
    § 248 ......................................................................................................................23

Cal. Civ. Code
    § 3427 ....................................................................................................................23

Cal. Gov't Code
    § 6215 ....................................................................................................................23
    § 6218 ....................................................................................................................23

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Over the course of multiple years, David Daleiden and his co-conspirators engaged in an elaborate fraud to infiltrate NAF's 2014 and 2015 annual meetings, surreptitiously record abortion providers, and release videos of those providers, all in violation of confidentiality agreements they entered into with NAF. Defendants' release of videos prompted an unprecedented groundswell of threats, harassment, and violence directed at abortion providers.

The grounds for summary judgment on NAF's breach of contract claim and entry of a permanent injunction are straightforward and indisputable. In the related *Planned Parenthood* litigation, this Court made findings of fact and entered judgment against Defendants on the very claim at issue here—breach of the NAF Confidentiality and Exhibitor Agreements in 2014 and 2015. Under bedrock principles of preclusion law, Defendants are barred from relitigating their breach of those agreements. Overwhelming evidence similarly supports entry of a permanent injunction. Documentary and testimonial evidence adduced both in this case and through trial in *Planned Parenthood* has borne out the Court's findings in the preliminary injunction: Defendants' dissemination of videos has caused irreparable injury to NAF and its members, stoking threats, harassment, and violence towards abortion providers and forcing NAF to divert resources each time new videos are released in violation of Court orders. Absent a permanent injunction, Defendants will act on their promise to release a full set of illegally obtained footage, and NAF and its members will be left to suffer further harassment and violence without recourse.

NAF respectfully requests that the Court grant its motion for summary judgment, file judgment in NAF's favor on the breach of contract claim, and enter a permanent injunction.

### STATEMENT OF FACTS

**A.    NAF Seeks to Ensure Safe, Legal, and Accessible Abortion Care.**

NAF is the not-for-profit professional association of abortion providers. (Decl. of Melissa Fowler ISO NAF's MSJ & Entry of a Perm. Inj. ("Fowler Decl.") ¶ 4; *see also* ECF No. 3-34 ("Saporta Decl.") ¶¶ 2-3.) NAF's members include private and non-profit clinics; Planned Parenthood affiliates; women's health centers, physicians' offices, and hospitals in the U.S. and

Canada; public hospitals and public and private clinics in Mexico City; and private clinics in Colombia.  (Fowler Decl. ¶ 4; *see also* Saporta Decl. ¶¶ 2-3.)  NAF's mission is to unite, represent, serve, and support abortion providers in delivering patient-centered, evidence-based care.  (Fowler Decl. ¶ 5; *see also* Saporta Decl. ¶¶ 2-3.)  To further this mission, NAF implements programming including 24/7 security support and emergency assistance for NAF members; continuing medical education in abortion care; technical assistance and training; quality assurance services; and a community for abortion providers.  (Fowler Decl. ¶ 5.)

A critical part of NAF's work is ensuring the safety and security of its members, their patients, and facilities from harassment, intimidation, and violence perpetrated by anti-abortion extremists.  (Decl. of Michelle Davidson ISO NAF's MSJ & Entry of a Perm. Inj. ("Davidson Decl.") ¶ 3; *see also* Saporta Decl. ¶ 4.)  For almost 50 years since the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), anti-abortion extremists have targeted abortion providers with harassment, intimidation, and acts of violence in attempts to prevent women from exercising their constitutionally-protected right to abortion care.  (*See* App'x Ex. 2 at 2900:25-2902:24; Davidson Decl. ¶ 3.)  From 1977 through 2014, there were 17 attempted murders, 42 bombings, 182 arsons, and thousands of incidents of criminal activities directed at abortion providers—and the murder of 8 individuals.  (*See* App'x Ex. 3.)

For this reason, many abortion providers go to great lengths to protect their identity and safety, including by not telling anyone that they provide abortion care, changing the route they travel to and from work, purchasing property in their spouse's name rather than their own, and even wearing disguises or bulletproof vests when traveling to work.  (*See* App'x Ex. 2 at 2907:15-2908:11; Fowler Decl. ¶ 8.)  To ensure the safety of its members, NAF provides around-the-clock emergency assistance and support, onsite security trainings and risk assessments at facilities and the homes of clinic staff, and on-the-ground support during large-scale anti-abortion extremist events that target NAF's members.  (Davidson Decl. ¶ 3.)

Since 1977, NAF has held an annual meeting, which is one of the only places where abortion providers can safely gather to network and learn about the latest medical research without fear of harassment or intimidation.  (Fowler Decl. ¶ 6; Saporta Decl. ¶ 16.)  Meeting

1    attendees describe the NAF annual meeting as a "safe space" ███████████████

2    ████████████████████████████████████ (App'x Exs. 4 at 425:7-426:2; 5 at 1968:19-

3    1969:2 (the meetings are "really one of the only very safe spaces we have to share information

4    and research with one another, and feel like it's okay to say the word 'abortion' without worrying

5    about who's listening and about safety"); *see also* App'x Exs. 6 at 424:9-24; 7 at 347:6-23.)

6    Because NAF requires its meeting attendees to sign non-disclosure agreements (described below),

7    the attendees are reassured that conversations they have with others at the meeting are private and

8    confidential. (*See* App'x Exs. 8 at 1490:13-22, 1513:14-20; 6 at 424:7-14; 7 at 350:16-351:5.)

9         The annual meeting brings together up to 1,000 abortion providers, researchers, and

10   advocates, including individuals who are high-profile targets of anti-abortion extremists. (Fowler

11   Decl. ¶ 6.) Although NAF previously allowed known anti-abortion protestors to attend its

12   meetings, by the early 1990s, the escalation in violence and threats by extremists against

13   providers forced NAF to close its annual meetings to the public and increase security precautions.

14   (*Id.*; App'x Ex. 9 at 23:3-12.) The safety and security of meeting attendees is NAF's highest

15   priority, and NAF has extensive procedures in place to ensure that the meetings are a secure and

16   intimidation-free environment for attendees. (Davidson Decl. ¶ 5.)

17        NAF's security protocols for its annual meetings are extensive and multi-faceted. Well in

18   advance of each annual meeting, NAF's security team screens each potential meeting venue to

19   ensure that it meets strict security guidelines. (Davidson Decl. ¶ 6.) The security team has veto

20   power over potential meeting venues that do not meet NAF's security standards. (*Id.*) Unlike

21   other organizations, NAF does not publicize the dates or locations of its meetings, and it warns

22   conference participants to keep secret that information and any other information sent to them

23   about the meeting. (*Id.* ¶ 7.) Prior to the meeting, NAF works with hotel security, local and

24   federal law enforcement, and fire and rescue personnel to review security issues, potential threats,

25   and unique protocols for the meeting. (*Id.* ¶ 8; App'x Ex. 10.) At the meeting itself, NAF's

26   security team controls access to the meeting space to ensure that only registered attendees with

27   badges may enter the meeting area. (Davidson Decl. ¶ 9.) NAF security personnel and off-duty

28   law enforcement are posted at strategic locations throughout the meeting space to verify that each

1   person within the space is wearing a NAF meeting badge at all times.  (*Id*.)

2         As part of its extensive security protocols, NAF requires all attendees to sign Non-

3   Disclosure Agreements ("NDAs") when they approach NAF's registration desk before entering

4   the meeting space.  (Saporta Decl. ¶ 13; *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr.*

5   *for Med. Progress*, No. 3:16-cv-00236-WHO ("*PP*"), 2020 WL 2065700, ¶ 25 (N.D. Cal. Apr.

6   29, 2020) ("*PP* UCL Order").)  The NDA (*see, e.g.*, App'x Ex. 11) requires that, among other

7   things, (1) attendees not videotape or record at the meeting (*id.* ¶ 1); (2) all information made

8   available at the meeting be kept confidential and used only "to help enhance the quality and

9   safety of services provided by NAF members and other participants" (*id.* ¶ 2); and (3) attendees

10  not disclose any information learned at meetings to third parties without NAF's consent (*id.* ¶ 4).

11  Attendees of the meeting understand that everyone attending the meeting has signed an NDA and

12  agreed to its provisions.  (*See, e.g.*, App'x Ex. 5 at 1976:11-13.)

13        NAF also requires exhibitors at its meetings to sign Exhibitor Agreements, which require

14  identification of the exhibitor, its representatives, and products or services it plans to advertise at

15  the meeting.  (*See, e.g.*, App'x Exs. 12, 13.)  By signing the Exhibitor Agreement, exhibitors

16  affirm that they (1) have a legitimate business interest in reaching reproductive health care

17  professionals (*id.* ¶ 1); (2) will "truthfully [and] accurately" represent their business at the

18  meetings (*id.* ¶¶ 15, 19); and (3) will keep all information learned at the meetings in confidence

19  and not disclose that information to third parties without NAF's consent (*id.* ¶ 17).  Exhibitors

20  also agree that "monetary damages would not be a sufficient remedy for any breach" of the

21  Exhibitor Agreement, and that "NAF [would] be entitled to specific performance and injunctive

22  relief as remedies" for any breach.  (*Id.* ¶ 18.)

23        **B.    Defendants' Fraudulent and Illegal Scheme to Infiltrate NAF's Annual**
24            **Meetings.**

25        As has been established by indisputable evidence, David Daleiden and his agents engaged

26  in a multi-year conspiracy to infiltrate NAF's meetings, indiscriminately videotape NAF

27  members and meeting attendees, and release heavily edited tapes to the public.  Daleiden, a life-

28  long anti-abortion extremist who believes that abortion is the "industrial-scale killing of unborn

1    children," has made it his life-long goal to end legal abortion in the United States.  (App'x Exs. 5

2    at 2108:17-21; 14 at 2300:6-16; 15; *PP* UCL Order ¶ 49.)  In 2013, Daleiden created The Center

3    for Medical Progress ("CMP"), a not-for-profit organization whose supposed "non-partisan"

4    purpose was to "monitor and report on medical ethics."  (App'x Exs. 16, 17.)

5            In reality, CMP's true purpose was to infiltrate and illegally videotape abortion providers.

6    Through CMP, Daleiden secretly instituted the "Human Capital Project" to "investigate,

7    document, and report on the procurement, transfer, and sale of fetal tissue," with the goal of

8    "ignit[ing] public outrage against the abortion industry, permanently damag[ing] Planned

9    Parenthood's brand, and prompt[ing] defunding and criminal prosecutions" through the release of

10   smear videos.  (ECF No. 265-3 ¶ 3; App'x Exs. 14 at 2299:1-10; 18; *PP* UCL Order ¶ 3.)  As part

11   of the Human Capital Project, Daleiden established BioMax Procurement Services ("BioMax")

12   which publicly claimed to "suppl[y] medical researchers with human biological specimens," but

13   in fact acted as a "front organization" for his criminal enterprise.  (App'x Exs. 5 at 2104:7-14; 19;

14   20; 21; *PP* UCL Order ¶ 4.)  He recruited co-conspirators to act as representatives of BioMax,

15   created fake backgrounds for each imposter, trained them in undercover techniques, and taught

16   them "field worker" vocabulary to perfect the deception.  (App'x Ex. 22; *PP* UCL Order ¶ 7.)

17           Starting in November 2013, purporting to be "Brianna Allen" (a fake assistant to

18   BioMax's fake CEO Susan Tennenbaum), Daleiden sent NAF a series of emails requesting

19   exhibitor space at NAF's 2014 Annual Meeting.  (App'x Exs. 23, 24.)  NAF sent an Exhibitor

20   Agreement to him, which he reviewed, signed with the fake name "Susan Tennenbaum," and

21   returned to NAF on February 10, 2014 (App'x Ex. 12; ECF No. 187-3 ("Daleiden Tr.") 154:20-

22   22, 158:4-15), paying using a credit card he obtained in the name of "Philip Cronin" without

23   authorization from Mr. Cronin.  (App'x Exs. 25, 26; *PP* UCL Order ¶ 23.)  Upon presenting

24   themselves for registration at NAF's Annual Meeting at the St. Francis Hotel in San Francisco,

25   Daleiden (posing as "Robert Sarkis") and Sandra Susan Merritt (posing as "Tennenbaum")

26   presented fake California driver's licenses and signed NDAs to gain access to the meeting space.

27   (Daleiden Tr. 1651-173:6; App'x Exs. 11; 27; 28 at 2-3; *PP* UCL Order ¶¶ 10, 24.)  Brianna

28   Baxter (posing as "Allen") later went to registration and signed an NDA as well.  (App'x Ex. 28

1   at 1.)

2          Having gained access to NAF's meeting, Daleiden and his agents (presenting themselves

3   under their fake names) secretly, illegally, and indiscriminately taped NAF members and meeting

4   attendees.  They hid recording devices in purses, water bottles, ties, glasses, and shirt buttons, and

5   recorded ████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████████████████

7   (Daleiden Tr. 121:24-122:22, 124:1-15, 183:6-24; *PP* UCL Order ¶ 26.)  Daleiden and his agents

8   taped individuals who approached the BioMax exhibit booth, at which they handed out fake

9   business cards and brochures.  (App'x Exs. 14 at 2198:4-9; 29-32; *PP* UCL Order ¶ 9.)

10         Daleiden continued his illegal undercover campaign for nearly an additional year and half.

11  Between NAF's two annual meetings in 2014 and 2015, Daleiden (as "Sarkis") sent emails to

12  several providers he met at the 2014 NAF meeting to set up lunch meetings, which he and his

13  agents surreptitiously recorded.  (App'x Ex. 33; Daleiden Tr. 272:1-274:9, 276:3-277:1; *PP* UCL

14  Order ¶¶ 38-40.)  Daleiden followed the same pattern of infiltration for NAF's 2015 Annual

15  Meeting in Baltimore:  he again contacted NAF, signed Tennenbaum's name on an Exhibitor

16  Agreement, and attended the meeting as Sarkis with other imposters.  (*See* App'x Exs. 34, 35;

17  Daleiden Tr. 287:14-288:1; App'x Ex. 13; *PP* UCL Order ¶ 35.)  Daleiden avoided signing an

18  NDA by lying to NAF's staff that he had already signed one (*PP* UCL Order ¶ 32), but his agent

19  Adrian Lopez signed one (*id.* ¶ 36; App'x Ex. 36).

20         Over the course of the two annual meetings, Daleiden has admitted that he and his co-

21  conspirators secretly and illegally recorded nearly 504 hours of material, ████████████

22  ████████████████████████████████████████████████ (*See* Daleiden Tr.

23  180:12-181:7 & App'x Ex. 37 (████████████████████████████████); Daleiden Tr.

24  294:1-24 & App'x Ex. 38 (████████████████████████████).)[1]  But for their lies

25  and deception, Daleiden and his agents would have never been allowed into NAF's meetings

26

27         [1] All 504 hours of the illegally obtained audio and video were submitted under seal to this
    Court in connection with NAF's motion for a preliminary injunction.  (*See* ECF No. 225-4.)  All
28  of that audio and video is now covered by the preliminary injunction.  (*See* ECF No. 354.)

1   (App'x Ex. 39 at 228:19-25), and thus would have never obtained any of this material.

2          C.    **Defendants' Smear Campaign Goes Public, Resulting in Harassment and**
3                **Violence Directed at Abortion Providers.**

4          On July 14, 2015, Defendants went public and began releasing a series of secret, edited

5   videotapes of providers, at a steady pace of approximately one video per week. (*See* App'x Exs.

6   14 at 2293:14-23; 40, 41.)  The fallout of the release of the videos was as predictable as it was

7   intended:  the subjects of the videos and abortion providers writ-large faced an unprecedented

8   campaign of vitriol not seen in the history of NAF.  (*See, e.g.*, App'x Ex. 9 at 39:13-20 ("[T]he

9   volume of hate speech and threats are nothing I have ever seen in 20 years."); *cf.* Fowler Decl.

10  ¶ 10 ("In my 14 years at NAF, aside from the 2009 assassination of Dr. Tiller, Defendants' illegal

11  actions constitute the most challenging, violating, and disruptive event we have had to face.").)

12         Defendants' released videos targeted multiple NAF meeting attendees and abortion

13  providers.  Their first target was Dr. Deborah Nucatola, a NAF meeting attendee since 2002 and

14  (in 2014) the Senior Director of Medical Services at Planned Parenthood Federation of America.

15  (Davidson Decl. ¶ 11; App'x Exs. 4 at 424:15-21; 8 at 1489:18-19.)  They released that tape on

16  July 14, 2015.  (App'x Ex. 8 at 1514:16-17.)  As a direct result of that video, NAF observed

17  multiple threats against Dr. Nucatola.  By way of example, an individual using the handle

18  "Joseywhales" posted a threat on Fox Nation offering a $10,000 reward for Dr. Nucatola's

19  murder:  "I'll pay ten large to whomever kills Dr. Deborah Nucatola.  Anyone.  Go for it."

20  (Davidson Decl. ¶ 11.)  The FBI investigated the same individual for threatening to personally

21  murder the CEO of StemExpress, a legitimate tissue procurement company slandered by

22  Defendants.  (*Id.*)  The individual was identified, arrested, and indicted for making threats against

23  the CEO, including that she "should be hung by the neck with piano wire and propped up on the

24  lawn in front of the building with a note attached."  (Request for Judicial Notice ISO NAF's MSJ

25  & Entry of a Perm. Inj. ("RJN") & App'x Ex. 42.)  That individual was sentenced to one year and

26  one day in prison for transmitting interstate threats.  (RJN & App'x Exs. 43-44.)

27         Dr. Nucatola received numerous other threats after the release of the first video. ▐

28

1    ███████ (App'x Ex. 4 at 383:16-25.)  She was also forced to hire a bodyguard for the six weeks

2    after the release of the videos (and periodically afterwards when she would receive new threats)

3    and install a camera system and safe room in her house.  (App'x Ex. 8 at 1516:6-1517:7.)  Dr.

4    Nucatola has continued to receive threats, ████████████████████████ (App'x Ex.

5    4 at 384:18-24.)  The release of the videos made Dr. Nucatola fear for the safety of herself and

6    her family, ████████████████████████████████ (*Id.* at

7    435:20-436:8; App'x Ex. 8 at 1518:3-10.)  Because of the release of the videos and the threats

8    they precipitated, Dr. Nucatola ████████████████████████████████████

9    ████████████████████████ (App'x Ex. 4 at 436:9-22.)  Dr. Nucatola testified

10   that the damage Defendants did to her life "can never be undone."  (App'x Ex. 8 at 1558:13-21.)

11            While Dr. Nucatola feared for her life, Daleiden and his co-conspirators celebrated.  Albin

12   Rhomberg, a member of CMP's board who gave Daleiden tips on taping strategy and distributing

13   the videos (*PP* UCL Order ¶¶ 2, 15), called the release of the early videos a "'thermonuclear'

14   bomb on PP!!!" (App'x Ex. 45).  Troy Newman, another member of CMP's board who discussed

15   the Human Capital Project with Daleiden in 2012, said the release "exceeded our expectations"

16   and remarked, "We are off to a great start."  (*PP* UCL Order ¶¶ 1, 2; App'x Ex. 46).

17            Defendants, using tape excerpted from other lunch meetings, then targeted Drs. Mary

18   Gatter, the medical director at two Planned Parenthood affiliates, and Savita Ginde, Vice

19   President and Medical Director of Planned Parenthood of the Rocky Mountains.  Dr. Gatter felt

20   "violated" when the video of her was released.  (App'x Ex. 47 at 1249:17-25.)  Although Planned

21   Parenthood provided her armed security guards, Dr. Gatter was forced to move from her home of

22   nearly two decades due to the threats she faced, protestors who came to her neighborhood, and

23   graphic literature sent to her residence and neighbors.  (*Id.* at 1252:19-1253:11; 1250:1-1252:18.)

24   Dr. Ginde was threatened with "dismemberment" and the "electric chair."  (App'x Exs. 2 at

25   2970:7-18; 48.)  Dr. Ginde also left her house, relocated to a different residence in the mountains,

26   took herself out of the rotation at the health center she worked at, and accepted 24/7 protection.

27   (App'x Ex. 2 at 2970:19-2971:6.)

28            Over the course of several months, Defendants released videos targeting other doctors

1    whom they would not have met but for their fraudulent access to NAF's meetings.  In each case,

2    providers shown on the tapes and their clinics faced a wave of threats.  (*See, e.g.*, App'x Exs. 49

3    at 1675:24-1676:19 (describing "constant" telephone threats at Planned Parenthood Gulf Coast);

4    50 at 213:19-214:2 (death threats "piling up" in mail and voicemail); 6 at 314:17-315:1

5    (███████████████████████████████████████████████); 7 at 198:12-

6    18 (███████████████████████████).)  Subjects of the videos were provided

7    with armed security and forced to install camera systems or relocate from their homes.  (App'x

8    Exs. 49 at 1616:2-11; 6 at 406:21-407:3.)  These threats caused these doctors to live in constant

9    fear for their safety.  (*See, e.g.*, App'x Ex. 6 at 254:21-255:4.)

10    Numerous witnesses in the *Planned Parenthood* case who were not depicted on released

11    videos testified that they feared the same fate, living each day wondering whether they spoke to

12    Daleiden or his co-conspirators and whether tape of them would be released.  (*See, e.g.*, App'x

13    Exs. 51 at 993:10-994:14 ("Did they video me?  You know, what did I say?  Would they put my

14    name on the internet as an abortion provider?"); 5 at 1978:6-7 ("[I] didn't know if my face and

15    name would be on the news at some point as well.").)  The staff at clinics where taped providers

16    worked also feared for their lives and those of their colleagues.  (App'x Ex. 47 at 1378:10-

17    1379:6.)  The video release sowed "distrust" among clinic staff due to concerns that there were

18    "moles" within the clinics.  (App'x Ex. 51 at 995:7-22 (Planned Parenthood Southwest); *see also*

19    App'x Ex. 49 at 1616:16-21 (Planned Parenthood Gulf Coast: "loss of trust" among employees).)

20    These fears were warranted:  the threats, violence, and intimidation were broadly targeted

21    at abortion providers in general, not just those who were or thought they might be the subject of

22    Defendants' illegal taping.  (Davidson Decl. ¶ 10.)  Following each additional video release, the

23    NAF Security team observed in real-time a spike in internet threats and harassment at a level

24    NAF's Security Director had never seen in her time at NAF.  (*Id.*)  Threats like these poured in:

25    "1 Bullet = 1 Abortionist.  Bang.  End of Problem."  (*Id.* ¶ 15.)  "I say we abort the ones currently

26    walking around and just call it 'full birth abortion'.  I'd prefer the most painful way possible

27    too…just sayin.'"  (*Id.*)  At least one Twitter user threatened to "dox" NAF meeting attendees—

28    meaning to search for and publish private information about the attendees, often by hacking into

1    email or social media accounts.  (*Id.* ¶ 16.)

2          These threats were not abstract.  As but one of many examples, the day after Defendants

3    released the first video, NAF found that an anti-abortion extremist had posted online calling for

4    mass arsons at every abortion clinic in the country:  "One person setting fire to an abortion clinic

5    will not do anything but thousands setting fire to an abortion clinic will speak volumes to a nation

6    being turned into hell . . . .  It is not violent to set a building on fire . . . .  If thousands rallied

7    together to set each murder house on fire, we would see the end of abortion."  (Davidson Decl.

8    ¶ 12.)  Within three months of this call to action, NAF received reports of arsons at facilities in

9    Pullman, Washington; New Orleans, Louisiana; Aurora, Illinois; and Thousand Oaks, California.

10   (*Id.*; *see also* App'x Ex. 9 at 41:15-42:10.)

11         NAF monitored these threats so that its security team could follow-up with any members

12   mentioned and report threats to law enforcement.  (Davidson Decl. ¶ 10.)  From the date

13   Defendants posted their first video to the end of 2015, NAF reported a total of 69 threats to the

14   Department of Justice for investigation and monitored countless others.  (Davidson Decl. ¶ 16.)

15   NAF had to retain an outside security firm to help with 24/7 internet monitoring because it was

16   unable to keep up with the escalating activity in response to Defendants' smear videos, despite

17   "dramatically" increasing the number of its own staff who monitor online threats.  (*Id.* ¶ 17;

18   App'x Ex. 9 at 17:13-19.)  NAF security staff responded to increased "off hour" requests for

19   security assistance and advice from NAF members across the country.  (Davidson Decl. ¶ 14.)

20         As a result of Defendants' infiltration of NAF's meetings, NAF was forced to expend

21   additional time and resources on enhanced security measures for its meetings.  Among other

22   precautions, NAF purchased an ID scanner to check ostensibly government-issued IDs; bought

23   additional radios for guards to communicate with each other and NAF staff; and used an

24   explosives-detecting canine onsite during the 2015 fall meeting.  (*Id.* ¶ 24; *see also* App'x Ex. 9

25   at 73:7-25.)  NAF was also forced to modify its meeting security procedures and implement

26   additional confidential measures to protect its members from the likes of Defendants.  (Davidson

27   Decl. ¶ 25.)  But for Defendants' infiltration, NAF would not have incurred these expenses.

28

1

2

**D.     NAF Obtains a Temporary Restraining Order, Which Daleiden Promptly Flouts Through an Overbroad Disclosure to Congress.**

3       On July 31, 2015, NAF filed suit in this Court and obtained a temporary restraining order

4  ("TRO") enjoining Defendants and their agents from "publishing or otherwise disclosing to any

5  third party" any materials obtained at any NAF annual meetings, the dates or locations of any

6  future NAF meetings, or the names or addresses of NAF members learned at NAF meetings.

7  (ECF Nos. 1, 15.)  The TRO remained in effect through the resolution of NAF's motion for a

8  preliminary injunction.

9       In violation of the Court's order that "CMP shall not provide to Congress any footage,

10  documents or communications that have not been specifically requested" by a congressional

11  subpoena (ECF No. 155 at 3:12-14),                                   counsel for

12  Daleiden provided to Congress all 504 hours of illegally obtained video and audio, in addition to

13  hundreds of documents.  (Daleiden Tr. 295:25-298:3.)  A week later, Daleiden's "great friend"

14  Charles C. Johnson, an internet troll and self-proclaimed "journalist," began publishing enjoined

15  footage on the internet.  (*Id.* 65:24-66:6.)

16      The violation of the TRO was followed by a renewed escalation of threats and hate speech

17  culminating in the deadliest attack on an abortion facility ever on November 27, 2015.  (Davidson

18  Decl. ¶ 18.)  That day, a shooter went on a killing spree at a NAF-member clinic in Colorado

19  Springs, Colorado.  (*Id.*)  That clinic's medical director, Dr. Ginde, had been featured in

20  Defendants' second video.  (*Id.*)  The shooter has been charged in a 68-count indictment, which

21  alleges that he "intend[ed] to wage 'war'" on Planned Parenthood.  (*See* RJN & App'x Ex. 52.)

22  The indictment further alleges that over the course of a five-hour standoff, the shooter shot

23  multiple individuals in front of the clinic, forced his way inside, attempted to create an explosion

24  by placing and firing at a propane tank in the clinic's parking lot, and "repeatedly shot at the

25  firefighters and law enforcement officers" who tried to stop him.  (*Id.* ¶ 6.)  The shooter killed

26  three people and injured nine others inside and in the vicinity of the clinic.  (*See id.* ¶¶ 3-6;

27  Davidson Decl. ¶ 19.)

28      NAF was alerted of the shooting as it was happening and immediately diverted staff and

1    resources to ensuring the safety of its members.  (Davidson Decl. ¶ 19.)  NAF sent out six

2    member alerts to advise NAF members of developments.  (*Id.*)  The day after the attack, Ms.

3    Davidson traveled to Colorado Springs to provide immediate security support and emergency

4    assistance and visit two area facilities to review security procedures and emergency planning.

5    (*Id.*)  Following the killings in Colorado Springs, NAF security staff spent extensive time in late

6    2015 and early 2016 traveling to conduct onsite security trainings on request from NAF-member

7    facilities.  (*Id.* ¶ 20.)

8        E.    **Defendants and Daleiden's Attorneys Violate this Court's Preliminary**
          **Injunction.**
9

10        On February 5, 2016, this Court granted NAF's motion for a preliminary injunction,

11    which continued the provisions of the temporary restraining order in full force.  (*See* ECF No.

12    354.)  But Defendants were not to be deterred by another order of this Court.  In May 2017, Steve

13    Cooley and Brentford Ferreira—Daleiden's attorneys in a criminal case brought against him by

14    the State of California—posted on a "Media" page on their law firm website (1) a three-minute

15    "Preview" video containing video taken illegally at NAF's annual meetings; (2) a link to a

16    YouTube playlist with over 144 hours of enjoined video taken at NAF's meetings; (3) a link to a

17    YouTube playlist containing a set of 17 videos published by CMP, 14 of which were illegally

18    taken at NAF's 2014 and 2015 Annual Meetings; and (4) a list of 14 "Does" referenced in the

19    California Attorney General's complaint.  (ECF No. 482 at 4.)  Late on May 24, 2017, an online

20    blog posted a link to the "Media" page, and coverage from anti-abortion organizations followed.

21    (*Id.* at 4-5.)

22        NAF was again forced to scramble in response to Defendants' lawless actions to protect

23    the safety of its members, diverting its security team, communications staff, and senior staff away

24    from their normal work to respond to the breach.  (Davidson Decl. ¶ 21; Fowler Decl. ¶ 12.)

25    Despite NAF's best efforts to secure removal of the enjoined materials, some of the enjoined

26    materials continued to circulate on the internet after this Court's take-down order.  (ECF No. 482

27    at 5-7; *see also* ECF No. 409.)  This latest breach resulted in another surge of harassment and

28    threats of violence that were reported to NAF.  (Davidson Decl. ¶ 22.)  "We need to try and

1   publicly execute planned parenthood execs." (ECF No. 416-4 ("Gannon Decl.") ¶ 4.) "These are

2   a bunch of sick, sick people! Maybe these people should have their body parts dissected and

3   sold?" (*Id.*) In response to these threats, a member of NAF's security team traveled to conduct a

4   site visit and provide security recommendations for a NAF member featured in a published

5   enjoined video, which included a review of the member's travel route, a safety assessment of their

6   home, and a discussion of their family's personal security. (Davidson Decl. ¶ 23.) Members of

7   NAF's security team provided security and personal safety assessments to several other NAF

8   members who were featured in the released videos. (*Id.*)

9       This Court later issued an order of civil contempt, ordering Defendants and Daleiden's

10  attorneys to remove the offending content and requiring Daleiden to turn over to counsel all

11  enjoined materials. (ECF No. 482 at 23-24.) The Court imposed $195,359.04 in civil contempt

12  sanctions to be paid jointly and severally by CMP, Daleiden, Cooley, and Ferreira, which NAF

13  will collect plus interest after the conclusion of appeals in this case. (ECF Nos. 495 at 2; 612.)

14      **F.    Defendants Have Threatened to Release the Illegal Videos at Any**
15          **Opportunity.**

16      Throughout this litigation, Defendants have demonstrated a wanton disregard for the

17  orders of this Court by releasing enjoined videos obtained illegally at NAF's meetings.

18  Defendants have promised that they will continue to release videos at every opportunity, and they

19  have continued to do so through at least the summer of 2019. (App'x Ex. 14 at 2294:20-22; *PP

20  UCL Order* ¶ 59.) Defendants previously asserted to this Court that they needed access to

21  enjoined materials to "continue[] to work on the Human Capital Project" and "curat[e] available

22  raw investigative materials for disclosure to law enforcement and for release of [the] videos to the

23  public." (ECF No. 195.)

24      And in connection with a GoFundMe account raising money to pay the contempt

25  sanctions this Court imposed for the May 2017 violation of the preliminary injunction, Daleiden

26  stated that "CMP has more videos to release soon" and promised that the sanctions money could

27  have been used "to produce more video exposés of Planned Parenthood's sale of baby body

28  parts." (*PP UCL Order* ¶ 60; Fowler Decl. ¶ 14.) Each time Defendants release additional

illegally obtained video, NAF's work is derailed as it must immediately assess the renewed

threats to the safety of NAF members.  (Davidson Decl. ¶ 26.)  With each new release of video,

NAF can only hope that its members—medical professionals providing constitutionally protected

health care services to women—will not face another act of horrifying violence.  (*Id.*)

> ### G.     This Court Enters Judgment Against Defendants on Breach of the NAF Agreements.

In 2016, Planned Parenthood Federation of America and several of its affiliates filed suit

against Defendants and their co-conspirators in this Court.  (*See generally* Complaint, *PP*, ECF

No. 1.)  That suit included a claim against Daleiden, CMP, and BioMax for breach of the 2014

and 2015 NAF Exhibitor Agreements and NDAs (the "NAF Agreements"), asserting Planned

Parenthood's rights as a third-party beneficiary of those agreements.  In November 2019, Planned

Parenthood moved for judgment as a matter of law on that claim and others.  (*See* Rule 50 Mot.,

*PP*, ECF No. 979 (N.D. Cal. Nov. 7, 2019).)  This Court granted Planned Parenthood's Rule 50

motion as to breach of the NAF Agreements.  This Court found that Daleiden, CMP, and BioMax

had in both 2014 and 2015 breached (1) the provision of the NAF NDAs prohibiting videotaping

and other recording, and (2) the provision of the NAF Exhibitor Agreements requiring an

exhibitor to provide truthful, accurate, complete, and not misleading information.  (Order Re:

Pls.' Rule 50 Mot. & Verdict Form, *PP*, ECF No. 994 (N.D. Cal. Nov. 11, 2019) ("*PP* Rule 50

Order").)  The jury awarded $49,360 in damages to Planned Parenthood Federation of America

for those breaches.  (*See* Verdict Form at 7, *PP*, ECF No. 1016 (N.D. Cal. Nov. 15, 2019) ("*PP*

Verdict").)  After finding for Planned Parenthood on its UCL claim, this Court entered judgment

in favor of Planned Parenthood, including its claim for breach of the NAF Agreements.  (*See PP*

UCL Ord. at 1 & n.3; J., *PP*, ECF No. 1074 (N.D. Cal. Apr. 29, 2020) ("*PP* Judgment").)

> ## ARGUMENT

## I.     NAF IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM.

Issue preclusion bars the relitigation of issues that were actually and necessarily

adjudicated in previous litigation.  *Gilliam v. Am. Cas. Co.*, 735 F. Supp. 345, 348 (N.D. Cal.

1   1990).  The doctrine is based on the general principle that "[a]fter a claim or issue is properly

2   litigated, that should be the end of the matter for the parties to that action."  *Littlejohn v. United*

3   *States*, 321 F.3d 915, 919 (9th Cir. 2003).  Issue preclusion serves the dual purposes of sparing

4   litigants from having to relitigate identical issues and promoting judicial economy by preventing

5   needless litigation.  *Masson v. New Yorker Magazine, Inc.*, 85 F.3d 1394, 1400 (9th Cir. 1996).

6   "Offensive" collateral estoppel, in particular, applies when a plaintiff seeks to preclude a

7   defendant from litigating an issue the defendant previously litigated and lost against another

8   plaintiff.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979).  Courts routinely grant

9   summary judgment on issue preclusion grounds.  *See, e.g.*, *SEC v. Alexander*, 115 F. Supp. 3d

10  1071, 1083 (N.D. Cal. 2015) (granting motion for summary judgment on plaintiff's claims where

11  defendants were issue precluded from denying liability); *Alberto-Culver Co. v. Trevive, Inc.*, 199

12  F. Supp. 2d 1004, 1018 (C.D. Cal. 2002) (same).

13      Here, regardless of whether the Court applies federal or California issue preclusion rules,

14  the result is the same:  Defendants are barred from relitigating NAF's breach of contract claim,

15  because he previously litigated and lost the exact issue of his breach of the NAF Agreements.

16  (*See PP* Judgment.)

17      A.      **Under Federal Law, Defendants Are Barred From Relitigating NAF's Breach
              of Contract Claim.**

18

19      When a court exercising federal question jurisdiction issues a judgment, "uniform federal

20  rules" govern the issue-preclusiveness of that judgment in subsequent cases.  *Taylor v. Sturgell*,

21  553 U.S. 880, 891 (2008) (citation omitted).  This is true even where the prior judgment

22  concerned state law claims over which the court exercised supplemental jurisdiction.  *See Dauven*

23  *v. U.S. Bancorp*, 390 F. Supp. 3d 1262 (D. Or. 2019).

24      In *Dauven*, the court applied federal res judicata rules to analyze the preclusiveness of a

25  federal court's previous dismissal of a state law conversion claim.  *Id.* at 1276.  The court held

26  that it was of "no consequence" that the judgment was on a state law claim because the claim was

27  "considered on the basis of supplemental jurisdiction only."  *Id.*  This approach avoids a situation

28  in which courts evaluating the preclusiveness of a prior federal judgment in a federal question

1   case must parse the judgment and apply state preclusion rules to some of its holdings and federal

2   preclusion rules to others.  Moreover, "applying federal law to determine the res judicata effect of

3   a prior federal court judgment" helps "protect the integrity of the federal system." *Performance*

4   *Plus Fund, Ltd. v. Winfield & Co.*, 443 F. Supp. 1188, 1190 (N.D. Cal. 1977).

5       Here, this Court exercised supplemental jurisdiction over (and entered judgment on) a

6   state law breach of contract claim in the *Planned Parenthood* case.  (*See* First Amended

7   Complaint, *PP*, ECF No. 59 ¶ 13 (N.D. Cal. Mar. 24, 2016) ("*PP* FAC").)  Accordingly, federal

8   law determines the preclusive effects of that judgment.  *Dauven*, 390 F. Supp. 3d at 1279.

9   Federal collateral estoppel rules bar the relitigation of an issue previously litigated in a prior

10  matter when: "(1) there was a full and fair opportunity to litigate the issue in the previous action;

11  (2) the issue was actually litigated; (3) there was final judgment on the merits; and (4) the person

12  against whom collateral estoppel is asserted was a party to or in privity with a party in the

13  previous action." *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010).  These elements are

14  easily satisfied here.

15      First, Defendants had a "full and fair" opportunity to litigate NAF's breach of contract

16  claim in *Planned Parenthood*.  *See Wolfson*, 616 F.3d at 1064.  Indeed, this element is not even

17  implicated where, as here, the previous opportunity to litigate was before a federal district court.

18  *See Phonetele, Inc. v. Am. Tel. & Tel. Co.*, No. CV-74-3566-MML, 1984 WL 2943, at *4 (C.D.

19  Cal. Jan. 19, 1984) (dismissing as meritless defendant's argument that it was denied a "full and

20  fair" opportunity to litigate in a previous federal action because "all courts concerned belong to

21  the same system and operate under substantially the same rules").  In any case, there is no serious

22  question that the *Planned Parenthood* action—which was vigorously litigated for years before

23  this Court—afforded Defendants a "full and fair" opportunity to litigate the issue of whether or

24  not they breached the NAF Agreements.

25      Second, the issue sought to be estopped is "identical to an issue already litigated [and]

26  decided in the first case." *Grimes v. Ayerdis*, No. 16-CV-06870-WHO, 2018 WL 3730314, at *5

27  (N.D. Cal. Aug. 6, 2018).  NAF's contract claim is for breach of the 2014 and 2015 Exhibitor

28  Agreements and NDAs.  (*See* ECF No. 131 ¶¶ 193-200.)  Planned Parenthood asserted the

1  identical claim in the prior case.  (*See PP* FAC ¶¶ 182-188.)  The only difference was that

2  Planned Parenthood asserted these claims as third-party beneficiaries.  (*See id.* ¶ 185.)  The

3  breach of contract claim on which NAF now seeks summary judgment is not merely "closely

4  related" to the breach of contract claim in the prior case, *see Howard v. City of Coos Bay*, 871

5  F.3d 1032, 1041 (9th Cir. 2017), it is the same claim.

6      Third, the Court's judgment on the prior issue is final.  *See Wolfson*, 616 F.3d at 1064.

7  After granting Plaintiffs' Rule 50 motion, and following the jury's verdict, the Court entered final

8  judgment on the breach of contract claim on April 29, 2020.  (*See supra* Statement of Facts,

9  Section G.)  Defendants' pending appeal is irrelevant.  An appeal of a final judgment entered in

10  federal district court "in no way affect the 'firmness' of the [] decisions in the district court for

11  purposes of issue preclusion."  *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988).

12      Fourth, Defendants were all parties "in the previous action."  *Wolfson*, 616 F.3d at 1064.

13  Accordingly, because all elements of issue preclusion are met, NAF is entitled to summary

14  judgment on its cause of action for breach of contract.

15  **B.    Under California Law, Defendants Are Barred from Relitigating NAF's**
       **Breach of Contract Claim.**
16

17      When a federal court exercises diversity jurisdiction and issues a judgment on a state law

18  claim, federal law looks to "the rules of preclusion applied by the State in which the rendering

19  court sits" to evaluate the preclusive effects of that judgment.  *Taylor*, 553 U.S. at 891 n.4.  The

20  Court did not exercise diversity jurisdiction in the *Planned Parenthood* case.  (*See PP* FAC ¶ 13.)

21  Rather, the Court exercised federal question jurisdiction, and supplemental jurisdiction over the

22  state law claims.  (*See id.*)  Accordingly, under *Dauvan*, federal law applies and there is no need

23  to consider the preclusive effects of the earlier judgment under California law.  *Dauvan*, 390 F.

24  Supp. 3d at 1279.

25      However, the Fourth Circuit has looked to state law issue preclusion rules where the prior

26  judgment involved a federal court exercising supplemental jurisdiction over (and disposing of) a

27  state law claim.  *See Hately v. Watts*, 917 F.3d 770, 777 (4th Cir. 2019).  Other courts have noted

28  uncertainty in this area.  *See In re Berge*, 953 F.3d 907, 917 (6th Cir. 2020).  In any event, there is

1    no need for the Court to decide whether federal or state law issue preclusions apply here—the

2    result is the same regardless.  *See id.* (declining to resolve this issue because of "little, if any

3    difference" between state and federal issue preclusion principles).

4         California's issue preclusion rules bar the relitigation of an issue: "(1) after final

5    adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit

6    and (4) asserted against one who was a party in the first suit or one in privity with that party."

7    *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 825 (2015).  The only material difference

8    between these standards and federal issue preclusion rules is that California follows the "minority

9    rule" that a judgment entered in California *state* court is not considered final until appeals are

10   exhausted.  *See Performance Plus Fund*, 443 F. Supp. at 1190.

11        California courts do not apply this minority rule to judgments entered in *federal* court.

12   Rather, under California issue preclusion rules, federal court judgments are "as final in California

13   courts as [they] would be in federal courts."  *Calhoun v. Franchise Tax Bd.,* 20 Cal. 3d 881, 887

14   (1978); *Martin v. Martin*, 2 Cal. 3d 752, 761 (1970) ("A federal court judgment has the same

15   effect in the courts of this state as it would in a federal court").  This is true even if the district

16   court rendering the judgment exercised diversity jurisdiction.  *See Burdette v. Carrier Corp.*, 158

17   Cal. App. 4th 1668, 1682 (2008), *as modified on denial of reh'g* (Feb. 14, 2008) (applying

18   California law to evaluate preclusiveness of judgment issued by federal court sitting in diversity

19   and, in doing so, looking to federal finality rule).  Since California's issue preclusion rules

20   incorporate by reference "[t]he established rule in federal courts" that a "final judgment retains all

21   of its res judicata consequences pending decision of the appeal," *Tripati v. Henman*, 857 F.2d

22   1366, 1367 (9th Cir. 1988) (citations omitted), under California law, the *Planned Parenthood*

23   judgment is final for issue preclusion purposes notwithstanding Defendants' pending appeal.

24        The remainder of California's issue preclusion principles are the same as federal law

25   principles.  The identical issue was adjudicated in the prior proceeding, that issue was litigated

26   and necessarily decided in *Planned Parenthood*, and Defendants were parties in that case.  *See*

27   *DKN Holdings LLC*, 61 Cal. 4th at 825.  Applying either federal or California issue preclusion

28   rules, the result is the same:  Defendants are barred from relitigating NAF's breach of contract

1    claim, and NAF is entitled to summary judgment on that claim.

2    **II.    NAF IS ENTITLED TO ENTRY OF A PERMANENT INJUNCTION.**

3        The remedy NAF seeks for Defendants' breach of contract is a permanent injunction.  The

4    proposed injunction is virtually identical to this Court's preliminary injunction.  (*See* ECF No.

5    354.)  The proposed injunction also incorporates the additional requirements this Court imposed

6    in its sanctions order (*see* ECF No. 482), and adds a provision barring Defendants and their

7    agents from entering or attempting to enter NAF offices or events by misrepresenting their

8    identity or with intent to take video or audio recordings once inside.  (ECF No. 626-1; *see also*

9    Proposed Order attached hereto.)[2]  The proposed injunction further leaves to the California state

10   court the discretion to issue orders regarding the use of enjoined materials in the state criminal

11   proceedings against Daleiden, as this Court has repeatedly held is the case under the preliminary

12   injunction.  (*See, e.g.*, ECF No. 572 at 2, 30-31.)

13       In particular, the proposed permanent injunction is identical in the scope of the materials it

14   seeks to enjoin:  all recordings and confidential information obtained at any NAF meeting.

15   ████████████████████████████████████████████████████

16   ████████        (*See supra* Statement of Facts, Section B.)  Defendants previously argued in opposing

17   NAF's motion for a preliminary injunction that the NAF Agreements should be read narrowly to

18   cover only information provided by NAF in formal conference sessions.  (*See* ECF No. 265-1 at

19   26-27.)  The Court rejected this argument, holding that "[t]he only reason defendants gained

20   access to the NAF Annual Meetings was under their guise as exhibitors and all information they

21   received was in the course of that role, even if gathered in places other than the exhibition hall."

22   (ECF No. 354 at 25-26.)  That remains true today.

23       The standard for granting a permanent injunction is "essentially the same" as for a

24

25       [2] Although NAF incurred significant monetary expenses due to Defendants' infiltration
     (*see supra* Statement of Facts, Section C), NAF is not seeking monetary damages here.  NAF is
26   entitled to nominal damages on its contract claim as a matter of law.  *See PP*, 402 F. Supp. 3d
     615, 666 (N.D. Cal. 2019) (citing *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (1959)).  The
27   Court already awarded NAF costs the organization incurred in connection with Defendants' May
     2017 breach of the preliminary injunction.  (ECF No. 495.)
28

1  preliminary injunction, except that the plaintiff must show actual success on the merits instead of

2  a probability of success.  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

3  Accordingly, in addition to actual success on the merits, a plaintiff must show "(1) that it has

4  suffered an irreparable injury; (2) that the remedies available at law . . . are inadequate to

5  compensate for that injury; (3) that, considering the balance of hardships between plaintiff and

6  defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

7  by a permanent injunction."  *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 977 (9th Cir.

8  2017) (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010)).  NAF easily

9  satisfies each of these elements.

10      **A.    Absent a Permanent Injunction, NAF and Its Members Will Suffer
            Irreparable Injury for Which the Remedies at Law are Inadequate.**

11

12      Enjoining breaches of the NAF Agreements prevents exactly the types of harms that

13  courts recognize constitute "irreparable injury."  *See E. Bay Sanctuary Covenant v. Trump*, 950

14  F.3d 1242, 1280 (9th Cir. 2020) ("intangible injuries" are irreparable harm); *Harris v. Bd. of*

15  *Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (pain, suffering and death constitute

16  irreparable injury); *see also PP* UCL Order, 2020 WL 2065700, at *13 ("staff reactions" to

17  Defendants' intrusions and "disruptions to the normal work of [Planned Parenthood] to internally

18  investigate and respond to [Defendants'] intrusions" constituted irreparable injury not

19  compensable by damages).

20      In granting a preliminary injunction, this Court found that the release of the enjoined

21  materials "directly led to a significant increase in harassment, threats, and violence directed not

22  only at the 'targets' of CMP's videos but also at NAF and its members more generally."  (ECF

23  No. 354 at 36.)  This Court found that "allowing defendants to use the NAF materials in future

24  Project videos would likely lead to the same result—release of misleading 'highlight' videos

25  disclosing the identity and comments of NAF members and meeting attendees, resulting in further

26  harassment and incidents of violence against the individuals shown in those recordings.  The NAF

27  members and attendees in the recordings have a justifiable expectation that release of the

28  materials – in direct contravention of the NAF confidentiality agreements – will result not only in

NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf-4224983

20

1    harassment and violence but reputational harms as well." (*Id.* at 36-37.)  Overwhelming evidence

2    confirms this Court's earlier finding that "[i]f the NAF materials were publicly released, it is

3    likely that the NAF attendees shown in those recordings would not only face an increase in

4    harassment, threats, or incidents of violence, but also would have to expend more effort and

5    money to implement additional security measures." *Id.* at 36; (*see infra* Statement of Facts,

6    Sections C, D, E (detailing the threats, harassment, and violence that abortion providers faced in

7    the aftermath of Defendants' repeated releases of illegally obtained videos).)

8         Without a permanent injunction, moreover, NAF would be forced to divert staff time

9    away from NAF's day-to-day operations and towards crisis management and risk mitigation.

10   (*See* Davidson Decl. ¶ 26; Fowler Decl. ¶¶ 11-13.)  Without a permanent injunction, NAF's

11   ability to carry out its mission will be impaired if Defendants are allowed to continue to incite

12   new waves of vitriol and violence by releasing illegal videos.  Such disruptions to organizational

13   operations are impossible to adequately compensate by damages because of "difficulties in their

14   valuation and ascertainability."  (*PP* UCL Order, 2020 WL 2065700, at *13 ; *see also* ECF No.

15   354 at 37 ("If defendants are allowed to release the NAF materials, NAF and its members would

16   suffer immediate harms, including the need to take additional security measures.").)

17        For those reasons, any remedy at law—such as money damages—would be inadequate to

18   compensate NAF for its harms.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

19   (2006); *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994) (showing

20   of irreparable injury "one basis for showing the inadequacy of the legal remedy") (citing 11

21   Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 (1973)).  Indeed,

22   when Defendants signed the Exhibitor Agreements in 2014 and 2015, they agreed that "monetary

23   damages would not be a sufficient remedy for any breach of [the] agreement . . . and that NAF

24   will be entitled to specific performance and injunctive relief as remedies for any such breach."

25   (*See* App'x Exs. 12 ¶ 18; 13 ¶ 18.)  NAF now seeks to enforce Defendants' agreement to that

26   statement, which all the evidence adduced in this case and *Planned Parenthood* supports.

27        **B.    The Balance of Hardships Weighs Heavily in NAF's Favor.**

28        To evaluate the balance of the hardships, courts "must balance the competing claims of

1    injury and must consider the effect on each party of granting or withholding the requested relief."

2    *Klein v. City of San Clemente*, 584 F.3d 1196, 1199-1200 (9th Cir. 2009).  "The assignment of

3    weight to particular harms is a matter for the district courts to decide."  *Earth Island Inst. v.*

4    *Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).  Where a defendant's conduct is willful, a court need

5    not balance the equities at all.  *See EPA v. Envt'l Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir.

6    1990) (citing *Guam Scottish Rite Bodies v. Flores*, 486 F.2d 748, 749 (9th Cir. 1973)).

7    Defendants' years-long campaign to fraudulently infiltrate NAF's meetings and breach the NAF

8    Agreements is clearly willful, so the Court need not explicitly balance the hardships here.  (*See*

9    *supra* Statement of Facts.)

10          But if the Court is inclined to evaluate the balance of the hardships, the balance is not

11    even close.  As described above, NAF members and abortion providers writ-large faced

12    unprecedented threats and violence in the wake of Defendants' release of his videos.  (*See supra*

13    Statement of Facts, Section C.)  Abortion providers faced renewed surges after each release of

14    video in violation of this Court's orders.  (*See id.* Sections D, E.)  In each case, NAF itself was

15    forced to divert staff from their normal work to respond to the consequences of Defendants' video

16    releases.  (Davidson Decl. ¶ 26; Fowler Decl. ¶¶ 11-13.)

17          In contrast, Defendants have no legitimate claim of hardship.  As this Court has held, their

18    intention to "infiltrate the NAF Annual Meetings in order to uncover evidence of alleged criminal

19    wrongdoing . . . does not give [them] an automatic license to disregard the confidentiality

20    provisions" in the NAF Agreements.  (ECF No. 354 at 30.)  Those very allegations of

21    wrongdoing were false—this Court "reviewed the recordings relied on by [Defendants] and

22    [found] no evidence of criminal wrongdoing."  (*Id.*)  A permanent injunction here would "merely

23    . . . prevent[] [Defendants] from engaging in unlawful activity" by breaching the NAF

24    Agreements that they signed.  *DISH Network L.L.C. v. Rios*, No. 14-2549, 2015 WL 632242, at

25    *7 (E.D. Cal. Feb. 13, 2015); *see also ITT Telecom Prods. Corp. v. Dooley*, 214 Cal. App. 3d

26    307, 317-19 (1989) (no hardship where party only forced to comply with contract voluntarily

27    entered into); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life*

28    *Activists*, 290 F.3d 1058, 1085-86 (9th Cir. 2002) (en banc) (conduct "without First Amendment

1   protection" where it targets specific abortion providers, foreseeably elicits need for "extraordinary

2   security measures," and makes it so providers "can no longer participate in the debate"). Absent

3   an injunction, NAF would have no remedy for Defendants' breach of the NAF Agreements.

4         **C.**    **The Public Interest Favors a Permanent Injunction.**

5         The permanent injunction NAF requests is clearly "in the public interest." *Internet*

6   *Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985 (9th Cir. 2009) (citing

7   *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). Both state and federal law recognize a robust

8   public policy in favor of protecting abortion providers from harassment, invasion of privacy, and

9   threats. *See, e.g.*, Cal. Gov't Code §§ 6215, 6218 (address confidentiality and online privacy of

10  providers and their employees, volunteers, and patients); Cal. Civ. Code § 3427 (cause of action

11  against impermissible obstruction of health care facilities); 18 U.S.C. § 248 (civil and criminal

12  penalties against those who obstruct or threaten persons seeking reproductive health services). As

13  discussed above, the recordings NAF seeks to have enjoined from publication have already

14  facilitated the harassment and intimidation of abortion providers. Permanently enjoining their

15  publication thus advances the public's interest in protecting these practitioners from abuse.

16        The requested permanent injunction also advances the public interest by promoting a

17  business environment free of fraud and breaches of contract. *See Diamond Multimedia Sys., Inc.*

18  *v. Super. Ct.*, 19 Cal. 4th 1036, 1064 (1999) (recognizing a "legitimate and compelling" public

19  interest in maintaining "a business climate free of fraud and deceptive practices"); *Robinson*

20  *Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 992 (2004) ("[F]raudulent conduct cannot be

21  considered a 'socially useful business practice[].'"). The videos NAF seeks to have enjoined

22  were illegally obtained through a coordinated, multi-year fraudulent scheme. By granting the

23  permanent injunction, the Court would prevent Defendants from benefitting from fraud and

24  advance the public interest in curbing fraudulent and deceptive business practices.

25        The further release of any videos in breach of the NAF Agreements would infringe on

26  NAF's associational rights and operations. *See* U.S. Const. amend. I. The Supreme Court has

27  recognized "the vital relationship between freedom to associate and privacy in one's

28  associations." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). The NAF

1    Agreements will not be enforced absent a permanent injunction, which would hinder NAF's and

2    its members' ability to associate in furtherance of its mission to unite, represent, serve, and

3    support abortion providers in delivering patient-centered, evidence-based care.  NAF's

4    associational rights would be impaired because, absent enforcement of the NAF Agreements,

5    NAF's annual meetings would no longer be the "safe space" for abortion providers to build

6    community and exchange knowledge without fear of harassment, intimidation, or violence.  (*See*

7    *supra* Statement of Facts, Section A.)  In contrast, for the same reasons as explained above,

8    Defendants can claim no public interest in release of illegal tapes they obtained through breach of

9    contracts.  (*See supra* Argument, Section II.B.)  The public interest weighs heavily in favor of

10    entering a permanent injunction.

### III.    THE COURT SHOULD ENTER JUDGMENT IN NAF'S FAVOR ON THE BREACH OF CONTRACT CLAIM TO ACCELERATE AN APPEAL.

13    To perfect the record for appeal, NAF respectfully requests that the Court enter judgment

14    in NAF's favor on the breach of contract claim.  Federal Rule of Civil Procedure 54(b) allows a

15    court to enter judgment as to "one or more, but fewer than all" claims if it expressly determines

16    that there "is no just reason for delay."  The rule is "designed to permit acceleration of appeals in

17    multiple claim-cases" and "avoid the possible injustice of delaying judgment on a distinctly

18    separate claim pending adjudication of the entire case."  *Gelboim v. Bank of Am. Corp.*, 574 U.S.

19    405, 409-10, 416 (2015).  There is "no just reason for delay" here because NAF will obtain its

20    desired remedy—a permanent injunction—through success on this motion.  Should NAF succeed,

21    entering judgment on the contract claim will "permit acceleration of appeals" of the permanent

22    injunction and avoid the possibility of more serial appeals in this case.  *Id.* at 409, 416.  If NAF is

23    successful in defending a permanent injunction on appeal, it would stipulate to dismissal of its

24    remaining claims[3] with prejudice (subject to its right to seek attorneys' fees on its contract claim),

25    ending this case.  (*See* ECF No. 538 at 3.)

---

[3] NAF voluntarily dismissed without prejudice the first, second, and seventh through eleventh claims in the First Amended Complaint.  (ECF No. 542.)  The only remaining claims are civil conspiracy, promissory fraud, fraudulent misrepresentation, and breach of contract.  (ECF No. 131 ¶¶ 170-200.)

1

**CONCLUSION**

2          For the foregoing reasons, the Court should enter summary judgment in favor of NAF on

3   its breach of contract claim against all remaining Defendants and enter a permanent injunction.

4   Dated: October 23, 2020                     DEREK F. FORAN
                                                SPENCER MCMANUS
5                                               KAREN LEUNG
                                                MORRISON & FOERSTER LLP
6

7                                       By:  */s/ Derek F. Foran*
                                                DEREK F. FORAN
8
                                            Attorneys for Plaintiff
9                                           NATIONAL ABORTION FEDERATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28