| | |
|---|---|
| DEREK F. FORAN (CA SBN 224569)<br>DForan@mofo.com<br>SPENCER MCMANUS (CA SBN 322824)<br>SMcManus@mofo.com<br>KAREN LEUNG (CA SBN 323029)<br>KLeung@mofo.com<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, California  94105-2482<br>Telephone: 415.268.7000<br>Facsimile: 415.268.7522<br><br>Attorneys for Plaintiff<br>NATIONAL ABORTION FEDERATION (NAF) | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ABORTION FEDERATION (NAF),<br><br>                  Plaintiff,<br><br>                  v.<br><br>THE CENTER FOR MEDICAL PROGRESS,<br>BIOMAX PROCUREMENT SERVICES LLC,<br>DAVID DALEIDEN (aka "ROBERT SARKIS"),<br>and TROY NEWMAN,<br><br>                  Defendants. | Case No. 3:15-cv-3522-WHO<br><br>Judge William H. Orrick, III<br><br>**DECLARATION OF MICHELLE DAVIDSON IN SUPPORT OF NATIONAL ABORTION FEDERATION'S MOTION FOR SUMMARY JUDGMENT AND ENTRY OF A PERMANENT INJUNCTION**<br><br>Date:    February 3, 2021<br>Time:   2:00 p.m. |

I, Michelle Davidson, hereby declare as follows:

1. My name is Michelle Davidson. I am the Security Director for Plaintiff National Abortion Federation ("NAF"). I make this Declaration in Support of NAF's Motion for Summary Judgment and Entry of a Permanent Injunction. I have personal knowledge of the facts set forth in this declaration, unless otherwise indicated, and if called to testify, I could testify competently thereto.

2. Prior to joining NAF, I worked at a NAF member clinic in Albuquerque, New Mexico, where in addition to other duties, I assisted with security and was on staff when the clinic suffered an arson that destroyed the facility. In 2011, I joined NAF as a Clinic Defense and Research Associate. In 2016, I was promoted to Clinic Defense and Research Associate Manager. And in 2018, I was promoted to my current position of Security Director. From these experiences, I have extensive knowledge of NAF's security protocols.

3. NAF's Security program is an essential part of our work to serve and support abortion providers. Our security work helps ensure the safety and security of our members, their patients, and facilities. Many of our members take great precautions to keep their names and images out of the public domain because of the well-documented history of violence against abortion providers by anti-abortion extremists. Our members fear for their safety and the safety of their families. In my role as Security Director, I provide around-the-clock emergency assistance and support, onsite security trainings and risk assessments at facilities and the homes of clinic staff, and on-the-ground support during large-scale anti-abortion events targeting our members. I also engage with law enforcement on behalf of abortion providers and work with an outside security firm to monitor for threats 24/7 and track anti-abortion events occurring around the country.

4. Another essential function of my job is to secure our Annual Meetings to ensure the safety and confidentiality of attendees. I worked directly with NAF's former Security Director on all aspects of security for the 2014 Annual Meeting in San Francisco and the 2015 Annual Meeting in Baltimore.

5. The safety and security of our members and meeting attendees is our highest

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

1

priority. We have extensive security measures in place to ensure that our meetings are a safe, secure, and an intimidation-free environment for our attendees. NAF meetings are known for their security, which others in our field have described as the "gold standard."

6. Our meeting security measures start long before the actual conference takes place. Together with the head of our Security Department, I am involved in the selection process for meeting hotels to ensure that the sites meet our strict security guidelines. When screening a site, we prioritize the location and floor of meeting space as well as the ability to secure NAF meeting rooms and restrict access from others in the hotel. The Security team has veto power over potential meeting venues, and we have rejected sites that do not meet our security standards. After we select a site, I work with the head of our Security Department to develop and implement a comprehensive security plan for each conference.

7. Unlike most other organizations, we employ extensive measures to protect the dates and locations of our meetings. We do not post information about our meeting dates and locations on our public website. We provide this information only to members, staff at Planned Parenthood affiliates, or other trusted people known in our movement. We include a warning about security in conference emails instructing recipients to: "Please be mindful of security concerns and do not forward this email or share information about NAF meetings." The conference Final Program also includes additional information about our security practices and instructions for attendees, including that they must wear their NAF-issued name badges at all times in the NAF meeting areas and refrain from posting on social media about the content or location of the meeting.

8. We also work with the hotel staff in advance of the meeting to ensure they understand our unique security concerns. We meet with hotel management and hotel security staff to discuss the overall security plan and how hotel security will assist in that plan. We also coordinate with local law enforcement, FBI, and fire and rescue personnel to review security issues, potential threats, and the unique protocols for our meeting.

9. Our Security staff's main role onsite at meetings is to ensure safe access for attendees and to control access to the space so that only registered attendees with badges may

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

2

1  enter the meeting areas.  We hire additional security personnel to serve on our lead team and
2  contract with local law enforcement to hire off-duty law enforcement officers whom we post at
3  strategic locations throughout the meeting space.  These personnel are trained to recognize who
4  should be permitted within NAF meeting areas and to verify that each person in the space is
5  wearing a NAF meeting badge.  We also utilize an explosives-detecting K-9 to sweep our
6  meeting areas daily.

7       10.     When The Center for Medical Progress ("CMP") started releasing their smear
8  videos targeting abortion providers on July 14, 2015, NAF monitored and witnessed in real-time a
9  significant spike in online harassment and threats directed at its members like I have never seen in
10 my time at NAF.  These harassment and threats were not just directed at the subjects of the
11 videos, but also at abortion providers more broadly.  We immediately started hearing from
12 concerned members.  NAF staff monitored the online comments and posts in response to the
13 video and subsequent news coverage and sent screenshots to me so I could follow up with any
14 members mentioned and report threats to the Department of Justice or law enforcement for
15 investigation.

16      11.     The first video targeted Dr. Deborah Nucatola, a NAF member who had attended
17 our meetings.  As a direct result of the videos, we observed threats against Dr. Nucatola,
18 including a $10,000 reward for her murder.  Using the handle "Joseywhales," an individual
19 posted on Fox Nation: "I'll pay ten large to whomever kills Dr. Deborah Nucatola.  Anyone.  Go
20 for it."  This individual also threatened to murder the CEO of StemExpress, a legitimate
21 biomedicine procurement company who has exhibited at NAF meetings, and was named in the
22 CMP videos.  NAF reported this threat to federal authorities and the FBI pursued an investigation.
23 Federal law enforcement identified and arrested the perpetrator, federal authorities prosecuted
24 him for making illegal threats, and a federal court sentenced him to one year and one day in
25 prison for transmitting interstate threats.

26      12.     The day after Defendants released the first video, we uncovered through our
27 monitoring work that an anti-abortion individual had posted online calling for mass arsons at
28 every abortion clinic in the country: "One person setting fire to an abortion clinic will not do

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

3

anything but thousands setting fire to an abortion clinic will speak volumes to a nation being turned into hell….It is not violent to set a building on fire…If thousands rallied together to set each murder house on fire, we would see the end of abortion…" The Security team reported this threat to law enforcement, and the FBI followed-up by going to the home of the man who posted it to interview him. Within three months of the post, we learned that abortion facilities in Pullman, Washington; New Orleans, Louisiana; Aurora, Illinois; and Thousand Oaks, California were victims of arson.

13. Among the threats we reported to DOJ was a post made two days after the first video release, which featured a picture of a woman in front of a NAF member clinic in Albuquerque with a statement targeting the site's owner, Dr. Curtis Boyd, saying: "Tick tock says your life expectancy clock, Curtis Boyd".

14. As a result of the dramatic escalation in anti-abortion threats and intimidation both online and offline in the wake of Defendants' campaign, I responded to increased "off hour" requests for security assistance and advice from our members from all over the country. Additionally, during this time period, I worked with multiple NAF members who received death threats. For example, one member reported an incident in August 2015 where an unknown male called a hospital switchboard in North Carolina saying, "We will kill all UNC Chapel Hill abortion doctors…."

15. Following each additional CMP video release, NAF witnessed in real time a spike in internet threats and harassment. After each video was released, NAF monitored social media, blogs, and news websites, which were filled with inflammatory comments about the doctors whom Defendants misrepresented in the videos, including that they were "evil," "vile," "inhuman," "murderers," and that abortion providers "deserve everything they have coming" to them. By way of example only, here are some of the posts targeting abortion providers that we discovered online:

- "All these butchers will burn in hell."
- "1 Bullet = 1 Abortionist. Bang. End of Problem"

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771                                                                                              4

- "I say we abort the ones currently walking around and just call it 'full birth abortion'. I'd prefer the most painful way possible too...just sayin'"
- "EVIL—forget prison, these killers need to be EXECUTED."

16. In total, during the last half of 2015, NAF reported 69 threats we had uncovered through our monitoring to the DOJ for investigation. This number far exceeded any other time period during my time at NAF up to that point. As another example, one of these threats that I personally reported to DOJ was posted online by someone who identified as a white supremacist and who reposted videos from our meetings after he claimed he received them from Daleiden's friend Charles Johnson. This specific threat was posted on Twitter on October 26, 2015: "Should I dox National Abortion Federation conference attendees to pro-life activists until they drop the suit and apologize for censorship?" "Dox" means to search for and publish on the internet private or identifying information about a particular individual, typically with malicious intent. Perpetrators of this behavior have also been known to hack into email accounts and post the content publicly on the internet.

17. Due to the overwhelming volume of threats targeting abortion providers that Defendants' smear videos caused, we retained an outside security firm in November 2015 to help us conduct internet monitoring 24/7. We had previously been able to conduct this monitoring in-house but were unable to keep up with the escalating activity in response to the smear videos.

18. This escalation of threats culminated in the deadliest attack on an abortion facility ever, in November 2015. November 27, 2015 was one of the most challenging and devastating days of my professional career. On that day, I received a phone call notifying me of an active shooter near a NAF member clinic in Colorado Springs. This facility is part of the Planned Parenthood of the Rocky Mountains affiliate and their Medical Director, Dr. Savita Ginde, had been featured in the second CMP video released July 28, 2015. Dr. Ginde's picture and the address of that clinic had been posted on the AbortionDocs website, run by Daleiden's co-conspirator Troy Newman, which NAF monitors.

19. When I learned about the reports from Colorado Springs, I immediately began coordinating with NAF's Communications staff and President and CEO to monitor the situation

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

5

and began providing updates to our members. I helped craft and disseminate three member alerts on the day of the shooting and three alerts in the days that followed to keep members informed about the incident and fatalities and to advise them to remain on a heightened security alert and report any concerns to NAF's Security Department. Three people were killed and nine others were injured during this attack. The day after the attack, I traveled to Colorado Springs to provide immediate security support and emergency assistance. I reached out to members in the area and visited two facilities where I reviewed security procedures and emergency planning. I also returned to Colorado Springs to monitor any disruptive activity during the perpetrator's arraignment hearing.

20. Unsurprisingly, we received multiple requests for onsite security trainings from member facilities in the weeks and months following the fatal attack in Colorado Springs. I spent extensive time on the road conducting these assessments at the end of 2015 and early 2016.

21. On May 25, 2017, we learned that two criminal defense attorneys hired by Defendants had posted a new three minute and nine second CMP smear video entitled "Preview" and a link to 14 separate "Doe" videos containing footage Defendants took at NAF meetings and the names of at least 11 NAF members who were subjects of those recordings to their website. This release once again significantly disrupted my work, and my team was put on high alert. I helped compose an alert to NAF members to let them know about the release and to instruct them to contact NAF with any security concerns.

22. Just as in 2015, we once again witnessed a sharp increase in negative and disturbing comments posted online in the days following the video release. I personally monitored this activity in real time and worked on tracking where the videos were being reposted and how often they were being shared and by whom. Within hours after news of the videos broke, one of the NAF members Defendants showed in the newly released material started to receive hateful emails, which they shared with us. One email with the subject line "a good plan" suggested that the doctor receiving the email have their legs ripped off.

23. On May 26, 2017—the day after Defendants' criminal attorneys posted the enjoined videos—I traveled to meet with a member featured in the video. I conducted a site

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

6

assessment of the member's office and provided recommendations to enhance building security. I also evaluated the member's travel route to and from work, conducted a safety assessment of their home, and discussed personal security awareness with the member and the member's family. Later, I also had extensive conversations with another NAF member who was featured in the video and had concerns about their personal safety. I talked to this member's spouse and sister as they too were concerned about safety due to the video release. Several other members whom CMP featured in the video also reached out to us requesting assistance with their personal safety in reaction to the release of this video.

24. As a result of Defendants' infiltration, NAF was forced to increase our security measures and incur additional security costs. These costs include, among other things, $200 on radios so guards could communicate with each other, and with NAF staff, as they secured the meeting site; $2,864 to have an explosives-detecting canine onsite during the fall meeting; and $341.64 for an ID scanner to use onsite at NAF meetings.

25. Additionally, as a result of Defendants' infiltration, we have been forced to modify our meeting security procedures and implement additional measures—particularly around checking and scanning ostensibly government-issued IDs—in order to ensure the safety and security of our meetings and attendees.

26. Each time Defendants release one of their smear videos, my work is derailed as I must immediately assess the video's damage and threats to our members. Each time Defendants release a video, we can only hope that it will not incite another act of horrifying violence.

///
///
///
///
///
///
///
///

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

7

1   I declare under penalty of perjury that the foregoing is true and correct. Executed this
2   23rd day of October, 2020, in Washington, D.C.

_____
MICHELLE DAVIDSON

DAVIDSON DECL. ISO NAF'S MOTION FOR SUMMARY JUDGMENT & ENTRY OF A PERMANENT INJUNCTION
CASE NO. 3:15-CV-3522
sf- 4328771

8